Hon. Richard A. Jones

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| EL PAPEL, LLC; BERMAN 2, LLC; and KARVELL LI, an individual, | ) ) ) | Civil Action No. 2:20-cv-01323-RAJ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| JAY R. INSLEE, in his official capacity as Governor of the State of Washington; JENNY A. DURKAN, in her official capacity as the Mayor of the City of Seattle; and THE CITY OF SEATTLE, a municipal Corporation, | ) ) ) ) ) ) ) | **Noted on Motion Calendar: October 23, 2020** **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) ) | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

RELIEF REQUESTED.................................................................................................... 1

INTRODUCTION AND STATEMENT OF THE CASE................................................. 1

   I.    Landlords' remedies for unlawful detainer and unpaid rent ................................. 2

   II.   Eviction bans and rent repayment restrictions .................................................. 3

   III.  Plaintiff Landlords .............................................................................................. 5

LEGAL STANDARD...................................................................................................... 7

ARGUMENT .................................................................................................................. 7

*P. Mot. for Preliminary Injunction - i*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

I.    The Plaintiffs are likely to succeed on the merits ................................................. 8

    a.    The eviction bans violate the Contract Clause ........................................... 8

       i.    The eviction bans render lease agreements unenforceable ........................... 8

       ii.   The eviction bans favor one group over another and therefore fail to qualify as a
             legitimate police power action ................................................................. 10

       iii.  The eviction bans are unreasonable because they fail to protect the landlords' right to
             a reasonable return and are more extensive than necessary to cope
             with the pandemic. ............................................................................... 11

             1.    The eviction bans must ensure compensation ...................................... 11

             2.    The eviction bans extend well beyond the government's interests ......................... 13

             3.    The eviction bans are not tailored to the emergency .............................. 14

             4.    There are less oppressive means of achieving the governments' interests ............. 16

    b.    The eviction bans cause a physical occupation of Plaintiffs' rental housing units in
          violation of the Fifth Amendment's Takings Clause. ................................................. 17

    c.    Injunctive relief is a proper remedy for physical invasion of Plaintiffs' property. .... 20

II.   The Plaintiffs have suffered and will likely continue to suffer irreparable harm ............. 21

III.  The balance of hardships weighs in Plaintiffs' favor ....................................... 22

IV.   A preliminary injunction would serve the public interest ............................................... 23

CONCLUSION ............................................................................................................ 24

CERTIFICATE OF SERVICE ................................................................................... 26

*P. Mot. for Preliminary Injunction - ii*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ...............................7

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) ......................................13

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ...............................................................7, 21, 22

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ..........................22, 23

*Arkansas Game & Fish Comm'n v. United States*,
    568 U.S. 23 (2012) ..............................................................................................18

*Baca v. Moreno Valley Unified Sch. Dist.*,
    936 F. Supp. 719 (C.D. Cal. 1996) ....................................................................24

*Barnitz v. Beverly*, 163 U.S. 118 (1896) ............................................9, 10, 12, 13

*Block v. Hirsh*, 256 U.S. 135 (1921) ......................................................13, 19, 20

*Bronson v. Kinzie*, 42 U.S. 311 (1843) ....................................................... *passim*

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003) ......................................20

*Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93 (2d Cir. 1999) .....................21

*Christensen v. Ellsworth*, 162 Wn.2d 365 (2007).................................................2

*D.A.B.E., Inc. v. City of Toledo*, 292 F. Supp. 2d 968 (N.D. Ohio 2003)....................20

*East Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004) ...........................21

*Edwards v. Kearzey*, 96 U.S. 595 (1877)..........................................................9

*Energy Ress. Group, Inc. v. Kan. Power & Light Co.*,
    459 U.S. 400 (1983) ..........................................................................................10

*First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*,
    482 U.S. 304 (1987) ..........................................................................................18

*FPA Crescent Assocs., LLC v. Jamie's, LLC*,
    190 Wn. App. 666 (2015) ...................................................................................3

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
    549 F.3d 1079 (7th Cir. 2008) ...........................................................................21

*Goodwin v. Walton Cty. Florida*, 248 F. Supp. 3d 1257 (N.D. Fla. 2017)....................20

*hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099 (N.D. Cal. 2017) ..................22

*Home Building & Loan Association v. Blaisdell*,
    290 U.S. 398 (1934) ..........................................................................12, 13, 15, 24

*P. Mot. for Preliminary Injunction - iii*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*Howard v. Bugbee*, 65 U.S. 461 (1860) ...................................................................12, 13, 15

*K-Mart Corp. v. Oriental Plaza, Inc.*,
875 F.2d 907 (1st Cir. 1989) ...................................................................................21

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) .................................................18

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......................................18

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .................................................................................................18

*Lynch v. United States*, 292 U.S. 571 (1934) ............................................................9

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..................................................23

*Minard Run Oil Co. v. U.S. Forest Service*,
670 F.3d 236 (3d Cir. 2011) .....................................................................................21

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) ...........................................20

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998) ..........................20

*RUI One Corp. v. City of Berkeley*, 371 F.3d 1137 (9th Cir. 2004) ...........................8

*Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) .........................................24

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ........................................22

*Sveen v. Melin*, 138 S. Ct. 1815 (2018) ...............................................................9, 10

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) .................................................................................................17

*United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*,
633 F.3d 37 (1st Cir. 2011) .......................................................................................15

*United States Trust Co. v. New Jersey*,
431 U.S. 1 (1977) ...............................................................................................14, 16

*United States v. General Motors Corp.*,
323 U.S. 373 (1945) .................................................................................................18

*United States v. Petty Motor Co.*,
327 U.S. 372 (1946) .................................................................................................18

*W.B. Worthen Co. v. Kavanaugh*,
295 U.S. 56 (1935) .......................................................................................12, 13, 15

*Wash. Legal Found. v. Legal Found. of Wash.*,
271 F.3d 835 (9th Cir. 2001) ...................................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................21, 22, 23

*Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*,
274 F.3d 1085 (6th Cir. 2001) .................................................................................21

*Yee v. City of Escondido*, 503 U.S. 519 (1992) .........................................................19

*P. Mot. for Preliminary Injunction - iv*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**Statutes**

District of Columbia Rents Act, Ch. 80, 41 Stat. 298 § 109 (1919) ............................................. 13

RCW 7.28 ................................................................................................................................. 2

RCW 59.12.030 ........................................................................................................................ 2

RCW 59.12.030–59.12.170 (2020) ........................................................................................ 24

RCW 59.12.080 ........................................................................................................................ 2

RCW 59.12.090 ........................................................................................................................ 2

RCW 59.18.365–59.18.410 (2020) ........................................................................................ 24

RCW 59.18.370 ........................................................................................................................ 2

RCW 59.18.380 ........................................................................................................................ 2

Seattle Municipal Code § 22.206.160 .................................................................................. 24

**Constitutional Provisions**

U.S. Const. amend. V ............................................................................................................. 17

U.S. Const. amend. XIV ........................................................................................................ 17

U.S. Const. art. I, § 10, cl. 1 ................................................................................................... 8

**Court Rule**

Fed. R. Civ. P. 65 .............................................................................................................. 7, 24

**Other Authorities**

85 Fed. Reg. 55,292 (Sept. 4, 2020) ..................................................................................... 23

Bailey, Peggy, *Trump Executive Orders Likely Won't Help the Millions
    Struggling to Pay Rent*, Center on Budget and Policy Priorities (Aug. 8, 2020),
    https://www.cbpp.org/blog/trump-executive-orders-likely-wont-help-the-
    millions-struggling-to-pay-rent ...................................................................................... 17

11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ................................................................... 22

Furth, Salim, *When the Moratorium Expires: Three Quick Steps to Reduce
    Eviction*, Mercatus Center (June 19, 2020),
    https://www.mercatus.org/publications/covid-19-economic-recovery/when-
    moratorium-expires-three-quick-steps-reduce-eviction ............................................ 17

Michigan Supreme Court, Administrative Order No. 2020-17,
    https://courts.michigan.gov/Courts/MichiganSupremeCourt/rules/court-rules-
    admin-matters/Administrative%20Orders/2020-08_2020-06-
    09_FormattedOrder_AO2020-17.pdf ........................................................................... 16

Seattle.gov, Support for Small Businesses and Nonprofits,
    http://www.seattle.gov/mayor/covid-19#smallbusinessnonprofitsupport ............... 11

*P. Mot. for Preliminary Injunction - v*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

University of Washington Center for Studies in Demography and Ecology, *Seattle Housing Report* (2018),
https://www.seattle.gov/Documents/Departments/CityAuditor/auditreports/UWSRHS FINAL.pdf ............................................................................................................10

*P. Mot. for Preliminary Injunction - vi*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**RELIEF REQUESTED**

Plaintiffs ask this Court to enjoin Defendants' eviction bans during the pendency of this litigation. Plaintiffs are likely to succeed on the merits of the Contract Clause and Takings claims, they face irreparable harm due to their inability to enforce valid lease agreements and possess their own property, the balance of hardships favors Plaintiffs because Defendants have alternative ways to accomplish their interests without violating Plaintiffs' property rights, and halting unconstitutional action by Defendants is in the public interest.

**INTRODUCTION AND STATEMENT OF THE CASE**

In response to the pandemic, Defendants have imposed bans on eviction for indefinite lengths of time and have restricted landlords' ability to collect on unpaid rent during that timeframe.[1] As a result, landlords are unable to enforce their contractual and property rights for an unsustainable period. Defendants have thereby substantially and unreasonably impaired every residential lease agreement in their respective jurisdictions in violation of the Contract Clause of the United States Constitution. Defendants have also stripped landlords of their right of possession in violation of the Fifth Amendment Takings Clause. Defendants have thereby pressed onto the shoulders of landlords the economic burdens of the pandemic that ought to settle on the public as a whole.

Lifting the eviction bans is an urgent matter for affected property owners, who are suffering irreparable injury each day while struggling to maintain their property and their businesses under the uncertainty of the bans' indefinite duration. Plaintiffs ask that this Court preliminarily enjoin the eviction bans while the merits of these important constitutional questions are resolved. Plaintiffs are entitled to preliminary relief because: (1) Plaintiffs are likely to succeed on the merits of their constitutional claims; (2) Plaintiffs are suffering irreparable harm because the key remedy of eviction has been indefinitely delayed, preventing them from taking action to prevent ongoing material breaches of their lease agreements; (3) the equities tilt in Plaintiffs' favor, given the widespread and severe impact the eviction bans are having and will continue to have on the rental

---

[1] For the sake of simplicity, Defendants' actions at issue in this matter are collectively referred to as "eviction bans."

housing industry; and (4) an injunction would serve the public interest by vindicating constitutional rights and providing interim relief to the thousands of landlords across the state who face ongoing expenses like property taxes, mortgages, and maintenance expenses but lack the cash flow to cover these costs.

I.      **LANDLORDS' REMEDIES FOR UNLAWFUL DETAINER AND UNPAID RENT**

Under Washington law, a landlord has a statutory right to evict tenants through an unlawful detainer action to enforce residential lease agreements. RCW 59.12.030. "An unlawful detainer action is a statutorily created proceeding that provides an expedited method of resolving the right to possession of property." *Christensen v. Ellsworth*, 162 Wn.2d 365, 370–71 (2007). A tenant is liable for unlawful detainer in a variety of circumstances, including:

- When the tenant "holds over or continues in possession" of the property after the residential lease agreement has expired;

- When a tenant continues in possession after a default in rent and fourteen days after notice in writing has demanded either payment or surrender of the premises; and

- When a tenant retains possession after "neglect or failure to keep or perform any condition or covenant of the lease or agreement and continues possession after expiration of a ten-day notice."

RCW 59.12.030. A property owner who prevails in an unlawful detainer action is entitled to a writ of restitution that restores possession. RCW 59.12.090.

Upon issuance of a summons, a tenant has at least five days to answer before entry of a default judgment. RCW 59.12.080. A landlord has a right to apply immediately for the court to order the tenant to appear and show cause why a writ of restitution should not issue. RCW 59.18.370. The show-cause hearing must occur no more than thirty days from the date the order is served on the tenant. *Id.* Upon notice of a writ of restitution, the tenant has three days to relinquish possession. RCW 59.18.380.

A landlord seeking to repossess property can also bring an ejectment action against the party currently in possession. *See* RCW 7.28. This cause of action, however, lacks the expedited

*P. Mot. for Preliminary Injunction - 2*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

process for unlawful detainer actions. *See FPA Crescent Assocs., LLC v. Jamie's, LLC*, 190 Wn. App. 666, 675 (2015) ("The [unlawful detainer] action relieves a landlord of having to file an expensive and lengthy common law action of ejectment.").

Landlords can also bring a breach-of-contract claim to recover unpaid rent. All these available remedies, however, are severely impaired by Defendants.

## II.   EVICTION BANS AND RENT REPAYMENT RESTRICTIONS

Defendants have imposed bans on eviction and restrictions on a landlords' ability to collect overdue rent. These bans restrict landlords' statutory remedies under Washington's unlawful detainer and ejectment laws as well as common-law remedies to collect overdue rent.

The Washington State Eviction Ban

In February 2020, Governor Inslee proclaimed a State of Emergency in response to the pandemic. Declaration of Ethan W. Blevins, Exh. 1. A month later, he issued another proclamation to prohibit certain "activities related to residential evictions by all residential landlords" until April 17, 2020. *Id.* Exh. 2. These prohibited actions related to landlords' right to remove a tenant and repossess their property.

The governor has extended the eviction ban three times, which is now set to expire on October 15, 2020. *See id.* Exhs. 3–5. Upon each renewal, the governor has made minor changes to the language. In its current form, landlords are prohibited from "threatening to serve or enforce" any notice demanding that a tenant comply with the lease or vacate the premises. *Id.* Exh. 5. It likewise prohibits landlords from enforcing any judicial eviction orders. *Id.* The ban applies to tenancies that have expired or will expire during the ban. *Id.*

There are a few minor exceptions. A landlord may carry out an eviction order or notice if they submit an affidavit stating that eviction is "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident." *Id.* A landlord may also seek eviction if 60 days' notice is given of intent to either sell the property or personally occupy it as a primary residence. *Id.*

*P. Mot. for Preliminary Injunction - 3*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The ban also restricts rent collection and late fees. It prohibits landlords from treating unpaid rent as an "enforceable debt or obligation that is owing or collectable," unless the landlord proves in court that the tenant rejected a reasonable repayment plan. *Id.* Similarly, landlords cannot assess late fees for overdue rent during the ban. *Id.* The ban also prohibits rent increases. *Id.*

Landlords who violate the governor's eviction ban face criminal penalties. *Id.*

Seattle Mayor's Eviction Ban

In March, 2020, Seattle Mayor Jenny Durkan issued a proclamation of civil emergency. *See id.* Exh. 6. Shortly after, she issued an order preventing landlords from initiating any unlawful detainer actions or otherwise evicting tenants unless the eviction is in response to tenant behavior that rises to an imminent threat to health or safety. *Id.* Exh. 7. The original order was set to last until the civil emergency ended or 60 days had passed since the order took effect, whichever came first. *Id.* The Mayor has extended the ban three times, and it is now set to last through the end of the year or until the civil emergency ends, whichever is earliest. *See id.* Exhs. 8–10.

Seattle City Council's Eviction Ban

The Seattle City Council has also passed an eviction ban. *See id.* Exh. 11. The Council's ordinance creates an affirmative defense to eviction if the eviction requires the tenant to vacate the rental unit within six months of the end of the mayor's moratorium and if the reason for eviction is either: (1) the failure to comply with a 14-day notice to pay rent or vacate for rent due during the Mayor's moratorium or six months after; or (2) the tenant "habitually fails to pay rent resulting in four or more pay-or-vacate notices in a 12-month period." *Id.* To take advantage of the affirmative defense, a tenant must submit a declaration that the tenant is suffering financial hardship. *Id.* The ban does not require the financial hardship to be related to the pandemic. *See id.*

Seattle City Council's Rent Repayment Ordinance

In May 2020, the City Council passed an ordinance governing the repayment of all unpaid rent that accrues during the civil emergency order and the six months following the order's termination. *See id.* Exh. 12. The ordinance imposes installment plans that vary based on the amount of rent owed. *See id.* It also bans late fees or interest on the unpaid rent accrued during or

*P. Mot. for Preliminary Injunction - 4*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

six months following the civil emergency. *Id.* The City Council passed the ordinance in order to address any difficulty paying rent due to "the economic disruptions caused by COVID-19." *Id.* The council deemed the ordinance "immediately necessary to protect public health, support stable housing, and decrease the likelihood that individuals and families will fall into homelessness." *Id.*

The ordinance also grants tenants the right to pay overdue rent that accumulated during the civil emergency or six months after in installment plans established by law. *Id.* The repayment schedule varies depending on the quantity of overdue rent: one month or less of overdue rent can be paid in three consecutive, equal monthly installments; over one and up to two months of overdue rent is payable in five such installments; any overdue rent over two months is payable in six installments. *Id.* The tenant may also propose an alternative payment schedule, which supersedes this repayment schedule with landlord consent. *Id.* Late fees, interest, or other charges resulting from late payment are prohibited within six months of the end of the civil emergency. *Id.*

## III.   PLAINTIFF LANDLORDS

Plaintiffs are residential landlords with tenants in breach of their lease agreements who remain in possession of the Plaintiffs' rental units.

El Papel, LLC

Mark Travers and Michele Ruess own El Papel, LLC. Declaration of Mark Travers ¶ 2. El Papel owns and rents out a Seattle townhouse as a residential property with two units. *Id.* ¶ 3. In one unit, two tenants whose fixed-term leases expired on July 31, 2020, continue to occupy the premises. *Id.* The tenants have expressed no intent to vacate as required by the terms of the lease and Washington's landlord-tenant laws. *Id.* ¶ 3. Neither of these tenants has consistently paid rent since April 2020. *Id.* Instead, as of the date of this filing, the tenants collectively owe El Papel $17,403.44 in unpaid rent. *Id.*

Under the lease agreement with El Papel, the tenants agreed to pay rent in monthly installments on the first day of each calendar month of the lease term. *Id.* Exh. 13. The lease agreement imposes a $75 late fee for rent received after the third day of a given month. *Id.*

Berman 2, LLC

*P. Mot. for Preliminary Injunction - 5*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Berman 2, LLC, is owned by Osho Berman. Declaration of Osho Berman ¶ 2. Berman 2 owns and manages a residential building with over 20 rental units in Seattle. *Id.* ¶ 3. Berman 2 rents these units to low-income tenants, many of whom were previously homeless, at below-market rates. *Id.* ¶ 3. Berman 2 relies on the eviction process to keep these units safe and comfortable for tenants and to keep rates low. *Id.*

Tenants occupying six of Berman 2's rental units have accrued overdue rent during the eviction bans and are currently declining to pay rent. *Id.* ¶ 5. The total rent owed during the eviction bans amounts to about $10,818. *Id.* ¶ 5. Mr. Berman has personally attempted to negotiate with his non-paying tenants by phone, text, and in-person, but the non-paying tenants have been unresponsive. *Id.* In his communications, Mr. Berman has indicated he is willing to accept partial payment or repayment; however, his tenants have refused to respond and are continuing to occupy Berman 2's rental units in violation of their lease agreements. *Id.*

Berman 2's lease agreements are for fixed terms and do not roll into month-to-month tenancies upon expiration. *Id.* ¶ 6, Ex. 14. The lease agreements state that Berman 2's tenants agree to "pay all rent and other charges promptly when due or assessed, including utilities for which [the tenant] is responsible and to provide proof of payment." *Id.* Exh. 15. It also provides: "Any rent unpaid by the due date is termed delinquent." *Id.* The lease states that late rent will result in a late payment charge of $75 plus $5 each additional day that rent has not been paid in full. *Id.*

<u>Karvell Li</u>

Karvell Li owns a townhouse in Seattle, which he rents out as a single-family rental unit. Declaration of Karvell Li ¶¶ 1, 4. His current tenant has a month-to-month tenancy and continues to occupy the unit despite not paying rent for several months. *Id.* ¶ 4. In the lease, the tenant agreed to pay monthly rent on or before the first day of each month. *Id.* Exh. 15. Otherwise, a $25 late fee is charged for each day that the rent is delinquent, up to a maximum of ten percent of one month's rent. *Id.*

*P. Mot. for Preliminary Injunction - 6*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Mr. Li's tenant has remained employed throughout the tenancy but nonetheless began to neglect her payment obligation in June 2019. *Id.* ¶ 4. As of this filing, the tenant owes $27,059.55 in accumulated rent and late fees. *Id.* ¶ 5.

Mr. Li has issued seven separate 14-day notices to pay or vacate in the last 12 months. *Id.* ¶ 7. He has made repeated efforts to negotiate payment plans and offer the tenant help. *Id.* ¶ 6. He has offered to waive rent and certain fees, pay utility expenses, and even pay all the tenant's moving expenses. *Id.* Mr. Li's tenant has denied or refused to respond to such offers. *Id.* At this point, Mr. Li wants to regain possession of his property and file a claim to recover overdue rent, but the eviction bans prevent him from doing so. *Id.* ¶ 8.

## LEGAL STANDARD

Analysis for preliminary relief depends on (1) likelihood of success on the merits of the underlying complaint, (2) the likelihood of suffering irreparable harm if preliminary relief is not granted, (3) whether the balance of equities tips in the movant's favor, and (4) whether granting preliminary relief would be in the public interest. Fed. R. Civ. P. 65; *see Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit uses a "sliding scale," such that "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

## ARGUMENT

Plaintiffs meet the standards for preliminary injunction. They are likely to succeed on the merits of their claims for two primary reasons: (1) the eviction bans strip away the key remedy for lease violations without safeguarding landlords' right to timely payment; and (2) the bans compel a physical occupation of the landlords' property. These constitutional injuries are presumed irreparable. Additionally, the inability to collect on rent or repossess their property forces landlords to face possible foreclosure and damaged credit scores as the bans drag on. The equities lean toward Plaintiffs, as the harms they face are imminent, and the Defendants have adequate alternatives to satisfy their own interests. Finally, a preliminary injunction would be in the public

interest, given the widespread impact on rental housing across Seattle and Washington and the low likelihood of harm to the public should the bans be enjoined.

## I.      THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### a.   The eviction bans violate the Contract Clause

The eviction bans substantially and unreasonably impair the contractual obligations of hundreds of thousands of lease agreements in Seattle and throughout the state.

The United States Constitution says, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. A Contract Clause analysis follows three steps. *See RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004). First, a court examines whether the law creates a "substantial impairment" of contractual obligations. *Id.* (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). If yes, then the court asks whether the government has a "significant and legitimate public purpose" designed to solve a "broad and general social or economic problem" as opposed to offering "a benefit to special interests." *Id.* (quoting *Energy Ress. Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983)). If so, then the court asks whether the law "is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977)).

The eviction bans cause a substantial impairment of residential lease agreements by removing the key remedy for contractual violations. They fail to resolve a general social problem and instead offer a benefit to a particular group—residential tenants—at the expense of landlords. And the bans are neither "reasonable" nor "appropriate," as established by a long line of caselaw requiring governments to offer a reasonable rate of return to property owners who are denied the right to repossess their property from a tenant or mortgagor who has failed to comply with contractual terms.

### i.    The eviction bans render lease agreements unenforceable.

To determine whether a law substantially impairs contractual obligations, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's

*P. Mot. for Preliminary Injunction - 8*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). Here, the eviction bans substantially impair every residential lease agreement in the city and state by removing the key remedy for violations of residential lease agreements: eviction. Likewise, the repayment restrictions block alternative remedies for non-payment of rent, such as breach of contract.

An obligation is substantially impaired when a law handicaps enforcement of that obligation. "Contracts between individuals or corporations are impaired within the meaning of the Constitution (article 1, s 10, cl. 1) whenever the right to enforce them by legal process is taken away or materially lessened." *Lynch v. United States*, 292 U.S. 571, 580 (1934). After all, "it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether." *Bronson v. Kinzie*, 42 U.S. 311, 317 (1843).

In *Bronson*, for instance, the Supreme Court invalidated a law that delayed foreclosures by extending mortgagors' redemption periods. *See Bronson*, 42 U.S. at 312. The Court stated that government-imposed change to the remedy that effectively impairs contractual obligations offends the Contract Clause because "it is immaterial whether [impairment of a contract] is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the Constitution." *Bronson*, 42 U.S. at 316. The extended redemption period was thus an unlawful impairment of contract. *Id. See also Barnitz v. Beverly*, 163 U.S. 118, 131 (1896) ("[T]he change of remedy [can be] detrimental to such a degree as to amount to an impairment of the plaintiff's right[.]").

As *Bronson* demonstrates, contractual impairments can still be substantial even where a remedy for contractual breaches is only temporarily removed. After all, "[i]f a State may stay the remedy for one fixed period, however short, it may for another, however long." *Edwards v. Kearzey*, 96 U.S. 595, 602 (1877). Although rent continues to accrue on paper with the hope of collection someday, the ability to collect rent in a timely manner and enforce that obligation in a timely manner is the crux of the rental business model. This is why the unlawful detainer statute offers an expedited process. Hence, the ability to enforce timely payments through the remedies created by state law is an essential tool, and even temporary suspension constitutes a substantial

P. Mot. for Preliminary Injunction - 9
Case No: 2:20-cv-01323-RAJ

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(425) 576-0484

impairment. *See, e.g.*, *Bronson*, 42 U.S. at 311; *Barnitz*, 163 U.S. at 130 (act violated Contract Clause by "carv[ing] out for the mortgagor . . . an estate of several months more than was obtainable by him under the former law[.]").

The eviction bans, while differing in minor details, all constitute a substantial impairment of contract because they remove the enforcement mechanism of eviction, thus preventing landlords from enforcing lease obligations unless the tenant's behavior rises to an imminent threat to health or safety. Just as extension on a foreclosure remedy is a substantial impairment of contract, so also is a temporary ban on the remedy of eviction. In both cases, the means of enforcement are stripped away, leaving contractual obligations meaningless. Neutering a lease agreement by removing the primary enforcement mechanism "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822.

Additionally, the eviction bans close off other avenues for enforcing a landlord's contractual right to overdue rent. The state prevents landlords from treating overdue rent as an enforceable debt through breach-of-contract or similar actions, and the City of Seattle requires landlords to submit to a repayment schedule rather than seek to enforce their contractual right through an enforcement action. The eviction bans substantially impair every residential lease agreement in their respective jurisdictions.

### ii.   The eviction bans favor one group over another and therefore fail to qualify as a legitimate police power action.

Substantial impairments of contractual obligations must have a "significant and legitimate public purpose" directed at "a broad and general social or economic problem." *Energy Reserves Group, Inc.*, 459 U.S. at 411–12. By contrast, a law designed to provide a "benefit to special interests" is not a valid exercise of the police power warranting deference. *Id.* at 412.

The eviction bans select one group to favor during the pandemic at the expense of another group experiencing the same crisis. Most Seattle landlords are individuals who own a small number of units as a way to supplement their primary income or fund retirement. *See* University

*P. Mot. for Preliminary Injunction - 10*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

of Washington Center for Studies in Demography and Ecology, *Seattle Housing Report* at 2, 15 (2018), https://www.seattle.gov/Documents/Departments/CityAuditor/auditreports/UWSRHS FINAL.pdf. These landlords face the same turmoil as their tenants and are just as likely as tenants to face unemployment, health problems, and other challenges associated with the pandemic. Yet the Defendants have called on them to sacrifice their income and endanger their investment by stripping away the means of enforcing their leases.

Meanwhile, the City of Seattle has offered assistance to other small businesses, recognizing that they face serious hardship, such as a ban on commercial evictions and tax deferment. *See* Seattle.gov, Support for Small Businesses and Nonprofits, http://www.seattle.gov/mayor/covid-19#smallbusinessnonprofitsupport. Landlords, on the other hand, are asked to cope with their own financial hardship while also bearing the hardship of renters. The eviction bans do not aim to resolve a broad and general social problem, instead relieving one group of contractual obligations at the expense of another, and therefore fail to satisfy the Contract Clause.

**iii.    The eviction bans are unreasonable because they fail to protect the landlords' right to a reasonable return and are more extensive than necessary to cope with the pandemic.**

**1.    The eviction bans must ensure compensation.**

This is not the first time that state governments have sought to provide temporary relief from foreclosure or eviction. The Supreme Court has upheld such measures against Contract Clause challenges only when the statutes provided safeguards and enforceable requirements that tenants or mortgagors continue making payments during the extended forbearance period. However, where a statute, like the eviction bans here, provides no enforcement mechanism to ensure continuing payment while the tenant or mortgagor continued to possess the property, the Supreme Court has struck it down as an unreasonable interference with contractual obligations.

This pattern began with *Bronson* in 1843, the case invalidating the Illinois law extending the period in which a defaulting mortagee had to redeem their property. The *Bronson* Court held that a law imposing a delay in the mortgagee's right to foreclose caused an unconstitutional

*P. Mot. for Preliminary Injunction - 11*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

interference with contract. *Bronson*, 42 U.S. at 319. The Court struck down similar extended redemption periods in *Howard v. Bugbee*, 65 U.S. 461 (1860), and *Barnitz v. Beverly*, 163 U.S. 118 (1896). The parallel in the rental context is clear: just as removing the remedy of foreclosure for failure to pay monthly installments on a mortgage was an unconstitutional interference, so also is a ban that prohibits landlords from evicting when a tenant fails to pay monthly rent or otherwise violates lease terms.

The Supreme Court has adopted a narrow exception for schemes that extended redemption periods but only if the mortgagee's right of reasonable return was adequately protected. In *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), the Supreme Court upheld a Minnesota law that allowed judges to extend contractual redemption periods. *Blaisdell* did not overrule *Bronson*, however, and a key distinction between the cases has direct relevance to the eviction bans.

In *Blaisdell*, the Minnesota law required the mortgagor to continue paying the fair-market rent during the extended redemption period as a condition of the extension, thus providing some relief for the mortgagee. *Id.* at 425. The *Blaisdell* majority relied on this difference in distinguishing *Bronson*: "It will be observed that in the *Bronson* case . . . there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." *Id.* at 432. The same distinction arose in *Barnitz*, where the Court noted: "[T]he act carves out for the mortgagor or the owner of the mortgaged property an estate of several months more than was obtainable by him under the former law, with full right of possession, *and without paying rent or accounting for profits in the meantime.*" *Barnitz*, 163 U.S. at 130 (emphasis added).

The Supreme Court underscored this distinction a year after *Blaisdell* in *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 61 (1935), where the Supreme Court struck down a temporary delay on foreclosure with no enforceable requirement that the mortgagor make payments. The fatal flaw with the Arkansas law was that the mortgagor "ha[d] every incentive to refuse to pay a dollar." *Id.* at 60–61. That problem did not exist in *Blaisdell*, where the Minnesota statute required continuing payment.

P. Mot. for Preliminary Injunction - 12
Case No: 2:20-cv-01323-RAJ

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(425) 576-0484

The same distinction arises with respect to eviction bans. In *Block v. Hirsh*, 256 U.S. 135 (1921), the Supreme Court dealt with a rent-control law that banned evictions during a World War I housing shortage. While a divided Court upheld the ban against a Contract Clause challenge, the majority noted that "[m]achinery [wa]s provided to secure to the landlord a reasonable rent" during the eviction ban, *id.* at 157, and the tenant was protected from eviction only "so long as he pa[id] the rent and perform[ed] the other terms and conditions of the lease." District of Columbia Rents Act, Ch. 80, 41 Stat. 298 § 109 (1919). The *Blaisdell* majority later found this fact directly relevant to the Contract Clause analysis, noting that, in *Block*, "provision was made for reasonable compensation to the landlord during the period he was prevented from regaining possession." *Blaisdell*, 290 U.S. at 441–42.

This precedent reveals a telling pattern: the Court has narrowly upheld laws temporarily preventing eviction or foreclosure only where the law requires, as a condition of the extension, that the tenants/mortgagors continue paying fair rent (*Blaisdell* and *Block*). Where no such payment is required as a condition of foreclosure protection, the Court has struck down temporary foreclosure delays (*Bronson*, *Howard*, *Barnitz*, and *W.B. Worthen*).

The eviction bans fail to provide an enforceable requirement that tenants protected from eviction pay anything during the interim as a condition of that protection. Governor Inslee's proclamation bans evictions and likewise bars landlords from treating missing rent as an "enforceable debt or obligation that is owing or collectable, where such non-payment was as a result of the COVID-19 outbreak and occurred on or after" the state of emergency began. Likewise, the City of Seattle does not protect landlords' right to a return, instead encouraging renters not to pay and take advantage of the mandated repayment plan. Rather than protecting landlords' right to compensation, these eviction bans create an unconstitutional "incentive to refuse to pay a dollar." *W.B. Worthen*, 295 U.S. at 60–61.

**2.    The eviction bans extend well beyond the government's interests.**

A law substantially impairing a contract must be "tailored to the emergency that it was designed to meet." *Allied Structural Steel Co.*, 438 U.S. at 242. A substantial impairment is

*P. Mot. for Preliminary Injunction - 13*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

therefore unreasonable and unnecessary when "an evident and more moderate course would serve [the government's] purposes equally well." *United States Trust Co. of New York*, 431 U.S. at 31.

The eviction bans list similar rationales. The governor's proclamation cites the concern that unemployment prompted by shutdowns will make it difficult for tenants to pay rent and thus increase the likelihood of eviction, "increasing the life, health, and safety risks to a significant percentage of our people." Blevins Decl. Exh. 2. The Seattle mayor's proclamation posits a similar causal chain resulting in more evictions, which may "result in a loss of housing and create housing instability, potentially increasing the number of people experiencing homelessness and creating a heightened risk of disease transmission." *Id.* Exh. 7. The City Council likewise cites more evictions resulting in more homelessness and disease transmission. *Id.* Exh. 11. The repayment ordinance, meanwhile, claims that the economic impact of the pandemic will extend beyond the City's state of emergency and that the City has a continuing interest in promoting housing stability and homelessness prevention. *Id.* Exh. 12. The eviction bans are not tailored to satisfy these interests.

### 3. The eviction bans are not tailored to the emergency.

The eviction bans extend beyond circumstances where tenants are likely to face homelessness if evicted. By their own terms, the government's interests are limited to preventing homelessness and an increased risk of disease transmission that homelessness entails during the pandemic.

Yet the eviction bans apply broadly to all tenants, regardless of financial circumstance or likelihood of finding alternative housing. A landlord cannot, for instance, file a notice to terminate a month-to-month tenancy with a well-to-do tenant so that the landlord can renovate the rental unit. Nor can a landlord evict tenants with good income for violations of the lease unrelated to rent payment. Tenants in these and similar situations are not likely to end up on the streets if a landlord exercises the right to repossess his property.

The City Council's ban does require that a tenant self-certify that they are experiencing hardship before evoking the affirmative defense to eviction, but that hardship need not be caused by the pandemic. This fig leaf is cold comfort to Seattle landlords who remain subject to the

*P. Mot. for Preliminary Injunction - 14*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

governor's and mayor's eviction bans, neither of which require a showing of hardship. Hardship, moreover, is left undefined in the ordinance, making it difficult for landlords to challenge a tenant's certification.

The Supreme Court has strongly implied that a showing of hardship is a necessity when delaying a property owner's right to repossess. In striking down a law that delayed foreclosure remedies, the Court noted: "There is not even a requirement that the debtor shall satisfy the court of his inability to pay." *W.B. Worthen Co.*, 295 U.S. at 61. The implication is clear—the bare minimum needed to delay an eviction requires a showing of hardship, and even that might not be adequate.

The eviction bans' one-size-fits-all approach also distinguishes this case from *Blaisdell*. In that case, the Minnesota statute granted judges authority to extend redemption periods on a case-by-case basis "for such additional time as [a] court may deem just and equitable." 290 U.S. at 416. Indeed, *Blaidell* distinguished *Bronson* and *Howard* partially on this basis, noting that the extended redemption periods in *Bronson* and *Howard* were "unconditional," unlike the Minnesota law that did not impose an inflexible, across-the-board mandate. *Id.* at 432. The eviction bans fail to offer similar flexibility that would result in a more tailored approach.

Additionally, the City Council's eviction ban unnecessarily extends six months beyond the termination of the Mayor's emergency order. By the order's terms, the Mayor will only terminate her order when she has determined "that extraordinary measures are no longer required for the protection of the public peace, safety and welfare." Blevins Decl. Exh. 7. Yet if the Mayor determines that such measures are no longer necessary, then the City's interest in taking such measures will likewise have come to an end. The City, therefore, has no need to extend the eviction ban to either protect against disease transmission or protect against a surge in homelessness caused by the crisis. *See United Auto., Aerospace, Agr. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 46 (1st Cir. 2011) (to comply with the Contract Clause, substantial impairments on contractual obligations should be "limited to the duration of the emergency").

*P. Mot. for Preliminary Injunction - 15*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The restrictions on rent collection have an even less clear relationship to the governments' interests. The governor's proclamation bars landlords from treating unpaid rent as an enforceable debt by, for instance, bringing a breach-of-contract action. Yet the governor's interests in preventing homelessness and disease transmission are not furthered by preventing a landlord from bringing an action to collect on overdue rent. The same is true of Seattle's repayment ordinance, which bars landlords from seeking to collect rent in a manner that deviates from the city-mandated repayment schedule. That schedule ensures that renters need not face any repayment obligation until six months after the city emergency has concluded, well after an official determination that a public crisis no longer exists. This not only extends beyond the duration of the emergency but also has no bearing on the prevention of homelessness that may exacerbate transmission during the crisis.

### 4.      There are less oppressive means of achieving the governments' interests.

The Defendants have several other "more moderate courses" of satisfying their interests other than banning virtually all evictions, barring recovery of rent, and leaving no recourse for landlords. *See United States Trust Co. of New York*, 431 U.S. at 31.

The government could, for instance, manage eviction filings to prevent a surge, while still allowing landlords to exercise their contractual rights. For example, Michigan courts have passed a rule directing courts to process evictions through a "prioritization approach," which requires courts to move through eviction processing in order of five priorities: first, complaints of illegal activity; second, complaints alleging nonpayment of rent for 120 days or more, then 90 days or more, 60 days or more, and 30 days or more. Michigan Supreme Court, Administrative Order No. 2020-17, https://courts.michigan.gov/Courts/MichiganSupremeCourt/rules/court-rules-admin-matters/Administrative%20Orders/2020-08_2020-06-09_FormattedOrder_AO2020-17.pdf.  This ensures that the most serious situations can receive prompt resolution while granting more time for tenants struggling with non-payment. Similarly, the government could impose a weekly or monthly cap on the number of eviction filings. This would address the government's concerns

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

about rising eviction rates while allowing landlords to exercise their rights and protect their own interests.

The government can also provide some form of compensation for landlords. This could include, among other things, tax credits or no-interest loans for landlords who agree to continue housing non-payers or partial payers.

Other solutions could allow landlords to exercise their rights and address homelessness should an eviction surge occur. The government could, for instance, exercise its eminent domain power to temporarily commandeer hotels and other facilities for temporary housing, supply homeless individuals with hygiene kits, and so on. *See also* Peggy Bailey, *Trump Executive Orders Likely Won't Help the Millions Struggling to Pay Rent*, Center on Budget and Policy Priorities (Aug. 8, 2020), https://www.cbpp.org/blog/trump-executive-orders-likely-wont-help-the-millions-struggling-to-pay-rent (suggesting alternative ways to help renters); Salim Furth, *When the Moratorium Expires: Three Quick Steps to Reduce Eviction*, Mercatus Center (June 19, 2020), https://www.mercatus.org/publications/covid-19-economic-recovery/when-moratorium-expires-three-quick-steps-reduce-eviction (same).

**b.  The eviction bans cause a physical occupation of Plaintiffs' rental housing units in violation of the Fifth Amendment's Takings Clause.**

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.; U.S. Const. amend. XIV. The eviction bans cause a physical taking by compelling landlords to house tenants who no longer satisfy lease terms, including tenants whose leases have already expired.

The Supreme Court has held that a physical occupation of property is a categorical taking requiring compensation. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."). Even minor physical invasions that do not interfere with use constitute a categorical taking. For instance, in

*P. Mot. for Preliminary Injunction - 17*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court held that a taking occurred where a law authorized television companies to install cable on private property.

This categorical rule requiring compensation for physical takings applies even where the government authorizes a third party to physically occupy or invade property. In *Loretto*, government-authorized installation of privately owned cable constituted a physical taking. *Id.* at 440–41. And in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), a navigational easement imposed on a privately owned lagoon caused a categorical taking by authorizing private vessels to intrude on private property.

A physical taking can be either permanent or temporary in nature. *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 33–34 (2012) ("[W]e have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have worked a taking of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.") (cleaned up); *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 318 (1987) ("[Supreme Court] cases reflect the fact that 'temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation."). Where diminution of value is not a relevant factor in the takings inquiry, as with physical takings, the temporary nature of the government action does not obviate the taking. For instance, in *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), the government temporarily occupied a plant for wartime use—the temporary nature of the occupation did not obviate the compensation requirement. *See also United States v. Petty Motor Co.*, 327 U.S. 372, 378 (1946) (temporary government use of building was a taking warranting compensation); *United States v. General Motors Corp.*, 323 U.S. 373 (1945) (same). Indeed, even the more limited view of temporary takings expressed by the dissenters in *First English*, 482 U.S. at 331–32, accepted as uncontroversial that "the state certainly may not occupy an individual's home for a month and then escape compensation by leaving and declaring the occupation 'temporary.'"

*P. Mot. for Preliminary Injunction - 18*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The eviction bans constitute a categorical taking because they authorize a temporary physical occupation of Plaintiffs' property by a third party against Plaintiffs' will. Plaintiffs and other landlords must suffer occupancy by tenants who no longer meet the conditions for landlords' consent to their possession. El Papel, for instance, is forced to endure the possession of its property by individuals whose lease has expired. Berman 2 and Mr. Li, meanwhile, must abide possession of their property by individuals who are not meeting the material terms of their lease agreements.

This situation is distinguishable from cases holding that landlords did not suffer a taking when the government granted tenants certain statutory privileges with respect to the landlord's property. In *Yee v. City of Escondido*, 503 U.S. 519, 526–28 (1992), for instance, the Supreme Court dealt with a claim that a rent-control law caused a physical taking because mobile home park owners could "no longer set rents or decide who their tenants will be." The Court disagreed because the tenants were invited by the landlords and "not forced upon them by the government." *Id.* at 528. Here, in contrast, the tenants have exceeded the scope of the landlords' invitation, thus resulting in a compelled physical occupation. In El Papel's case, the invitation to occupy the premises ended on July 31, 2020. Travers Decl. Exh. 13. For the other Plaintiffs, the invitation ended when the tenants ceased honoring a material term of their lease agreements—payment of rent.

Nor does this case resemble *Block*, 256 U.S. at 155, where, as mentioned above, the Supreme Court held that a temporary law allowing tenants to stay beyond lease expiration did not violate the Takings Clause. In *Block*, the regulation still allowed landlords to evict tenants who violated the terms of the lease agreement, unlike the bans here. *Id.* at 157. Moreover, *Block* preceded the entire era of regulatory takings jurisprudence, including *Loretto*'s categorical physical takings rule and the recognition of temporary takings, so subsequent precedent has superseded *Block*'s holding. And *Block* itself recognized that "regulations of the present sort pressed to a certain height might amount to a taking without due process of law." *Id.* at 156. Indeed, a year later the Court indicated that the "certain height" might not need to be much higher, since

*P. Mot. for Preliminary Injunction - 19*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*Block* had extended "to the verge of the law but fell short" of a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

Therefore, because the eviction bans force the Plaintiffs to keep their tenants, regardless of the rental agreement's terms, the bans constitute a physical taking.

**c. Injunctive relief is a proper remedy for physical invasion of Plaintiffs' property.**

While just compensation is the default remedy for a taking of property, "injunctive relief is available in limited circumstances." *Goodwin v. Walton Cty. Florida*, 248 F. Supp. 3d 1257, 1266 (N.D. Fla. 2017) (citing *Peters v. Vill. of Clifton*, 498 F.3d 727, 732–33 (7th Cir. 2007)) (recognizing injunctive relief may be granted where there are either unavailable or inadequate procedures for seeking just compensation); *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680–81 (1st Cir. 1998) (affirming preliminary injunction for a facial takings claim); *D.A.B.E., Inc. v. City of Toledo*, 292 F. Supp. 2d 968, 973 (N.D. Ohio 2003) (recognizing that a preliminary injunction is an available remedy for a facial regulatory takings claim). Hence, "the district court should accept jurisdiction over takings claims for injunctive relief in the few cases where a Claims Court remedy is so inadequate that the plaintiff would not be justly compensated." *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001) (en banc), *aff'd on other grounds by Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003).

An injunction is appropriate here for at least two reasons. First, the harm caused by a physical invasion of this kind is intangible and difficult to quantify. For example, in El Papel's case, the tenants' rental agreement has expired. Therefore, the tenants are holdovers and quantifying El Papel's injury is not as simple as adding overdue rent and late fees. Moreover, an injunction is appropriate because it offers a far less costly means of settling the property rights of landlords across the city and state than innumerable case-by-case claims for compensation. In the context where a facial takings claim affects the interests of so many property owners, injunctive relief offers a more workable and equitable solution than compensation.

P. Mot. for Preliminary Injunction - 20
Case No: 2:20-cv-01323-RAJ

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(425) 576-0484

## II.     THE PLAINTIFFS HAVE SUFFERED AND WILL LIKELY CONTINUE TO SUFFER IRREPARABLE HARM

A plaintiff seeking preliminary relief must show a likelihood of irreparable injury. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Where constitutional claims are alleged, courts "presume irreparable harm." *Id. See also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). Here, the likelihood of success on the merits of Plaintiffs' constitutional claims suffices to demonstrate a likelihood of irreparable harm. Even absent such a presumption, however, irreparable harm remains likely.

Plaintiffs face irreparable injury because they are unable to regain possession of their property. "As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1090 (7th Cir. 2008); *see also Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 256 (3d Cir. 2011) ("[W]here 'interests involving real property are at stake, preliminary injunctive relief can be particularly appropriate because of the unique nature of the property interest.'") (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)); *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999); *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989). Disallowing possession of one's property specifically constitutes irreparable injury. *See East Tennessee Nat. Gas Co. v. Sage*, 361 F.3d 808, 828–29 (4th Cir. 2004) (gas company's inability to immediately possess condemned property was irreparable harm). By denying Plaintiffs the right to repossess their property, the eviction bans have caused and will continue to cause irreparable injury.

Additionally, a remedy at law is inadequate because the financial harm imposed on Plaintiffs will have an irreparable impact before monetary relief can be awarded. Every month that slips by is one more during which Plaintiffs must suffer non-paying tenants physically occupying their property without any compensation. Yet Plaintiffs remain obligated to pay mortgages, real

*P. Mot. for Preliminary Injunction - 21*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

estate taxes, insurance, and maintenance and repair costs. Monetary relief down the road will not suffice to make Plaintiffs whole if missed mortgage payments damage their credit score or force them into foreclosure. *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058 (harm to reputation considered irreparable); *hiQ Labs, Inc. v. LinkedIn Corp.*, 273 F. Supp. 3d 1099, 1105–07 (N.D. Cal. 2017) (threat to a business's continuing viability is an irreparable injury); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("Even if a loss is fully compensable by an award of money damages, however, extraordinary circumstances, such as a risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary for a preliminary injunction.").

## III.    THE BALANCE OF HARDSHIPS WEIGHS IN PLAINTIFFS' FAVOR

A plaintiff seeking preliminary relief must show that "the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. Courts "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009).

Establishing a likelihood that a policy violates the Constitution suffices to also establish that balance of hardships favor a preliminary injunction. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). As Plaintiffs here raise two meritorious constitutional claims, the balance of hardships presumptively weighs in their favor. Even in the absence of such a presumption, however, the balance of hardships would still tilt toward Plaintiffs for three reasons: Plaintiffs face immediate hardship due to the eviction bans, the Defendants have alternative means to achieve their interests, and the federal eviction ban will continue to protect the Defendants' interests should this Court enjoin the eviction bans.

Plaintiffs in this action face serious hardship. While they have no choice but to continue renting to non-paying tenants, they remain bound to cover regular mortgage, insurance, escrow, and maintenance expenses. The lack of consistent revenue from their rentals forces them to grapple with those costs from their personal income, savings, or other sources. They are months away from recovering any lost rent, assuming that their tenants are not judgment-proof. Meanwhile, the

*P. Mot. for Preliminary Injunction - 22*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Defendants will not face significant hardship due to a temporary injunction because alternative means of addressing their interests exist, as described above.

Moreover, the Center for Disease Control's recent order banning some evictions nationwide will act as a backstop should the Court enjoin the state and local eviction bans, thus safeguarding the Defendants' interests. *See* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020). That ban applies where no local or state ban is not already in effect. *See id.* at 55,294. If this Court were to enjoin the eviction bans, therefore, the Defendants' interests would still be protected by the federal order. Granted, the federal order is not as broad as Defendants' bans, since it requires tenants to make partial payments to the best of their ability and requires them to certify that they've suffered financial hardship as a result of the pandemic, that they've exhausted government assistance programs, and that they will likely become homeless if evicted. *See id.* at 55,297. Hence, Plaintiffs here may be able to evict some tenants who are not making any partial payments under the federal ban. But a narrower ban will not endanger Defendants' interests because, as argued above, the current eviction bans are more extensive than necessary. And while the federal ban may expire before the city council's extended eviction ban, this litigation will likely be resolved by the time the federal order would expire.

## IV.    A PRELIMINARY INJUNCTION WOULD SERVE THE PUBLIC INTEREST

A motion for preliminary injunction must show "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. In the Ninth Circuit, it is never "in the public's interest to allow the state to violate the requirements of federal law." *Brewer*, 757 F.3d at 1069 (holding that likelihood of success on equal protection and preemption challenges also satisfied balance of hardships factor). This is particularly true with respect to constitutional rights. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal citation omitted). Hence, the public interest favors an injunction here, where federal constitutional rights are at issue.

*P. Mot. for Preliminary Injunction - 23*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

In contrast, permitting the Plaintiffs to have full access to eviction proceedings would not harm the public interest. It is not guaranteed that by beginning eviction proceedings the Plaintiffs' tenants will actually be evicted. Instead, in order to obtain relief, the Plaintiffs will still have to go through traditional legal channels and prove the rental agreement was violated and ensure that they satisfy the city's just-cause eviction standards. RCW 59.12.030–59.12.170, 59.18.365–59.18.410 (2020); SMC § 22.206.160 (2020). Consequently, the public is adequately protected by existing laws, which already dictate legal standards for eviction proceedings.

Additionally, while the public may have an interest in preventing widespread evictions, it also has an interest in preventing widespread foreclosures, which would likely result in immediate lease terminations as eviction bans lift. Such a result would negatively harm all parties. Therefore, this Court should grant the injunction because it would promote the public interest by enjoining Defendants' violations of Plaintiffs' constitutional rights, and by allowing landlords, like the Plaintiffs, to protect their property and their livelihoods.

## CONCLUSION

Even at its most permissive, the Supreme Court has insisted that the government cannot "adopt as its policy . . . the destruction of contracts or the denial of means to enforce them." *Blaisdell*, 290 U.S. at 439. Here, Defendants have responded to a pandemic that afflicts all members of society with laws that demand that landlords shoulder not only their own burdens through the crisis, but also the burdens of others. This approach to an emergency does not comport with constitutional guarantees. Plaintiffs ask the Court to grant their motion for a preliminary injunction.[2]

---

[2] Plaintiffs ask the Court to exercise its equitable discretion to waive the bond typically required under Federal Rule of Civil Procedure 65(c) or set it at a nominal amount. Waiver of the bond is appropriate in public interest litigation raising constitutional claims. *Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal. 1996) (waiving bond because "to require a bond would have a negative impact on plaintiff's constitutional rights, as well as the constitutional rights of other members of the public affected by the policy").

*P. Mot. for Preliminary Injunction - 24*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

DATED:  September 21, 2020.

Respectfully submitted:

s/  ETHAN W. BLEVINS
s/  BRIAN T. HODGES
Ethan W. Blevins, WSBA # 48219
Brian T. Hodges, WSBA # 31976
Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
Telephone: (425) 576-0484
Email: EBlevins@pacificlegal.org
Email: BHodges@pacificlegal.org

s/ KATHRYN D. VALOIS
KATHRYN D. VALOIS**
Fla. Bar. No. 1010150
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Email: KValois@pacificlegal.org
Telephone: (561) 691-5000

** Pro hac vice

*Attorneys for Plaintiffs*

*P. Mot. for Preliminary Injunction - 25*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/  ETHAN W. BLEVINS
Ethan W. Blevins, WSBA # 48219

*Attorney for Plaintiffs*

*P. Mot. for Preliminary Injunction - 26*
*Case No: 2:20-cv-01323-RAJ*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*