The Honorable Richard A. Jones
The Honorable J. Richard Creatura

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

EL PAPEL, LLC, et al.

                Plaintiffs,

     v.

JAY R. INSLEE, in his official capacity
as Governor of the State of Washington,
et al.,

              Defendants.

NO.  2:20-cv-01323-RAJ-JRC

GOVERNOR JAY INSLEE'S
RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

## TABLE OF CONTENTS

I.   INTRODUCTION..................................................................................................1

II.  FACTUAL BACKGROUND ...............................................................................2

    A.   The COVID-19 Pandemic .............................................................................2

    B.   Washington State's Response to COVID-19.................................................3

    C.   The Risk and Costs of Mass Evictions .........................................................3

    D.   The Governor's Evictions Moratorium .........................................................4

    E.   The Safe Start Plan and the Continuing Crisis .............................................5

    F.   Federal, State, and Local Rental Assistance Measures.................................6

    G.   The CDC Evictions Moratorium...................................................................6

    H.   The Landlords' Lawsuit.................................................................................7

III. ARGUMENT ........................................................................................................8

    A.   Jurisdictional Bars Require Dismissal of Plaintiffs' Claims Against the
        Governor .......................................................................................................8

    B.   Preliminary Injunction Standards ............................................................... 10

    C.   Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims............................ 10

        1.   The Moratorium does not violate the Contracts Clause ................................... 10

            a.   The Moratorium substantially impairs no contractual relationship .......... 11

                (1)   The Moratorium does not undermine the contractual bargain ....... 11

                (2)   The Moratorium does not impair reasonable expectations ........... 12

                (3)   Landlords may safeguard or reinstate their rights ......................... 13

            b.   The Moratorium reasonably advances a significant public purpose......... 14

                (1)   The Moratorium's purpose is significant and legitimate .............. 14

                (2)   The Moratorium is reasonable and appropriate............................. 15

        2.   The Moratorium does not violate the Takings Clause ..................................... 17

            a.   Injunctive relief is not available to remedy a taking................................. 18

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

b.   Plaintiffs' takings claim is unripe ............................................. 18

c.   The Moratorium does not constitute a physical taking ............................ 19

3.   The Moratorium is constitutional under *Jacobson v. Massachusetts* ............... 20

D.   Plaintiffs Have Failed to Establish Irreparable Harm ............................... 21

1.   Plaintiffs' economic injuries are by definition not irreparable ...................... 21

2.   The Landlords have adequate remedies outside of a preliminary injunction ........................................................................... 22

E.   The Balance of Equities and the Public Interest Weigh Against an Injunction ....... 23

IV.   CONCLUSION ............................................................................. 24

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Ariz. Dream Act Coalition v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ...................................................................... 22, 24

*Auracle Homes, LLC v. Lamont*,
  --- F. Supp. 3d ----, No. 3:20-cv-00829,
  2020 WL 4558682 (D. Conn. Aug. 7, 2020) ........................................... 2, 12-13, 24

*Baptiste v. Kennealy*,
  No. 1:20-cv-11335-MLW, 2020 WL 5751572 (D. Mass. Sept. 25, 2020) ...................... 2, 17

*Chiafalo v. Inslee*,
  224 F. Supp. 3d 1140 (W.D. Wash. 2016) ................................................................. 21

*Chicago Bd. of Realtors, Inc. v. City of Chicago*,
  819 F.2d 732 (7th Cir. 1987) ............................................................................... 13

*City of El Paso v. Simmons*,
  379 U.S. 497 (1965) ..................................................................................... 12, 16

*Colo. River Indian Tribes v. Town of Parker*,
  776 F.2d 846 (9th Cir. 1985) ............................................................................... 21

*Connolly v. Pension Ben. Guar. Corp.*,
  475 U.S. 211 (1986) ........................................................................................... 15

*Diffenderfer v. Central Baptist Church*,
  404 U.S. 412 (1972) ............................................................................................. 9

*Doe v. Va. Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ................................................................................. 8

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ............................................................................... 23

*Elmsford Apt. Assocs., LLC v. Cuomo*,
  No. 20-cv-4062 (CM), 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ....................... 2, 12, 20

*Energy Rsrvs. Grp. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983) ..................................................................................... 11-12, 14-15

*Ex Parte Young*,
  209 U.S. 123 (1908) ............................................................................................. 9

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Goldie's Bookstore, Inc. v. Superior Court*,
    739 F.2d 466 (9th Cir. 1984) .................................................................................. 23

*HAPCO v. City of Phila.*,
    No. CV 20-3300, 2020 WL 5095496 (E.D. Pa. Aug. 28, 2020) .................................... passim

*Home Bldg. and Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)................................................................................ 11, 12, 15-16

*In re Abbott*,
    954 F.3d 772 (5th Cir. 2020) ................................................................................. 20

*In re Abbott*,
    956 F.3d 696 (5th Cir. 2020) ................................................................................. 10

*In re Excel Innovations, Inc.*,
    502 F.3d 1086 (9th Cir. 2007) ............................................................................... 23

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905)....................................................................................... 2, 20-21

*Johnson v. City of S.F.*,
    No. C 09-05503 JSW, 2010 WL 3078635 (N.D. Cal. Aug. 5, 2010).................................. 22

*Kentucky v. Graham*,
    473 U.S. 159 (1985)........................................................................................... 9

*L.A. Cnty. Bar Ass'n v. Eu*,
    979 F.2d 697 (9th Cir. 1992) ................................................................................. 9

*L.A. Mem'l Coliseum Comm'n v. NFL*,
    634 F.2d 1197 (9th Cir. 1980) ............................................................................... 21

*Local Div. 589, Amalgam. Transit Union v. Massachusetts*,
    666 F.2d 618 (1st Cir. 1981).................................................................................. 10

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................................................... 19

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)............................................................................................ 8

*Luke's Catering Serv., LLC v. Cuomo*,
    No. 20-CV-1086S, 2020 WL 5425008 (W.D.N.Y. Sept. 10, 2020).................................... 20

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*MacEwen v. Inslee,*
  No. C20-5423 BHS, 2020 WL 4261323 (W.D. Wash. July 24, 2020) ............................ 8, 10

*Matsuda v. City and Cnty. of Honolulu,*
  512 F.3d 1148 (9th Cir. 2008) ...................................................................... 10

*Nader v. Saxbe,*
  497 F.2d 676 (D.C. Cir. 1974) ...................................................................... 9

*Planned Parenthood of Idaho, Inc. v. Wasden,*
  376 F.3d 908 (9th Cir. 2004) ...................................................................... 10

*Prof'l Beauty Fed'n of Cal. v. Newsom,*
  No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126 (C.D. Cal. June 8, 2020) ................. 18, 20

*Recording Indus. Ass'n v. Diamond Multimedia Sys., Inc.,*
  180 F.3d 1072 (9th Cir. 1999) ...................................................................... 21

*Ruckelshaus v. Monsanto Co.,*
  467 U.S. 986 (1984) ...................................................................... 18

*S. Bay United Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020) ...................................................................... 14-15, 20-21

*S. Cal. Gas Co. v. City of Santa Ana,*
  336 F.3d 885 (9th Cir. 2003) ...................................................................... 11

*Sampson v. Murray,*
  415 U.S. 61 (1974) ...................................................................... 21, 23

*Sanitation & Recycling Indus., Inc. v. City of New York,*
  107 F.3d 985 (2d Cir. 1997) ...................................................................... 12

*Seminole Tribe of Florida v. Florida,*
  517 U.S. 44 (1996) ...................................................................... 9

*Sierra Club v. Trump,*
  379 F. Supp. 3d 883 (N.D. Cal. 2019),
  *aff'd*, 963 F.3d 874 (9th Cir. 2020) ...................................................................... 22

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ...................................................................... 8

*Slidewaters LLC v. Wash. Dep't of Labor & Indus.,*
  No. 2:20-cv-0210-TOR, 2020 WL 3130295 (E.D. Wash. June 12, 2020) ............................ 23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Sofamor Danek Group, Inc. v. Brown*,
  124 F.3d 1179 (9th Cir. 1997) ................................................................ 9

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*,
  560 U.S. 702 (2010) ............................................................................ 18

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018) ................................................................. passim

*Thomas v. Zachry*,
  256 F. Supp. 3d 1114 (D. Nev. 2017) ................................................... 22

*Tohono O'odham Nation v. Ducey*,
  130 F. Supp. 3d 1301 (D. Ariz. 2015) ................................................. 10

*Troy Ltd. v. Renna*,
  727 F.2d 287 (3d Cir. 1984) ................................................................ 17

*U.S. Trust Co. v. New Jersey*,
  431 U.S. 1 (1977) ....................................................................... 11-13, 16

*US West Commc'ns v. MFS Intelenet, Inc.*,
  193 F.3d 1112 (9th Cir. 1999) ............................................................ 18

*Va. Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) .............................................................................. 9

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
  587 F.3d 464 (1st Cir. 2009) ............................................................... 22

*W.B. Worthen Co. v. Kavanaugh*,
  295 U.S. 56 (1935) .............................................................................. 16

*Wash. Legal Found. v. Legal Found. of Wash.*,
  271 F.3d 835 (9th Cir. 2001) .............................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................... 8, 10, 23

*Workman v. Mingo Cnty. Bd. of Educ.*,
  419 F. App'x 348 (4th Cir. 2011) ........................................................ 14

*Yee v. City of Escondido*,
  503 U.S. 519 (1992) ........................................................................ 19-20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

## **Statutes**

2  Pub. L. No. 116–136 ........................................................................................................ 6

3  Pub L. No. 116–136, § 4024 ........................................................................................... 6

4  RCW 38.52.050 .............................................................................................................. 3

5  RCW 59.12.030–.230 .................................................................................................... 13

6  RCW 59.16.010–040 ...................................................................................................... 13

7  RCW 59.18.230 .............................................................................................................. 13

8  RCW 59.18.610 .............................................................................................................. 13

9

## **Constitutional Provisions**

10  U.S. Const. amend. V .................................................................................................. 8, 18

11  U.S. Const. amend. XI ................................................................................................... 9

12  U.S. Const. art. I, § 10, cl. 1 ......................................................................................... 8

13  U.S. Const. art. III ......................................................................................................... 8

14  Wash. Const. art. I, § 16 ............................................................................................... 18

## **Other Authorities**

17  Joseph Blocher, *Bans*,
      129 Yale L.J. 308 (2019) ........................................................................................ 8

19  Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19,
      85 Fed. Reg. 55,292-01 ..................................................................................... 6, 7

## **Rules**

21  Fed. R. Civ. P. 12(h)(3) ................................................................................................ 8

22  Fed R. Civ. P. 65(b)(1) ................................................................................................ 10

23

24

25

26

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

vii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# I.      INTRODUCTION

The COVID-19 pandemic is not only a public health crisis, but also an economic one. Because of the pandemic and the measures necessary to fight it, more than one million Washingtonians have filed unemployment claims and 140,000 have lost their jobs. The State has experienced the worst economic devastation since the Great Depression.

In response to this crisis, Defendant Governor Jay Inslee has issued emergency proclamations to slow COVID-19's spread and mitigate its economic hardships. Like the federal government and other states, the Governor issued a moratorium on most residential evictions (the Moratorium). Recognizing that the pandemic would leave many tenants in financial distress and at risk of eviction for nonpayment of rent, the Governor sought to keep people in their homes during this public health emergency. Eviction forces people into congregate settings such as homeless shelters and shared living quarters, where COVID-19 spreads most aggressively. With up to 740,000 Washingtonians at risk of eviction by the end of the year, epidemiological modeling projects that mass evictions would cause up to 21,100 more COVID-19 infections and 348 more deaths in the state. The Moratorium helps avoid these unacceptable losses.

Plaintiffs El Papel LLC, Berman 2 LLC and Karvell Li (together, the Landlords) are Seattle property owners with tenants owing unpaid rent. Wishing to evict their tenants during the pandemic, the Landlords filed this lawsuit alleging that the Moratorium violates the Contracts Clause and the Takings Clause of the federal Constitution. Seeking a preliminary injunction, the Landlords contend that their tenants' unpaid rent constitutes an irreparable injury outweighing the State's interest in protecting its residents from the disastrous social costs of mass evictions. The Landlords are wrong on the merits, wrong on irreparable harm, and wrong on the equities.

As a threshold matter, the Landlords' claims should be dismissed because the federal eviction moratorium leaves them without standing, and because the Governor is immune from this suit under the Eleventh Amendment. Even if their claims were justiciable, the Landlords are unlikely to prevail under traditional constitutional standards, let alone the more deferential

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

standard that applies to emergency public health measures. *See Jacobson v. Massachusetts*, 197 U.S. 11 (1905). The Landlords cannot show irreparable harm because their injury—unpaid rent—is economic and compensable in damages. And however much the Landlords may wish to evict their tenants, their pecuniary interests pale in comparison to the paramount public interest in preventing the dire consequences of mass evictions during a pandemic: severe economic dislocations and a new wave of COVID-19 infections that would sicken or kill many thousands.

The Court should therefore join the growing consensus of federal courts that have uniformly rejected challenges to state and local COVID-19 eviction moratoria. *See, e.g.*, *Baptiste v. Kennealy*, No. 1:20-cv-11335-MLW, 2020 WL 5751572, at *4 (D. Mass. Sept. 25, 2020) (denying motion for preliminary injunction against Massachusetts evictions moratorium and rejecting Contracts Clause and Takings claims); *HAPCO v. City of Phila.*, No. CV 20-3300, 2020 WL 5095496, at *1 (E.D. Pa. Aug. 28, 2020) (same for Philadelphia evictions moratorium); *Auracle Homes, LLC v. Lamont*, --- F. Supp. 3d ----, No. 3:20-cv-00829, 2020 WL 4558682, at *1 (D. Conn. Aug. 7, 2020) (same for Connecticut evictions moratorium); *Elmsford Apt. Assocs., LLC v. Cuomo*, No. 20-cv-4062 (CM), 2020 WL 3498456, at *1 (S.D.N.Y. June 29, 2020) (entering summary judgment against Contracts Clause and Takings claims).

## II.     FACTUAL BACKGROUND

### A.     The COVID-19 Pandemic

The SARS-CoV-2 virus that causes COVID-19 is highly contagious and potentially fatal. Declaration of Dr. Kathy Lofy (Lofy Decl.) ¶¶ 6–7. Seniors and persons with medical conditions are most vulnerable to complications and death, and people of color disproportionately contract and experience severe COVID-19 health outcomes. *Id.* ¶¶ 7–8. The virus spreads primarily through close interactions via respiratory droplets. *Id.* ¶ 6. There is a lag of several days before the onset of symptoms. Declaration of Brian Rowe (Rowe Decl.), Ex. A. Some with COVID-19 experience no symptoms, so an infected person may spread it unknowingly. *Id*.

On January 21, 2020, the Washington Department of Health (DOH) announced the first

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    case of COVID-19 in the state. Lofy Decl. ¶ 4. New cases increased quickly through March. *Id.*

2    **B.    Washington State's Response to COVID-19**

3        On February 29, the Governor issued Proclamation 20-05, declaring a State of

4    Emergency in Washington due to COVID-19. Declaration of Kathryn Leathers (Leathers Decl.),

5    ¶ 4, Ex. A; *see* RCW 38.52.050. With few proven therapeutics and no vaccine, a primary strategy

6    to slow COVID-19's spread is social distancing measures designed to minimize interactions with

7    those outside one's household. Lofy Decl. ¶¶ 10, 12. The State's mitigation measures grew

8    stricter as cases and deaths accelerated. Leathers Decl. ¶ 10. They culminated with Proclamation

9    20-25 (the Stay Home Proclamation), which required people to cease leaving their homes except

10   for essential activities and essential business. Leathers Decl., Ex. C.

11   **C.    The Risk and Costs of Mass Evictions**

12       From the outset of the pandemic, the Governor's Office understood that the pandemic

13   would significantly reduce economic output and the income of many Washingtonians, making

14   many tenants unable to afford rent. *See* Declaration of Jim Baumgart (Baumgart Decl.) ¶ 8. Due

15   to a variety of reasons, a homelessness and housing instability crisis predated the pandemic in

16   Washington, where 21% of tenants were extremely low-income while affordable housing stock

17   declined by one-third since 2012. Baumgart Decl., Ex. A, E; Rowe Decl., Ex. B. Between 2013

18   and 2017, over 130,000 Washington adults faced an eviction, and by 2018 homelessness reached

19   Great Recession levels. Baumgart Decl., Ex. E. According to a 2017 survey of unlawful detainer

20   cases in Seattle, most evictions resulted in homelessness, with only 12.5% of evictees finding

21   "another apartment or home to move into." Rowe Decl., Ex. C at 3.

22       Against that backdrop, the Governor's Office anticipated that, without countermeasures,

23   the COVID-19 pandemic's economic dislocations would result in mass evictions, exacerbating

24   homelessness and housing instability in Washington. Baumgart Decl. ¶ 8, Ex. J at 3. Such mass

25   evictions would imperil both the economy and public health. *Id.* ¶ 8. Mass evictions would not

26   only displace people from their residences at the very time that it was critical to stay home, but

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

also force many into congregate settings like shelters and over-occupied homes, further spreading COVID-19. *Id.*; Lofy Decl. ¶ 19. Research shows that a rise in evictions leads to significant increases in COVID-19 infections and deaths. Baumgart Decl., Ex. Q.

**D.      The Governor's Evictions Moratorium**

Given the likelihood and obvious dangers of mass evictions in the wake of the COVID-19 pandemic, numerous state and local governments across the country took immediate action to restrict residential evictions during the pandemic. *See id.* On March 18, 2020, Governor Inslee issued Proclamation 20-19, temporarily prohibiting most residential evictions in Washington (the Moratorium). Leathers Decl., Ex. B. Correctly predicting COVID-19 to "cause a sustained global economic slowdown," the Governor logically determined that "the inability to pay rent by these members of our workforce increases the likelihood of eviction from their homes, increasing the life, health, and safety risks to a significant percentage of our people from the COVID-19 pandemic." *Id.* at 1. Originally set to expire on April 17, the Moratorium has been amended and extended three times as the pandemic and recession persisted. A forthcoming amended proclamation will extend the Moratorium until December 31. Leathers Decl. ¶ 20.

In crafting amendments to the Moratorium, the Governor's Office sought input from a wide range of stakeholders, including residential property owners, managers, and landlords (collectively, property owners). Leathers Decl. ¶ 18. Based on their input, the Governor added several exceptions to protect property owners and induce tenants able to pay rent to do so.

In its current form, the Moratorium prohibits property owners from serving, seeking, or enforcing eviction notices or orders unless: (1) eviction is "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident;"[1] (2) the landlord intends to "personally occupy the premises as a primary residence" (and so notifies the tenant in writing at least 60 days in advance); or (3) the landlord provides notice of intent to "sell the property" (with the same notice requirement). Leathers Decl., Ex. H at 4.

---

[1] "Property" was added to this list at the behest of some property owners. Baumgart Decl. ¶ 14.

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Property owners sought a mechanism to collect unpaid rent during the Moratorium. Baumgart Decl. ¶ 15. As amended, the Moratorium provides one. Though it generally prohibits property owners from treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," that prohibition applies only when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020." Leathers Decl., Ex. H at 5. Thus, the Moratorium permits a landlord to take action short of eviction to collect unpaid rent that predated or is unrelated to the pandemic. The Moratorium also permits a landlord to collect unpaid rent if a tenant refuses or fails to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident." *Id.* This provision reflects the Moratorium's general thrust to "provide relief to those individuals who have been impacted by the COVID-19 crisis" while encouraging property owners and tenants to "communicate in good faith . . . , and to work together, on the timing and terms of payment and repayment solutions." *Id.* at 6. The Moratorium makes clear that tenants "who are not materially affected by COVID-19 should and must continue to pay rent." *Id.* at 2.

**E.      The Safe Start Plan and the Continuing Crisis**

On May 4, the Governor set forth a four-phase "Safe Start" reopening plan. Leathers Decl., Ex. D. After a surge in cases, in mid-July the Governor indefinitely paused the plan and extended the Moratorium until October 15, finding that the COVID-19 pandemic "continue[s] to threaten the life and health of our people as well as the economy of Washington." *Id.*, Ex. E at 3. Since the pandemic began, over one million Washingtonians have filed unemployment claims, and the state's unemployment rate has exceeded its Great Recession peak. Baumgart Decl. ¶ 7, Ex. H; Rowe Decl., Ex. D. The pandemic has forced 18,000 Washingtonians to rely on cash assistance programs and 129,000 to apply for food assistance. Baumgart Decl., Ex. I.

With the economy's continuing fragility, housing instability remains a significant concern. According to Census survey data, 7.3% of renters in Washington (114,087 people) have fallen behind on their rent. Rowe Decl., Ex. E. And 14.4% of renters (226,000 people) reported

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

having little or no confidence in their ability to make rent. *Id.*, Ex. F. An analysis of this data found that 649,000 to 789,000 people in Washington (up to 10.3% the population) would be at risk of eviction by year end without the Moratorium. Baumgart Decl., Ex. N at 8. The University of Washington's Institute for Health Metrics and Evaluation (IHME) projects that such mass evictions in would lead to 21,100 more COVID-19 cases, 1,177 more hospitalizations, and 348 more deaths in the state. Declaration of Dr. Christopher J. L. Murray (Murray Decl.), Ex. B.

**F.      Federal, State, and Local Rental Assistance Measures**

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which included $150 billion in direct assistance for state, territorial, and tribal governments. Pub. L. No. 116–136, 134 Stat. 281. From this fund, in early August, the Washington Department of Commerce allocated more than $100 million in Eviction Rent Assistance Program (ERAP) grants. Baumgart Decl. ¶ 11. Administered by local community organizations, ERAP funds provide up to three months of rent assistance to property owners on an eligible tenant's behalf. *Id.* Cities and local authorities may run their own rental assistance programs, including as encouraged through certain tax programs under state law. *Id.* The CARES Act also imposed a 120-day national moratorium on evictions of renters participating in federal housing assistance programs or living in a property with a federally backed mortgage. Pub L. No. 116–136, § 4024, 134 Stat. at 492–93. That moratorium expired on July 24.

**G.      The CDC Evictions Moratorium**

On September 4, the CDC adopted a nationwide eviction moratorium until 2021. Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292-01. The CDC found eviction moratoria "an effective public health measure" that prevents the spread of disease by "facilitat[ing] self-isolation" and by "allow[ing] State and local authorities to more easily implement stay-at-home and social distancing directives[,]" and recognized that "housing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

then puts individuals at higher risk to COVID-19." *Id.* at 55,292. The CDC moratorium prohibits property owners from evicting tenants who attest that they (1) have used "best efforts" to obtain government rent or housing assistance; (2) expect to earn no more than $99,000 in annual income in 2020; (3) are unable to pay full rent due to substantial loss of income, reduced hours or wages, a lay-off, or medical expenses; (4) are "using best efforts to make timely partial payments" in light of "other nondiscretionary expenses"; and (5) would likely be rendered homeless or forced "to live in close quarters in a new congregate or shared living setting" if evicted. *Id.* at 55,293. The CDC moratorium does not apply wherever a state or local government's evictions moratorium provides "the same or greater level of public-health protection." *Id.* at 55,294.

## H.    The Landlords' Lawsuit

The Landlords filed this lawsuit on September 3, 2020, nearly six months after the Governor issued the Moratorium. Plaintiffs El Papel and Berman 2 rent out multiple properties. Dkt. #1 ¶¶ 32, 39. Since the COVID-19 pandemic began, tenants in one of El Papel's rental units and six of Berman 2's units (of over 20 that each Landlord owns)[2] have fallen behind in their rent payments. Dkt. #18 ¶ 3; Dkt. #19, ¶ 5. Plaintiff Karvell Li owns a townhouse in Seattle that he has rented since June of 2017 in month-to-month tenancy. Dkt. #20, ¶ 4. Li's tenant stopped paying rent consistently in June 2019, but he evidently declined to file an unlawful detainer action before the pandemic arrived. None of the Landlords appears to have sought a court declaration that any tenant was "offered, and refused or failed to comply with" a "reasonable" repayment plan based on the tenant's "financial, health and other circumstances," which would enable the Landlords to treat unpaid rent as an enforceable debt. Leathers Decl., Ex. H at 5. The Landlords provide no information regarding their tenants' circumstances.

Inaccurately dubbing it an eviction "ban,"[3] Dkt. #16 at 1 n.1, the Landlords mount a facial

---

[2] State, King County, and City records reveal that El Papel owns property with a total of 27 rental units. Dkt. #24 ¶¶ 8–12, Exs. 7–11. In addition to the more than 20 units owned by Plaintiff Berman 2, two other Washington corporations—Berman 1 LLC, and Berman 3 LLC—share the same sole governor and registered agent, Osho Berman. *Id.* ¶ 3, Exs. 1–4. Those LLCs own two properties totaling four units. *Id.*, Exs. 5–6.

[3] Because "[c]haracterizing something as a ban typically frames the challenged law as unconstitutional,"

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

challenge to the Moratorium under the Contracts Clause, U.S. Const. art. I, § 10, cl. 1, and the Takings Clause, *id.* amend. V. The Landlords also challenge the Seattle Moratorium and Repayment Ordinances on their face. They moved for a preliminary injunction, asking the Court to enjoin Defendants from enforcing the challenged orders and ordinances. Dkt. #16-1 at 1–2.

## III.    ARGUMENT

### A.    Jurisdictional Bars Require Dismissal of Plaintiffs' Claims Against the Governor

Before reaching the merits of Plaintiffs' motion, the Court must first consider the threshold question of jurisdiction. *See* Fed. R. Civ. P. 12(h)(3); *see, e.g.*, *MacEwen v. Inslee*, No. C20-5423 BHS, 2020 WL 4261323, at *2 (W.D. Wash. July 24, 2020). At the preliminary injunction stage, the Landlords bear the burden of making a "clear showing" that subject matter jurisdiction exists. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The Landlords cannot carry that burden because they lack standing and the Governor has sovereign immunity under the Eleventh Amendment.

### 1.    Plaintiffs lack standing

The CDC moratorium leaves the Landlords without standing to challenge the Moratorium. To have Article III standing, the Landlords must demonstrate "as an irreducible minimum" that they have suffered (1) an injury in fact that is (2) "fairly traceable" to the challenged laws, and that is (3) "likely to be redressed by the requested relief." *Lujan*, 504 U.S. at 590 (cleaned up). The traceability and redressability elements are not met "when there exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976) (injury to plaintiffs must "be traced to the challenged action of the defendant"). If Washington's and Seattle's evictions moratoria were enjoined, the CDC moratorium would apply in Washington.

---

"[o]ne need not be a full-fledged legal realist to recognize the possibility that calling something a ban reflects a conclusion of invalidity rather than a basis for it." Joseph Blocher, *Bans*, 129 Yale L.J. 308, 315, 338 (2019).

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*See* Mot. at 23. While the CDC moratorium protects a narrower subset of tenants, the Landlords fail even to allege—let alone make a "clear showing"—that their tenants could not meet the CDC's requirements to avoid eviction. Like the Moratorium, the CDC moratorium will expire on December 31, 2020, so an injunction would leave the Landlords in the same position they are in now—unable to commence eviction proceedings this year.[4] They lack standing.

### 2.    The Eleventh Amendment bars Plaintiffs' claims against the Governor

The second threshold barrier is the "jurisdictional bar of the Eleventh Amendment," *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73 (1996), which prohibits "federal courts from hearing suits brought by private citizens against state governments without the state's consent," *Sofamor Danek Group, Inc. v. Brown*, 124 F.3d 1179, 1183 (9th Cir. 1997). The narrow exception articulated in *Ex Parte Young*, 209 U.S. 123, 157 (1908), permits suits for prospective injunctive relief against state officials only if they have a proven connection to enforcing the challenged law. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011). The connection "must be fairly direct[,]" and "a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision" does not suffice. *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).

The *Ex parte Young* exception does not apply here because the Governor does not have a "fairly direct" connection to enforcement of the Moratorium. Under state law, the Governor has authority to issue an emergency proclamation, but enforcement power lies with others. If an official "cannot direct, in a binding fashion, the prosecutorial activities of the officers who actually enforce the law or bring his own prosecution, he may not be a proper defendant."

---

[4] Neither the CDC moratorium nor the CARES Act moratorium was in effect from July 24, 2020 to September 4, 2020, so presumably the Landlords could allege a discrete economic injury from lost rent during just that period. However, not only would the Eleventh Amendment bar such a claim for damages against the Governor, *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985), but the Landlords do not even seek any damages in this lawsuit, only injunctive and declaratory relief. Dkt. #1 ¶¶ 63–105. They therefore cannot establish standing on the basis of damages they do not—and cannot—claim. *See, e.g.*, *Nader v. Saxbe*, 497 F.2d 676, 680 (D.C. Cir. 1974) ("Dismissal was . . . proper, for plaintiffs lack standing to sue[ ]" where they "do not seek any relief, e.g., damages, for injuries already inflicted upon them by the allegedly unlawful policies" but seek "only prospective relief" that "will not remedy plaintiffs' injuries") (cleaned up) (citing *Diffenderfer v. Central Baptist Church*, 404 U.S. 412 (1972)).

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). "Were the law otherwise, the exception would always apply[ ]" and "[g]overnors who influence state executive branch policies (which virtually all governors do) would always be subject to suit under *Ex parte Young*." *Tohono O'odham Nation v. Ducey*, 130 F. Supp. 3d 1301, 1311 (D. Ariz. 2015). As a court of this district recently noted in holding the Governor immune from a suit seeking to enjoin his COVID-19 proclamations, "'[t]he power to promulgate law is not the power to enforce it.'" *MacEwen*, 2020 WL 4261323, at *2 (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (holding same with respect to Texas governor's COVID-19 orders)). The Landlords' claims against the Governor must be dismissed for lack of subject matter jurisdiction.

**B.     Preliminary Injunction Standards**

To obtain a preliminary injunction, the Landlords must make a "clear showing" that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in their favor; and (4) an injunction is in the public interest. *See* Fed R. Civ. P. 65(b)(1); *Winter*, 555 U.S. at 20.

**C.     Plaintiffs Are Unlikely to Prevail on the Merits of Their Claims**

**1.     The Moratorium does not violate the Contracts Clause**

The Supreme Court has construed the Contracts Clause "narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively." *Matsuda v. City and Cnty. of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008) (citations omitted). Since the early 1930s, then, courts have "struck down state laws only infrequently" under the Contracts Clause. *Local Div. 589, Amalgam. Transit Union v. Massachusetts*, 666 F.2d 618, 638–39 (1st Cir. 1981) (Breyer, J.). A two-part framework now governs the analysis. Courts first ask "whether the state law has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (cleaned up). Only if a substantial impairment exists do courts proceed to the second step: "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Energy Rsrvs. Grp. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–412 (1983)). The Moratorium—a temporary, carefully-crafted emergency measure—meets both steps.

### a.  The Moratorium substantially impairs no contractual relationship

Three factors govern the analysis of whether a law imposes a "substantial impairment" on a contractual relationship: "the extent to which" the law (1) "undermines the contractual bargain," (2) "interferes with a party's reasonable expectations," and (3) "prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822.

### (1)  The Moratorium does not undermine the contractual bargain

The Moratorium does not undermine the Landlords' contractual bargain with their tenants for a simple reason: their lease agreements do not provide that nonpayment of rent constitutes grounds for eviction. *See* Dkt. #18-1 (El Papel lease); Dkt. #19-1 (Berman 2 lease); Dkt. #20-1 (Li lease). The substantial impairment factor "focus[es] on the importance of the term which is impaired, not the dollar amount[ ]" affected. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 892 (9th Cir. 2003). Here, however, eviction for nonpayment is not a term at all.

Even if eviction for nonpayment were implied into the Landlords' leases, the mere delay in the right to exercise a statutory remedy does not materially undermine the agreements. In *Home Bldg. and Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)—the "leading case in the modern era of Contract Clause interpretation[,]" *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 15 (1977)— the Supreme Court upheld a Depression-era mortgage moratorium law extending mortgagors' redemption period for up to two years. The Court recognized that contractual obligations may be "impaired by a law which renders them invalid, or releases or extinguishes them," such as a "state insolvent law" that wholly "discharge[s] the debtor from liability" for preexisting debts. *Blaisdell*, 290 U.S. at 431. The mortgage moratorium, however, did not impose such an impairment, for it represented a "temporary restraint of enforcement . . . to protect the vital

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1   interests of the community[ ]" from a "great public calamity." *Id.* at 439.[5]

2       The same is true of the Moratorium here. As the *Elmsford* court explained in upholding

3   New York's eviction moratorium, it "does not eliminate the suite of contractual remedies

4   available to the Plaintiffs; it merely postpones the date on which landlords may commence

5   summary proceedings against their tenants." *Elmsford*, 2020 WL 3498456, at *15.[6] The

6   Landlords' claim that the Moratorium makes their "lease agreements unenforceable," Mot. at 8,

7   overlooks the fact that "tenants are still bound to their contracts," and the Landlords may still

8   "obtain a judgment for unpaid rent if the tenants fail to honor their obligations." *Elmsford*, 2020

9   WL 3498456, at *15. Equally inaccurate is the Landlords' assertion that the Moratorium

10  "prevents [them] from treating overdue rent as an enforceable debt through breach-of-contract

11  or similar actions." Mot. at 10. In fact, the Moratorium expressly permits property owners to

12  treat unpaid rent as an enforceable debt if they "demonstrate . . . to a court that the resident was

13  offered, and refused or failed to comply with" a reasonable repayment plan. Leathers Decl.,

14  Ex. H at 5. In this way and others, the Moratorium respects the benefit of the Landlords' bargain.

15          **(2)    The Moratorium does not impair reasonable expectations**

16      "The primary consideration in determining whether the impairment is substantial is the

17  extent to which reasonable expectations under the contract have been disrupted." *Sanitation &*

18  *Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). The reasonableness

19  of a party's contractual expectations largely depends on "whether the industry the complaining

20  party has entered has been regulated in the past." *Energy Rsrvs. Grp.*, 459 U.S. 400 at 411.

---

[5] The Landlords ignore *Blaisdell* and rely instead on nineteenth century cases, *see, e.g.*, Mot. at 9–10, "when the Contract Clause was regarded as an absolute bar to any impairment" of contracts. *U.S. Trust Co.*, 431 U.S. at 19 n.17. These anachronistic arguments overlook that *Blaisdell* "amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause[.]" *City of El Paso v. Simmons*, 379 U.S. 497, 508 (1965). This Court should reject the Landlords' efforts to restore a "rigid," *Lochner*-era jurisprudence deploying the Contracts Clause to "invalidate state legislation" for the general welfare. *U.S. Trust Co.*, 431 U.S. at 16.

[6] *See also HAPCO*, 2020 WL 5095496, at *8 (Philadelphia moratorium is "only a minimal alteration of contractual obligations" because, "[a]s in *Blaisdell*, . . . it merely postpone[s] the date on which landlords may commence eviction proceedings and collect full rent") (cleaned up); *Auracle Homes*, 2020 WL 4558682, at *17 (Connecticut moratorium does "not eliminate Plaintiffs' contractual remedies for evicting nonpaying tenants; Plaintiffs instead have to wait before they may issue notices to quit or initiate summary proceedings.").

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

This factor, too, undercuts the Landlords' claim. "[T]he landlord-tenant relationship is, if nothing else, heavily regulated." *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 736 (7th Cir. 1987).[7] Thus, an "eviction moratorium" cannot "operate as a substantial impairment of [the Landlords'] contractual rights," because it is not "wholly unexpected government" action. *Auracle Homes*, 2020 WL 4558682, at *17 (cleaned up); *see also HAPCO*, 2020 WL 5095496, at *8 ("Against this heavily-regulated backdrop, it is doubtful that any impairment . . . has occurred as a result of the [eviction moratorium].") (cleaned up).

Moreover, none of the Landlords' lease agreements provides for nonpayment of rent as a ground for eviction. As the Supreme Court has held, "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." *U.S. Trust Co.*, 431 U.S. at 19 n.17. For this reason, too, the Moratorium does not substantially impair the Landlords' contractual relationships.

### (3)    Landlords may safeguard or reinstate their rights

The Moratorium allows the Landlords to protect their contractual rights and thus does not impair them. In *Sveen*, the Supreme Court held that a law altering contractual remedies without nullifying them does not "prevent[ ] the party from safeguarding or reinstating [their] rights." 138 S. Ct. at 1822. The Moratorium neither relieves tenants' obligation to pay all rent owed nor eliminates the Landlords' right to enforce that obligation. Rather, it merely requires them "to wait before they may issue notices to quit or initiate summary proceedings." *Auracle Homes*, 2020 WL 4558682, at *17. Because "the tenants are still bound to their contracts, the contractual bargain is not undermined and landlord rights are safeguarded." *HAPCO*, 2020 WL 5095496, at *8. The Moratorium further mitigates the temporary burden by allowing property owners to evict if they sell or occupy the home. Leathers Decl., Ex. H at 5. Or they may offer a reasonable repayment plan and, if refused or violated, take steps to recover unpaid rent.

---

[7] For example, Washington law regulates lease terms and conditions, security deposits and fees, and the grounds and legal procedures for evictions. RCW 59.18.230, 59.18.610, 59.12.030–.230, 59.16.010–040.

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

The Moratorium preserves landlord protections and imposes no substantial impairment.

**b.      The Moratorium reasonably advances a significant public purpose**

Even if the Moratorium substantially impaired any contract, it still would not violate the Contracts Clause under step two. A temporary emergency measure to prevent economic dislocation and slow the spread of disease, the Moratorium furthers "a significant and legitimate public purpose" in "an appropriate and reasonable way." *Sveen*, 138 S. Ct. at 1822 (cleaned up).

**(1)      The Moratorium's purpose is significant and legitimate**

The Moratorium's purposes—to "reduce economic hardship" of those "unable to pay rent as a result of the COVID-19 pandemic" and "promote public health and safety by reducing the progression of COVID-19 in Washington State," Leathers Decl., Ex. H at 2—are undoubtedly significant and legitimate. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614 (2020) (Kavanaugh, J., dissenting) ("California undoubtedly has a compelling interest in combating the spread of COVID–19 and protecting the health of its citizens."); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest.").

The Landlords claim that the Moratorium "does not aim to resolve a broad and general social problem," but "instead reliev[es] one group of contractual obligations at the expense of another." Mot. at 11. Their argument defies credulity and reality. The manifest purpose of the Moratorium is to protect the entire state from the economic and public health consequences that would result from mass evictions. It does not relieve any obligations of tenants, who continue to owe any unpaid rent. The Moratorium thus cannot plausibly be characterized as "special interest" legislation. Mot. at 10 (quoting *Energy Rsrvs. Grp.*, 459 U.S. at 411–12). In *Energy Reserves Group*, the Supreme Court explained that the "requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." 459 U.S. at 412. Virtually every law "regulating commercial and other human affairs . . . creates burdens for some that directly benefit others[,]" but that does not make it

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

unconstitutional "whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 223 (1986). Designed to avert an economic and public health catastrophe, the Moratorium is no more a "special interest" law than was the mortgage moratorium that passed muster in *Blaisdell*.

**(2)      The Moratorium is reasonable and appropriate**

The only question is whether the Moratorium is a "reasonable" and "appropriate" to advance the State's interests. The Court must "defer" to the Governor's judgment as to the necessity and reasonableness of a particular measure" in answering that question. *Energy Rsrvs. Grp.*, 459 U.S. at 412–413 (cleaned up). And the "latitude must be especially broad" where "officials . . . act in areas fraught with medical and scientific uncertainties." *S. Bay*, 140 S. Ct. at 1613–14 (Roberts, C.J., concurring) (cleaned up). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health . . . ." *Id.* at 1614 (cleaned up).

The Moratorium fits paradigmatically within the Supreme Court's standard for a reasonable and appropriate law. Like the moratorium upheld in *Blaisdell*, the Moratorium is a response to an unprecedented "emergency which threaten[s] the loss of homes." *Blaisdell*, 290 U.S. at 444–45 (cleaned up). The Moratorium is "not for the mere advantage of particular individuals but for the protection of a basic interest of society," that is, to prevent mass evictions and the spread of COVID-19. *Id.* Its terms are reasonable: it does not repudiate or reduce tenants' rent obligations, so their "indebtedness is not impaired[.]" *Id.* at 445. And the Moratorium is "temporary in operation[ ]" and "limited to the exigency which called it forth." *Id.* at 447. In sum, "as in *Blaisdell*, where [the Court upheld] temporary measures enacted in response to emergency conditions to allow people to remain in their homes[,]" the Moratorium advances important state goals in a reasonable, appropriate way. *HAPCO*, 2020 WL 5095496, at *10.

The Landlords illogically contend that the Moratorium is unreasonable because it does not compel "tenants . . . [to] continue making payments during" the Moratorium. Mot. at 11.

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

However, if a moratorium on eviction *for nonpayment* "required as a condition of . . . protection" that tenants "continue paying fair rent," *id.* at 13, it would be no protection at all. Moreover, the Landlords' attempt to read such a "continuing payments" requirement into *Blaisdell* falls flat. The moratorium there required mortgagors "to pay all or a reasonable part of . . . [the] rental value" of the property, as "determined . . . by the court . . . under all the circumstances, [to] appear just and equitable." *Blaisdell*, 290 U.S. at 417 n.1. This was just one factor the Court identified in concluding that the moratorium was reasonable, *id.* at 446, and nothing suggests it was dispositive or represents a categorical rule for all moratorium cases—particularly one, like this, involving not only an economic crisis but also a public health emergency. In any event, the Moratorium provides a corresponding judicial process through which a property owner may treat unpaid rent as enforceable debt if a tenant refuses or violates a reasonable repayment plan. Leathers Decl., Ex. H at 7. Nothing in *Blaisdell* or the other Depression-era cases the Landlords cite[8] supports their impractical theory that an emergency eviction moratorium designed to keep people at home during a pandemic constitutionally must condition protection on payment of rent.

The Landlords also argue that the Moratorium is not sufficiently "tailored" to the COVID-19 emergency because a "'more moderate course would serve the government's purposes equally well.'" Mot. at 14 (quoting *U.S. Trust Co.*, 431 U.S. at 31). Their argument presumes that the Contracts Clause has a "least restrictive means" requirement. It does not. "[T]he appropriate test is not strict scrutiny, which would require that there was no less restrictive alternative to the terms of the Moratorium." *Baptiste*, 2020 WL 5751572, at

---

[8] Four of the five other cases Landlords cite were decided before *Blaisdell*, which "amounted to a comprehensive restatement of [Contracts Clause] principles[.]" *City of El Paso*, 379 U.S. at 508; *see* Mot. at 11–13 (citing cases). The fifth, *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935), is distinguishable for several reasons. There, Arkansas enacted a moratorium on foreclosure on municipal bonds secured by mortgages (in which the state was an interested party), such that the mortgagee could not take possession of collateral for a "minimum" of 6.5 years regardless of economic crisis's duration. 295 U.S. at 63. The Court struck down the law, distinguishing *Blaisdell* because the mortgagors in *Blaisdell* remained obligated to "pay the rental value of the premises as ascertained in judicial proceedings" and because the moratorium's maximum forgiveness period was just two years (compared to 6.5 years) and did not extend "beyond the then existing emergency," *id.* (quoting *Blaisdell*, 290 U.S. at 445). Here, the Moratorium is closer to *Blaisdell*'s than *Kavanaugh*'s because it will expire on December 31, 2020 and thus will not "outlast the emergency" that necessitated it. *Blaisdell*, 290 U.S. at 447.

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*19 n.10. The *HAPCO* plaintiffs argued that Philadelphia had to consider "more 'moderate courses,'" "such as 'reducing the eviction moratorium, . . . or making direct payments . . . under the CARES Act.'" *HAPCO*, 2020 WL 5095496, at *9–10 (brackets omitted). The court rejected the plaintiffs' proposed narrow tailoring requirement because the Contracts Clause "does not require courts . . . to sit as superlegislatures, choosing among various options proposed by plaintiffs." *HAPCO*, 2020 WL 5095496, at *10 (cleaned up). Rather, at step two, courts ask only "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1822 (cleaned up).

The Moratorium easily meets that deferential standard. The Moratorium "undoubtedly helps residents remain in their homes and, especially considering the COVID-19 pandemic during which it is critical that people . . . remain socially distant from each other, it is reasonable and appropriate for the City to 'protect[ ] the mental and physical health of citizens who could suffer greatly by evictions.'" *HAPCO*, 2020 WL 5095496, at *10 (quoting *Troy Ltd. v. Renna*, 727 F.2d 287, 298 (3d Cir. 1984)). This Court, too, should defer to the Governor's judgment that a temporary moratorium on evictions is a "reasonable" and "appropriate" way to keep renters in their homes and slow the spread of COVID-19. *See id.* at *10.[9]

### 2.     The Moratorium does not violate the Takings Clause

The Landlords are not entitled to a preliminary injunction under the Takings Clause for three reasons. First, the remedy for a taking is "just compensation," not injunctive relief. Second, the Landlords' takings claim is unripe because the Moratorium is temporary, not final. Third, the Moratorium does not constitute a physical taking under clear Supreme Court precedent.

---

[9] Though the Contracts Clause contains no "least restrictive means" requirement, all the alternatives the Landlords propose either have already been implemented or are impractical. *See* Mot. at 16. Neither eviction triage nor a cap on eviction filings would fulfill the Moratorium's objective—to keep as many people as possible in their homes, away from public gatherings, and out of congregate settings, until the danger has passed. *See* Mot. at 16–17; Baumgardt Decl. ¶ 13 (cap on evictions would be difficult to implement and ineffective). The Landlords suggest that the State "can also provide some form of compensation for landlords," but the Governor has already provided $100 million in ERAP funds, much of which were allocated directly to property owners. *Id.* ¶ 11.

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

### a.   Injunctive relief is not available to remedy a taking

The obvious problem with the Landlords' request for a preliminary injunction on the basis of their takings claim is that "damages—not injunctive relief—are the proper remedy for a taking." *Prof'l Beauty Fed'n of Cal. v. Newsom*, No. 2:20-cv-04275-RGK-AS, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020). Because the Takings Clause only prohibits the state from taking private property for public use "without just compensation," U.S. Const. amend. V, "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking," *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984); *accord Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot.*, 560 U.S. 702, 740 (2010) (Kennedy, J., concurring). Washington has an adequate, effective procedure to compensate takings of property. *See* Wash. Const. art. I, § 16. If the Landlords had a viable takings claim (which they do not), their remedy would be damages, not injunctive relief.

### b.   Plaintiffs' takings claim is unripe

The Landlords' takings claim also fails because it does not satisfy the special ripeness requirement for such claims. Though the ripeness standard has changed in recent years, it remains that "'the government entity . . . [must have] reached a final decision regarding the application of the regulations to the property at issue.'" *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 851 (9th Cir. 2001) (cleaned up). The Landlords cannot establish that the Moratorium represents a "final decision" by the Governor. *See, e.g.*, *US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1126 (9th Cir. 1999) (takings claim unripe when challenged policy is "interim" policy and government has "not taken final action"). The Moratorium is by nature temporary and subject to modification. *See* Baumgart Decl. ¶ 18 ("[The Governor's Office] continue[s] to consider the necessity of the evictions moratorium and ways we can better tailor it to minimize harms to all stakeholders."); Leathers Decl. ¶ 21 ("The Governor's Office continues to monitor evolving circumstances in light of new data and scientific analysis . . . .").

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

This ripeness requirement presents an insurmountable hurdle to the Landlords' takings claim.

### c.      The Moratorium does not constitute a physical taking

Finally, the Landlords' takings claim fails on the merits because the Moratorium's regulation of landlord-tenant relationships does not effect a *per se* physical taking. In *Loretto v. Teleprompter Manhattan CATV Corp.*, the Court held that it was a *per se* taking for the government to mandate a "permanent physical occupation of another's property." 458 U.S. 419, 435 (1982). But the Court denied that this "physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships." *Id.* at 440. That "broad" power is perfectly compatible with the *Loretto* rule so long as the government does not authorize "the *permanent* occupation of the landlord's property by a third party." *Id.* (emphasis added). The Moratorium falls outside that "very narrow" rule, *id*. at 441, as cabined by its seminal case.

If *Loretto* had left any doubt that landlord-tenant regulations fall outside the physical occupation rule, the Court dispelled them in *Yee v. City of Escondido*, 503 U.S. 519 (1992). In *Yee*, mobile home park owners challenged an ordinance that, along with a state law, prevented them from either "set[ting] rents or decid[ing] who their tenants will be" or "evict[ing] a mobile home owner or easily convert[ing] the property to other uses." *Id.* at 526–27. This made "the mobile home owner . . . effectively a perpetual tenant of the park," according to the park owners. *Id.* They argued for a *per se* taking under *Loretto*, because "what has been transferred from park owner to mobile home owner is no less than a right of physical occupation of the park owner's land." *Id.* at 527. The Supreme Court unanimously rejected the park owners' expansive theory of physical takings. *See id.* at 532 (majority), 539 (concurrence). "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land." *Id.* at 527 (majority). The mobile home park laws did "no such thing" because the park owners "voluntarily rented their land to mobile home owners." *Id.* In light of that acquiescence, the "laws at issue here merely regulate petitioners' *use* of their land by regulating the relationship between landlord and tenant," and thus do not constitute a physical taking. *Id*. at 528. The

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Moratorium is the same: it simply regulates the landlord-tenant relationship by temporarily delaying the Landlords' recourse to the statutory remedy of eviction. Indeed, the *Yee* Court rejected the very argument the Landlords now make in claiming the Moratorium "force[s] [them] to keep their tenants," Mot. at 20. *Yee* held that, because the park owners "voluntarily open[ed] their property to occupation by others," they "cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." 503 U.S. at 531. As in *Yee*, the Moratorium is just "one more example of government regulation of the rental relationship [that] does not constitute a physical taking." *Elmsford*, 2020 WL 3498456, at *8 (cleaned up).

### 3.  The Moratorium is constitutional under *Jacobson v. Massachusetts*

Under a straightforward application of traditional constitutional standards, the Landlords are unlikely to prevail. During this unprecedented public health emergency, however, a state's interests in protecting its residents are at their apex, tipping the scale in its favor. Thus, federal courts have developed a more deferential framework for constitutional claims against emergency health orders, a framework that Chief Justice Roberts has made clear applies in the current crisis. *See S. Bay*, 140 S. Ct. at 1613 (concurring). Derived from *Jacobson*, 197 U.S. 11, the standard allows states to "implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *In re Abbott*, 954 F.3d 772, 784–85 (5th Cir. 2020) (quoting *Jacobson*, 197 U.S. at 31); *see also Luke's Catering Serv., LLC v. Cuomo*, No. 20-CV-1086S, 2020 WL 5425008, at *7 (W.D.N.Y. Sept. 10, 2020) (applying *Jacobson* to Contracts Clause claim); *Prof'l Beauty Fed'n*, 2020 WL 3056126, at *8 (applying *Jacobson* to takings claim). Deference is "especially" important when "a party seeks emergency relief . . . while local officials are actively shaping their response to changing facts on the ground." *S. Bay*, 140 S. Ct. at 1614 (Roberts, C.J., concurring).

The Moratorium easily passes the *Jacobson* standard. On its face, the Moratorium addresses an ongoing public health crisis. *See Abbott*, 954 F.3d at 787. And as explained above,

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

the Moratorium is constitutional, and certainly not "beyond all question, a plain, palpable invasion of [the Landlords'] rights." *Jacobson*, 197 U.S. at 31. It is a temporary measure to address a once-a-century pandemic, and warrants deference to the expertise of "the politically accountable officials of the States." *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).

Because the Landlords are unlikely to prevail under either traditional standards or *Jacobson*, their Motion should be denied. *See, e.g.*, *Recording Indus. Ass'n v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1081 (9th Cir. 1999) (where plaintiff unlikely to prevail, court "need not consider . . . balance of hardships or . . . irreparable harm" requirements).

## D.  Plaintiffs Have Failed to Establish Irreparable Harm

The "single most important" *Winter* requirement is that the Landlords show they are "likely to suffer irreparable harm in the absence of preliminary relief." *Chiafalo v. Inslee*, 224 F. Supp. 3d 1140, 1146 (W.D. Wash. 2016) (cleaned up). The Landlords fail this requirement because their temporary loss of rental payments is an economic injury—by definition not irreparable—that Landlords can remedy through multiple non-injunctive means.

### 1.  Plaintiffs' economic injuries are by definition not irreparable

The Landlords' alleged injury is economic, not irreparable. *See Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 851 (9th Cir. 1985) ("economic injury alone is not considered irreparable"). The Landlords do not claim to wish to sell or personally occupy their properties, and the Moratorium would not stop them doing so. The essence of the Landlords' injury, then, is not a loss of property, but a temporary deprivation of rental payments. That injury is fully reducible to a dollar amount—indeed, reduced to the penny by the Landlords themselves: $17,403.44 for El Papel, $10,818 for Berman 2, and $27,059.55 for Karvell Li. Mot. at 5–7. These temporary losses are "monetary injuries which could be remedied by a damage award," *i.e.*, the hallmark of reparable harm. *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980); *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury").

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

There is no merit to the Landlords' suggestion that their constitutional claims warrant a presumption that their economic harm is irreparable. Mot. at 21. Not only are the Landlords' constitutional claims highly dubious, *see supra* section III.A–C, but even a strong showing on the merits provides no substitute for the irreparable harm requirement. To meet it, a plaintiff "must demonstrate some likely irreparable harm in the absence of a preliminary injunction barring the challenged action, and not simply a constitutional violation." *Sierra Club v. Trump*, 379 F. Supp. 3d 883, 925 (N.D. Cal. 2019), *aff'd*, 963 F.3d 874 (9th Cir. 2020); *see also Johnson v. City of S.F.*, No. C 09-05503 JSW, 2010 WL 3078635, at *3 (N.D. Cal. Aug. 5, 2010) ("to the extent Plaintiff makes out a plausible claim for denial of his rights to the equal protection of the laws under the Fourteenth Amendment, the harm he alleges to have suffered is economic harm which is not irreparable as a matter of law") (citing *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484–85 (1st Cir. 2009)). The Landlords have failed to do so because their only injuries are purely economic, remediable in damages, and thus, by definition, not irreparable.

Nor does the involvement of real property make the Landlords' injury any less compensable. *See* Mot. at 21. Courts routinely decline to find irreparable harm where injuries related to real property can be reduced to a measurable dollar amount. *See, e.g.*, *Thomas v. Zachry*, 256 F. Supp. 3d 1114, 1122 (D. Nev. 2017) (finding partial loss of real property "compensable through monetary damages and declaratory relief"). Here, the Landlords have reduced their injuries to dollar amounts, Mot. at 5–7, so their injuries are not irreparable.

## 2.     The Landlords have adequate remedies outside of a preliminary injunction

"Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Here, the Moratorium gives the Landlords an adequate remedy for addressing their economic harms. The Moratorium encourages property owners to offer tenants reasonable repayment plans. Leathers Decl., Ex. H at 6. If a property owner does so and a tenant refuses or fails to comply, the Moratorium allows the owner to take action to collect the unpaid

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

rent. *Id.* at 5. Moreover, business owners like the Landlords have access to multiple sources of relief, such as rental assistance programs that provide federal CARES Act funds to landlords. *See* Baumgart Decl. ¶ 11; *HAPCO*, 2020 WL 5095496, at *17–18 (cataloguing "myriad of programs currently protecting landlords from foreclosure" through federal and other sources). Together, these options provide "adequate compensatory relief" and confirm the reparability of the Landlords' alleged harm. *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984); *see also Sampson*, 415 U.S. at 90 (possibility of "adequate compensatory or other corrective relief . . . weighs heavily against a claim of irreparable harm.").

All these sources of non-injunctive relief further compound the speculative nature of the Landlords' assertion that "missed mortgage payments" could "damage their credit score or force them into foreclosure." Mot. at 22; *see In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm."). Without evidence of even a single missed mortgage payment, the Landlords' assertions of non-economic harm are theoretical—and improbable in light of other governmental relief available to them. *See, e.g.*, *HAPCO*, 2020 WL 5095496, at *18 (rejecting "speculation that the obvious result of a landlord's inability to immediately collect all payments owed under the lease will lead to foreclosure"). The Landlords fail to show irreparable harm, and no injunction should issue.

## E.    The Balance of Equities and the Public Interest Weigh Against an Injunction

Given the grave economic and health dangers that would result from enjoining the Moratorium, both the balance of equities and the public interest weigh strongly against "employing the extraordinary remedy of injunction" in this case. *Winter*, 555 U.S. at 24.[10]

Enjoining the Moratorium would unleash tragic public consequences with which the Landlords' economic harms cannot possibly compare. First, an injunction would lead to hundreds of thousands of evictions. Baumgart Decl., Ex. N. A wave of evictions on its own

---

[10] These final two *Winter* factors merge when a state official is a defendant. *See Slidewaters LLC v. Wash. Dep't of Labor & Indus.*, No. 2:20-cv-0210-TOR, 2020 WL 3130295, at *5 (E.D. Wash. June 12, 2020) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

would be a serious public harm, as exemplified by the testimony of struggling tenants on the precipice of losing their homes. *See* Declarations of Jody Wirtz, Mike Fulop, and Samantha Shurtz. Evictions inflict severe and lasting injuries and reduce children's educational outcomes and social well-being. Baumgart Decl. ¶ 10, Ex. R. These impacts fall disproportionately on the poor and minorities. *Id.* ¶ 10. Second, the wave of evictions would force hundreds of thousands of people into unsafe and congregate settings—precisely at a time when colder weather is driving more people into crowded shelters already in short supply. Baumgart Decl. ¶¶ 5, 8, Exs. C, D. Third, as COVID-19 spreads more easily in congregate settings, infections would rise. Lofy Decl. ¶ 19; Murray Decl., Ex. B. The result would likely be hundreds of deaths and thousands more serious illnesses with potential long-term effects. Murray Decl., Ex. B.

All these public harms are incomparably greater than the Landlords' temporary economic losses. The Landlords' injury is a temporary loss of rent on one of multiple properties they own. Dkt. #24-1–11. It is of no consequence that the Landlords couch their economic injuries in terms of constitutional violations. The case the Landlords cite for their contrary suggestion involved Arizona's denial of driver's licenses to undocumented immigrants, not an economic injury like lost rent. Mot. at 22 (citing *Ariz. Dream Act Coalition*, 757 F.3d at 1069). Here, the Landlords' temporary loss of rent pales in comparison to the life-threatening harms that would befall tenants and all Washingtonians were the Moratorium enjoined.

Protecting the health, safety, and well-being of residents is a paramount state interest. As courts considering challenges to eviction moratoria in other jurisdictions have held, there is no contest between the public interests the Moratorium protects and the private economic interests driving the Landlords' requested injunction. *See, e.g.*, *Auracle Homes*, 2020 WL 4558682, at *21 ("the balance of the equities and the public interest favor denying a preliminary injunction").

## IV.  CONCLUSION

The Governor respectfully requests that the Court deny the Landlords' motion for a preliminary injunction.

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO. 2:20-cv-01323-RAJ-JRC

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    DATED this 14th day of October, 2020.

2                                ROBERT W. FERGUSON
3                                  Attorney General

4                                /s/Zachary Pekelis Jones
                                 ZACHARY PEKELIS JONES, WSBA No. 44557
5                                BRIAN H. ROWE, WSBA No. 56817
                                   Assistant Attorneys General
6                                  Complex Litigation Division
7                                JEFFREY T. EVEN, WSBA No. 20367
                                   Deputy Solicitor General
8                                800 Fifth Avenue, Suite 2000
                                 Seattle, WA  98104
9                                (206) 332-7089
                                 (206) 389-3888
10                               (360) 586-0728
11                               zach.jones@atg.wa.gov
                                 brian.rowe@atg.wa.gov
12                               jeffrey.even@atg.wa.gov

13                               Attorneys for Defendant Governor Jay Inslee

14

15

16

17

18

19

20

21

22

23

24

25

26

## DECLARATION OF SERVICE

I hereby declare that on this day I caused the foregoing document to be electronically filed with the Clerk of the Court using the Court's CM/ECF System which will send notification of such filing to all counsel of record.

DATED this 14th day of October, 2020, at Seattle, Washington.


*/s/ Brian H. Rowe*
BRIAN H. ROWE, WSBA No. 56817
Assistant Attorney General

GOVERNOR'S RESPONSE TO MOTION
FOR PRELIMINARY INJUNCTION
NO.  2:20-cv-01323-RAJ-JRC

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744