The Honorable Richard A. Jones
The Honorable J. Richard Creatura

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EL PAPEL, LLC, et al.,<br><br>                   Plaintiffs,<br><br>    vs.<br><br>JAY R. INSLEE, et al.,<br><br>                   Defendants. | No.   2:20-CV-01323-RAJ-JRC<br><br>AMICUS BRIEF |

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................1

II.  ARGUMENT .....................................................................................2

    A.  The public interest favors protecting persons not before the Court: renters facing eviction and exposure to harm in the midst of a public health crisis .........................................................................................2

    B.  Enjoining the eviction moratoria would result in a wave of evictions and exacerbate the public health crisis ..........................................................3

        1.  Renters were already struggling with high rents and eviction prior to the COVID-19 pandemic ....................................................3

        2.  Evictions disproportionately harm people of color.........................5

        3.  Evicted low-income households do not have equal access to justice ..............................................................................................7

    C.  Evictions cause lasting harm beyond the immediate loss of housing .........8

    D.  The pandemic has worsened an already troubling housing crisis.............10

    E.  Evictions will dramatically rise if the moratoria are enjoined .................13

    F.  Increased evictions will exacerbate the COVID-19 pandemic .................14

    G.  The courts and the local governments need time to adapt to allow renters to have access to justice ................................................................17

        1.  Courts are not adapted to meet the need of an uncontrolled eviction tsunami .......................................................................17

        2.  The current digital divide impedes renters from litigating their cases and staying in their homes ...................................................18

        3.  Making evictions remote proceedings does not provide due process of law ..............................................................................20

        4.  Significant gaps in legal assistance will disadvantage renters and result in unjust outcomes......................................................21

        5.  The Court should not disrupt the status quo; it should give the state time to develop a solution.....................................................22

- i -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

H.    Landlords have other options to address their alleged harms ....................23

III.    CONCLUSION .......................................................................................24

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hundtofte v. Encarnacion*,
  181 Wn.2d 1 (2014) ..................................................................................................9

*Roths et al. v. Weiss, et al.*,
  No. 98396-8 (Wash. April 8, 2020) ......................................................................20

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) .............................................................................2, 3

*Weinberger v. Romero–Barcelo*,
  456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) .............................................2

**Federal Statutes**

CARES Act...........................................................................................................14, 24

**Other Authorities**

Alyssa Therrlen, *Washington State to provide low-income families with free
  internet access,* Daily Hive News Seattle (Aug. 6, 2020),
  https://dailyhive.com/seattle/washington-state-provide-low-income-families-
  with-free-internet ..................................................................................................23

Andrew Tangel and Kim Mackrael, *In Seattle, Coronavirus Fallout Opens
  Economic Divide*, The Wall Street Journal (May 24, 2020),
  https://www.wsj.com/articles/in-seattle-coronavirus-fallout-opens-economic-
  divide-11590328819 ..............................................................................................11

Center for Disease Control and Prevention, Health Equity Considerations and
  Racial and Ethnic Minority Groups (July 24, 2020),
  https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-
  ethnicity.html ........................................................................................................16

Colin Rigley, *When Court is Back in Session: The Plan for Washington Courts to
  Resume During COVID-19*, NW Sidebar (June 23, 2020),
  https://nwsidebar.wsba.org/2020/06/23/when-court-is-back-in-session-the-
  plan-for-washington-courts-to-resume-during-covid-19/ ......................................18

Danyelle Solomon & Darrick Hamilton*, The Coronavirus Pandemic and the
  Racial Wealth Gap*, Center for American Progress, Mar. 99, 2020,
  https://www.americanprogress.org/issues/race/news/2020/03/19/481962/coron
  avirus-pandemic-racial-wealth-gap/ ......................................................................12

- iii -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

David Kroman, *A Debt Crisis Looms As Renters Turn To Credit Cards To Stay Afloat*, Crosscut (Sep. 14, 2020), https://crosscut.com/focus/2020/09/debt-crisis-looms-renters-turn-credit-cards-stay-afloat ................................................................. 11

Deena Greenberg, Carl Gershenson, and Matthew Desmond, *Discrimination in Evictions: Empirical Evidence and Legal Challenges*, 116 Harv. C.R.-C.L. L. Rev. 115 (2016), https://scholar.harvard.edu/files/mdesmond/files/greenberg_et_al._.pdf .............................. 5

Eric J. Magnuson and Nicole S. Frank, *The High Cost of Efficiency: Courthouse Tech and Access to Justice*, ABA Center for Professional Responsibility, The Professional Lawyer Volume 22, Number 4 (2014) at 3–5, https://www.robinskaplan.com/-/media/pdfs/the-high-cost-of-efficiency.pdf ...................... 19

Emily Benfer, et al., *The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America are at Risk* (Aug. 7, 2020) ("Aspen Inst. Report") at 3, https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/ ............................... 5, 8, 9, 10, 16, 22

George Lipsitz, *In an Avalanche Every Snowflake Pleads Not Guilty": The Collateral Consequences of Mass Incarceration and Impediments to Women's Fair Housing Rights*, 59 UCLA L. Rev. 1746, 1749-50 (2012) .............................................. 6

Innovation for Justice Program, University of Arizona James E. Rogers College of Law, Cost of Eviction Summary Report at 2-3 (July 23, 2020), https://arizona.app.box.com/s/0cgdsbf8zj7i9rakayy5ehag4n55txwp ...................... 9

Joint Center for Housing Studies of Harvard University, America's Rental Housing 2020 (2020) ("Harvard Report") at 5, https://www.jchs.harvard.edu/sites/default/files/reports/files/Harvard_JCHS_Americas_Rental_Housing_2020.pdf ................................................................ 4, 9

Joint Center for Housing Studies of Harvard University, The State of the Nation's Housing 2019 4-5, https://www.jchs.harvard.edu/sites/default/files/Harvard_JCHS_State_of_the_Nations_Housing_2019.pdf ................................................................................. 6

Joint Center of Housing Studies of Harvard University, *Renter Cost Burdens by Race and Ethnicity*, https://www.jchs.harvard.edu/ARH_2017_cost_burdens_by_race ........................... 6

Joint Center for Housing Studies at Harvard University, A Triple Pandemic?: The Economic Impacts of COVID-19 Disproportionately Affect Black and Hispanic Households (July 7, 2020) ("Harvard Article"), https://www.jchs.harvard.edu/blog/a-triple-pandemic-the-economic-impacts-of-covid-19-disproportionately-affect-black-and-hispanic-households ................................. 11

- iv -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

Justin Baer, Theo Francis, and Eric Morath, *The Covid Economy Carves Deep Divide Between Haves and Have-Nots*, The Wall Street Journal (Oct. 5, 2020), https://www.wsj.com/articles/the-covid-economy-carves-deep-divide-between-haves-and-have-nots-11601910595 ........................................................11

Katrina vanden Heuvel, *America's digital divide is an emergency*, The Washington Post (June 23, 2020), https://www.washingtonpost.com/opinions/2020/06/23/americas-digital-divide-is-an-emergency/ ...........................................................................19

Kim Parker, Rachel Minkin, and Jesse Bennett, Economic Fallout from COVID-19 Continues to Hit Lower-Income Americans the Hardest (Sept. 24, 2020)**,** https://www.pewsocialtrends.org/2020/09/24/economic-fallout-from-covid-19-continues-to-hit-lower-income-americans-the-hardest/ ....................................13

King County Eviction Prevention and Rent Assistance Program, https://kingcounty.gov/depts/community-human-services/COVID/eviction-prevention-rent-assistance.aspx ...........................................................23

King County Bar Ass'n & Seattle Women's Commission, *Losing Home: The Human Cost of Eviction in Seattle* (2018) ("Losing Home"), http://www.kcba.org/Portals/0/pbs/pdf/Losing%20Home%202018.pdf .............................5, 8

Kriston McIntosh, Emily Moss, Ryan Nunn & Jay Shambaugh, *Examining the Black-white wealth gap*, https://www.brookings.edu/blog/up-front/2020/02/27/examining-the-black-white-wealth-gap/ (Feb. 27, 2020) .............................6

Matthew Desmond, On the Brink of Homelessness: How the Affordable Housing Crisis and the Gentrification of America is Leaving Families Vulnerable: Statement Before the U.S. House of Representatives Comm. on Financial Servs. (Jan. 14, 2020)**,** https://www.congress.gov/116/meeting/house/110362/witnesses/HHRG-116-BA00-Wstate-DesmondM-20200114.pdf ...............................................................8

Matthew Desmond, Unaffordable America: Poverty, Housing, and Eviction, Fast Focus, Institute for Research on Poverty, University of Wisconsin-Madison (2015), https://www.irp.wisc.edu/publications/fastfocus/pdfs/FF22-2015.pdf ......................9

Mike Carter & Sara Jean Green, *Your right to a jury trial is on hold. Here's how coronavirus is changing the justice system*, Seattle Times (June 2, 2020), https://www.seattletimes.com/seattle-news/crime/coronavirus-has-closed-courthouses-stopped-trials-how-does-washingtons-justice-system-come-back/ ........17, 18, 20

Mike Lindblom, *Second Metro bus driver, 'godfather of the North Base,' dies of coronavirus*, Seattle Times (July 3, 2020), https://www.seattletimes.com/seattle-news/obituaries/second-metro-bus-driver-godfather-of-the-north-base-dies-of-coronavirus/ ......................................18

- v -

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

Monica Anderson And Madhumitha Kumar, *Digital divide persists even as lower-income Americans make gains in tech adoption,* Pew Research Center (May 7, 2019), https://www.pewresearch.org/fact-tank/2019/05/07/digital-divide-persists-even-as-lower-income-americans-make-gains-in-tech-adoption/ ............................19

National Low Income Housing Coalition, *State Data Overview, Washington*, https://nlihc.org/housing-needs-by-state/washington ............................................6

National Low Income Housing Coalition, The Gap: A Shortage of Affordable Homes (March 2020) App. A, https://reports.nlihc.org/sites/default/files/gap/Gap-Report_2020.pdf ......................................4

National Housing Law Project, *Procedural Due Process Challenges to Evictions during the Covid-19 Pandemic* (May 22, 2020) ("National Housing Law Project Report"), https://www.nhlp.org/wp-content/uploads/procedural-due-process-covid-evictions.pdf ...................................................................18, 19, 20

Noah Goldberg, Wes Parnell & Molly Crane-Newman, *Coronavirus Leaves Trail of Illness and Death in NYC Courthouses As Slow-to-Change System Struggles to Cope With Pandemic*, N.Y. Daily News (May 25, 2020), https://www.nydailynews.com/coronavirus/ny-coronavirus-pandemic-unprepared-nyc-courts-20200526-fe2zknj7cbgutpjdn3vtfruiiq-story.html ...........................17

Office of Civil Legal Aid Interim Report on Emergency COVID-19 Legal Assistance, at 1, https://ocla.wa.gov/wp-content/uploads/2020/09/COVID-19-Emergency-Civil-Legal-Aid-Program-Interim-Report-9-2020.pdf ...................................13, 15

Order Authorizing Eviction Resolution Program in Superior Courts, In the Matter of Statewide Response by Washington State Courts to the Covid-19 Public Health Emergency, No. 25700-B-639 (Wash. Sept. 9, 2020).................................................23

Patricia Lee Refo, President, American Bar Association, Letter to U.S. Senate and House Leadership re ABA Support for Emergency Rental Assistance to End the COVID-19 Eviction Crisis (Sept. 5, 2020) ("ABA Letter"), https://www.americanbar.org/content/dam/aba/administrative/government_affairs_office/eviction-crisis-letter-september.pdf?logActivity=true ....................................9, 22

Patrick Quinn, Looming "Tsunami" in Housing Crisis Already Altering Seattle Communities, KOMO News (Sept. 3, 2020) ("KOMO Article"), https://komonews.com/news/local/looming-tsunami-in-housing-crisis-already-altering-seattle-communities ....................................................................10, 11, 22

Peter Hepburn and Renee Louis, Preliminary Analysis: Shifts in Eviction Filings from the CARES Act to the CDC Order, Sept. 22, 2020**,** https://evictionlab.org/shifts-in-eviction-filings-from-cares-act-to-cdc-order/ ....................14

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

Public Health-Seattle & King County, Homelessness and COVID-19,
   https://www.kingcounty.gov/depts/health/covid-19/data/homeless.aspx ...............................16

Sam Gustin, Systemic Racial Discrimination Worsens the US Digital Divide,
   Study Says, Vice News (Dec. 14, 2016),
   https://www.vice.com/en/article/aek85p/systemic-racial-discrimination-
   worsens-the-us-digital-divide-study-says ...............................19

Scott Hanson, 1 in 5 Washington Residents Could Face Hunger This Year as
   COVID-19 Pandemic Wears On, Says Food Lifeline CEO, Seattle Times
   (Sept. 10, 2020), https://www.seattletimes.com/seattle-news/food-insecurity-
   crisis-in-washington-likely-to-get-worse-as-covid-19-pandemic-drags-on-
   officials-say/ ...............................12

Seattle Civil Rights and Labor History Project, University of Washington,
   "Segregated Seattle," http://depts.washington.edu/civilr/segregated.htm ...............................5

Teresa Wiltz, As COVID-19 Tanks the Economy, Eviction Moratoriums Expire
   (Aug. 6, 2020), https://www.pewtrusts.org/en/research-and-
   analysis/blogs/stateline/2020/08/06/as-covid-19-tanks-the-economy-eviction-
   moratoriums-expire ...............................19, 20

Timothy Thomas, Ott Toomet, Ian Kennedy, and Alex Ramiller, The State of
   Evictions: Results from the University of Washington Evictions Project (Feb.
   17, 2019) ("UW Eviction Study") §§ 1, 5.2,
   https://evictions.study/washington/ ...............................4, 5, 6,  7

U.S. Census Bureau, Week 15 Household Pulse Survey ("Household Pulse
   Survey"), Housing Table 2b,
   https://www.census.gov/data/tables/2020/demo/hhp/hhp15.html#tables ...............................10, 11, 12

U.S. Dept. of Health & Human Services, Temporary Halt in Residential Evictions
   to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 at 55, 295
   (Sept. 4, 2020) ("CDC Moratorium"),
   https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf ...............................10, 15, 16, 17

U.S. Fed. Res., Report on the Economic Well-Being of U.S. Households in 2018
   – May 2019: Dealing with Unexpected Expenses,
   https://www.federalreserve.gov/publications/2019-economic-well-being-of-
   us-households-in-2018-dealing-with-unexpected-expenses.htm ...............................7

University of Washington Runstad Center for Real Estate Research,
   http://realestate.washington.edu/wp-
   content/uploads/2020/05/2020SpringApartmentMarketReport-2.pdf ...............................4

Washington State Department of Commerce, Economic Recovery Dashboard,
   https://www.commerce.wa.gov/datadashboard/ ...............................12

- vii -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

Washington State Department of Commerce, Aug. 3, 2020,
   https://www.commerce.wa.gov/news-releases/community-grants/100-million-
   rental-assistance-headed-to-washington-communities/ ..........................................................24

Washington State Employment Security Department, Weekly Initial Claims
   Report**,**
   https://public.tableau.com/profile/jeff.robinson#!/vizhome/InitialClaimsapplic
   ationsforUnempIoymentInsurance-WA_ETA539-/Story1 ......................................................12

*Washington State Public Library Services during COVID-19 Building Closure &
   Reopening*, Access Washington, https://data.wa.gov/Culture-and-
   Community/Washington-State-Public-Library-Services-during-CO/ma99-
   sxnd ..........................................................................................................................................19

Washington Supreme Court Civil Legal Needs Study Update Committee, 2015
   Washington State Civil Legal Needs Study Update (2015)**,**
   https://ocla.wa.gov/wp-
   content/uploads/2015/10/CivilLegalNeedsStudy_October2015_V21_Final10_
   14_15.pdf ...................................................................................................................................7

William Wan, Coronavirus Kills Far More Hispanic and Black Children than
   White White Youths, CDC Study Finds, Wash. Post (Sept. 15, 2020),
   https://www.washingtonpost.com/health/2020/09/15/covid-deaths-hispanic-
   black-children/ ....................................................................................................................2, 16

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

**IDENTITY AND INTEREST OF AMICI CURIAE**

Amici American Civil Liberties Union of Washington, Building Changes, Columbia Legal Services, Fred T. Korematsu Center for Law and Equality, Northwest Justice Project, Washington State Pro Bono Council (on behalf of eight volunteer lawyer programs around the state), Tenant Law Center, Tenants Union of Washington State, and Washington Low Income Housing Alliance submit this amicus brief in support of the defendants' response opposing plaintiffs' motion for a preliminary injunction.

Amici are organizations that provide legal services to low-income renters, advocate for affordable housing and homeless services in the state of Washington, advocate to ensure that laws and policies do not contribute to or exacerbate racial disparities in housing and rather reduce such race disparities, provide housing-related services to low-income renters, and are membership organizations whose members are low-income renters, all of whom stand to be impacted by the Court's ruling on the plaintiffs' motion. Amici's specific areas of expertise are laid out more fully in the accompanying motion for leave to file this amicus brief.

## I.   INTRODUCTION

The standard for issuance of a preliminary injunction requires the Court to weigh the interest of the public and persons not before the Court with the interests of the plaintiffs in enjoining the moratoria. As amici demonstrate, renters throughout the state of Washington stand to be harmed if the moratoria are lifted prematurely because, as the national data shows, evictions will increase dramatically in the absence of a moratorium. Harm to these renters, in turn, will worsen the existing pandemic and housing crisis and do precisely what the defendants intended to avoid: exacerbation of the spread of COVID-19 by renters forced into homelessness and other housing crises, such as living on the streets, staying with relatives, or in congregate

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

shelters. In addition, premature lifting of the moratoria will have a disparate impact on people of color, who already experience homelessness at higher rates than others. Moreover, the disparate public health impact is evident in the fact that people of color already suffer disproportionately from COVID-19, including that nearly 75 percent of children dying from COVID-19 are people of color.[1] The Court should deny the plaintiffs' motion.

## II.   ARGUMENT

### A.   The public interest favors protecting persons not before the Court: renters facing eviction and exposure to harm in the midst of a public health crisis

The public interest is an important factor in the Court's consideration when non-parties stand to be impacted by the issuance of an injunction. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). As in *Stormans*, cited by the plaintiffs, parties not before the Court stand to be harmed if the Court issues an injunction prior to the final determination of the merits of plaintiffs' claims. The Court should take their concerns into account.

While the constitutional rights of the plaintiffs are important, *Stormans* shows that the public interest is still a relevant consideration before an injunction may be granted. "[When] an injunction is asked which will adversely affect a public interest ... the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312–13, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Amici's experiences with low-income renters provide them with ample ability to inform the Court about eviction and the legal services programs that would be tasked with assisting these renters.

---

[1] William Wan, Coronavirus Kills Far More Hispanic and Black Children than White Youths, CDC Study Finds, Wash. Post (Sept. 15, 2020), https://www.washingtonpost.com/health/2020/09/15/covid-deaths-hispanic-black-children/ (hereinafter "Wan Article").

- 2 -

Amicus Brief
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

The mere fact that plaintiffs allege constitutional claims does not make the public interest irrelevant. Instead, the Court must weigh these interests. *Stormans, Inc.*, 586 F.3d at 1139. As in *Stormans*, the consequences to the public and interests represented by amici if the moratoria are lifted are immediate and obvious: renters face eviction, homelessness, or being forced into crowded housing situations due to the tight housing market. All of these conditions will increase their exposure to COVID-19 and worsen the pandemic and its racial disparities, the result that the State and City are attempting to avoid with their moratoria. The Court should avoid causing "otherwise avoidable human suffering" from the issuance of the preliminary injunction when the public interest demonstrates the likelihood of such harm occurring. *Id.* at 1140. As amici demonstrate below, lifting the moratoria will result in crowded courtrooms, renters who have no access to justice, eviction and homelessness, worsened racial disparities, and a worsening of the pandemic.

**B.  Enjoining the eviction moratoria would result in a wave of evictions and exacerbate the public health crisis**

> 1.  <u>Renters were already struggling with high rents and eviction prior to the COVID-19 pandemic</u>

To appreciate the impact that removal of the eviction moratoria would have, it helps to start with the already challenging environment for renters prior to the onset of the pandemic. An insufficient supply and increased cost of rental housing in the state over the past 10 years fueled an increase in the number of households that were rent-burdened.  A household that spends over 30 percent of its income on housing is considered "rent-burdened."  A household that spends over 50 percent of its income on housing is considered "severely rent-burdened." In March 2020, the National Low Income Housing Coalition, using 2018 data, reported that Washington had only 31 affordable and available units per 100 households whose income was at or below the

- 3 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

federal poverty line. Seventy-two percent of those households were severely burdened by their housing cost.[2] Likewise, vacancy rates at any income level are extremely low, indicating a short supply of housing available to meet the need.[3]

Rent-burdened households are households susceptible to eviction. "After paying rent each month, lowest-income households have little money left over for other necessities. The median renter earning less than $15,000 in 2018 had only $410 left each month for food, transportation, healthcare, and other basic needs."[4] The comparable figure for households earning $30,000-$44,999 was only $2,010.[5] Any loss of income or any significant unanticipated expense makes it impossible to pay rent and puts the household at risk of eviction. This further negatively impacts others who depend on that household, such as family and employers.

The University of Washington Eviction Project reported, as of February 2019, that 46 percent of Washington renters were rent-burdened, with nearly half that group being severely rent-burdened. "This leaves a large portion of the population near the brink of losing their homes."[6] The Project reported that "the period between 2012 to 2017 seems to have largely impacted low-income households that may not have recovered from losses during the Great Recession. In other words, our overall growing economy over the past eight years may have

---

[2] National Low Income Housing Coalition, The Gap: A Shortage of Affordable Homes (March 2020) App. A, available at https://reports.nlihc.org/sites/default/files/gap/Gap-Report_2020.pdf (last visited Oct. 14, 2020).
[3] *See* University of Washington Runstad Center for Real Estate Research, available at http://realestate.washington.edu/wp-content/uploads/2020/05/2020SpringApartmentMarketReport-2.pdf (last visited Oct. 15, 2020).
[4] Joint Center for Housing Studies of Harvard University, America's Rental Housing 2020 (2020) ("Harvard Report") at 5, available at https://www.jchs.harvard.edu/sites/default/files/reports/files/Harvard_JCHS_Americas_Rental_Housing_2020.pdf (last visited Oct. 14, 2020).
[5] *Id.*
[6] Timothy Thomas, Ott Toomet, Ian Kennedy, and Alex Ramiller, The State of Evictions: Results from the University of Washington Evictions Project (Feb. 17, 2019) ("UW Eviction Study") §§ 1, 5.2, available at https://evictions.study/washington/ (last visited Oct. 14, 2020).

- 4 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

concealed the danger of housing insecurity among the most vulnerable Washington citizens."[7]

"By 2017, we lost a large portion of affordable housing stock, [saw] homelessness increasing

beyond Great Recession numbers, and evictions keeping a steady pace since 2009."[8]

2. Evictions disproportionately harm people of color

"Studies from cities throughout the country have shown that people of color, particularly

Black and Latinx people, constitute approximately 80% of people facing eviction."[9] Even before

the COVID-19 pandemic, the most populous counties in western Washington experienced vast

racial disparities in evictions. From 2012-2017, one in six Black adults in Pierce County faced an

eviction, and in King County, one in eleven.[10] In King County, this rate was more than five times

the eviction rate of white adults; in Pierce County, almost seven times more. In Seattle in 2017,

51.7 percent of evictions were filed against persons of color. Of those evictions, 31.2 percent

were filed against Black tenants, an eviction rate 4.5 times what would be expected based on the

Black share of the population.[11]

In cities like Seattle, a history of racially restrictive covenants, entrenched redlining

practices, zoning regulations, and gentrification has resulted in a racially segregated city.[12]

Housing segregation both causes and exacerbates barriers to housing for people with criminal

---

[7] *Id.* § 5.1.

[8] *Id.*

[9] Emily Benfer, et al., The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America are at Risk (Aug. 7, 2020) ("Aspen Inst. Report") at 3, available at https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/ (last visited Oct. 14, 2020); *see also* Deena Greenberg, Carl Gershenson, and Matthew Desmond, Discrimination in Evictions: Empirical Evidence and Legal Challenges, 116 Harv. C.R.-C.L. L. Rev. 115 (2016), available at https://scholar.harvard.edu/files/mdesmond/files/greenberg_et_al._.pdf (last visited Oct. 14, 2020).

[10] Timothy A. Thomas et al., *The State of Evictions: Results from the University of Washington Evictions Project*, https://evictions.study/washington/results.html#race-of-the-evicted (last visited Oct. 15, 2020).

[11] King County Bar Ass'n & Seattle Women's Commission, Losing Home: The Human Cost of Eviction in Seattle (2018) ("Losing Home") at 2, available at http://www.kcba.org/Portals/0/pbs/pdf/Losing%20Home%202018.pdf (last visited Oct. 14, 2020).

[12] *See* Seattle Civil Rights and Labor History Project, University of Washington, "Segregated Seattle," *available at* http://depts.washington.edu/civilr/segregated.htm (last visited Oct. 14, 2020).

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

records, who are disproportionately people of color. Segregation "promotes the concentration of poverty in neighborhoods inhabited largely by [B]lacks and Latinos, making members of these groups especially vulnerable to the criminalization of poverty [and] the proliferation of punishments inside the criminal justice system."[13] Evictions then follow patterns of segregation: Tracing evictions by neighborhood over time reveals that when households of color move into other neighborhoods to escape rising housing costs, eviction rates in their new neighborhoods rise as those neighborhoods become more racially diverse.[14] Those who are evicted for an inability to pay rent find themselves with fewer and fewer options, as Washington has far fewer affordable housing units than families who need them.[15]

Because of historic inequality and legally enshrined housing discrimination, households of color face significantly higher risk of eviction due to an inability to pay rent. In Washington, more than half of Black and Latino households are rent-burdened, meaning that they spend more than 30 percent of their income on housing.[16] And when income drops due to unemployment, or rent rises, households of color have less wealth to fall back on: The typical white family has ten times as much wealth as the typical Black family, and seven times as much wealth as the typical Latino family.[17] In 2018, 4 in 10 American families reported that they would have trouble

---

[13] George Lipsitz, "*In an Avalanche Every Snowflake Pleads Not Guilty": The Collateral Consequences of Mass Incarceration and Impediments to Women's Fair Housing Rights*, 59 UCLA L. Rev. 1746, 1749-50 (2012).
[14] Timothy A. Thomas et al., *The Evictions Study Map*, https://evictions.study/maps.html (last visited Oct. 14, 2020).
[15] National Low Income Housing Coalition, *State Data Overview, Washington*, https://nlihc.org/housing-needs-by-state/washington (last visited Oct. 15, 2020).
[16] Joint Center of Housing Studies of Harvard University, *Renter Cost Burdens by Race and Ethnicity*, https://www.jchs.harvard.edu/ARH_2017_cost_burdens_by_race
(last visited Oct. 16, 2020)*; see also* Joint Center for Housing Studies of Harvard University, The State of the Nation's Housing 2019 4-5, *available at*
https://www.jchs.harvard.edu/sites/default/files/Harvard_JCHS_State_of_the_Nations_Housing_2019.pdf.
[17] Kriston McIntosh, Emily Moss, Ryan Nunn & Jay Shambaugh, *Examining the Black-white wealth gap*, *available at* https://www.brookings.edu/blog/up-front/2020/02/27/examining-the-black-white-wealth-gap/ (Feb. 27, 2020).

- 6 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

covering an unexpected $400 expense, and 58 percent of Black families reported that in the event of such an expense, they would be unable to cover their other bills.[18]

     3.    <u>Evicted low-income households do not have equal access to justice</u>

In Washington, the 2015 Civil Legal Needs Study Update, commissioned by the Supreme Court, reported that more than 71 percent of the state's low-income households experience at least one civil legal problem each year and that approximately 76 percent of people do not get the legal help they need to address these problems. Nearly 28 percent of Washington households faced legal issues related to housing in 2014; for Black households, the percentage was nearly 45 percent.[19]

The University of Washington Evictions Project reported that, during the period 2004-2017, fewer than 8 percent of unlawful detainer defendants in Washington had an attorney to represent them. Thirty of Washington's 39 counties, including three of the five most-populous counties (Clark, Pierce, and Spokane) had lower percentages. Not surprisingly, given the lack of representation, default judgments were entered in many of these actions, with rates in the five largest counties, as of 2017, ranging from nearly 30 percent to nearly 50 percent.[20]

When eviction defendants did have the benefit of counsel, it made a difference. For example, a 2017 study of Seattle unlawful detainer actions found that tenants with legal counsel were about twice as likely to remain in their homes and more than three times as likely to receive some form of settlement or stipulation as those without legal counsel. Those that remained in

---

[18] U.S. Fed. Res., *Report on the Economic Well-Being of U.S. Households in 2018 – May 2019: Dealing with Unexpected Expenses*, https://www.federalreserve.gov/publications/2019-economic-well-being-of-us-households-in-2018-dealing-with-unexpected-expenses.htm (last visited Oct. 15, 2020).
[19] Washington Supreme Court Civil Legal Needs Study Update Committee, 2015 Washington State Civil Legal Needs Study Update (2015) at 5, 7, 15, 26**,** available at https://ocla.wa.gov/wp-content/uploads/2015/10/CivilLegalNeedsStudy_October2015_V21_Final10_14_15.pdf (last visited Oct. 14, 2020).
[20] UW Eviction Study §§ 4.2, 4.3.

- 7 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

their homes were able to dismiss the action entirely—a stark difference from those that were kicked out of their homes and ordered to pay a judgment that would burden them with debt.[21] But most tenants were forced to defend against evictions by themselves. In the midst of a pandemic, with limited resources and access to the courts unclear, amici believe that even more renters would not be able to count on access to legal services.

## C.   Evictions cause lasting harm beyond the immediate loss of housing

The impacts of evictions on members of the evicted households are enormous and varied. "An eviction comes with a legal record, which prevents families from relocating to safe neighborhoods and decent housing because many property owners view such a record as disqualifying. Eviction records also bar families from public housing since Public Housing Authorities count eviction as a mark against their application, systematically denying help to the families who need it most."[22] "Following eviction, a person's likelihood of experiencing homelessness increases, mental and physical health are diminished, and the probability of obtaining employment declines."[23] "Many people think that job loss leads to eviction, but eviction can also lead to job loss. An eviction not only can consume renters' time, causing them to miss work, it also can consume their thoughts and cause them to make mistakes on the job, and also result in their relocating farther away from their worksite, increasing their likelihood of tardiness and absenteeism."[24] "Eviction is linked to numerous poor health outcomes, including

---

[21] Losing Home at 65.

[22] Matthew Desmond, On the Brink of Homelessness: How the Affordable Housing Crisis and the Gentrification of America is Leaving Families Vulnerable: Statement Before the U.S. House of Representatives Comm. on Financial Servs. (Jan. 14, 2020) at 4, available at https://www.congress.gov/116/meeting/house/110362/witnesses/HHRG-116-BA00-Wstate-DesmondM-20200114.pdf (last visited Oct. 14, 2020).

[23] Aspen Inst. Report at 8.

[24] Matthew Desmond, Unaffordable America: Poverty, Housing, and Eviction, Fast Focus, Institute for Research on Poverty, University of Wisconsin-Madison (2015) at 4-5, available at https://www.irp.wisc.edu/publications/fastfocus/pdfs/FF22-2015.pdf (last visited Oct. 14, 2020).

- 8 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

depression, suicide, and anxiety," as well as respiratory diseases.[25]  Eviction "is particularly damaging to children, who suffer in ways that impact their educational development and well-being for years."[26] Even when an eviction is filed without merit or the tenants have a defense to the eviction and are able to stay in their home, the record of the eviction remains on their record and can lead to future housing instability and the consequences described above. *See Hundtofte v. Encarnacion*, 181 Wn.2d 1, 10 (2014).

The negative impacts of eviction are not limited to the persons evicted. Eviction also imposes significant costs on local governments and other social service providers. For example, evictions increase the costs of providing shelters, other forms of housing assistance, hospital services (inpatient and emergency), child welfare services, and criminal justice.[27]

In the experience of amici, Washington's homelessness response system is not equipped to respond to an increase in need. Prior to COVID-19, Washington's homelessness response was not able to meet the full needs of any community in our state. Exacerbating this problem, shelter providers reduced shelter capacity statewide during COVID-19, largely due to social distancing and loss of donated shelter space. Without the eviction moratorium, homelessness would increase significantly and there would not be sufficient resources in any county in our state to address the new need.

---

[25] Aspen Inst. Report at 8; *see also* Harvard Report at 35; Letter from Patricia Lee Refo, President, American Bar Association, to U.S. Senate and House Leadership re ABA Support for Emergency Rental Assistance to End the COVID-19 Eviction Crisis (Sept. 5, 2020) ("ABA Letter") at 2**,** available at https://www.americanbar.org/content/dam/aba/administrative/government_affairs_office/eviction-crisis-letter-september.pdf?logActivity=true (last visited Oct. 14, 2020).
[26] Aspen Inst. Report at 8; *see also* Harvard Report at 35; ABA Letter at 2. Presumably, in a time when much schooling is done remotely, homeless children would have even greater difficulty keeping up with their studies.
[27] Innovation for Justice Program, University of Arizona James E. Rogers College of Law, Cost of Eviction Summary Report at 2-3 (July 23, 2020) **,** available at https://arizona.app.box.com/s/0cgdsbf8zj7i9rakayy5ehag4n55txwp (last visited Oct. 14, 2020); Aspen Inst, Report at 8; Harvard Report at 36.

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

**D.      The pandemic has worsened an already troubling housing crisis**

The pandemic has multiplied the financial plight and risk of eviction for renters, particularly for low-income renters, many of whom were already rent-burdened. As of August 7, 2020, the Aspen Institute reported that "[c]urrent projections indicate that America is facing an urgent and unprecedented eviction crisis." The Institute estimated that 29-43 percent of renter households (30-40 million people nationally) are at risk of eviction by the end of 2020.[28]

Projections for Washington are similar. The Aspen Institute estimated that 26-34 percent of Washingtonians are at risk of eviction by the end of the year.[29] The U.S. Census Bureau, as of the two-week period ending September 28, reported that 38.9 percent of Washingtonians surveyed thought it either very or somewhat likely they would face eviction within two months.[30] The data reported by the defendants in their response shows a similar risk of eviction for state residents. *See* Baumgart Decl., Ex. N at 8 (Dkt. #29-2).

The Centers for Disease Control, relying on the Aspen Institute's projection, noted that a "wave of evictions on this scale would be unprecedented in modern times."[31] A representative of Seattle-based Solid Ground has stated: "We're looking at it as a tsunami that is building and when it crashes it will wipe out whole swaths of communities."[32] The Government Affairs Director for the Rental Housing Association of Washington, which represents landlords, also warned that "[t]here is going to be this eviction cliff if these things end too dramatically."[33]

---

[28] Aspen Inst. Report at 6-7.
[29] Id. at 7.
[30] U.S. Census Bureau, Week 15 Household Pulse Survey ("Household Pulse Survey"), Housing Table 2b, available at https://www.census.gov/data/tables/2020/demo/hhp/hhp15.html#tables (last visited Oct. 15, 2020).
[31] U.S. Dept. of Health & Human Services, Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 at 55,295 (Sept. 4, 2020) ("CDC Moratorium")**,** available at https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf (last visited Oct. 14, 2020).
[32] Patrick Quinn, Looming "Tsunami" in Housing Crisis Already Altering Seattle Communities, KOMO News (Sept. 3, 2020) ("KOMO Article")**,** available at https://komonews.com/news/local/looming-tsunami-in-housing-crisis-already-altering-seattle-communities (last visited Oct. 14, 2020).
[33] Id.

- 10 -

1   The anticipated flood of evictions is an expected consequence of the loss of income

2   suffered by renters directly related to the pandemic. The Joint Center for Housing Studies at

3   Harvard University reported, as of July 7, that 52 percent of all renters had lost income from

4   employment in the previous two months.[34] As a consequence, the number of Washington-based

5   renters using credit cards and loans to make rental payments has grown at an alarming rate in the

6   last several months.[35] Furthermore, with a reduction to unemployment benefits, infection rates

7   rising, and a pending economic recovery that has disproportionally affected working class

8   Americans in certain industries,[36] it is likely that more Washington-based renters will turn to

9   credit card payments and loans to delay or avoid escalation of housing insecurity. Needless to

10  say, an entire year of economic uncertainty can have a serious and lasting effect on an individual

11  or a family's ability to recover financially. This results in "network impoverishment," where not

12  only the individual is harmed but the network of people that interact with that individual.

13  Unemployment figures in Washington also paint a dire picture.[37] In addition, the U.S.

14  Census Bureau reported, as of September 28, that 22.4 percent of Washingtonians expected

---

[34] Joint Center for Housing Studies at Harvard University, A Triple Pandemic?: The Economic Impacts of COVID-19 Disproportionately Affect Black and Hispanic Households (July 7, 2020) ("Harvard Article")**,** available at https://www.jchs.harvard.edu/blog/a-triple-pandemic-the-economic-impacts-of-covid-19-disproportionately-affect-black-and-hispanic-households (last visited Oct. 14, 2020).

[35] *See* Household Pulse Survey, Housing Table 2b; David Kroman, *A Debt Crisis Looms As Renters Turn To Credit Cards To Stay Afloat*, Crosscut (Sep. 14, 2020), *available at* https://crosscut.com/focus/2020/09/debt-crisis-looms-renters-turn-credit-cards-stay-afloat. (last visited Oct. 14, 2020).

[36] Justin Baer, Theo Francis, and Eric Morath, *The Covid Economy Carves Deep Divide Between Haves and Have-Nots*, The Wall Street Journal (Oct. 5, 2020), *available at* https://www.wsj.com/articles/the-covid-economy-carves-deep-divide-between-haves-and-have-nots-11601910595 (last visited Oct. 14, 2020); *see also* Andrew Tangel and Kim Mackrael, *In Seattle, Coronavirus Fallout Opens Economic Divide*, The Wall Street Journal (May 24, 2020), *available at* https://www.wsj.com/articles/in-seattle-coronavirus-fallout-opens-economic-divide-11590328819 (last visited Oct. 15, 2020).

[37] Washington State's Employment Securities Department records indicate that initial claims for unemployment benefits averaged just over 7000 for the first nine weeks of 2020. After March 7, through May 16, they averaged 131,245 per week, with a peak of 181,975 initial claims during the week of March 22-28. Washington State Employment Security Department, Weekly Initial Claims Report**,** available at https://public.tableau.com/profile/jeff.robinson#!/vizhome/InitialClaimsapplicationsforUnempIoymentInsurance-WA_ETA539-/Story1 (last visited Oct. 15, 2020).

- 11 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

someone in their household to suffer a further loss of income within the next four weeks.[38] 25.6 percent of Washingtonians reported that it had been somewhat or very difficult to pay for usual household expenses during the pandemic.[39] Many people have had to choose between buying food and paying the rent, not being able to afford both.[40]

The racial disparities existed before the COVID-19 pandemic and are only exacerbated by the national economic downturn. Economic recovery in Washington is a "tale of two states." Data published by the Department of Commerce show that for workers in higher-paying or remote-enabled industries, like legal or business services, employment is recovering strongly; but lower-paying jobs, such as those in the restaurant and hospitality industries, still face staggering losses in employment.[41] Black, Asian, and Latino workers are overrepresented in the industries most impacted by the COVID-19 crisis—industries where working from home is not possible, and which are less likely to provide comprehensive benefits.[42] Lower-paid workers are more likely either to be unemployed, or to have to choose between staying home to protect their health and going to work. According to the Pew Research Center, 43 percent of Black adults and 37 percent of Latino adults have had trouble paying their bills.[43] These households are much

---

[38] Household Pulse Survey, Employment Table 1.
[39] *Id.*, Spending Table 1.
[40] *Id.*, Housing Table 1.1, Food Sufficiency & Food Security Tables 2b, 3b, 5.  The number of food-insecure Washingtonians nearly doubled from June 2019 to June 2020. The CEO of Food Lifeline has estimated that one-fifth of the state's population could be facing hunger by year-end. Scott Hanson, 1 in 5 Washington Residents Could Face Hunger This Year as COVID-19 Pandemic Wears On, Says Food Lifeline CEO, Seattle Times (Sept. 10, 2020)**,** available at https://www.seattletimes.com/seattle-news/food-insecurity-crisis-in-washington-likely-to-get-worse-as-covid-19-pandemic-drags-on-officials-say/ (last visited Oct. 15, 2020).
[41] Wash. Dep't of Com., *Economic Recovery Dashboard*, https://www.commerce.wa.gov/datadashboard/ (last visited Oct. 14, 2020).
[42] Danyelle Solomon & Darrick Hamilton, *The Coronavirus Pandemic and the Racial Wealth Gap*, Center for American Progress, Mar. 99, 2020, *available at* https://www.americanprogress.org/issues/race/news/2020/03/19/481962/coronavirus-pandemic-racial-wealth-gap/.
[43] Kim Parker, Rachel Minkin, and Jesse Bennett, Economic Fallout from COVID-19 Continues to Hit Lower-Income Americans the Hardest (Sept. 24, 2020)**,** available at https://www.pewsocialtrends.org/2020/09/24/economic-fallout-from-covid-19-continues-to-hit-lower-income-americans-the-hardest/ (last visited Oct. 15, 2020).

- 12 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

1    more likely to have lost income from employment during the pandemic than other groups (58

2    percent of Latino households, 53 percent of Black households, 39 percent of white households).

3    The experience in Washington is similar. "The COVID-19 pandemic and resulting economic

4    calamity have caused disproportionate harm to low-income people in Washington State, with

5    special hardships experienced by low-wage workers ('essential' and displaced workers) and

6    communities of color."[44]

7         Under normal circumstances, unemployment benefits may assist some temporarily

8    unemployed persons and help prevent evictions. In the current state of the pandemic, however,

9    unemployment has persisted for many. Washington's Employment Security Department has not

10   been able to pay claimants in a timely manner, and additional federal help (following an initial

11   stimulus package) has been mired in disputes in the other Washington.

12   **E.    Evictions will dramatically rise if the moratoria are enjoined**

13        There is no question that the Washington and Seattle moratoria have been effective in

14   preventing evictions that otherwise would have occurred during the pandemic. Data obtained by

15   amici from the Washington State Administrative Office of the Courts demonstrate this

16   phenomenon. In January and February of 2020, respectively, 1316 and 1228 unlawful detainer

17   actions were filed in the state of Washington. That number declined to 777 in March and

18   averaged 92 per month for April through August.[45]

19        Similarly, there is no question that evictions would skyrocket in the absence of moratoria,

20   not merely to pre-pandemic levels, but far in excess of those levels. The Eviction Lab at

21   Princeton University has tracked evictions in selected major cities during the pandemic.

22

23   [44] Office of Civil Legal Aid Interim Report on Emergency COVID-19 Legal Assistance, at 1, *available at* https://ocla.wa.gov/wp-content/uploads/2020/09/COVID-19-Emergency-Civil-Legal-Aid-Program-Interim-Report-9-2020.pdf.

24   [45] Data provided by Washington State Administrative Office of the Courts (Sept. 14, 2020) (on file with amici).

- 13 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

Focusing on the period between the August 23 expiration of the CARES Act moratorium and the September 2 implementation of the CDC moratorium, Eviction Lab researchers determined that the presence of a moratorium has a significant effect.  In four of the sixteen cities studied, the presence of state or local moratoria meant that the gap between the two federal moratoria had no significant effect.  In the vast majority of the other twelve cities, however, the absence of a moratorium had a dramatic effect. In Richmond, Virginia, for example, evictions for the week of August 16-22 were at 24% of historical levels. For the week of August 30-September 5, they jumped to 410% of historical levels, before declining again to 24% for the week of September 6-12. The following chart displays the impact of even a temporary gap in moratorium coverage.[46]

| City | 8/16-8/22 Evictions as % of Historical Average | 8/30-9/5 Evictions as % of Historical Average | 9/6-9/12 Evictions as % of Historical Average |
|---|---|---|---|
| Cincinnati, OH | 39% | 144% | 53% |
| Cleveland, OH | 48% | 52% | 26% |
| Columbus, OH | 97% | 110% | 35% |
| Fort Worth, TX | 23% | 219% | 27% |
| Gainesville, FL | 55% | 113% | 62% |
| Houston, TX | 41% | 142% | 35% |
| Jacksonville, FL | 63% | 123% | 75% |
| Kansas City, MO | 35% | 131% | 23% |
| Milwaukee, WI | 45% | 110% | 29% |
| Pittsburgh, PA | 6% | 113% | 61% |
| Richmond, VA | 24% | 410% | 24% |
| St. Louis, MO | 36% | 44% | 17% |

**F.       Increased evictions will exacerbate the COVID-19 pandemic**

A wave of evictions on the scale anticipated in the absence of moratoria would be a disaster for hundreds of thousands of households in Washington.[47] It would also exacerbate the

---

[46] Peter Hepburn and Renee Louis, Preliminary Analysis: Shifts in Eviction Filings from the CARES Act to the CDC Order, Sept. 22, 2020, available at https://evictionlab.org/shifts-in-eviction-filings-from-cares-act-to-cdc-order/ (last visited Oct. 15, 2020).
[47] Office of Civil Legal Aid Report at 4 n.4.

- 14 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

current health crisis. The Centers for Disease Control, in announcing its eviction moratorium, emphasized that "[i]n the context of a pandemic, eviction moratoria . . . can be an effective public health measure utilized to prevent the spread of communicable disease."[48] The CDC identified five ways in which evictions would spread the disease and moratoria would inhibit such a spread.

First, "eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition."[49]

Second, eviction moratoria "allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19."[50]

Third, "many evicted renters move into close quarters in shared housing or other congregate settings. According to the Census Bureau American Housing Survey, 32% of renters reported that they would move in with friends or family members upon eviction…. Studies show that COVID-19 transmission occurs readily within households; household contacts are estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts."[51]

Fourth, a wave of evictions would lead many evicted households to move to another state. As a result, "mass evictions would likely increase the interstate spread of COVID-19."[52]

Fifth, evictions would increase the number of people experiencing homelessness. The CDC noted that in Seattle-King County, 5 to 15 percent of people experiencing homelessness between 2018 and 2020 cited eviction as the primary reason for becoming homeless. Some of

---

[48] 85 Fed. Reg. at 55,294.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.* at 55,295.

- 15 -

these people would move to homeless shelters. It is extremely difficult, if not impossible, to take the precautions necessary to prevent the spread of the disease while living in a shelter. The CDC noted that "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters," specifically citing an outbreak in Seattle at a network of three related homeless shelters. Indeed, the CDC pointed out that "research suggests that the population of persons who would be evicted and become homeless would include many who are predisposed to developing severe disease from COVID-19."[53]

The CDC summarized as follows: "In short, evictions threaten to increase the spread of COVID-19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase. Unsheltered homelessness also increases the risk that individuals will experience severe illness from COVID-19."[54]

In addition, the public health impact of evictions would be experienced disproportionately by people of color, as the CDC has recognized. The CDC recognizes the fact that COVID-19 disproportionately impacts communities of color.[55] As already noted, people of color are much more likely to experience eviction and have worse outcomes. The combination of

---

[53] *Id.* at 55,295; *see also* Public Health-Seattle & King County, Homelessness and COVID-19, available at https://www.kingcounty.gov/depts/health/covid-19/data/homeless.aspx  (last visited Oct. 15, 2020) (homeless individuals account for 17.7% of King County hospitalizations for COVID-19); Aspen Inst. Report at 8 ("In addition, eviction is linked with respiratory disease, which would increase the risk of complications if COVID-19 is contracted, as well as mortality risk during COVID-19.")
[54] 85 Fed. Reg. at 55,296.
[55] Center for Disease Control and Prevention, Health Equity Considerations and Racial and Ethnic Minority Groups, July 24, 2020, https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html. *See also* Wan Article (75% of COVID-19 children deaths are minorities).

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

existing disparities and emerging disparities from the pandemic therefore creates an even worse harm for these communities.

**G.      The courts and the local governments need time to adapt to allow renters to have access to justice**

Courts simply cannot safely hear a high volume of eviction cases with litigants and counsel attending hearings in person. Nor would remote hearings adequately protect the rights of low-income renters.  In addition, renters would be disadvantaged because legal services programs could not cope with a dramatic increase in need, in spite of additional resources that may become available.

1.      <u>Courts are not adapted to meet the need of an uncontrolled eviction tsunami</u>

We know that continuing to operate courts at pre-COVID volumes has been deadly.[56] While courts have attempted to mitigate risk by limiting the number of cases they hear, using plexiglass, offering hand-sanitizer, and requiring social distancing, these measures still fail to keep people safe. Months into the pandemic, when the danger of crowded courtrooms was well known, there were reports of people sitting "shoulder-to-shoulder" during a criminal docket.[57] In Spokane County, local officials initially struggled to procure protective equipment and faced challenges "figuring out how to socially distance people in a 125-year-old courthouse."[58] In-person hearings would not only mean crowded courtrooms but would risk further exposure and

---

[56] Noah Goldberg, Wes Parnell & Molly Crane-Newman, *Coronavirus Leaves Trail of Illness and Death in NYC Courthouses As Slow-to-Change System Struggles to Cope With Pandemic*, N.Y. Daily News (May 25, 2020), available at https://www.nydailynews.com/coronavirus/ny-coronavirus-pandemic-unprepared-nyc-courts-20200526-fe2zknj7cbgutpjdn3vtfruiiq-story.html (last visited Oct. 15, 2020).
[57] Mike Carter & Sara Jean Green, *Your right to a jury trial is on hold. Here's how coronavirus is changing the justice system*, Seattle Times (June 2, 2020) ("Jury Trial Article"), available at https://www.seattletimes.com/seattle-news/crime/coronavirus-has-closed-courthouses-stopped-trials-how-does-washingtons-justice-system-come-back/ (last visited Oct. 15, 2020).
[58] Colin Rigley, *When Court is Back in Session: The Plan for Washington Courts to Resume During COVID-19* , NW Sidebar (June 23, 2020), available at https://nwsidebar.wsba.org/2020/06/23/when-court-is-back-in-session-the-plan-for-washington-courts-to-resume-during-covid-19/ (last visited Oct. 15, 2020).

- 17 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

transmission because of the litigants and court staff that would inevitably travel on public transportation.[59] Lifting the moratoria would flood superior courts across the state with eviction cases. Holding in-person hearings without significant changes to courthouse infrastructure and docket size would risk COVID outbreaks among litigants and the greater community. Volunteer lawyer programs, such as those represented by amicus Pro Bono Council, have already encountered difficulty retaining qualified pro bono counsel because of their fear of needing to appear in court and contracting COVID-19. This would also deter renters, especially those that are deemed high-risk, from appearing in court or asking witnesses to appear on their behalf.[60] As King County Superior Court Chief Criminal Judge Patrick Oishi stated, if the court doesn't "get it right" on COVID-safety measures, the courthouse "could be a hotbed for COVID."[61] Washington has made great strides in reducing COVID numbers and should not risk further outbreaks by holding in-person eviction hearings.

2.   The current digital divide impedes renters from litigating their cases and staying in their homes

Across the state, courts themselves are struggling to adapt to new technology they must use due to COVID restrictions. And many renters defending an unlawful detainer action, especially the most vulnerable in our communities, do not have access to the technology they need to meaningfully litigate their case.[62] It is not only a matter of having a device and internet to

---

[59] Mike Lindblom, *Second Metro bus driver, 'godfather of the North Base,' dies of coronavirus*, Seattle Times (July 3, 2020), available at https://www.seattletimes.com/seattle-news/obituaries/second-metro-bus-driver-godfather-of-the-north-base-dies-of-coronavirus/ (last visited Oct. 15, 2020).
[60] National Housing Law Project, *Procedural Due Process Challenges to Evictions during the Covid-19 Pandemic* (May 22, 2020) ("National Housing Law Project Report") at 4, available at https://www.nhlp.org/wp-content/uploads/procedural-due-process-covid-evictions.pdf (last visited Oct. 15, 2020).
[61] Jury Trial Article.
[62] *See* Monica Anderson And Madhumitha Kumar, *Digital divide persists even as lower-income Americans make gains in tech adoption*, Pew Research Center (May 7, 2019), available at https://www.pewresearch.org/fact-tank/2019/05/07/digital-divide-persists-even-as-lower-income-americans-make-gains-in-tech-adoption/ (last visited Oct. 15, 2020); Eric J. Magnuson and Nicole S. Frank, *The High Cost of Efficiency: Courthouse Tech and Access to*

- 18 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

attend a hearing over zoom or the phone, but also the technology required to gather and file documents and evidence, research the law, and attain legal assistance from online media. For example, a tenant could no longer simply bring a hard copy of their lease into court with them and they may not be aware of or have access to methods to otherwise present the document.[63] It is well known that the digital divide disproportionately impacts low-income people and people of color.[64] Compounding the lack of at-home technology is the fact that many of the places where low-income people could use free computers and internet are now closed or severely limited.[65] Even when available, these resources don't provide a litigant with a private setting from which to present their case. With a digital divide that disproportionately affects low-income, renters of color, virtual litigation and hearings will only further exacerbate unjust outcomes and racial inequity.

The risks of in-person hearings and remote proceedings set up an "'impossible choice' for tenants facing eviction."[66] Many of the tenants facing eviction come from communities that have been disproportionately affected by COVID and legitimately fear coming to court.  Yet remote hearings are also a challenge for tenants who are struggling to pay basic bills including internet and cellphone bills.[67]

---

*Justice*, ABA Center for Professional Responsibility, The Professional Lawyer Volume 22, Number 4 (2014) at 3–5, available at https://www.robinskaplan.com/-/media/pdfs/the-high-cost-of-efficiency.pdf (last visited Oct. 15, 2020).
[63] National Housing Law Project Report at 6.
[64] *See* Katrina vanden Heuvel, *America's digital divide is an emergency*, The Washington Post (June 23, 2020), available at https://www.washingtonpost.com/opinions/2020/06/23/americas-digital-divide-is-an-emergency/ (last visited Oct. 15, 2020); Sam Gustin, Systemic Racial Discrimination Worsens the US Digital Divide, Study Says, Vice News (Dec. 14, 2016), available at https://www.vice.com/en/article/aek85p/systemic-racial-discrimination-worsens-the-us-digital-divide-study-says (last visited Oct. 15, 2020).
[65] *See, e.g., Washington State Public Library Services during COVID-19 Building Closure & Reopening*, Access Washington, available at https://data.wa.gov/Culture-and-Community/Washington-State-Public-Library-Services-during-CO/ma99-sxnd (last visited Oct. 15, 2020).
[66] Teresa Wiltz, *As COVID-19 Tanks the Economy, Eviction Moratoriums Expire* (Aug. 6, 2020), available at https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/08/06/as-covid-19-tanks-the-economy-eviction-moratoriums-expire (last visited Oct. 15, 2020).
[67] *Id.*

- 19 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

3.   <u>Making evictions remote proceedings does not provide due process of law</u>

Even if we were not battling the digital divide, shifting to remote court proceedings is insufficient to protect the due process rights of renters. Remote hearings are most difficult for people who do not speak English and need at least one interpreter and for people with disabilities that make it difficult to engage in telephonic/video proceedings.[68] Additionally, academic studies have shown that video hearings tend to dehumanize already-vulnerable people, compounding the deck stacked against low-income renters.[69]

Shifting to remote proceedings also has the potential to set up procedures that would violate the due process rights of litigants.[70] This was exemplified by Snohomish County Superior Court's procedures established earlier this year, which required unlawful detainer litigants to appear via Court Call, but did not require plaintiffs to provide notice of the special procedures enacted for the new system, including scheduling an appearance via Court Call by 2:00 pm the day prior to the hearing.[71] After amicus Northwest Justice Project petitioned for a writ of mandamus to the Washington State Supreme Court on behalf of a legal services provider and mother who had an upcoming eviction hearing that threatened to leave her and her children homeless, the court entered into a settlement agreement to ameliorate these harmful procedures.

Remote proceedings also render pre-hearing negotiation obsolete. Negotiation in the hallways of the courtroom has been one of the major solutions to efficiently resolving eviction cases. Housing Justice Project and Volunteer Lawyer Programs in many counties would provide on-the-spot advice to unlawful detainer defendants and negotiate with opposing counsel on their behalf. Though it was an imperfect model, it provided fast and effective assistance to renters who

---

[68] National Housing Law Project Report at 9–10.
[69] Jury Trial Article.
[70] National Housing Law Project Report at 1–6.
[71] *See* Petition for Writ of Mandamus, Roths, et al. v. Weiss, et al., No. 98396-8 (Wash. April 8, 2020).

- 20 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

otherwise had no legal assistance. Such assistance cannot be replicated remotely without substantial technology and administration, as it would require group chats to ensure confidential conversations between attorneys and clients and between attorneys when they negotiate.

    4.   <u>Significant gaps in legal assistance will disadvantage renters and result in unjust outcomes</u>

The current civil legal aid resources are insufficient to provide the legal assistance that will be needed when the moratoria are lifted. Representation and legal advice make a critical difference. As noted above, unlawful detainer defendants with counsel are much more likely to remain in their homes, obtain dismissal of the action, and avoid debt associated with the action. The surge in eviction cases would undoubtedly make it less likely that renters will be represented or even receive legal advice. Knowing that prior to the pandemic, fewer than 8% of unlawful detainer defendants in Washington had representation, the surge in cases would drive the number down even further.

Though some civil legal aid organizations in Washington have received increased funding to respond to COVID-related legal issues, that funding is not sufficient to address the eviction surge if the moratoria were suddenly lifted. Additionally, the amici legal services providers are already addressing multiple surges caused by the pandemic—there has been an increase in domestic violence, child abuse, and unemployment benefits legal issues. If the moratoria were lifted without time to develop the resources and systems needed to justly process unlawful detainer actions, we will see thousands of renters kicked out of their homes because they did not receive the legal assistance they needed.

- 21 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

5.      The Court should not disrupt the status quo; it should give the state time to develop a solution

Multiple commentators, across the spectrum, have recognized that additional time is needed to develop solutions to avoid the consequences of a sudden end to eviction moratoria. The Rental Housing Association of Washington's Government Affairs Director, after warning that "[t]here is going to be this eviction cliff if these things end too dramatically," endorsed federal financial assistance and coordination between governments and organizations to support tenants.[72] The American Bar Association, in a letter to Congressional leaders, also endorsed "extend[ing] the evictions and foreclosure moratoriums until a time of greater economic stability and to provide rental and mortgage assistance to vulnerable families and property owners."[73] As the Aspen Institute has noted, "[t]he eviction crisis and its devastating outcomes are entirely preventable. Policy interventions at the national, state, and local levels could avoid many of the devastating costs" of evictions.[74]

Unfortunately, efforts to enact the federal relief necessary to prevent the devastating outcomes of the crisis are currently stalled. Continuation of the moratoria is necessary to provide time for government officials and other policy-makers to implement measures to avoid the "eviction cliff."

State and local authorities have made progress in developing interventions such as rental assistance,[75] a new eviction resolution program,[76] and increased internet service that would

---

[72] KOMO Article.
[73] ABA Letter at 3.
[74] Aspen Inst. Report at 8.
[75] *See*, King County Eviction Prevention and Rent Assistance Program, available at https://kingcounty.gov/depts/community-human-services/COVID/eviction-prevention-rent-assistance.aspx (last visited Oct. 15, 2020).
[76] Order Authorizing Eviction Resolution Program in Superior Courts, In the Matter of Statewide Response by Washington State Courts to the Covid-19 Public Health Emergency, No. 25700-B-639 (Wash. Sept. 9, 2020).

- 22 -

benefit eviction defendants.[77] But further resources are needed to provide rental assistance, ensure renters have access to legal assistance that is connected to rental and housing assistance, bridge the digital divide, and provide alternative housing for the most vulnerable in our society, all while preventing additional inequalities from occurring. Lifting the moratoria before these resources are in place would result in a tragic number of individuals and families becoming homeless and debt ridden.

**H.     Landlords have other options to address their alleged harms**

The moratorium does not create an irreparable harm for landlords. It does not cancel any tenant's rent. A landlord is still owed every dollar in rent that a tenant has not been able to pay due to COVID-19. Furthermore, the moratorium only postpones the recovery of rent that is unpaid as a result of the pandemic; a landlord is not prohibited from collecting rent owed prior to the pandemic or unrelated to the pandemic. *See* Leathers Decl. Ex. B at 28-32 (Dkt. #30-1).

The moratorium also places the burden on the tenant to accept a reasonable payment plan when offered one by the landlord. The moratorium permits a landlord to take legal action to collect unpaid rent if a tenant refuses or fails to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident." *Id*. The moratorium has not cut off landlords' ability to communicate with tenants in seeking a reasonable solution to the issue of unpaid rent that can be mutually beneficial, nor has it allowed for tenants to participate in any "rent strike" when they are capable of paying.

---

[77] Alyssa Therrlen, *Washington State to provide low-income families with free internet access*, Daily Hive News Seattle (Aug. 6, 2020), *available at* https://dailyhive.com/seattle/washington-state-provide-low-income-families-with-free-internet (last visited Oct. 15, 2020).

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

Moreover, the Coronavirus Aid, Relief, and Economic Security (CARES) Act included $150 billion in direct assistance for state governments,[78] from which the Washington Department of Commerce allocated more than $100 million in Eviction Rent Assistance Program (ERAP) grants.[79] ERAP funds provide up to three months of rent assistance to landlords on an eligible tenant's behalf.[80] This assistance mitigates the necessary harm that landlords suffer by having their right to take legal action to collect unpaid rent temporarily postponed by the moratorium.

## III.   CONCLUSION

The Court should find that the public interest is not served by enjoining the state and city moratoria during the ongoing state of emergency related to the COVID-19 pandemic. This factor weighs in favor of denying the plaintiffs' motion for preliminary injunction.

DATED this 21st day of October, 2020

NORTHWEST JUSTICE PROJECT

/s/ Scott Crain
Scott Crain, WSBA#37224
401 Second Ave. S, Suite 407
Seattle, WA 98104
Ph.: (206) 707-0900
Email: ScottC@nwjustice.org

/s/ David Tarshes
David Tarshes, WSBA #13658
401 2nd Ave. S, Suite 407
Seattle, WA 98104
Ph.: (206) 464-1519
Email DavidT@nwjustice.org
Counsel for Amicus Curiae
Northwest Justice Project
Building Changes
Tenants Union of Washington State
Washington Low Income Housing Alliance

---

[78] Pub. L. No. 116–136, 134 Stat. 281.
[79] Washington State Department of Commerce, Aug. 3, 2020, https://www.commerce.wa.gov/news-releases/community-grants/100-million-rental-assistance-headed-to-washington-communities/
[80] Id.

- 24 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

**Northwest Justice Project**
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

COLUMBIA LEGAL SERVICES

/s/ Janet S. Chung
Janet S. Chung, WSBA #28535
Columbia Legal Services
101 Yesler Way, Suite 300
Seattle, WA 98104
(206) 464-6911
Email: janet.chung@columbialegal.org

/s/ Sarah Nagy
Sarah Nagy, WSBA# 52806
Columbia Legal Services
711 Capitol Way S., Ste. #706
Olympia, WA 98501
Ph.: (360) 943-6260
Email: sarah.nagy@columbialegal.org
Counsel for Amicus Curiae
Columbia Legal Services


FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY

/s/ Robert S. Chang
Robert S. Chang, WSBA #44083
Ronald A. Peterson Law Clinic
1112 E. Columbia St.
Seattle, WA 98122
Phone: 206.398.4025
Email: changro@seattleu.edu
Counsel for Amicus Curiae
Fred T. Korematsu Center for Law and Equality

PRO BONO COUNCIL

/s/ Michael Terasaki
Michael Terasaki, WSBA #51923
Pro Bono Council Manager
Michael@probonocouncil.org
1239 120th Ave, Suite J
Bellevue, WA 98005
(425) 495-0132
Counsel for Amicus Curiae
Pro Bono Council

- 25 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501

AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON

/s/ Breanne Shuster
Breanne Schuster, WSBA #49993
P.O. Box 2728
Seattle, WA 98111
Ph: (206) 624-2184
Email: bschuster@aclu-wa.org
Counsel for Amicus Curiae
American Civil Liberties Union of Washington

TENANT LAW CENTER

/s/ Anne E. Mjaatvedt
Anne E. Mjaatvedt, WSBA #46937
100 23rd Avenue South
Seattle, WA  98144
Phone: (206) 328-5936
Email: AnneMj@ccsww.org
Counsel for Amicus Curiae
Tenant Law Center

- 26 -

AMICUS BRIEF
No. 2:20-CV-01323-RAJ-JRC

Northwest Justice Project
401 Second Ave. S #407
Seattle, WA 98104
Tel 206-707-0900 Fax 206-624-7501