# Exhibit 1

2020 WL 6364310
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

RICHARD LEE BROWN, et al., Plaintiffs,
v.
ALEX AZAR, in his official capacity as Secretary, U.S. Department of Health & Human Services, et al., Defendants.

CIVIL ACTION NO. 1:20-CV-03702-JPB
|
10/29/2020

**ORDER**

**\*1** This matter is before the Court on Richard Lee Brown, Jeffrey Rondeau, David Krausz, Sonya Jones and the National Apartment Association's ("NAA") (collectively, "Plaintiffs") Motion for Preliminary Injunction. [Doc. 18]. This Court finds as follows:

FACTS AND PROCEDURAL HISTORY

"It would be a colossal understatement to say that the COVID-19 pandemic has had far-reaching effects. It has changed everything from the way that friends and families interact to the way that businesses and schools operate to the way that courts hear and decide cases." Swain v. Junior, 961 F.3d 1276, 1280 (11th Cir. 2020). As a result of the pandemic, "Federal, State, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria." Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292 (Sept. 4, 2020). This case involves one of those measures—eviction moratoria for certain qualifying individuals.

On September 4, 2020, the Centers for Disease Control and Prevention ("CDC"), a division of the Department of Health and Human Services ("HHS"), implemented a temporary eviction moratorium to prevent the further spread of COVID-19 (the "Order"). Id. While the Order is in place (September 4, 2020, through December 31, 2020, unless extended, modified or rescinded), landlords are prohibited from evicting a covered person from a residential property for the non-payment of rent. Id. at 55,292, 55,297. To qualify as a covered person, the individual tenant must provide a declaration to their landlord under penalty of perjury indicating that: (1) "[t]he individual has used best efforts to obtain all available government assistance for rent or housing"; (2) the individual satisfies certain income requirements; (3) "the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses"; (4) "the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses"; and (5) "eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting— because the individual has no other available housing options." Id. at 55,293.

While the Order temporarily prohibits evictions of covered persons, the Order makes clear that it "does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract." Id. at 55,294. The Order explicitly provides that the landlord is not precluded from charging or collecting fees, penalties or interest as a result of the failure to pay rent on a timely basis. Id. Moreover, nothing in the Order prevents evictions based on the tenant:

> **\*2** (1) [e]ngaging in criminal activity while on the premises; (2) threatening the health or safety of other residents; (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance or other similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment.

Id.

Except for Plaintiff NAA,[1] Plaintiffs are landlords seeking to evict their tenants for the non-payment of rent. Each of the individual plaintiffs supplied affidavits in support of the Motion for Preliminary Injunction. [Docs. 18-2, 18-3, 18-4 and 18-5]. Plaintiff Brown, according to his affidavit, owns a rental property in Virginia and is currently leasing it to a tenant

for $925.00 per month. [Doc. 18-2, pp. 1-2]. Plaintiff Brown asserts that his tenant has not made payments for the past several months, and that if he initiates eviction proceedings against her, she will provide a declaration indicating that she is a covered person under the Order. Id. at 2-3. Plaintiff Brown concludes his affidavit by stating that his tenant is insolvent, and he will not be able to obtain any economic relief or damages from her. Id. at 3.

Similarly, Plaintiff Rondeau owns a rental property in Vale, North Carolina. [Doc. 18-3, p. 1]. Plaintiff Rondeau's property is currently leased to a tenant at a rate of $1,000.00 per month. Id. When Plaintiff Rondeau's tenant fell behind on her rental payments, Plaintiff Rondeau secured a writ of possession, and the Sheriff's Department scheduled the eviction for September 21, 2020. Id. The eviction, however, did not proceed because the tenant provided Plaintiff Rondeau with a declaration indicating that she is a covered person under the Order. Id. at 1-2. Like Plaintiff Brown, Plaintiff Rondeau concludes his affidavit by stating that the tenant is insolvent, and he will not be able to obtain any economic relief or damages from her. Id. at 2.

Plaintiff Krausz owns a rental property in Columbia, South Carolina, and is currently leasing the property to a tenant for a monthly rent of $700.00. [Doc. 18-4, p. 1]. When Plaintiff Krausz' tenant failed to comply with the terms of a consent agreement regarding past due rent, Plaintiff Krausz obtained a writ of possession and scheduled the eviction for September 21, 2020. Id. at 2. Before the eviction could be executed, Plaintiff Krausz' tenant provided him with a declaration indicating that she is a covered person under the Order. Id. at 2-3. As a result, the eviction did not proceed as scheduled. Id. Plaintiff Krausz asserts that the tenant appears to be insolvent and that he will likely be unable to obtain any economic relief or damages from her. Id. at 3.

Plaintiff Jones owns a rental property in Georgia. [Doc. 18-5, p. 1]. On August 24, 2020, Plaintiff Jones began the eviction process by serving her tenant with a dispossessory affidavit. Id. At the hearing to determine whether the tenant would be evicted, which was held on September 8, 2020, Plaintiff Jones' tenant represented to the court that his failure to pay rent was related to the COVID-19 pandemic. Id. Even though Plaintiff Jones' tenant did not submit a declaration that would comply with the Order or show that he is a covered person, the dispossessory court continued all proceedings until January 2021. Id. Plaintiff Jones concludes that her tenant is insolvent and that she will not be able to obtain any economic relief or damages from him. Id. at 2.

**\*3** On September 8, 2020, Plaintiff Brown brought this action against Alex Azar, in his official capacity as Secretary of HHS, HHS, Nina B. Witkofsky, in her official capacity as acting chief of staff for the CDC, and the CDC (collectively, "Defendants") seeking to invalidate the Order. [Doc. 1]. Thereafter, on September 18, 2020, an Amended Complaint was filed adding the other plaintiffs. [Doc. 12]. The instant Motion for Preliminary Injunction was also filed on September 18, 2020. [Doc. 18]. In their Motion for Preliminary Injunction, Plaintiffs ask this Court to enter an order prohibiting Defendants from enforcing the Order. Id. at 10. Briefing on the motion closed on October 16, 2020,[2] and oral argument was heard by video conference on October 20, 2020. Plaintiffs' motion is ripe for review.

ANALYSIS

A plaintiff seeking preliminary injunctive relief must show the following:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause to the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest.

Sofarelli v. Pinellas Cnty., 931 F.2d 718, 723-24 (11th Cir. 1991) (citation omitted). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establish[es] the 'burden of persuasion' as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Granting a preliminary injunction is the exception rather than the rule. Id.

As a preliminary matter, Defendants challenge Plaintiffs' standing to bring the suit. They also argue that the action cannot proceed because Plaintiffs failed to join indispensable parties. The Court will first address the standing and joinder issues before turning to an analysis of the four preliminary injunction prerequisites.

I. Preliminary Issues

A. Plaintiffs' Standing

This Court must first answer the threshold question of whether Plaintiffs have standing. Litigants must have standing to properly invoke the jurisdiction of the federal courts. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims, and the court is powerless to continue." Hollywood Mobile Estates Ltd. v. Seminole Tribe, 641 F.3d 1259, 1265 (11th Cir. 2011) (citation omitted). The standing doctrine requires a plaintiff to show that he:

(1) suffered an injury-in-fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. Lujan, 504 U.S. at 560. At the pleading stage, the court must accept as true all material allegations and must construe them in favor of the complaining party. Corbett v. Transp. Sec. Admin., 930 F.3d 1225, 1228 (11th Cir. 2019). If a court is presented with "facts beyond the four corners of the pleading that are relevant to the question of standing," the court may consider those facts. Id. (citation and punctuation omitted).

Defendants contest the injury-in-fact requirement. The injury-in-fact requirement helps "ensure that the plaintiff has a 'personal stake in the outcome of the controversy.' " Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation omitted). A plaintiff must show that the injury is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.' " Id. (citation omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur." Id. (citation and punctuation omitted).

*4 Each of the individual plaintiffs stated in their affidavits that because of the Order, they had incurred "damages to [their] property." [Docs. 18-2, p. 3, 18-3, p. 2, 18-4, p. 3 and 18-5, p. 2]. Taking issue with this particular statement, Defendants argue that the Order does not actually apply to any of the individual plaintiffs, and thus they are not injured. Defendants contend that the individual plaintiffs are permitted to evict each of their tenants now, despite the Order, because the Order permits a landlord to evict a tenant who damages property or poses a significant risk of damage to property. This Court disagrees.

As an initial matter, "[w]here only injunctive relief is sought, only one plaintiff with standing is required." Gwinnett Cnty. NAACP v. Gwinnett Cnty. Bd. of Registration & Elections, 446 F. Supp. 3d 1111, 1118 (N.D. Ga. 2020) (citation and punctuation omitted); see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 n.9 (1977) (holding that when at least one plaintiff has standing, the Court need not consider whether the other plaintiffs have standing to maintain the suit). For the reasons explained below, this Court finds that at least two of the plaintiffs—Plaintiff Rondeau and Plaintiff Krausz—have shown that they have standing to bring this action.

Plaintiff Rondeau submitted an affidavit wherein he explained that he currently has a tenant renting his property in Vale, North Carolina for $1,000.00 a month. [Doc. 18-3, p. 1]. Plaintiff Rondeau's tenant has not paid any rent since July 6, 2020, and currently owes $2,100.00 in unpaid rent and associated late fees. Id. On August 24, 2020, Plaintiff Rondeau obtained a writ of summary ejectment for the non-payment of rent, which became final on September 3, 2020. Id. He subsequently obtained a writ of possession and scheduled the eviction for September 21, 2020. Id. Before Plaintiff Rondeau's tenant was removed, his tenant provided him with a declaration consistent with the Order, thus stopping the eviction. Id. at 1-2. Although Plaintiff Rondeau stated in his affidavit that he has incurred "damages to [his] property," no evidence is before the Court that Plaintiff Rondeau's tenant damaged the property in such a way that she could be evicted for anything other than the non-payment of rent.[3] The fact remains that Plaintiff Rondeau obtained a writ of possession based on the non-payment of rent, and not on any other ground.

This Court finds that Plaintiff Rondeau's injury is concrete and particularized. He obtained a writ of summary ejectment based on the non-payment of rent, a writ of possession and subsequently scheduled an eviction for September 21, 2020. When his tenant provided a declaration consistent with the Order, he was unable to proceed with the eviction. Now, his tenant remains in the property despite not paying rent. This is not a conjectural or hypothetical injury. But for the Order, Plaintiff Rondeau would have evicted his tenant. Accordingly, Plaintiff Rondeau has shown that he has standing to pursue the action.

Similarly, Plaintiff Krausz obtained a writ of ejectment with an eviction scheduled for September 21, 2020. [Doc. 18-4, p. 2]. Like Plaintiff Rondeau, the eviction was immediately stayed after Plaintiff Krausz' tenant presented a declaration showing that she is a covered person under the Order. Id. at 2-3. Accordingly, for the same reasons Plaintiff Rondeau has standing, Plaintiff Krausz does also.

**\*5** For different reasons, Defendants separately attack the standing of Plaintiff Brown, Plaintiff Jones and Plaintiff NAA.[4] As explained above, however, when a case involves multiple plaintiffs and injunctive relief is sought, a court need not address the standing for each plaintiff. Therefore, at this time, this Court will not analyze whether the remaining plaintiffs have standing.

B. Indispensable Parties

Defendants contend that Plaintiffs' tenants are indispensable parties, thus precluding the possibility of injunctive relief. Federal Rule of Civil Procedure 19 sets forth a two-part test for determining whether a party is indispensable. The court must first decide under Rule 19(a) whether the person in question should be joined. Laker Airways, Inc. v. British Airways, PLC, 182 F.3d 843, 847 (11th Cir. 1999). Then, if the court determines that the person should be joined, but for some reason cannot be, "the court must analyze the factors outlined in Rule 19(b) to determine whether 'in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person thus regarded as indispensable.' " Id. (citation omitted).

Rule 19(a)(1) sets forth two categories of necessary parties who must be joined if feasible:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or
>
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

In deciding whether a party should be joined under Rule 19(a), " 'pragmatic concerns, especially the effect on the parties and the litigation,' control." Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc., 669 F.2d 667, 669 (11th Cir. 1982) (citation omitted).

In this case, Defendants have not shown that the tenants are necessary parties who should be, but cannot be, joined under Rule 19(a). As to the first category of necessary parties, Defendants have made no showing that complete relief is impossible absent the joinder of the tenants. Although Defendants argue that the tenants are necessary parties because an issue exists as to whether the tenants are actually covered persons under the Order, the parties can determine through discovery whether the tenant is a covered person even if that tenant is not made a party to this litigation. This argument is thus without merit.

As to the second category of necessary parties, which includes whether the party has an interest related to the subject of the action and the party's absence may impede the party's ability to protect that interest, Defendants have also failed to meet their burden. Even though Plaintiffs' tenants unquestionably have an interest in this litigation inasmuch as if the Order is enjoined, then the tenants would no longer have protection against eviction through December 31, 2020, the tenants' interests remain adequately protected because they squarely align with Defendants' interests. Cf. Fla. Wildlife Fed'n, Inc. v. U.S. Army Corps. of Eng'rs, 859 F.3d 1306, 1317 (11th Cir. 2017) (recognizing that the potential indispensable party at issue had a strong interest in the outcome of the litigation and that the party's interest was not adequately protected by the existing parties). Furthermore, even though Plaintiffs' tenants have an interest in the home in which they live and are currently renting, the existing parties are not subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations because of that interest. Ultimately, because the tenants do not fit any of the Rule 19(a) categories for persons who should be joined if feasible, the tenants are not indispensable parties under Rule 19. As Defendants have not shown that Plaintiffs' tenants should be joined as parties, this Court need not analyze the second part of the test— determining whether in equity and good conscience the action should proceed.

**\*6** For the reasons explained in the sections above, the Court is satisfied that Plaintiff Rondeau and Plaintiff Krausz have standing, and the action need not be dismissed for the failure to join indispensable parties. As such, this Court will now review whether preliminary injunctive relief is proper.

II. Preliminary Injunction Prerequisites

A. Substantial Likelihood of Success on the Merits
A plaintiff seeking preliminary injunctive relief must show a substantial likelihood that he will ultimately prevail on the merits of his claim. Sofarelli, 931 F.2d at 723. This factor is

generally considered the most important of the four factors. Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986).

Plaintiffs' Amended Complaint raises eight challenges to the Order. [Doc. 12]. In their Motion for Preliminary Injunction, however, they advance only three of the claims. First, Plaintiffs contend that the Order lacks a statutory and regulatory basis. Second, Plaintiffs assert that even if the Order was authorized, the Order is arbitrary and capricious. Third, Plaintiffs argue that the Order violates Plaintiffs' rights to access the courts.

1. Statutory and Regulatory Basis

Plaintiffs argue that the CDC acted without statutory and regulatory authority because both 42 U.S.C. § 264 and 42 C.F.R. § 70.2 limit the CDC to implementing regulations that involve inspection, fumigation, disinfection, sanitation, pest extermination and destruction of animals or articles believed to be sources of infection. Alternatively, Plaintiffs contend that even if the CDC has the authority to issue other types of regulations, the CDC acted without statutory and regulatory authority because (1) the Order is not reasonably necessary to prevent the spread of disease; and (2) the Order does not show that the state and local laws were insufficient to prevent the spread of disease.[5]

The question before this Court is whether the CDC had the authority to temporarily halt evictions for certain covered persons. The resolution of the question "requires an inquiry familiar to the courts: interpreting a federal statute to determine whether executive action is authorized by, or otherwise consistent with, the enactment." Gonzales v. Oregon, 546 U.S. 243, 249 (2006). Importantly, this Court's review is a narrow one: "to discern the meaning of the statute and the implementing regulation[ ]." Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607, 663 (1980) (Burger, J., concurring). Under no circumstances does the judicial function "extend to substantive revision of regulatory policy. That function lies elsewhere—in Congressional and Executive oversight or amendatory legislation." Id.

The Order in this case was issued pursuant to 42 U.S.C. § 264 and 42 C.F.R. § 70.2, and thus discussions of both are necessary to determine whether the CDC had a statutory and regulatory basis for issuing the Order. 42 U.S.C. § 264(a) authorizes the Secretary of HHS[6] to "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States...or from one State ...into any other State." The statute then states that for purposes of carrying out and enforcing such regulations, the Secretary of HHS "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." § 264(a).

*7 In turn, the Secretary of HHS delegated authority to the Director of the CDC. 42 C.F.R. § 70.2. § 70.2 states that whenever the Director of the CDC determines that the measures taken by the health authorities of any state or local jurisdiction are insufficient to prevent the spread of a communicable disease, "he/she may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."

The Eleventh Circuit has directed that " 'courts should always begin the process of legislative interpretation...where they often should end it as well, which is with the words of the statutory provision.' " United States ex rel. Hunt v. Cochise Consultancy, Inc., 887 F.3d 1081, 1088 (11th Cir. 2018) (citation omitted). See also CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) (stating that ordinarily, courts should begin the construction of a statutory provision with its words). Indeed, the Supreme Court has reiterated "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (internal citations and quotation marks omitted).

In determining whether the CDC was authorized to implement the Order, the starting point is therefore "the language of the delegation provision itself." Gonzales, 546 U.S. at 258. "In many cases authority is clear because the statute gives an agency broad power to enforce all provisions of the statute." Id. For example, when an agency is authorized to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act," Congress' intent to give an agency broad power is clear. Id. at 259 (citation and punctuation omitted).

Here, the grant of authority is broad because the delegation provision (42 U.S.C. § 264) is not substantially different from statutes that give an agency the authority to "prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of the Act." Id. at 258. Thus, Congress' intent, as evidenced by the plain language of the delegation provision, is clear: Congress gave the Secretary of HHS broad power to issue regulations necessary to prevent the introduction, transmission or spread of communicable diseases. Because, as forth below, the Order is necessary to control the COVID-19 pandemic, the CDC was authorized to issue it.

The Court could rest its conclusion on this basis alone. See Polkey v. Transtecs Corp., 404 F.3d 1264, 1268 (11th Cir. 2005) (stating that where the "statute's meaning...is clear and unambiguous, its plain language controls [the] analysis," and the "language [of the statute] both begins and ends [the] inquiry"); Conn. Nat'l Bank, 503 U.S. at 253-54 ("When the words of a statute are unambiguous, then...judicial inquiry is complete.") (internal quotation marks omitted). But additional analysis is useful in this case, particularly in light of Plaintiffs' argument that the second sentence of § 264(a), which states that "[f]or purposes of carrying out and enforcing such regulations, the [Secretary of HHS] may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary," operates to limit the Secretary of HHS' authority to just those (or similar) measures. Thus, the Court will look at the "whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities." Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 7 (2011).

**\*8** Further analysis amplifies the flaws in Plaintiffs' arguments. First, limiting the authority of the Secretary of HHS in the way Plaintiffs suggest makes little sense when considering the subsequent subsections of § 264. Specifically, § 264(b) provides, in part, that "[r]egulations prescribed under this section shall not provide for the apprehension, detention, or conditional release of individuals except for the purpose of preventing the introduction, transmission, or spread of such communicable diseases as may be specified from time to time." § 264(c) provides that except as detailed in § 264(d), regulations providing for "the apprehension, detention, examination, or conditional release of individuals, shall be applicable only to individuals coming into a State...from a foreign country." § 264(d)(1) clarifies that when an individual is reasonably believed to be infected with a communicable disease and moving between states, the regulations may provide that the individual "be detained for such time and in such manner as may be reasonably necessary."

In this Court's view, if the Secretary of HHS is only permitted to make and enforce regulations concerning the enumerated list found in § 264(a), then Congress had no reason to explain what authority the Secretary of HHS has when issuing regulations concerning individuals reasonably believed to be infected with a communicable disease as outlined in §§ 264(b)-264(d). In other words, if the list is exhaustive, then the Secretary of HHS would have no power at all to detain individuals. The presence of the additional subsections governing detainment of individuals means that the list contained in the first subsection is not an exhaustive list of the permissible measures available to the Secretary of HHS. See United States v. Hastie, 854 F.3d 1298, 1304 (11th Cir. 2017).

42 C.F.R. § 70.2, which is fully contained within one sentence, closely mirrors its statutory counterpart,[7] and therefore, for the same reasons the Secretary of HHS has broad authority to make and enforce regulations as in his judgment are necessary to prevent the spread of disease, the CDC likewise has the same authority. The only qualifying condition is that the CDC cannot act unless it determines that the measures taken by the health authorities of state or local governments are insufficient to prevent the spread of disease.

Additionally, this Court notes that the regulation states that the CDC may take measures to prevent the spread of disease as it deems necessary, "including" the enumerated items. § 70.2. "[T]he word *include* does not ordinarily introduce an exhaustive list." Hastie, 854 F.3d at 1304. In Hastie, the Eleventh Circuit explained that the Supreme Court has "repeatedly held that the word 'including' in a statute signifies enlargement, not limitation." Id. Because the term "including" in the regulation does not signal an exhaustive list, this Court finds that the list of measures in the regulation following the word including are not the only measures available to the CDC.

Finally, at least one other federal court has considered and rejected the argument Plaintiffs make here. Indep. Turtle Farmers of La. v. United States, 703 F. Supp. 2d 604, 620 (W.D. La. 2010). In Independent Turtle Farmers, the court analyzed a regulation promulgated by the Food and Drug

Administration ("FDA") that banned the sale of viable turtle eggs and live turtles with a shell of less than four inches in length ("Turtle Ban"). Id. at 607. The Turtle Ban is the only federally enacted ban on the sale of any pet and was enacted primarily to curb the spread of salmonellosis. Id. The plaintiffs, an association of commercial turtle farmers, argued that the FDA did not have statutory and regulatory authority to enact and maintain the Turtle Ban. Id. at 618.

In analyzing whether Congress delegated power to the FDA to regulate the sale of turtles as pets, the court explained that the FDA derived its authority to enact the regulation from 42 U.S.C. § 264(a)—the same implementing statute involved in this case. Id. at 618-19. The court acknowledged that § 264(a) specifies that the FDA may provide for inspection, fumigation, disinfection, sanitation, pest extermination and destruction of animals or articles found to be so infected or contaminated. Id. at 619. Like Plaintiffs in this case, the Independent Turtle Farmers plaintiffs asked the court to "read this list of 'powers' as an exhaustive one." Id. That, the court was not willing to do.

 *9  First, the court explained that the list of enumerated items "directly precedes a 'catch-all' grant of authority, allowing the Secretary (or the FDA Commissioner) to enact '*other measures, as in his judgment may be necessary*,' in addition to the measures suggested in the list." Id. at 619-20 (emphasis added). The court explained that the catch-all phrase "precludes interpretation of the list as exhaustive." Id. at 620. The court further stated that "the list does not act as a limitation upon the types of regulations that may be enacted under [§ 264]. Instead, the list contains certain 'measures' which the FDA may employ [f]or purposes of carrying out and enforcing such regulations." Id. (citation omitted). Even though the enumerated list only speaks in terms of "destruction of animals"—and not regulating or preventing the sale of such animals—the court concluded that the Turtle Ban was permissible because "there is no express prohibition in the statute evidencing contrary congressional intent." Id. The court reasoned that the list of measures "is not phrased as a limitation upon the *type* of regulation that may be promulgated by the FDA. Instead, [§ 264(a)] grants the FDA authority to enact 'such regulations as in [its] judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases.' " Id. (citation omitted). Ultimately, the court found that the FDA had the authority to enact a ban on the sale of turtles. Id.

In sum, the clear and broad delegation of authority in the first sentence of § 264(a); the context provided by the subsequent subsections; the parroting language of § 70.2, which specifically uses the term including—a term of enlargement; and persuasive authority from the Independent Turtle Farmers court all point to the same conclusion: the Order has statutory and regulatory authority, and the CDC may take those measures that it deems reasonably necessary to prevent the spread of disease, so long as it determines that the measures taken by any state or local government are insufficient to prevent the spread of the disease.

Plaintiffs' additional argument that several of the canons of construction (*ejusdem generis*, *expression unius*, *noscuitur a sociis* and *casus omisus*) compel a different result is not persuasive. "For one thing, canons are not mandatory rules. They are guides that 'need not be conclusive.' " Chickasaw Nation v. United States, 534 U.S. 84, 94 (2001) (citation omitted). See also Conn. Nat'l Bank, 503 U.S. at 253 (stating that "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation"). Canons are not necessarily outcome determinative because "other circumstances evidencing congressional intent can overcome their force," and "[s]pecific canons are often countered by some maxim pointing in a different direction." Chickasaw Nation, 534 U.S. at 94 (citation and internal punctuation omitted).

In any event, none of the four cannons Plaintiffs offer applies here because there is no ambiguity to which they could be applied. As the Court has already explained, the implementing statute (and derivative regulation) demonstrate Congress' unambiguous intent to delegate broad authority to the CDC to enter an order such as the one at issue here. The Court will nevertheless address each canon briefly for the purposes of a complete record.

The principle of *ejusdem generis* counsels that " 'when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.' " Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 223 (2008) (citation omitted). " 'The rule...is only an instrumentality for ascertaining the correct meaning of words *when there is uncertainty*,' " and " 'it may not be used to defeat the obvious purpose of legislation.' " United States v. Powell, 423 U.S. 87, 91 (1975) (emphasis added) (citation omitted). Thus, where the court discerns no uncertainty in the statute and congressional intent is clear, it is inappropriate to

apply the rule. Harrison v. PPG Indus., Inc., 446 U.S. 578, 588-89 (1980).

The Court finds it inappropriate to apply the principle of *ejusdem generis* here in large part because it has already found that there is no ambiguity in the statute or regulation. Accordingly, the rule cannot be used to procure a different result or defeat clear congressional intent. Moreover, the canon is not applicable to § 70.2 because that regulation does not contain the requisite list of specific terms followed by a general one. Instead, the specific terms are *preceded* by the word "including," which signifies a more expansive, non-exhaustive list.

**\*10** The *expressio unius* canon "stands for the proposition that the mention of one thing implies the exclusion of the other." Wilhelm Pudenz, GmbH v. Littlefuse, Inc., 177 F.3d 1204, 1209 (11th Cir. 1999). "The force of any negative implication...depends on context," and "[the Supreme Court] ha[s] long held that the *expressio unius* canon does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.' " Marx v. Gen. Revenue Corp., 568 U.S. 371, 381 (2013) (citation omitted). See also N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 940 (2017) ("The *expressio unius* canon applies only when 'circumstances support[ ] a sensible inference that the term left out must have been meant to be excluded.' ") (citation omitted).

In this case, there is no "sensible inference" that Congress meant to limit the measures the CDC may properly implement to just those listed in the text or their counterparts. Nor is there evidence that Congress meant to exclude the specific measure at issue here. Rather, the language employed in the statute and regulation demonstrates the opposite. As a result, the *expressio unius* canon does not apply.

At the core of the doctrine of *noscitur a sociis*, the third canon advanced by Plaintiffs, is the principle that " 'an ambiguous term may be given more precise content by the neighboring words with which it is associated.' " Bilski v. Kappos, 561 U.S. 593, 604 (2010) (citation omitted). For example, in Jarecki v. G. D. Searle & Co., the court looked at two other words enumerated in a sentence, "exploration" and "prospecting," to determine the meaning of a third word, "discovery," which the court found was ambiguous and capable of many meanings. 367 U.S. 303, 307 (1961). The *noscitur a sociis* canon is not "an invariable rule [because] [a] word may have a character of its own not to be submerged

by its association." Russell Motor Car Co. v. United States, 261 U.S. 514, 519 (1923). Importantly, it "ha[s] no place [in statutory construction],...except in the domain of ambiguity," and it cannot be used to create doubt—only to remove it. Id.

Apart from the obvious flaw that Plaintiffs have failed to identify the existing ambiguous *word* that must be defined in reference to other similar enumerated words, like the other canons Plaintiffs have invoked, this rule is not applicable in the absence of ambiguity. Thus, its use here would be improper.

Finally, the principle of *casus omissus* echoes the common thread in this Court's opinion—that the "import of statutory language is what it says, not what it ought to say" or, in this case, not what Plaintiffs argue it meant to omit. Mamani v. Berzain, 825 F.3d 1304, 1310 (11th Cir. 2016) (noting that the court is not "allowed to add or subtract words from a statute" that may better serve a certain policy and underscoring that its "task is merely to apply statutory language, not to rewrite it"). Under this rule, a seeming omission in a statute "does not justify judicial legislation." Ebert v. Poston, 266 U.S. 548, 554 (1925).

Contrary to Plaintiffs' assertion, reading the statute broadly as it is written is exactly in line with the *casus omissus* canon. And refusing to improperly narrow its meaning, as Plaintiffs propose, is not akin to inserting terms that Congress did not include.

In sum, this Court finds that Plaintiffs have not clearly shown a substantial likelihood of success on the merits as to their claim that the Order was promulgated without statutory and regulatory authority. In other words, Plaintiffs have not clearly shown that the regulation limits the CDC's authority to measures involving inspection, fumigation, disinfection, sanitation, pest extermination and the destruction of animals or articles believed to be sources of infection.

2. Arbitrary and Capricious

**\*11** This Court will next analyze Plaintiffs' argument that the Order is arbitrary and capricious. The Administrative Procedure Act ("APA") "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." Franklin v. Massachusetts, 505 U.S. 788, 796 (1992). Agencies must engage in "reasoned decisionmaking," and agency rules must be set aside if they are arbitrary or capricious. Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1905 (2020).

An agency rule is arbitrary and capricious if the agency relied on factors that Congress did not intend for it to consider, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Wright v. Everson, 543 F.3d 649, 654 (11th Cir. 2008). The arbitrary and capricious standard is exceedingly deferential and "courts are required to defer to conclusions reached by an agency that are base[d] on its specialized expertise." Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior, 835 F.3d 1377, 1384 (11th Cir. 2016). Certainly, where officials undertake to act in areas fraught with medical and scientific uncertainties, as is the case here, "their latitude must be 'especially broad.' " S. Bay United Pentecostal Church v. Newsom, 140 S. Ct. 1613, 1613 (2020) (Roberts, J., concurring) (citation omitted). Moreover, "[w]here those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." Id. at 1613-14 (citation omitted).

Plaintiffs argue that the Order is arbitrary and capricious because it is not supported by substantial evidence or relevant data. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Nat'l Parks, 835 F.3d at 1384. "This standard precludes a reviewing court from 'deciding the facts anew, making credibility determinations, or re-weighing the evidence.' " Id. (citation omitted). "It is a 'foundational principal of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.' " Dep't of Homeland Sec., 140 S. Ct. at 1907 (citation omitted). Importantly, "[a]n agency must defend its actions based on the reasons it gave when it acted." Id. at 1909. "To put a finer point on it, the APA requires agencies to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." Brotherhood of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin., 972 F.3d 83, 115 (D.C. Cir. 2020).

In this case, Plaintiffs contend that: (1) the CDC did not show with substantial evidence that a temporary eviction moratorium is reasonably necessary to prevent the spread of COVID-19; and (2) the CDC did not demonstrate with substantial evidence that state and local measures were insufficient to prevent the spread of COVID-19.

i. Reasonably Necessary

Plaintiffs argue that the Order is not supported by evidence that shows that an eviction moratorium is "reasonably necessary" to prevent the further spread of disease. Specifically, Plaintiffs contend that the evidence does not show that evictions will increase COVID-19 infections. Plaintiffs then question why the CDC elected to address the issue of evictions instead of other things that might increase the risk of community spread, like attending school or patronizing bars. Plaintiffs ultimately contend that the Order is not reasonably necessary because it is "hardly the most pressing concern for virus containment." [Doc. 15-1, p. 27].

**\*12** This Court disagrees with Plaintiffs because the Order explains, in detail, why a temporary eviction moratorium is reasonably necessary. The Order states that there is currently a global pandemic of COVID-19, which presents a "historic threat to public health." Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,292. As of August 24, 2020, COVID-19 had infected over 5.5 million individuals in the United States, resulting in over 174,000 deaths. Id. Underscoring the seriousness of the pandemic, the CDC referenced one study that showed that the mortality rate associated with COVID-19 during the early phase of the outbreak was comparable to the 1918 influenza pandemic, where 675,000 lives were lost in the United States alone. Id. In the Order, the CDC explains that despite measures such as border closures, travel restrictions and stay-at-home orders, COVID-19 continues to spread, and further action is needed. Id.

Without an eviction moratorium, evidence relied upon by the CDC shows that as many as thirty to forty million people in the United States—an unprecedented number—could be at risk of eviction. Id. at 55,295. In plain terms, the Order notes that evicted people must move and many who are evicted (32% according to a Census Bureau American Housing Survey) move into shared housing or other congregate settings. Id. at 55,294. Shared housing includes moving in with friends and family or moving into transitional housing or shelters. Id.

In its Order, the CDC addresses the spread of disease in these congregate housing situations. First, the CDC recognizes that "COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about [six] feet), mainly through respiratory droplets

produced when an infected person coughs, sneezes, or talks." Id. at 55,292. The Order indicates that in transitional housing or shelters, challenges maintaining social distancing (staying more than six feet apart) exist because residents often gather closely or use shared equipment, such as kitchen appliances, laundry facilities, stairwells and elevators. Id. at 55,294. Importantly, studies cited by the CDC demonstrate that "COVID-19 transmission occurs readily within households" and "household contacts are estimated to be [six] times more likely to be infected by an index case of COVID-19 than other close contacts." Id. In sum, the evidence shows that the transmission rates will increase if people are forced to live in congregate settings.

While some evicted individuals may move into shared housing or other congregate settings, as explained above, other evicted individuals may become homeless, thus raising a different set of concerns. Id. at 55,295. Between 2018 and 2019, approximately five to fifteen percent of individuals experiencing homelessness did so as the result of being evicted. Id. In terms of COVID-19, homeless individuals are a high-risk population because it may not be possible to avoid a congregate setting, like a homeless shelter, especially as winter approaches and the temperature drops. Id. Citing to evidence showing high infection rates in homeless shelters, the CDC explains that homeless shelters are particularly vulnerable to COVID-19 outbreaks, especially if they become overcrowded. Id. For the homeless not seeking refuge in a homeless shelter, the Order explains that many lack basic sanitation tools and equipment to effectively prevent disease. Id.

Based on this evidence, the CDC "determined the temporary halt in evictions...constitutes a reasonably necessary measure under 42 C.F.R. § 70.2 to prevent the further spread of COVID-19 throughout the United States." Id. at 55,296. The Order explains that this is an appropriate measure "[b]ased on the convergence of COVID-19, seasonal influenza, and the increased risk of individuals sheltering in close quarters in congregate settings such as homeless shelters, which may be unable to provide adequate social distancing as populations increase, all of which may be exacerbated as fall and winter approach." Id. Significantly, the eviction moratorium only applies to those individuals whose housing options, if evicted, are limited to congregate settings or homelessness. Id. at 55,293. Throughout the Order, the potential risks and dangers of moving into a congregate living situation or becoming homeless are detailed, and the Order only prevents evictions of those individuals that swear, under penalty of perjury, that an eviction would result in congregate living or homelessness. Id. at 55,292.

**\*13** Contrary to Plaintiffs' argument, the CDC need not show that the eviction moratorium is the only measure that will prevent the spread of COVID-19 or the most pressing concern. The CDC also need not show that it is the very best measure to reduce the spread of disease. "A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n, 136 S. Ct. 760, 782 (2016). In the situation we have here —an unprecedented pandemic with widespread contagion —this Court finds that the CDC's response is reasonably calibrated to the seriousness of the disease it is combatting. Simply put, the CDC has shown what it needs to: that an eviction moratorium for individuals likely to be forced into congregate living situations is an effective public health measure that prevents the spread of communicable diseases because it aids the implementation of stay-at home and social distancing directives. It is not this Court's job to render a judgment that the CDC should have taken some other public measure. Id. at 784. This Court's "important but limited role is to ensure that the [CDC] engaged in reasoned decisionmaking." Id. This Court is satisfied that it has done so, as the CDC cited evidence and intelligibly explained the reasons for implementing the Order. Ultimately, Plaintiffs have not shown a substantial likelihood of success on their claim that the Order is not reasonably necessary to prevent the spread of disease.

ii. State Measures

Plaintiffs also argue that the CDC did not show that the measures taken by the state and local governments were insufficient. This Court disagrees, as the Order plainly states that the measures in state and local jurisdictions that do not provide protections for renters equal to or greater than the protections provided for in the Order are insufficient to prevent the spread of COVID-19. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,296. Furthermore, at the outset of the CDC's analysis, the CDC acknowledges that despite "best efforts, COVID-19 continues to spread and further action is needed." Id. at 55,292.

Although the Order does not discuss non-eviction related mitigation efforts taken by the various states and local governments, the CDC did analyze each state's eviction restrictions, and the evidence suggested that in the absence

of eviction moratoria, tens of millions of Americans could be at risk of eviction on a scale that would be unprecedented in modern times. Id. at 55,295-96 n.36. The Eviction Lab Scorecard ("Scorecard"), which is cited by the CDC in its Order, contains a state-by-state analysis of eviction measures. COVID-19 Housing Policy Scorecard, Eviction Lab, https://evictionlab.org/covid-policy-scorecard/ (last visited Oct. 24, 2020). Specifically, the Scorecard distills the contents of "thousands of newly-released emergency orders, declarations, and legislation into a clear set of critical measures included in, and left out of, state-level pandemic responses related to eviction and housing." COVID-19 Housing Policy Scorecard Methodology, Eviction Lab, https://evictionlab.org/covid-housing-scorecard-methods/ (Apr. 20, 2020). The Scorecard "provides comprehensive information about the varying approaches state-by-state" by analyzing the following categories: (1) initiation of eviction; (2) court process; (3) enforcement of eviction order; (4) short-term supports; and (5) tenancy preservation measures. Id. "The [S]corecard also includes figures for the number of renters in each state who could be affected by the housing crisis." Id.

In Alabama, for instance, where it is estimated that the rental population exceeds 1.4 million, no state restrictions currently exist on the initiation of eviction proceedings, the court processes associated with evictions or the enforcement of eviction orders. COVID-19 Housing Policy Scorecard, Eviction Lab, https://evictionlab.org/covid-policy-scorecard/ (last visited Oct. 24, 2020). In other words, in Alabama, absent the Order, a landlord could evict a tenant for non-payment of rent even if the tenant had sustained a substantial loss of household income and would likely be forced to live in a congregate living situation. Id. Like numerous other states, Virginia, North Carolina, South Carolina and Georgia—all states where Plaintiffs have rental properties—also currently have no state restrictions on evictions. Id.

**\*14** The CDC referenced the measures in place in various jurisdictions and, based on that knowledge, determined that a moratorium was necessary.

Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,295-96 n.36. The knowledge that state and local governments in some of these jurisdictions have no restrictions at all on evictions (i.e., that evictions proceed unabated) combined with evidence that evictions contribute to the spread of COVID-19 by increasing the number of individuals living in congregate settings where disease spreads more rapidly is substantial evidence to show that the state restrictions (or lack thereof) were not adequate to prevent the spread of disease. Because substantial evidence exists that state and local measures were inadequate to prevent the spread of disease (as some states have no measures at all), Plaintiffs are not substantially likely to succeed on their claim that the Order is arbitrary and capricious.

3. Right to Access the Courts

Plaintiffs next argue that they have shown a substantial likelihood of success on the merits because the Order unlawfully strips them of their constitutional rights to access the courts. To properly determine whether Plaintiffs' rights to access the courts are violated, it is important to consider what the Order does and does not do.

The Order in this case does, on a temporary basis, prohibit a landlord from evicting a covered person from a residential property for the non-payment of rent. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,292. The Order does not, however, apply to every tenant or to every possible reason for an eviction. It also does not apply to all possible avenues of recovery for a landlord or to all procedural aspects of eviction proceedings.

As stated immediately above, the Order does not apply to every person renting a property. Instead, the Order only applies to those persons who provide a declaration to their landlord under penalty of perjury indicating that: (1) "[t]he individual has used best efforts to obtain all available government assistance for rent or housing"; (2) the individual satisfies certain income requirements; (3) "the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses"; (4) "the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses"; and (5) "eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options." Id. at 55,293.

The Order also does not apply to every reason a landlord may evict a tenant. Specifically, the Order does not impede evictions of tenants who:

(1) engag[e] in criminal activity while on the premises; (2) threaten[ ] the health or safety of other residents; (3) damag[e] or pos[e] an immediate and significant risk of damage to property; (4) violat[e] any applicable building code, health ordinance or other similar regulation; or (5) violat[e] another contractual obligation, other than the timely payment of rent.

**\*15** Id. at 55,294.

Moreover, the Order does not prohibit Plaintiffs from seeking a different remedy to recover their losses. The Order plainly preserves Plaintiffs' rights to charge and collect "fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis." Id. at 55,292. Nothing in the Order prohibits a landlord from collecting these fees or past due rent via a breach of contract action or other similar remedy available under state law.

Lastly, the Order does not apply to all procedural aspects of the eviction proceedings. In a document entitled "Frequently Asked Questions," which was published by the CDC, the CDC clarified that "[t]he Order is not intended to terminate or suspend the operations of any state or local court. Nor is it intended to prevent landlords from starting eviction proceedings, provided that the *actual eviction* of a covered person for non-payment of rent does NOT take place during the period of the Order." [Doc. 43-1, p. 1] (first emphasis added). As clarified by the CDC, under the Order, landlords are therefore not precluded from serving their tenants with any required non-payment notices, commencing court proceedings, attending trials or obtaining judgments. The Order only delays the actual eviction.

The narrow issue thus presented in this case is whether a law that temporarily curtails the enforcement of an eviction order—not a plaintiff's ability to secure that eviction order or pursue another type of action, like a breach of contract action —violates a plaintiff's right to access the courts.

The Supreme Court has indicated that there are two categories of claims involving the denial of access to courts. Christopher v. Harbury, 536 U.S. 403, 412-13 (2002). The first category of cases involves systemic official action that frustrates a plaintiff or a class of plaintiffs in preparing and filing suits at the present time. Id. at 413.

> In cases of this sort, the essence of the access claim is that official action is presently denying an opportunity to litigate for a class of potential plaintiffs. The opportunity has not been lost for all time, however, but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed.

Id. The second category of claims involving the denial of access to courts "covers claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." Id. at 413-14.

While the circumstances vary for each category of claims, "the ultimate justification for recognizing each kind of claim is the same." Id. at 414. "[T]he very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." Id. at 414-15. Right of access cases "rest on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Id. at 415.

**\*16** In evaluating state-mandated eviction moratoriums as they relate to a right to access claim, two federal courts have held that the landlords failed to show that their rights to access the courts were violated. In Elmsford Apartment Associates, LLC v. Cuomo, the court analyzed New York's eviction moratorium, which completely barred landlords from filing eviction proceedings for the non-payment of rent. No. 20-cv-4062 (CM), 2020 WL 3498456, at \*4 (S.D.N.Y. June 29, 2020). Two primary reasons supported the court's conclusion that the eviction moratorium did not implicate the constitutional right to access. Id. at 16. First, the court held that the landlords had not shown that the eviction moratorium had the actual effect of frustrating their efforts to pursue a legal claim because the landlords could "still sue their tenants for arrearages through a breach of contract action." Id. The eviction moratorium "suspended one of several avenues by which landlords can seek relief for nonpayment, while leaving other (if less favored) remedial proceedings for breach of contract (which is exactly what a breach of a lease is) in place." Id. at 17.

Second, the court held that the "mere delay" to filing a lawsuit cannot form the basis of a constitutional violation "when the plaintiff will, at some point, regain access to legal process." Id. at 16. Finding that the landlords' opportunity to bring eviction proceedings was merely delayed because they could bring an action upon the moratorium's expiration, the court denied the right to access claim. Id. The court

concluded its analysis by stating that to rule that the eviction moratorium violates the constitutional right to access the courts "would greatly exaggerate the actual effects of a temporary pause on a subset of evictions, which nevertheless preserved the landlords' economic rights under the affected rental agreements, and which was tailored to avoid crowding in housing courts and homeless shelters during an ongoing public health emergency." Id. at 17.

Similarly, in Baptiste v. Kennealy, the court analyzed an eviction moratorium that barred landlords from filing and prosecuting eviction cases. No. 1:20-cv-11335-MLW, 2020 WL 5751572, at *25 (D. Mass. Sept. 25, 2020). The court determined that the landlords were not reasonably likely to prevail on their claim that "by temporarily removing access to the Housing Court to pursue the statutory summary procedures to evict, the [eviction moratorium] when enacted violated their constitutional right to access the courts." Id. (implying that the "gravamen" of the landlords' claim was "not total deprivation...but only delay").

Turning to an analysis of the federal eviction moratorium at issue in this case, for three different reasons, this Court finds that it does not violate Plaintiffs' constitutional rights to access the courts. First, the Order does not prohibit Plaintiffs from pursuing a breach of contract action either now or in the future. Accordingly, Plaintiffs still have some form of relief available to them within the courts. While a breach of contract action is often not a landlord's "preferred remedy," the Order does not suspend a landlord's right to this remedy in any manner whatsoever, and this is significant. Elmsford, 2020 WL 3498456, at *16.

Second, the Order is temporary; therefore, Plaintiffs' ability to evict their tenants is only merely delayed until it expires on December 31, 2020, unless extended, modified or rescinded. As recognized in Elmsford, "mere delay" to filing a lawsuit cannot form the basis of a constitutional violation, "when the plaintiff will, at some point, regain access to legal process." Id. Here, it is clear that Plaintiffs will regain access to legal process upon expiration of the Order.

Lastly, instead of completely foreclosing Plaintiffs' rights to pursue an eviction, Plaintiffs can immediately start eviction proceedings now and are only delayed in enforcing any eviction order they might obtain. It is noteworthy that, in this regard, the Order is even more narrow than the state eviction moratoriums analyzed in Elmsford and Baptiste, neither of which were found to have violated a landlord's constitutional right to access the courts. The moratoriums at issue in those cases completely prohibited landlords from even beginning an eviction proceeding. This distinction is notable because the eviction process can be slow and cumbersome. See Elmsford, 2020 WL 3498456, at *4. Taking the New York state procedures discussed in Elmsford as an example, a landlord there must first serve the tenant with a notice of non-payment and give the tenant a chance to cure within fourteen days. Id. If the tenant does not cure within that time frame, the landlord can then commence summary non-payment proceedings by "filing a petition in the civil court, returnable by the tenant within [ten] days." Id. In the event a tenant responds, a trial is set within an eight-day period but can be "adjourned up to ten additional days if the parties so require in order to produce their witnesses." Id. If a warrant issues, the sheriff must then give the tenant another fourteen days' notice in writing prior to the execution of the warrant. Id. Only after all these steps are completed may a landlord remove a tenant from his home. Based on these numbers, the entire eviction process can be time-consuming.

*17 As clarified by the CDC, the Order at issue here does not preclude landlords from starting eviction proceedings or from taking most of the follow-up steps in the process (like commencing court proceedings, attending trials or obtaining judgments)—all of which can take considerable time. Thus, Plaintiffs here are less delayed than the landlords in Elmsford and Baptiste, where the entire eviction process was halted. Under this Order, Plaintiffs can obtain an eviction order now, and once the Order is lifted, immediately evict their tenants, instead of waiting until the Order expires to begin the potentially lengthy process.

Ultimately, because Plaintiffs are still permitted to file breach of contract actions and begin eviction proceedings, and are only merely delayed in enforcing eviction orders, this Court finds (for the same reasons explained in Elmsford and Baptiste) that Plaintiffs have not clearly shown a substantial likelihood of success on the merits as to their claim that the Order violates their constitutional rights to access the courts.

B. Irreparable Injury
"A showing of irreparable injury is the 'sine qua non of injunctive relief.' " Siegel, 234 F.3d at 1176 (citation omitted). Even if a plaintiff can show a substantial likelihood of success on the merits, which is not the case here, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." Id. See also Northeastern Fla. Chapter of Ass'n of Gen. Contractors

v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (holding that "[w]e need not address each element because we conclude that no showing of irreparable injury was made"); Commodities & Minerals Enter., Ltd. v. Citibank, N.A., No. 12-22333-CIV-UNGARO/TORRES, 2012 WL 12844749, at *3 (S.D. Fla. Aug. 16, 2012) (declining to analyze the other preliminary injunction requirements where the plaintiff could not demonstrate that he would suffer irreparable harm). In analyzing whether an injury is irreparable, the Eleventh Circuit has held that:

> [m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

United States v. Jefferson Cnty., 720 F.2d 1511, 1520 (11th Cir. 1983). The irreparable injury "must be neither remote nor speculative, but actual and imminent." Siegel, 234 F.3d at 1176. Stated another way, "[t]he moving party must make a 'clear showing' of 'substantial,' 'actual and imminent' irreparable harm, as opposed to 'a merely conjectural or hypothetical—threat of future injury.' " FHR TB, LLC v. TB Isle Resort, LP., 865 F. Supp. 2d 1172, 1206 (S.D. Fla. 2011) (citation omitted).

Plaintiffs argue the following irreparable harms: (1) violation of their constitutional rights; (2) noncompensable loss of the value of their property; and (3) deprivation of residential property.[8] Each purported harm is addressed below.

1. Violation of Constitutional Rights

 *18  Plaintiffs argue that because the Order is unconstitutional, they need not show any additional harm to satisfy the irreparable injury requirement. In other words, Plaintiffs argue that their constitutional rights were violated; thus, the irreparable injury requirement is automatically satisfied. [Doc. 15-1, p. 36]. This Court disagrees. Merely asserting a constitutional claim is insufficient to trigger a finding of irreparable harm.

Plaintiffs cite only to General Contractors for the proposition that additional harm beyond a violation of a constitutional right need not be shown. 896 F.2d 1283. In that case, however, the Eleventh Circuit explicitly held that "[t]he only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is in the area of first amendment and right of privacy jurisprudence." Id. at 1285. The court further explained that "[t]he rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." Id. This Court finds that the rationale for finding irreparable injury for certain constitutional violations does not apply in this case. This case involves neither free speech nor invasion of privacy. Furthermore, "the damage to [Plaintiffs] here is chiefly, if not completely, economic." Id. at 1286.

2. Noncompensable Loss of the Value of Property

Plaintiffs assert that the irreparable injury requirement is satisfied because they will never be able to recover economic damages that accrue while the Order is in place. Specifically, Plaintiffs assert that their tenants are insolvent, and thus any judgment obtained against them would be uncollectible. [Doc. 15-1, pp. 36-37]. Defendants, on the other hand, contend that Plaintiffs' fears that a judgment would not be collectible are "unsupported" and "speculative." [Doc. 22, p. 34].

This Court will begin its review of Plaintiffs' argument by analyzing United States v. Askins & Miller Orthopaedics, P.A., a recent decision from the Eleventh Circuit squarely addressing, for the first time by the court, the issue of "whether the collectability of a future money judgment to cure an expected future injury matters." 924 F.3d 1348, 1358 (11th Cir. 2019). In Askins, the defendants habitually failed to pay their federal employment taxes. Id. at 1351. As a result, the Internal Revenue Service ("IRS") asked the court for an injunction to protect it from the defendants' future non-payment of taxes—taxes that the IRS knew it would never be able to collect. Id. at 1358.

The evidence presented in Askins showed that the defendants failed to pay their employment taxes from 2010 until 2017. Id. at 1351. During this seven-year period, the IRS made numerous attempts to collect the debt, including conducting thirty-four meetings and entering into installment agreements with the defendants and warning them of further legal action. Id. at 1352. The IRS even served levies on multiple entities, but most responded by indicating that there were no funds available to cover the debt. Id. The IRS' collection efforts were made more difficult because the defendants unlawfully diverted their money to other accounts to avoid collection. Id.

In analyzing whether the IRS showed an irreparable harm, the court held that " 'extraordinary circumstances,' including the likelihood that a defendant will never pay, [is] one way 'to give rise to the irreparable harm necessary for a preliminary injunction.' " Id. at 1359 (citation omitted). In the court's opinion, the fact that the IRS was attempting to avoid future losses was important. Id. The court noted that as long as the defendants continued to accrue taxes, the IRS would continue to lose money, and this "sets the IRS apart from the position of other creditors (who can cut their losses by refusing to extend additional credit), and—crucially—means that the injunction sought is not simply an attempt to provide security for *past* debts." Id. The court highlighted that the proposed injunction "would staunch the flow of ongoing *future* losses." Id. Finding that irreparable harm was shown, the court stated that "[o]n these facts, the IRS's ability to sit on its hands until the defendants fail to pay their taxes (again) and only then bring an action for money damages does not qualify as an 'adequate' legal remedy." Id. at 1358. Ultimately, the court held that "the record amply demonstrates that, absent the requested injunction, the [IRS] will continue to suffer harm from [the defendants'] willful and continuing failure to comply with its employment tax obligations...and that, in all likelihood, the [IRS] will never recoup these losses." Id. at 1360.

**\*19** Therefore, in order to determine whether Plaintiffs will be irreparably harmed, this Court must analyze, under Askins, whether Plaintiffs have clearly shown that, in all likelihood, they will never recoup the losses that occur while the Order is in place. The instant case presents some similarities to Askins but also some important differences. As to the similarities, Plaintiffs in this case are not seeking an injunction to ensure collection of a previous debt owed, but they are seeking injunctive relief to protect against future losses—the non-payment of rent during the time the Order is in place. Like the IRS, Plaintiffs are not permitted to cut their losses, and so in that sense, Plaintiffs are involuntary creditors. In other words, Plaintiffs are not, of their own volition, extending additional credit to their tenants but are instead forced to allow the tenants to stay in the homes without payment.

Unlike Askins, where the IRS fully supported, with extensive evidence, its claim that a future judgment would not be collectible, Plaintiffs put very little evidence before this Court. Specifically, the IRS in Askins presented evidence explaining the efforts they had undertaken to ensure that they received payment, including, but not limited to, making phone calls, conducting in-person meetings, entering into repayment plans and levying the defendants' assets. Significantly, the IRS was able to show that despite the collection efforts, it did not appear that the defendants would be able to satisfy the debts. Moreover, the levies did not produce sufficient funds to satisfy the debts owed. Here, however, Plaintiffs have not presented any evidence regarding collection measures that they have taken to ensure that the rent is paid or whether a legal tool, such as a levy or garnishment, would be unsuccessful in the event a judgment is entered at a later time. Plaintiffs have also presented no evidence that their tenants, like the defendants in Askins, would unlawfully divert funds to avoid the payment of a judgment.

Another difference from Askins is the history of non-payment. The record in Askins showed that the defendants habitually failed to pay their taxes for a period of seven years and would likely, in the opinion of the court, continue not to pay for years to come. In this case, the tenants' failures to pay are not nearly as extreme or pervasive. Plaintiff Brown stated that his tenant has made no payments for several months. [Doc. 18-2, p. 2]. Plaintiff Rondeau provided that his tenant has not paid any rent since July 6, 2020. [Doc. 18-3, p. 1]. Similarly, Plaintiff Krauz' tenant fell behind on rent in July 2020. [Doc. 18-4, p. 1]. Lastly, Plaintiff Jones explained that her tenant is four months behind on rent. [Doc. 18-5, pp. 1-2]. It is much easier for a court to conclude that a debtor who has not paid for seven years will not pay in the future than it is for a court to conclude that a debtor who has recently stopped paying will continue the history of non-payment indefinitely, especially when the Order expires in only two months.

Plaintiffs' evidence that they will never be able to collect a future judgment is slight. When asked during oral argument what evidence supports Plaintiffs' conclusion that their tenants are insolvent, Plaintiffs' counsel pointed to conditions three and four of the tenants' declarations[9] and to the tenants' failure to pay rent. [Doc. 47, pp. 8-10]. He explained that condition three requires that the tenants swear that they are unable to pay the full amount of rent due to a substantial loss of household income, loss of compensable hours of work or extraordinary out-of-pocket medical expenses and that condition four requires the tenants to swear that they are using their best efforts to make timely partial payments. Id.; see Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,293. Plaintiffs' counsel then concluded that because the tenants are currently not paying their rent, the circumstances show that they are insolvent or judgment proof.[10] [Doc. 47, pp.

8-10]. Plaintiffs presented no additional evidence regarding the tenants' insolvency.

**\*20** This limited evidence is not enough for this Court to find that, in all likelihood, Plaintiffs' tenants will not pay rent in the future and are judgment proof. While it is undisputed that the tenants are currently delinquent on their rent, this Court does not know, for example, the occupation of any of the tenants, whether they are employed or unemployed (and, if unemployed, their prospect for reemployment), whether they are (or have been) sick, whether they have money in the bank, whether they qualify for some type of government assistance, whether they could obtain a loan to cover their rent or the nature of their credit histories. All of these things either affect a tenant's ability to pay or demonstrate his likelihood to pay future rent or a judgment. Plaintiffs also did not detail the efforts they have undertaken to collect the rent that is due or measures they will take once the Order is lifted.

Plaintiffs' lack of evidence precludes a finding of irreparable harm because it is the plaintiff who bears the burden to show a significant threat of irreparable harm, and a plaintiff cannot merely rely on remote or speculative injuries. Ruffin v. Great Dane Trailers, 969 F.2d 989, 995 (11th Cir. 1992). This Court finds that although the tenants may not currently be able to afford their rent due to a substantial loss of household income, loss of compensable hours of work or extraordinary out-of-pocket medical expenses, Plaintiffs have not shown that they will likely never be able to collect a judgment. Here, Plaintiffs have failed to disprove that there is a real possibility that "adequate compensatory or other corrective relief will be available" to them later, in the ordinary course of litigation. Jefferson Cnty., 720 F.2d at 1520. That alone "weighs heavily against a claim of irreparable harm." Id. Without more evidence concerning Plaintiffs' tenants' ability to pay rent or a future judgment, this Court finds that Plaintiffs' conclusory arguments that their tenants will never pay is "too nebulous and speculative" to meet Plaintiffs' burden of establishing irreparable harm. FHR TB, 865 F. Supp. 2d at 1213-14 (rejecting as unsupported by the evidence the plaintiffs' concerns that the defendant might not have the assets to satisfy a money damages judgment); see also HAPCO v. City of Philadelphia, No. 20-3300, 2020 WL 5095496, at \*16-18 (E.D. Pa. Aug. 27, 2020) (finding no irreparable harm suffered from a COVID-19 eviction moratorium where the plaintiffs did nothing more than speculate that the "obvious result of a landlord's inability to immediately collect all payments owed under the lease [would] lead to foreclosure"); Amato v. Elicker, No. 3:20-cv-464 (MPS), 2020 WL 2542788, at \*6 (D. Conn. May 19, 2020) (finding no irreparable harm where the plaintiffs only speculated that their business would be forced to permanently shut down as a result of a COVID-19 restriction).

Two other considerations bolster this Court's view that Plaintiffs have not clearly shown an irreparable injury. First, the Order has protections for the landlords. Specifically, landlords are not precluded from charging or collecting fees, penalties or interest as a result of the failure to pay rent on a timely basis. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,292. Landlords can also continue to seek arrears and tenants are required to make partial payments when able. Id. at 55,293.

Second, it is conceivable that the passage of time alone may repair Plaintiffs' injuries if either Plaintiffs' tenants or Plaintiffs themselves obtain government assistance. In particular, the tenants may obtain rental assistance from the federal government or receive a disbursement of unemployment benefits. [Doc. 33-1, p. 7]. And, Plaintiffs may obtain funds pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116-136), which aids individuals and businesses adversely affected by COVID-19.[11]

**\*21** The above finding that Plaintiffs have failed to present enough evidence to show an irreparable harm is not meant to discount the fact that Plaintiffs are currently being harmed. Because of the Order, Plaintiffs are forced to provide housing to non-paying tenants. Not only are they harmed from the tenants' failure to pay rent and other fees, Plaintiffs must also pay monthly maintenance costs and endure damage to their property from wear and tear, and they have lost the opportunity to rent their properties at fair market value.[12] [Doc. 18, p. 9]. While these harms are both concerning and significant to the Court, Plaintiffs simply have not met their burden to make a clear showing that their injury is noncompensable, and thus irreparable.

3. Deprivation of Residential Property

Plaintiffs assert that they have been wrongly deprived of access to their unique property and have thus been irreparably harmed because "courts across the country have recognized that being deprived of residential property is a *per se* irreparable injury." [Doc. 38-1, pp. 11-12]. None of the cases cited by Plaintiffs, however, compel a categorical finding that

Plaintiffs have suffered an irreparable harm. Plaintiffs' cases are inapposite because all involve permanent deprivation or destruction of property. For instance, in one of the cases, if an injunction did not issue, the moving party would have been forced to sell the subject property—a church. Third Church of Christ, Scientist v. City of New York, 617 F. Supp. 2d 201, 215 (S.D.N.Y. 2008). In another case, the moving party would have been forced to sell the family farm. Watson v. Perdue, 410 F. Supp. 3d 122, 131 (D.C. Cir. 2019). In that case, the court noted that "losing a family farm is more than just an economic loss. It involves the loss of generations of family history, sweat-equity, and memories." Id.

After review, this Court is unpersuaded that the "loss of real property, without some other unique factor attributed to the property, is a per se irreparable injury." Muck Miami, LLC v. United States, No. 14-24870-Civ-COOKE/TORRES, 2015 WL 12533140, at *3 (S.D. Fla. Feb. 13, 2015). "As it pertains to real estate, an 'irreparable injury is suffered when one is wrongfully ejected from his home.'" Id. at *4 (citation omitted). That situation is not alleged here. Each of the individual plaintiffs provided an affidavit showing that they owned property that they leased to tenants. There is no evidence before the Court that any of the individual plaintiffs reside in the properties or are in danger of losing those properties. In the situation alleged here, where the residential property is used as a rental property, Plaintiffs have not clearly shown that monetary damages will not afford adequate relief.

As explained above, Plaintiffs raise three possible irreparable injuries. After considering those alleged injuries, this Court finds that Plaintiffs have not met their burden to clearly show an irreparable injury. Solely on this ground, this Court finds injunctive relief improper, even if Plaintiffs were able to satisfy any of the other prerequisites. See Siegal, 234 F.3d at 1176 (finding that the absence of a substantial likelihood of an irreparable injury, standing alone, prohibits preliminary injunctive relief).

C. The Threatened Injury and the Harm the Preliminary Injunction Would Cause to the Non-Movant and the Public Interest

This Court will analyze the final two factors together: harm to the opposing party and the public interest. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020). Thus, the Court proceeds with analyzing whether the threatened injury to Plaintiffs outweighs the harm that the preliminary injunction would cause Defendants and the public.

 *22  Plaintiffs devote very little time to analyzing whether their threatened injury outweighs the harm that the preliminary injunction would cause Defendants and the public. This is important because it is Plaintiffs who bear the burden of clearly showing that the threatened injury outweighs the harm an injunction might cause. Plaintiffs contend that the balance of equities weighs heavily in their favor because a strong public interest exists that constitutional rights are not violated. [Doc. 15-1, p. 38]. This Court has already explained, however, that Plaintiffs have not clearly shown a substantial likelihood of success on the merits as to their claims that their constitutional rights are violated. See discussion infra Part II.A.3. Plaintiffs further contend that the CDC has "no evidence, much less any convincing argument, that its Order has *any* effect on the pandemic or would prevent even a single infection." [Doc. 45, p. 25]. This argument has also already been addressed, and rejected, by the Court. See discussion infra Part II.A.2.i-ii.

In evaluating whether the threatened injury of various state-mandated COVID-19 restrictions would outweigh the damage to the public's interest if they were overturned, federal courts across the country have routinely concluded that undoing orders deemed necessary by public health officials and experts to contain a contagious and fast-spreading disease would result in comparatively more severe injury to the community. For example, while the Sixth Circuit acknowledged in League of Independent Fitness Facilities & Trainers, Inc. v. Whitmer that "[s]haping the precise contours of public health measures entails some difficult line-drawing" and that the plaintiffs bore "the very real risk of losing their businesses," it ultimately granted an emergency stay of a lower court decision that had invalidated a COVID-19 executive order. 814 F. App'x 125, 129-30 (6th Cir. 2020). The court reasoned that "the Governor's interest in combatting COVID-19 [was] at least equally significant," where "the disease ha[d] infected thousands of [residents], and it ha[d] shown the potential to infect many more." Id.

Likewise, in Roman Catholic Diocese v. Cuomo, the court emphasized that its refusal to issue an injunction was not intended "to downplay the seriousness of [the] [plaintiff's] constitutional harm,[13] which [was] unlikely to be remedied" and explained that, rather, improperly enjoining an order designed "to contain a deadly and highly contagious disease"

could lead to "avoidable death on a massive scale." No. 20-cv-4844, 2020 WL 6120167, at *11 (E.D.N.Y. Oct. 16, 2020). See also Auracle Homes, LLC v. Lamont, No. 3:20-cv-00829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (finding that "the balance of the equities and the public interest favor[ed] denying a preliminary injunction" that would block an eviction moratorium entered to address the COVID-19 pandemic); TJM 64, Inc. v. Harris, No. 2:20-cv-02498, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (determining that an injunction reversing a restriction on the operation of gyms would be contrary to the public interest because "[p]reventing [the] [d]efendants from enforcing the [o]rder would present a risk of serious public harm and foster the continued spread [of] COVID-19 virus"); World Gym, Inc. v. Baker, No. 20-cv-11162, 2020 WL 4274557, at *5 (D. Mass. July 24, 2020) (finding that the public interest outweighed the plaintiffs' threatened economic loss because the respective orders were necessary to combat a "devastating" "global health crisis" that had taken numerous lives); Xponential Fitness v. Arizona, No. cv-20-01310, 2020 WL 3971908, at *11 (D. Ariz. July 14, 2020) (deciding that "the public's interest in controlling the spread of COVID-19 outweigh[ed] its interest in preventing the constitutional violations alleged" and declining to issue an injunction because "otherwise avoidable human suffering" would result).

Here, Defendants have shown that COVID-19 is an easily transmissible, potentially serious and sometimes fatal disease. See Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,292. As of October 8, 2020, the United States had documented over 7.5 million cases and 211,000 deaths, and the evidence presented shows that mass evictions could have dire consequences in this circumstance. [Doc. 33-1, p. 17]. This includes evidence of an anticipated surge in infections because displaced tenants may be forced into crowded living quarters or homeless shelters, where compliance with public health guidelines, including social distancing and self-quarantining, is impossible. Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. at 55,294. In other words, the consequences of eviction (overcrowding, homelessness and housing instability) undermine crucial strategies for containing COVID-19. And the deleterious effect is not limited to the millions who might be evicted, it extends to the community at large.

**\*23** On the other hand, Plaintiffs have alleged two harms: (1) constitutional harm in the form of a violation of the right to access the courts; and (2) economic harm, which includes unpaid rent. As to the constitutional harm, Plaintiffs failed to show that they were substantially likely to succeed on that claim. Even if Plaintiffs did show a constitutional violation, the showing would not be enough to outweigh the public interest. Although Plaintiffs have shown an economic harm, that economic harm pales in comparison to the significant loss of lives that Defendants have demonstrated could occur should the Court block the Order. Accordingly, the Court finds that the public's interest in controlling the spread of COVID-19 in not outweighed by Plaintiffs' interests in preventing the constitutional violation and economic harm alleged here.[14]

CONCLUSION

Although this pandemic has adversely affected Plaintiffs' rental businesses—as it has much of the nation's economy —Plaintiffs have failed to satisfy the standards necessary for obtaining a preliminary injunction as a matter of law. After thoroughly reviewing the record and the evidence cited therein, this Court finds that Plaintiffs have not clearly established their burden of persuasion as to any of the four prerequisites. Accordingly, Plaintiffs' Motion for Preliminary Injunction [Doc. 18] is **DENIED**.

**SO ORDERED** this 29th day of October, 2020.

**All Citations**

Slip Copy, 2020 WL 6364310

Footnotes

1     Plaintiff NAA, which has members in every state, is a trade association for owners and managers of rental housing. [Doc. 12, p. 3]. Plaintiff NAA is comprised of 157 state and locally affiliated apartment associations and over 85,485 members managing more than ten million rental units throughout the United States. Id. at 3-4.

2     In addition to the parties' briefs, and with the Court's permission, two amicus curiae briefs were filed with the Court. The first brief was submitted by twenty-four national and local associations and experts who focus on housing and/or public

| | |
|---|---|
| | health. [Doc. 31- 1, pp. 3-4]. Atlanta Legal Aid Society, the National Housing Law Project and Legal Services of Northern Virginia submitted the second brief. [Doc. 33-1]. |
| 3 | In addressing Defendants' argument as to this issue in their reply brief, Plaintiffs state that the damages mentioned in the affidavits refer to "wear and tear and ordinary damage to their property while their tenants remain [in the property] without legal authorization." [Doc. 45, pp. 4-5]. |
| 4 | For instance, Defendants attack the standing of Plaintiff Brown because he has not yet initiated eviction proceedings and merely believes that if he did start the proceedings, his tenant would submit a declaration showing that she is a covered person under the Order. |
| 5 | Plaintiffs' alternative arguments are addressed in this Court's discussion of whether the Order is arbitrary and capricious. |
| 6 | Although the statute assigns authority to the Surgeon General, Reorganization Plan Number 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education and Welfare, now the Secretary of HHS. 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966). The Office of the Surgeon General was reestablished in 1987, but the Secretary of HHS has retained these authorities. |
| 7 | Sometimes this is known as a "parroting regulation"—a regulation that merely paraphrases the statutory language. Gonzales, 546 U.S. at 257. |
| 8 | The final argument—deprivation of residential property as a per se irreparable harm— was raised for the first time in Plaintiffs' Reply Brief. "[A]rguments raised for the first time in a reply brief are not properly before a reviewing court." Herring v. Sec'y, Dep't. of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005). This Court, nevertheless, will consider the argument because Defendants were given the opportunity to address the issue at oral argument. |
| 9 | Only two tenants provided declarations to their landlords. |
| 10 | Insolvency, as defined by Black's Law Dictionary, means "[t]he condition of being unable to pay debts as they fall due or in the usual course of business." Insolvency, Black's Law Dictionary (11th ed. 2019). In the context of Plaintiffs' argument, however, Plaintiffs seem to use the term insolvent to encompass not only the inability to pay debts that are owed, but also the inability to ever collect on those debts. |
| 11 | Plaintiffs' counsel stated during oral argument that while none of the individual plaintiffs had received government assistance, some of the members of Plaintiff NAA may have applied for assistance under the CARES Act. [Doc. 47, pp. 39-40]. See HAPCO, 2020 WL 5095496, at *17 (discussing numerous programs available to landlords). |
| 12 | Robert Pinnegar, who is the CEO of Plaintiff NAA, explained in his affidavit that "the vast majority of rental housing in the United States is owned by small investors who use the rental income to supplement retirement plans and social security payments" and that the rental income is "disappearing." [Doc. 18-6, p. 2]. |
| 13 | Curtailed in-person church services. |
| 14 | Like the court in League of Independent Fitness Facilities, this Court sympathizes with the persons affected by the Order. As that court explained, "[c]rises like COVID-19 can call for quick, decisive measures to save lives. Yet those measures can have extreme costs—costs that often are not borne evenly. The decision [on how] to impose [and allocate] those costs rests with the [other] branches of government, in this case, [the CDC,]" and not with this Court. 814 F. App'x at 130. |

**End of Document**     © 2020 Thomson Reuters. No claim to original U.S. Government Works.