# Exhibit 1

2020 WL 6700568
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

APARTMENT ASSOCIATION OF LOS
ANGELES COUNTY, INC., Plaintiff,
v.
CITY OF LOS ANGELES,
ET AL., Defendants.

Case No. CV 20-05193 DDP (JEMx)
|
Filed 11/13/2020

### ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DEAN D. PREGERSON United States District Judge

**\*1** Presently before the court is Plaintiff Apartment Association of Los Angeles County, doing business as the Apartment Association of Greater Los Angeles ("AAGLA")'s Motion for Preliminary Injunction. Having considered the submissions of the parties and heard oral argument, the court denies the motion and adopts the following Order.[1]

[1] The court has also considered submissions from amici curiae (1) National Housing Law Project ("NHLP"); (2) Professors Ananya Roy and Paul Ong, of the University of California, Los Angeles ("UCLA Scholars"); and (3) the Cities of Chicago, Albuquerque, Austin, Baltimore, Boston, Cambridge, Chelsea, Cincinnati, Columbus, Dayton, Gary, Santa Cruz, Santa Monica, Seattle, St. Paul, Oakland, Portland, Tucson, Somerville, and West Hollywood, and Santa Clara County ("Amici Governments").

### I. Background

The COVID-19 global pandemic is the gravest public health crisis in over a century. At present, the novel coronavirus has killed at least 230,000 Americans and infected over 9 million more.[2] The true toll may never be known, but is likely significantly higher. The Centers for Disease Control and Prevention ("CDC"), for example, estimates that the number of "excess deaths" in the United States is closer to 300,000.[3] Neither the State of California nor the City of Los Angeles have been spared from the ravages of COVID-19. Nearly a million Californians have been infected, and nearly 18,000 have died.[4] Approximately 300,000 of those cases and 7,000 of those fatalities have occurred in the Los Angeles area.[5]

[2] See https://covid.cdc.gov/covid-data-tracker/?CDC AA refVal=https%3A%2F %2Fwww.cdc.gov %2Fcoronavirus%2F2019-ncov%2Fcases-updates %2Fcases-in -us.html#cases casesper100k

[3] See https://www.cdc.gov/mmwr/volumes/69/wr/mm6942e2.htm

[4] See https://www.cdph.ca.gov/Programs/OPA/Pages/NR20-293.aspx

[5] See http://dashboard.publichealth.lacounty.gov/covid19 surveillance das hboard/

Eight months into the pandemic, the City of Los Angeles remains in a state of emergency. In accordance with recommendations from national, state, and local public health authorities, state and local officials have taken hitherto unthinkable steps to slow the spread of the virus. For a time, all state and city residents were ordered to stay confined to their places of residence, with limited exceptions.[6] Although restrictions have eased somewhat at present, many types of businesses and gathering places remain closed in Los Angeles, including movie theaters, bars, athletic fields, theme parks, gyms and fitness centers, museums, live performance venues, indoor restaurants, and "non-critical" offices.[7] These measures, in conjunction with other coronavirus-related concerns, have had devastating economic consequences. By one estimate, over 16 million California households have lost employment income as a result of the coronavirus.[8] Over the last six months, the unemployment rate in the Los Angeles area has ranged from 15 to 20 percent.[9]

[6] See https://covid19.ca.gov/stay-home-except-for-essential-needs/; https://www.lamayor.org/sites/g/files/wph446/f/page/file/20200527%2 0Mayor%20Public%20Order%20SAFER%20AT%20HOME%20ORDER%202020.03.19%20 (REV%202020.05.27).pdf

[7] See https://corona-virus.la/sites/default/files/inline-files/MO COVID-1 9 What%27sOpen Updated %2020201007.pdf

[8] See https://www.census.gov/data/tables/2020/demo/hhp/hhp14.html

| 9 | See https://www.bls.gov/eag/eag.ca losangeles md.htm |
|---|---|

**\*2** Crises of national scope require national responses. Initially, the federal government rose to meet the economic challenge presented by the COVID crisis and passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"), Pub. L. No. 116-136. Among the CARES Act's provisions were (1) a one-time stimulus payment to taxpayers and (2) an additional $600 weekly payment to Americans collecting unemployment benefits.[10][11] Those additional unemployment payments expired, however, at the end of July, and Congress has not provided for further stimulus payments or other assistance to the American people. But the crisis has not abated. As the pandemic has worsened, its economic consequences have persisted.

| 10 | See https://home.treasury.gov/policy-issues/cares/assistance-for-americ an-workers-and-families; https://www.edd.ca.gov/about edd/coronavirus-2019/cares-act.htm |
|---|---|
| 11 | Undocumented immigrants, including those who pay federal taxes with an Individual Taxpayer Identification Number, are not eligible for one-time stimulus payments, nor are United States citizens who are married to and file taxes jointly with undocumented spouses. See, e.g., Amador v. Mnuchin, No. CV ELH-20-1102, 2020 WL 4547950, at \*4 (D. Md. Aug. 5, 2020). Many vulnerable renters in Los Angeles are concentrated in immigrant neighborhoods. (UCLA Scholars brief at 7.) |

These economic impacts have, unsurprisingly, affected the ability of many residential tenants to make rent payments. Somewhere between one million and 1.4 million California households are behind on their rent.[12] Approximately 14% of renter households in Los Angeles County are behind on rent, largely due to the effects of the pandemic on employment.[13] These households include over 450,000 people in the City of Los Angeles.[14]

| 12 | See https://www.census.gov/data/tables/2020/demo/hhp/hhp14.html |
|---|---|
| 13 | See UCLA Scholars brief at 4:10-11. |
| 14 | Id. at 5:12. |

As the CDC has explained, the novel coronavirus "spreads very easily and sustainably between people who are in close contact with one another ...."[15] "[H]ousing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings ..."[16] Thus, "[i]n the context of a pandemic, eviction moratoria – like quarantine, isolation, and social distancing – can be an effective public help measure utilized to prevent the spread of communicable disease," and "facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID-19."[17]

| 15 | See Dep't of Health and Human Serv.'s, Centers for Disease Control and Prevention, *Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19*, https://www.govinfo.gov/content/pkg/FR-2020-09-04/pdf/2020-19654.pdf |
|---|---|
| 16 | Id. |
| 17 | Id. |

Recognizing that "[t]he COVID-19 pandemic threatens to undermine housing security and generate unnecessary displacement of City residents," the City of Los Angeles adopted, among other measures, Ordinance 186606 ("the Eviction Moratorium," "City Moratorium," or "Moratorium"). The Moratorium "temporarily prohibits evictions of residential and commercial tenants for failure to pay rent due to COVID-19, and prohibits evictions of residential tenants during the emergency for no-fault reasons, for unauthorized occupants or pets, and for nuisances related to COVID-19." (Plaintiff's Request for Judicial Notice, Ex. 3 at 2.) Landlords may continue to seek to evict tenants for other reasons, and do not run afoul of the Moratorium at all if they seek to evict a tenant on the basis of a good faith belief that the tenant does not qualify for the Moratorium's protections.[18] (Id. at 3, 4).

| 18 | The Moratorium also creates a private right of action for residential tenants against landlords for certain violations, but only after written notice to the landlord and a fifteen day window to cure the alleged violation. (Moratorium at 4-5.) |
|---|---|

**\*3** The Moratorium's prohibition of evictions for COVID-related unpaid rent extends for twelve months after the expiration of the local emergency.[19] (Id. at 3.) In other words, tenants have one year after the end of the emergency to make any rent payments that were missed as a result of COVID, including as a result of workplace closures, health care expenses, child care expenses due to school closures, "or other reasonable expenditures stemming from government-ordered emergency measures."[20] (Id.) The Moratorium

explicitly states, however, that it does not "eliminate[ ] any obligation to pay lawfully charged rent." (Id. at 4.) If, at the end of the one year grace period, a tenant still owes rent that came due during the emergency period, a landlord may seek to evict for that unpaid rent. Landlords may not, however, charge late fees or interest for missed rent during the emergency or twelve month grace period. (Id. at 3.)

[19]  The City also adopted Ordinance No. 186607 (the "Rent Freeze Ordinance"), which prohibits rent increases on units subject to existing rent control provisions for a similar twelve-month period following the end of the COVID emergency. (Plaintiff's RJN, Ex. 4 at 21.)

[20]  As discussed in further detail below, this grace period will, by operation of state law, expire no later than March 1, 2022. See California Assembly Bill 3088 § 1179.05(a)(2)(A).

Plaintiff AAGLA is comprised of thousands of owners and managers of rental housing units, including over 55,000 properties within the City of Los Angeles. Plaintiff's Third Amended Complaint ("TAC") alleges that the City Eviction Moratorium and Rent Freeze Ordinance violate landlords' rights under the Contract Clause of the Constitution, as well as the Due Process Clause, Takings Clause, and Tenth Amendment. Plaintiff now moves for a preliminary injunction on the basis of the TAC's first two claims.

## II. Legal Standard

A private party seeking a preliminary injunction must show that: (i) it is likely to succeed on the merits; (ii) it will suffer irreparable harm in the absence of preliminary relief; (iii) the balancing of the equities between the parties that would result from the issuance or denial of the injunction tips in its favor; and (iv) an injunction will be in the public interest. Winter v. Natural Resources Def. Council, 555 U.S. 7, 20 (2008). Preliminary relief may be warranted where a party: (i) shows a combination of probable success on the merits and the possibility of irreparable harm; or (ii) raises serious questions on such matters and shows that the balance of hardships tips in favor of an injunction. See Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir. 1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id.; see also hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir. 2019). Under both formulations, the party must demonstrate a "fair chance of success on the merits" and a "significant threat of irreparable injury" absent the requested injunctive relief.[21] Arcamuzi, 819 F.2d at 937.

[21]  Even under the "serious interests" sliding scale test, a plaintiff must satisfy the four Winter factors and demonstrate "that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).

## III. Discussion

A. Likelihood of Success on the Merits

AAGLA contends that the Eviction Moratorium and the Rent Freeze Ordinance run afoul of the Contract Clause's prescription that states shall not pass "any Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10. Although this language "is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people." Energy Reserves Grp., Inc. v. Kansas Power & Light Co., 459 U.S. 400, 410 (1983) (internal quotation marks omitted). "The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 426 (1934). Thus, to determine whether the Eviction Moratorium runs afoul of the Contract Clause, this Court must examine (1) whether the law "operate[s] as a substantial impairment of a contractual relationship," (2) whether the City "has a significant and legitimate public purpose" in enacting the moratorium, and (3) whether the "adjustment" of the rights of the contracting parties is "based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." Energy Reserves, 459 U.S. at 411-12 (alterations omitted); see also Sveen v. Melin, 138 S. Ct. 1815, 1821 (2018) (combining public purpose and reasonableness inquiries). Here, although AAGLA concedes that the Eviction Moratorium is motivated by a legitimate public purpose, it nevertheless contends that the moratorium substantially and unreasonably impairs landlords' contract rights.[22]

[22]  Because the Rent Freeze Ordinance is less burdensome than the Eviction Moratorium, the discussion of the former is subsumed within that of the latter, herein.

1. Substantial Impairment

**\*4** Whether a law substantially impairs a contractual relationship depends upon "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights."[23] Sveen, 138 S. Ct. at 1822. AAGLA asserts that the Eviction Moratorium deprives landlords of the "primary enforcement mechanism embodied in residential leases," and that such mechanisms are "the heart of what the Supreme Court has held must be protected under the Contract Clause." (Memorandum in support of motion at 22:4-7.) This argument is premised upon several mischaracterizations. First, notwithstanding AAGLA's description of eviction as the "primary" enforcement mechanism of a rental contract, the Eviction Moratorium does not deprive landlords of their contract remedies. The Moratorium does not excuse tenants from their contractual obligations to pay rent, and landlords remain free to sue in contract for back rent owed.

[23] AAGLA asserts that an impairment is substantial "if it deprives a private party of an important right, thwarts performance of an essential term, defeats the expectations of the parties, or alters a financial term." S. California Gas Co. v. City of Santa Ana, 336 F.3d 885, 890 (9th Cir. 2003) (internal citations omitted). That slightly looser standard applies, however, to public contracts. Id.

Second, the Blaisdell court, contrary to AAGLA's representation, did not state that contract enforcement measures are sacrosanct. Although the Court did recount its prior observation in Von Hoffman v. City of Quincy, 71 U.S. 535, 551 (1866), that "[n]othing can be more material to the obligation [of a contract] than the means of enforcement," the Court explained, in the very same paragraph, that the Von Hoffman court itself limited its "general statement" with the observation that "it is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired.... Every case must be determined upon its own circumstances." Blaisdell, 290 U.S. at 430 (internal quotation marks omitted).[24] Indeed, the Court went on to reject the very argument raised by AAGLA here.

> [I]t does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake. \*\*\* And, if state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes.

Blaisdell, 290 U.S. at 439.

[24] The Blaisdell court further explained that none of the cases it cited, including Von Hoffman, were "directly applicable," and that "broad expressions contained in some of these opinions went beyond the requirements of the decision, and are not controlling." Blaisdell, 290 U.S. at 434.

That said, it would be difficult to conclude that the Moratorium does not, at a minimum, significantly interfere with landlords' reasonable expectations. The reasonableness of a party's expectations will depend, to a significant extent, on the degree of regulation in the relevant industry. See Energy Reserves, 459 U.S. at 413; Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 242 n.13 (1978); Snake River Valley Elec. Ass'n v. PacifiCorp, 357 F.3d 1042, 1051 n.9 (9th Cir. 2004). AAGLA concedes, as it must, that the landlord-tenant relationship has long been subject to extensive regulation. See, e.g., 42 U.S.C. § 3604; Cal. Civ. Code § 1942.4. Several courts, examining Contract Clause challenges to eviction moratoria in other locales, have relied upon this history of regulation to conclude that eviction moratoria are relatively minor alterations to existing regulatory frameworks, and therefore do not interfere with landlords' reasonable expectations. See, e.g., HAPCO v. City of Philadelphia, C.A. No. 20-3300, 2020 WL 5095496, \*7-8 (E.D. Pa. Aug. 28, 2020); Auracle Homes, LLC v. Lamont, No. 3:20-cv-00829 (VAB), 2020 WL 4558682, \*17 (D. Conn. Aug. 7, 2020); Elmsford Apt. Assocs., LLC v. Cuomo, No. 20-cv-4062 (CM), 2020 WL 3498456, \*1 (S.D.N.Y. June 29, 2020).

**\*5** This Court respectfully concludes that the scope and nature of the COVID-19 pandemic, and of the public health measures necessary to combat it, have no precedent in the modern era, and that no amount of prior regulation could have led landlords to expect anything like the blanket

Moratorium. See Baptiste v. Kennealy, No. 1:20-CV-11335-MLW, 2020 WL 5751572, at *16 (D. Mass. Sept. 25, 2020) ("[T]he court finds that a reasonable landlord would not have anticipated a virtually unprecedented event such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent."). This Court cannot ignore the possibility that some landlords may face, at the very least, the prospects of reduced cash flow and time value of missed rent payments and increased wear and tear on rental properties, and that these effects were, at least in terms of degree, unforeseeable. At this stage, therefore, the court concludes that AAGLA is likely to succeed in showing a substantial impairment of its contractual rights.[25]

[25]  This is not to say, of course, that further factual development could not affect the court's conclusion. In Baptiste, for example, the court found it "not possible to determine conclusively the extent of the impairment of plaintiffs' contractual right to evict" because of factual uncertainties regarding the temporal extent of Massachusetts' eviction moratorium. Baptiste, 2020 WL 5751572, at *17. That particular concern is less salient here, as the Moratorium's limitation on evictions will persist for at least one year from today, and likely until March 2022. Further factual development, however, such as on the question whether landlords are able, in practice, to secure their contractual rights without recourse to eviction, could yet affect the substantial impairment question.

2. Reasonableness

No party disputes that the Moratorium was enacted in pursuit of a legitimate public purpose. The next question, therefore, "is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." Energy Reserves, 459 U.S. at 412 (quoting United States Trust Co. of New York v. New Jersy, 431 U.S. 1, 22 (1977) (internal quotation marks and alterations omitted)). "Unless the State itself is a contracting party, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." Id. at 412-13 (internal quotation marks omitted).

Notwithstanding the Supreme Court's prescription, AAGLA urges this Court to set aside the City's determination that the Moratorium is necessary to protect public health, life, and property, and to conclude that the law is not a reasonable means of achieving its stated end.[26] AAGLA's argument rests largely upon unsupported factual assertions and a misreading of Supreme Court precedent. First, AAGLA asserts, without citation to any source, that "there is no need for the Ordinances now ..., with COVID cases decreasing ...." (Reply at 16:18-19.) It is unclear to the court whether that representation has been true at any point since the onset of the pandemic.[27] But even assuming that COVID cases were decreasing at the time of writing, that is most definitely not the case now, as fall wanes and winter approaches.[28]

[26]  See Moratorium at 2.

[27]  See https://covid.cdc.gov/covid-data-tracker/#trends totalandratecases

[28]  See https://covid.cdc.gov/covid-data-tracker/#trends dailytrendscases

Necessity aside, AAGLA primarily argues that, under Blaisdell, no "government entity, even in an acute and sustained economic emergency, may excuse tenants from paying a reasonable amount of rent contemporaneous with occupancy as a condition to avoiding eviction."[29] (Mem. in support at 24:18-19 (emphasis omitted).) AAGLA misreads Blaisdell, and subsequent cases interpreting it.

[29]  As discussed in further detail below, in the context of the irreparable harm analysis, this position is somewhat surprising in light of AAGLA's argument that a separate, statewide eviction moratorium is more reasonable than the City Ordinance, and that "we can certainly assume that the state law is constitutional." As discussed below, that state law, like the Moratorium, prohibits evictions for COVID-related nonpayment of rent, even where a tenant has paid no rent for a period of as much as eleven months.

*6 In 1933, in the midst of a state of economic emergency brought on by the Great Depression, Minnesota passed the "Mortgage Moratorium Law." Blaisdell, 290 U.S. at 416. The Mortgage Moratorium Law automatically extended the period of redemption from foreclosure sales for thirty days, and empowered county courts to grant "just and equitable" further extensions, during which mortgagee-purchasers would be unable to take possession or obtain title. Id. In Blaisdell, defaulting mortgagors obtained a two year extension of the redemption period, subject to the condition that they make payments equal to the reasonable rental value of the property. Id. at 420. The mortgagee, a building and loan association, contended that the Mortgage Moratorium Law

violated the Contract Clause, Due Process Clause, and Equal Protection Clause of the Fourteenth Amendment. Id. at 416.

The Supreme Court, focusing on the Contract Clause, disagreed.[30] Id. at 447-48. In so concluding, the Court observed that (1) a state of emergency existed, (2) the moratorium was addressed to "the protection of a basic interest of society" rather than to the benefit of particular individuals, (3) the moratorium's relief could only be "of a character appropriate to the emergency, and could only be granted upon reasonable conditions," (4) the moratorium, on balance, met that reasonableness requirement, and (5) the legislation was temporary. Id. at 447; see also Allied Structural Steel, 438 U.S. at 242. In finding the conditions imposed by the Minnesota Moratorium Law reasonable on balance, the Blaisdell court looked to several of the moratorium's provisions. Blaisdell, 290 U.S. at 445-46; Allied Structural Steel, 438 U.S. at 243. The relevant conditions included (1) a continuation of the mortgage indebtedness, (2) the continued validity of the mortgagee's right to title or a deficiency judgment, (3) the mortgagor's obligation to pay the reasonable rental value, and (4) the fact that most mortgagees were corporations and banks "not seeking homes or the opportunity to engage in farming." Id.

[30] "No State shall ... pass any ... Law impairing the Obligation of Contracts." U.S.Const., Art. I, § 10.

According to AAGLA, the Blaisdell court's inclusion of reasonable rental value as a factor relevant to the reasonableness of the Mortgage Moratorium Law was tantamount to a requirement that any "adjustment" of rights relating to tenancy or occupancy include rent payments. For support, AAGLA points to the Supreme Court's subsequent pronouncement in Allied Structural Steel that "[t]he Blaisdell opinion [ ] clearly implied that if the Minnesota moratorium legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause of the Constitution." Allied Structural Steel, 438 U.S. at 242. The characteristics to which the Allied Structural Steel court referred, however, were not the provisions bearing on the reasonableness of the Mortgage Moratorium Law, but rather the five broader considerations, of which reasonableness was but one. Id. As the Court explained,

> In upholding the state mortgage moratorium law, the [Blaisdell] Court found five factors significant. First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed.

Second, the state law was enacted to protect a basic societal interest, not a favored group. Third, the relief was appropriately tailored to the emergency that it was designed to meet. Fourth, the imposed conditions were reasonable. And, finally, the legislation was limited to the duration of the emergency.

Id. (internal citations omitted) (emphasis added). Thus, although the Blaisdell court might conceivably have reached a different conclusion in the absence of a reasonable rent requirement, it did not go so far as AAGLA would suggest. Furthermore, the Supreme Court has explained that, to the extent any of its post-Blaisdell decisions did impose any specific limitations on legislatures' powers vis-à-vis contracts, "[l]ater decisions abandoned these limitations as absolute requirements." U.S. Trust, 431 U.S. at 22 n.19. Instead, specific requirements, including such a seemingly fundamental consideration as the existence of an emergency, are "subsumed in the overall determination of reasonableness." Id. "Undoubtedly the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment, but [even] they cannot be regarded as essential in every case." Id.

*7 In the absence of any specific prerequisite for reasonableness, let alone a requirement that the Moratorium provide for rent payments to landlords, this Court will defer to the City Council's weighing of the interests at stake. In so doing, the court joins at least four other courts that have found eviction moratoria reasonable in light of the COVID-19 pandemic at the preliminary injunction stage, notwithstanding the lack of any provision for partial rent payments. See Baptiste, 2020 WL 5751572, at *19; HAPCO, 2020 WL 5095496, at *10; Auracle, 2020 WL 4558682, at *18-19; Elmsford, 2020 WL 3498456, at *15.[31][32] Notably, here, as in Blaisdell, the Moratorium is addressed to protect a basic societal need, is temporary in nature, does not disturb landlords' ability to obtain a judgment for contract damages, does not absolve tenants of any obligation to pay any amount of rent, does not appear to impact landlords' ability to obtain housing, and was implemented in the context of a state of emergency. Indeed, the current emergency is arguably more serious than that brought on by the Great Depression, coupling, as it does, the consequences of economic catastrophe with a serious, and worsening, threat to public health.

[31] To be sure, although all four of these cases involve eviction moratoria with no partial rent requirement,

the moratoria at issue differ in their particulars from each other and from the Moratorium here. Of the four moratoria at issue in the cited cases, the City's Moratorium is most akin to the City of Philadelphia's, discussed in HAPCO, 2020 WL 5095496, at *2-4.

[32] The Elmsford court converted a motion for a preliminary injunction into a motion for summary judgment, and, strictly speaking, did not reach the reasonableness question because it concluded, as a matter of law, that New York's eviction moratorium did not substantially impair landlords' contractual rights. Elmsford, 2020 WL 3498456, at *15.

AAGLA makes much of the fact that the Moratorium does not require tenants affected by COVID-19 to make an affirmative declaration to that effect. Although such a requirement would certainly make it more difficult for ill-intentioned, financially secure tenants to game the Moratorium, landlords remain free to seek to evict such nonpaying tenants, so long as there exists a good faith basis to believe that the tenant falls outside the Moratorium's protections. (Moratorium at 2.) There does not appear to this Court to be anything inherently unreasonable about the City Council's decision to spare legitimately-impacted tenants the burden of attestation.

Lastly, although the Moratorium does not mandate that tenants pay a reasonable, or any, amount of rent, neither has the City Council simply thrown landlords to the wolves. Along with the Moratorium and other coranavirus-related measures, the City implemented an Emergency Rental Assistance Program ("ERAS"), which will provide over $100 million in rental assistance payments to approximately 50,000 low-income households by the end of this year. (City Request for Judicial Notice, Ex. Y.) This rent subsidy "will be a grant paid directly to the tenant's landlord ...." (Id. at 5-6 (emphasis added).) The ERAS program does not impose any requirements on landlords beyond those already implemented by the Moratorium and the Rent Freeze Ordinance. (Id.) Although it is unlikely that the ERAS program will be sufficient to make up the entire shortfall of rent owed to AAGLA's members, the amount is not insignificant, and is at the very least indicative of the City Council's reasoned balancing of competing interests, including those of tenants, landlords, and the public health.[33]

[33] AAGLA's Due Process claim fails for these same reasons. "Substantive due process provides no basis for overturning validly enacted state statutes unless they are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Spoklie v. Montana, 411 F.3d 1051, 1059 (9th Cir. 2005) (internal quotation marks omitted). The Moratorium clearly meets this relatively low bar. Despite AAGLA's urging, this Court does not read Block v. Hirsh, 256 U.S. 135, 155 (1921) to create some different standard for cases involving regulation of rents. Indeed, AAGLA's argument appears to be no more than a due process recasting of its "reasonable rental value" theory. The court in Block, as in Blaisdell, conducted a reasonableness analysis to determine whether the District of Columbia Rents Act "goes too far." Block, 256 U.S. at 156. Although the fact that "[m]achinery is provided to secure the landlord a reasonable rent" was a relevant factor in that due process analysis, the existence of such "machinery" is not a prerequisite to constitutional validity, any more than is "reasonable rent" in the Contract Clause context. Id. at 157. Indeed, the Blaisdell court, having concluded that there was no Contract Clause violation, summarily disposed of a corresponding due process claim. Blaisdell, 290 U.S. at 448-49. ("We are of the opinion that the Minnesota statute ... does not violate the contract clause .... Whether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned. What has been said on that point is also applicable to the contention presented under the due process clause.") (citing Block) (emphasis added).

*8 Thus, even though the court is persuaded that AAGLA will be able to show that the Moratorium substantially impairs landlords' contract rights, AAGLA is not likely to succeed on its Contract Clause claim because any such impairment appears, at this stage, to be eminently reasonable under the extraordinary circumstances.[34]

[34] As suggested above, nothing in this Order shall be read to suggest that further litigation of this matter could not affect the Court's conclusions. See note 25, above. Although the Court finds the Moratorium reasonable on balance at this stage of proceedings, the rationales for each of the Moratorium's various provisions are not all equally apparent. For example, it stands to reason that economic difficulties will lead to some consolidation of households and an increase in the number of inhabitants in some units, and that to evict that entire expanded household would have serious public health consequences. And it may well be that, absent a prohibition on interest and late fees, tenants might "self-evict" rather than incur additional debt. (Intervenors' brief at 20 (citing HAPCO, 2020 WL 5095496, at *12)). This Court will not second-guess the City's apparent conclusion that the risk of such outcomes warrants a temporary suspension of interest charges, or that

impacted renters should not be penalized in the form of late fees for missed payments that are, by definition, attributable to the current emergency. It remains to be seen, however, whether a blanket prohibition on pet-related evictions in fact promotes, or can reasonably be assumed to protect, public safety.

B. Irreparable harm

A plaintiff seeking a preliminary injunction must demonstrate not just a possibility, but a likelihood of irreparable harm. Winter, 555 U.S. at 22; Alliance for the Wild, 632 F.3d at 1135. Although AAGLA asserts that irreparable harm can be presumed in the context of constitutional violations, the Ninth Circuit has cautioned that the irreparable harm requirement does not "collapse into the merits question," even where a plaintiff demonstrates a likelihood of success on the merits of a constitutional claim. Cuviello v. City of Vallejo, 944 F.3d 816, 831 (9th Cir. 2019). At the same time, however, the court has stated that certain constitutional violations, including First Amendment violations and unlawful detentions without due process, "unquestionably" constitute irreparable harm. See, e.g., Klein v. City of San Clemente, 584 F.3d 1196, 1207 (9th Cir. 2009) (First Amendment); Hernandez v. Sessions, 872 F.3d 976, 994 (9th Cir. 2017) (Due Process). Even assuming that economic injuries could also rise to the level of irreparable harm, this Court need not resolve this apparent tension because, for the reasons stated above, AAGLA has not demonstrated a likelihood of success on the merits of its constitutional claims.

AAGLA argues further that it is likely to suffer irreparable harm because, in the absence of injunctive relief, "tenants may simply live rent-free for the foreseeable future, without providing any documentation to their landlords." (Mem. in support at 19:18-19.) Although at first glance, it is somewhat unclear how landlords could possibly be irreparably harmed by the possibility of a temporary delay in rent payments "for the foreseeable future," AAGLA's reply makes clear that its theory of irreparable harm is that landlords have "no realistic chance of being paid ...." (Reply at 25:24.) It has long been established, however, "that economic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award." Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991) (citing Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1202 (9th Cir.1980); see also Goldie's Bookstore, Inc. v. Superior Court of State of Cal., 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury, however, will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation."). Indeed, the Ninth Circuit has relied upon that principle in denying a preliminary injunction, even when the economic injury at issue stemmed from an alleged constitutional violation. Amwest Sur. Ins. Co. v. Reno, 52 F.3d 332 (9th Cir. 1995) (unpublished disposition).

\*9 AAGLA contends that, notwithstanding the Ninth Circuit's pronouncements, economic harm may be irreparable where there is a significant risk that damages will never be collected. (Reply at 25.) Some courts, including this one, have occasionally found irreparable harm where a plaintiff seeks monetary damages from a defendant that is, or is likely to become, insolvent or may dissipate assets to avoid judgment. See, e.g., DirecTV, LLC v. E&E Enterprises Glob., Inc., No. 17-06110-DDP-PLA, 2017 WL 4325585, at \*5 (C.D. Cal. Sept. 25, 2017); Aliya Medcare Fin., LLC v. Nickell, No. CV1407806MMMSHX, 2014 WL 12526382, at \*5 (C.D. Cal. Nov. 26, 2014); Laguna Commercial Capital, LLC v. Se. Texas EMS, LLC, No. CV 11-09930 MMM PLAX, 2011 WL 6409222, at \*6 (C.D. Cal. Dec. 21, 2011). Those cases, however, bear little resemblance to the instant suit. Here, AAGLA seeks only declaratory and injunctive relief, not monetary damages. AAGLA does not cite, nor is this Court aware of, any authority for the proposition that an imminent irreparable harm exists simply because a plaintiff may be unable to collect a monetary judgment against some unascertained third party at the conclusion of some unrelated, separate suit that has yet to, and may never, be filed in the first instance. AAGLA's reliance on Baptiste is also misplaced. Although the Baptiste court did opine that landlords' contract remedies "will often be illusory" because tenants may be judgment-proof, it did so in the course of the substantial impairment analysis, and not as part of an irreparable harm inquiry. Baptiste, 2020 WL 5751572, at \*16.

Although monetary losses alone cannot, in this context, constitute irreparable harm, foreclosure theoretically could, as landlords' properties are unique. See Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 661 (9th Cir. 1988). Here, however, AAGLA has failed to demonstrate a likelihood, as opposed to a mere possibility, that landlords are in imminent danger of losing their properties to foreclosure. AAGLA has admittedly submitted declarations from only "a few" of its member landlords, only two of whom make any reference to mortgage difficulties.[35] (Mem. in support at 16-17.) One declarant states that four of twelve units he and his wife manage are not paying rent, but the declarant does not indicate that

he is unable to make mortgage payments.[36] (Declaration of Fred Smith ¶¶ 4,6.) Although the second declarant does state that her father is unable to make mortgage payments, and that one out of seven of his tenants is currently not paying rent, she further states that the mortgagor bank has agreed to one lengthy extension, and the declaration does not indicate that the bank has expressed any intention to foreclose in the foreseeable future. (Declaration of Evelyn Garcia, ¶¶ 4, 8.) The court is not aware of any evidence that mortgagors are, in fact, generally eager or likely to foreclose on residential rental units in the current environment. See Aliya Medcare, 2014 WL 12526382, at *4 ("It is not enough that the claimed harm be irreparable; it must be imminent as well." (citing Caribbean Marine Servs. Co., Inc. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)). Indeed, under the present circumstances, including the very Moratorium that AAGLA seeks to invalidate, mortgagors may have little incentive to foreclose and significant motivations to come to accommodations with property owners. Furthermore, it is not clear that Mr. Garcia's difficulties are attributable to the Moratorium, as his mortgage was already delinquent by April 2, 2020.[37] (Garcia Decl., Ex. A.)

[35] Of the other two declarants, only one mentions a mortgage at all, and, despite a pre-Covid negative cash flow of $11,000 to $26,000 per year, does not appear to have any difficulty making mortgage payments. (Declaration of Natalie Adomian ¶ 3). Adomian's declaration also undercuts AAGLA's contention that landlords will not be able to recover monetary damages, as she states that her delinquent tenant earns at least $225,000 per year, and likely significantly more. (Id. at ¶ 5.)

[36] The court in no way intends to minimize the hardship the declarant faces, and acknowledges that the declarant is paying a portion of the mortgages out of his savings. The monetary harm the declarant describes, however, do not rise to the level of irreparable harm.

[37] Again, this Court has no intention of minimizing the difficulties faced by Mr. Garcia or any other landlord. Those difficulties do not, however, constitute irreparable harm for purposes of a preliminary injunction enjoining the Moratorium.

 *10 Even putting all these considerations aside, AAGLA has failed to show that the preliminary injunction it seeks will prevent the harms it alleges. The Moratorium represents but one layer of protection Los Angeles renters currently enjoy. California state authorities have not remained idle in the face of the COVID crisis. In late August, the state legislature passed Assembly Bill 3088, the COVID-19 Tenant Rights Act (the "State Law"). The State Law is similar in some ways to the City's Moratorium, insofar as it also prohibits no-fault evictions and evictions for COVID-related rent delinquencies, without limiting landlords' ability to seek unpaid rent through other means. Cal. Code Civ. P. §§ CCP § 116.223, 1179.03, 1179.03.5. The State Law generally does not affect pre-existing local measures, such as the Moratorium, except to (1) trigger the commencement of any existing local rent repayment grace periods, including those conditioned upon the end of a declared state of emergency, on March 1, 2021, and (2) terminate any such repayment periods on March 31, 2022. Cal. Code Civ. P. § 1179.05.

In some aspects, however, the State Law goes beyond the Moratorium in ways that are more burdensome on landlords. The Moratorium, for example, allows evictions for back rent that remains unpaid at the conclusion of the Moratorium's twelve-month grace period. Under the State Law, in contrast, tenants can never be evicted for any COVID-related missed rent incurred between March 1, 2020 and August 31, 2020. Cal. Code Civ. P. § 1179.04(a). Similarly, tenants can never be evicted for failure to pay rent that comes due between September 1, 2020 and January 31, 2021, so long as the tenant pays, no later than January 31, twenty-five percent of the rent due during that period.[38] Cal. Civ. Code § 1179.03(g)(2)(B). Thus, although the State Law provides for a shorter grace period than does the City Moratorium, it also essentially forgives, for eviction purposes (and eviction purposes only), 100% of six months' rent and up to 75% of rent for a further five months. The City Moratorium includes no comparable "forgiveness" provisions.

[38] These protections only apply to tenants who provide landlords with a declaration that the tenant has missed rent due to decreased income or increased expenses attributable to COVID-19. The City Moratorium has no equivalent attestation requirement.

Notwithstanding the seemingly greater impacts of the State Law, AAGLA does not challenge the constitutionality of the State Law. To the contrary, AAGLA argues that the State Law is more reasonable than the Moratorium and, at that "we can certainly assume that the state law is constitutional." Against the backdrop of a presumptively valid State Law, however, it is unclear to the court how a preliminary injunction setting aside the Moratorium would aid Los Angeles landlords or, by the same token, how denial of such relief would put landlords in a materially worse position than that in which

they would otherwise be. In arguing that the Moratorium is unreasonable, AAGLA made much of the fact that the City Ordinance does not guarantee landlords even partial payments contemporaneous with occupancy. But neither does the State Law. Under the State Law, for example, a qualifying tenant who paid zero rent for the month of September, and pays zero rent for four months thereafter, cannot be evicted until February. AAGLA's members will not possibly suffer irreparable harm in the absence of an order preliminarily enjoining a Moratorium that, at the current juncture, does essentially the same thing as the admittedly reasonable and presumptively valid State Law.[39]

[39]  Of course, as discussed above, the City Moratorium and the State Law are not coterminous. But none of the most salient differences changes the result here. Although the State law does not restrict landlords' ability to seek late fees or interest at some point in the future, neither does it allow them to pursue evictions for such sums now. Furthermore, such purely economic damages cannot constitute irreparable harm, as explained above. And, although AAGLA makes much of the Moratorium's lack of an attestation requirement, AAGLA does not explain how that lack "deprive[s] landlords of meaningful tools and resources" in a way that causes immediate, irreparable harm. (Reply at 26:6-7.)

**\*11** For these reasons, AAGLA has failed to demonstrate any likelihood of irreparable harm.

### C. Balance of equities and the public interest

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." Padilla v. Immigration & Customs Enf't, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014)). As the court's prior discussion makes clear, the COVID-19 crisis is unparalleled in this country's modern history. It is, quite literally, a matter of life and death. The economic damage the pandemic has wrought, if left unmediated by measures such as the City Moratorium, would likely trigger a tidal wave of evictions that would not only inflict misery upon many thousands of displaced residents, but also exacerbate a public health emergency that has already radically altered the daily life of every city resident, and even now threatens to overwhelm community resources. The hardships wrought upon residential landlords as an unintended consequence of the City's efforts are real, and are significant, but must yield precedence to the vital interests of the public as a whole.

This Court will defer to the judgment of local authorities, who have the unenviable task of weighing all of the relevant considerations and choosing the least of all possible evils. It bears repeating, however, that the COVID-19 crisis is national in scope, and demands a national response.

Landlords and tenants alike are victims of the virus, both literally and economically. Tenants should not have to live in fear of eviction because of a calamity that was not of their making. Landlords should not have to live in fear of losing their hard-earned investments in our community because of a calamity that was not of their making. Our citizens should not have to fight each other to avoid economic and personal ruin.

Courts are an imperfect tool to resolve such conflicts. So too are ordinances and statutes that shift economic burdens from one group to another. The court respectfully implores our lawmakers to treat this calamity with the attention it deserves. It is, but for the shooting, a war in every real sense. Hundreds of thousands of tenants pitted against tens of thousands of landlords - that is the tragedy that brings us here. It is the court's reverent hope, expressed with great respect for the magnitude of the task at hand, that our leaders, and not the courts, lead us to a speedy and fair solution.

### IV. Conclusion

Although it appears at this stage of proceedings that the City Moratorium substantially affects landlords' contract rights, the manner in and extent to which it does so appears reasonable under the circumstances. AAGLA has not, therefore, demonstrated a likelihood of success on the merits of its constitutional claims. Nor has AAGLA demonstrated a likelihood of irreparable harm, or that the balance of the equities or the public interest weigh in favor of preliminary relief. Accordingly, AAGLA's motion for a preliminary injunction is DENIED, without prejudice.

**\*12** IT IS SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 6700568

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.