UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EL PAPEL LLC, *et al.*,

Plaintiffs,

v.

JAY INSLEE, *et al.*,

Defendants.

CASE NO. 2:20-cv-01323-RAJ-JRC

REPORT AND RECOMMENDATION

NOTED FOR: December 18, 2020

At issue in this lawsuit is the constitutionality of two residential eviction moratoria enacted in response to the novel coronavirus ("COVID-19") pandemic:  Washington State Governor Jay Inslee's moratorium, which is in place for the duration of the COVID-19 health crisis, and the City of Seattle's moratorium.  The City's moratorium includes a repayment plan for late rent and a post-COVID-19, six-month extension of the eviction moratorium.  The moratoria are intended to prevent lessors from evicting tenants during the COVID-19 health emergency and the ensuing predicted economic downturn.

Plaintiffs are three Seattle lessors who seek to evict residential tenants who are not paying rent, in order to re-let the premises to other tenants.  Plaintiffs argue that the moratoria violate the Contracts and Takings Clauses of the U.S. Constitution.  They now seek a preliminary injunction (Dkt. 16) halting enforcement of these moratoria until their lawsuit is decided.

In opposition to the preliminary injunction motion, defendants City of Seattle and Governor Inslee assert that plaintiffs lack standing, that Governor Inslee is immune from suit, and that plaintiffs have failed to meet their burden to show that a preliminary injunction should issue.  Because plaintiffs have neither shown that there is a likelihood that they will succeed on the merits nor the remaining preliminary injunction factors, the preliminary injunction motion should be denied.  Because defendant Governor Inslee is immune from suit, the Court should also *sua sponte* dismiss the claims against him.

## BACKGROUND

### I.  The COVID-19 Pandemic

2020 has seen the unfolding of a public health crisis that is unprecedented in recent times.  In December 2019, officials first reported a group of pneumonia cases in the Hubei Province of China—cases soon attributed to a novel strain of coronavirus named "COVID-19."  *See Timeline of WHO's Response to COVID-19*, World Health Organization (June 29, 2020).[1]

Within a few short months of the first reported cases, COVID-19 had spread around the world, evolving from a cluster of cases to a global pandemic.  By January 31, 2020, the U.S. Health and Human Services Secretary stated that the outbreak was a public emergency.  Dkt. 31, at 2.  On March 13, 2020, the President of the United States declared a national emergency

---

[1] https://www.who.int/news/item/29-06-2020-covidtimeline.

caused by the pandemic.  *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, WhiteHouse.gov (March 13, 2020).[2]

Although in these early days, little was known about COVID-19, we now understand that COVID-19 spreads easily from person to person, particularly in indoor settings, because it is transmitted by respiratory droplets or small particles produced when an infected person coughs, sneezes, or talks and by surface contact.  Dkt. 31, at 3.  Rendering this virus particularly pernicious, infected people are contagious even if they are asymptomatic—so that COVID-19 can be transmitted by someone who has no reason to believe that he or she is spreading the disease.  *See* Dkt. 31, at 3.  As of October 13, 2020, there were few treatments and no FDA-approved cures or vaccines for COVID-19.  Dkt. 31, at 4.  Thus, curbing transmission is the key to controlling the pandemic.  *See* Dkt. 31, at 6.

And while many of the those who contract the disease experience moderate, mild, or even no symptoms at all, for many others, COVID-19 is severe—even fatal.  Dkt. 31, at 3.  So quickly and perniciously does COVID-19 spread and such a significant of number of victims require hospitalization that "outbreaks threaten to overwhelm the healthcare system."  Dkt. 31, at 4.

As government officials scrambled to control the spread of COVID-19 and institute measures to prevent a mass outbreak from overwhelming our healthcare system, all of our lives have changed dramatically.  This case concerns the constitutionality of certain such measures adopted by the State of Washington and the City of Seattle to curb the economic hardships caused by this pandemic and to avoid increased transmission of COVID-19.

---

[2] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

1  **II.  Washington State's COVID-19 Response**

2  By January 21, 2020, Washington State had a confirmed case of COVID-19.  Dkt. 31, at

3  2.  Within two months, there was localized, person-to-person spread of COVID-19 in the State.

4  Dkt. 31, at 2.

5  On February 29, 2020, defendant Inslee proclaimed that a State of Emergency existed.

6  Dkt. 31, at 4.  Since then, in a series of proclamations geared toward trying to slow the spread of

7  COVID-19, defendant Inslee has taken actions including prohibiting large or public gatherings,

8  closing public venues and private businesses, and requiring Washington residents to wear facial

9  masks.  *See* Dkt. 31, at 4; *Inslee Announces Statewide Mask Mandate*, Washington Governor Jay

10  Inslee (June 23, 2020).[3]

11  In March 2020, when Washington had the "highest absolute number and . . . among the

12  highest number per capita of COVID-19 cases of any state in the country," defendant Inslee

13  escalated mitigation strategies.  Dkt. 31, at 5–6.  Defendant Inslee ordered Washington residents

14  to stay home unless it was essential to leave.  *See* Dkt. 31, at 6.  And, pertinent to this motion,

15  defendant Inslee issued a residential eviction moratorium that has been renewed through

16  December 31, 2020, citing the continued broad spread of COVID-19 in Washington and the

17  sustained global economic slowdown.  Dkt. 17-2, at 2; Dkt. 31, at 7; Dkt. 52-1, at 5.

18  The State moratorium, in its current form, prohibits lessors from serving, enforcing, or

19  threatening to serve or enforce any notice to vacate a dwelling—including an eviction notice,

20  notice to pay or vacate, notice of unlawful detainer, notice of termination of rental, notice to

21  comply or vacate, or processes related to seeking, enforcing, or threatening to seek or enforce

22  judicial eviction orders.  Dkt. 52-1, at 5–6.  It applies to ongoing tenancies, as well as those that

23

24  [3] https://www.governor.wa.gov/news-media/inslee-announces-statewide-mask-mandate.

expire during the health crisis.  Dkt. 52-1, at 5–6.  The only exceptions are for evictions of

tenants who pose an immediate risk to others' health, safety, or property or where a lessor seeks

to personally occupy or sell the property.  Dkt. 52-1, at 5–6.  Fees for late or unpaid rent are also

prohibited.  *See* Dkt. 52-1, at 6.  Finally, lessors cannot treat unpaid rent or charges "as an

enforceable debt or obligation that is owing or collectable, where such non-payment was as a

result of the COVID-19 outbreak and occurred on or after February 29, 2020, and during the

State of Emergency proclaimed in all counties in Washington State"  unless—

> a landlord, property owner, or property manager . . . demonstrates by a
> preponderance of the evidence to a court that the resident was offered, and refused
> or failed to comply with, a re-payment plan that was reasonable based on the
> individual financial, health, and other circumstances of that resident; failure to
> provide a reasonable repayment plan shall be a defense to any lawsuit or other
> attempts to collect.

Dkt. 52-1, at 7 (emphasis removed).

### III.  City of Seattle's COVID-19 Response

In conjunction with the State moratorium, lessors in Seattle (where the City also

recognizes a civil emergency (Dkt. 17-6, at 2)) must comply with the eviction moratorium

announced by defendant Mayor Jenny Durkan and the Seattle City Council.  For purposes of this

motion, understanding the relationship between the Council and the Mayor in enacting the

moratorium is not critical, and the Court does not re-state those facts herein.

To summarize, Seattle lessors must comply with three key protections for tenants.  First,

there is a moratorium on residential evictions through the earlier of the end of the civil

emergency or the end of 2020.  *See* Dkt. 17-10, at 3.  This moratorium proscribes a residential

lessor from "initat[ing] an unlawful detainer action, issu[ing] a notice of termination, or

otherwise act[ing] on any termination notice, including any action or notice related to a rental

1    agreement that has expired or will expire during the effective date of this Emergency Order[.]"

2    Dkt. 25-8, at 12.  Somewhat like the State moratorium, there is an exception for a dangerous

3    tenant; but unlike the State moratorium, there is no exception for a lessor who seeks to sell or

4    personally occupy the dwelling.  *See* Dkt. 25-8, at 12.  Like the State moratorium, fees cannot be

5    collected for late rent.  Dkt. 25-8, at 12.

6         The second key protection is a six-month extension of the eviction moratorium:

7         it is a defense to eviction if the eviction would result in the tenant having to vacate
          the housing unit within six months after the termination of the Mayor's eviction
8         moratorium, and if the reason for terminating the tenancy is:

9              1)  The tenant fails to comply with a 14-day notice to pay rent or vacate
          pursuant to RCW 59.12.030(3) for rent due during, or within six months after the
          termination of, the Mayor's residential eviction moratorium; or

10             2)  The tenant habitually fails to pay rent resulting in four or more pay-or-
          vacate notices in a 12-month period.

11        . . . .
               . . . *The tenant may invoke the defense . . . only if the tenant has submitted*
12        *a declaration or self-certification asserting the tenant has suffered a financial*
          *hardship and is therefore unable to pay rent.*

13    Dkt. 17-11, at 20 (emphasis added and underline removed).

14        The third key protection is a repayment plan for residential tenants who are unable to pay

15    rent when due during—or within six months after—the civil emergency:

16        The tenant shall pay one month or less of overdue rent in three consecutive, equal
          monthly installments.  The tenant shall pay over one month and up to two months
17        of overdue rent in five consecutive, equal monthly payments.  The tenant shall pay
          over two months of overdue rent in six consecutive, equal monthly payments.  Any
18        remainder from an uneven division of payments will be part of the last payment.
          The tenant may propose an alternative payment schedule, which, if the landlord
19        agrees to it, shall be described in writing and signed by the tenant and landlord and
          deemed an amendment to any existing rental agreement.
20        []No late fee, interest, or other charge due to late payment of rent shall accrue
          during, or  within one year after the termination of, the civil emergency proclaimed
21        by Mayor Durkan on March 3, 2020.
          . . . .
22        []Failure of the owner to accept payment under the installment schedule provided
          [above] is a defense to eviction.

23    Dkt. 17-12, at 8–9.

24

### IV. Proceedings in this Matter

The three plaintiffs in this matter have provided the following information about themselves. Plaintiff El Papel owns a townhouse in Seattle, which it rents as a duplex. Dkt. 18, at 2. Two roommates continue to live in a unit of the townhouse even though their leases ended July 2020. Dkt. 18, at 2. They have not consistently paid rent since April 2020 and owe approximately $17,400 in overdue rent. Dkt. 18, at 2.

Plaintiff Berman 2 has a building with more than twenty rental units, which it rents to low-income individuals at below-market rates. Dkt. 19, at 2. Berman 2's governor states that tenants in six units have stopped paying rent and have not responded to his attempts to set up a partial payment plan. Dkt. 19, at 2. Collectively, the tenants owe approximately $11,000 in overdue rent. Dkt. 19, at 2.

Plaintiff Li owns a townhouse occupied by a residential tenant, who is on a month-to-month lease and who began missing monthly payments in June 2019. Dkt. 20, at 2. Plaintiff Li states that he has tried on multiple occasions to work out a repayment plan with the tenant, who has rejected or ignored his offers. Dkt. 20, at 2. Plaintiff Li has sent seven "pay-or-vacate" notices to the tenant over the last year. Dkt. 20, at 2. The tenant currently owes approximately $27,000 in unpaid rent and late fees. Dkt. 20, at 2.

None of the plaintiffs say that they seek to evict a tenant in order to live in or sell the property. *See* Dkts. 18–20. At oral argument in this matter, counsel for plaintiffs confirmed that on this record, they seek eviction to re-let the premises to other tenants. *See* R. of Oral Arg., Nov. 20, 2020 (on file with the Court).

Plaintiffs brought suit in this Court in September 2020, and the Court referred the matter to the undersigned on September 11, 2020. Dkts. 1, 11; *see also* 28 U.S.C. § 636(b)(1).

1   Plaintiffs now seek preliminary injunctive relief preventing enforcement of the Governor's and

2   the City's moratoria.  Dkt. 16-1, at 1.  Defendants have filed their oppositions (Dkts. 27, 28), and

3   the matter is ripe for review.  Amici have also filed briefs in support of defendants' opposition.

4   *See* Dkts. 43, 49.  The amici briefs have been considered by the Court and are referred to as

5   appropriate herein.

6   **V.  Recent Circumstances**

7         Finally, it would be remiss of the Court not to note that at the time of this writing—and

8   after the parties prepared their briefing on the pending motion—the COVID-19 pandemic has

9   taken a turn for the worse.  In the first weeks of November 2020, alone, Washington State saw

10  the average number of cases in the State double.  *Inslee Announces Statewide Restrictions for*

11  *Four Weeks*, Washington Governor Jay Inslee (Nov. 15, 2020).[4]  The worsened situation is not

12  confined to Washington—in the week ending November 19, 2020, the United States counted

13  over one million new cases.  CDC Newsroom, *Transcript for CDC Telebriefing on the COVID-*

14  *19 Outbreak*, Centers for Disease Control and Prevention (Nov. 19, 2020).[5]

15        In response to the record-breaking increase in new cases in Washington, defendant Inslee

16  has announced a new set of restrictions to slow the spread of the disease, including more

17  restrictive limitations on public gatherings.  *See* Office of the Governor, *Proclamation 20-25.8*

18  (Nov. 15, 2020).[6]

19  ////

20  ////

21

22  [4] https://www.governor.wa.gov/news-media/inslee-announces-statewide-restrictions-four-weeks.

23  [5] https://www.cdc.gov/media/releases/2020/t1118-covid-19-update.html.

24  [6] https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-25.8.pdf.

**DISCUSSION**

## I. Standing

The Court begins by briefly addressing defendants' argument that plaintiffs lack standing. Dkt. 28, at 16–17; Dkt. 27, at 8–9.  Defendants argue that there is currently a federal eviction moratorium issued by the Centers for Disease Control and Prevention ("CDC")—a moratorium unchallenged in these proceedings—and that even if the Court agreed with plaintiffs that the local moratoria are unconstitutional, the CDC moratorium would prevent them from evicting their tenants.  Put in terms of the traditional requirements for standing in federal court, defendants challenge the "redressability" of plaintiffs' alleged injuries.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 589–90 (1992) (To have standing, there must be (1) "injury in fact;" (2) that is "fairly traceable" to a defendant's challenged conduct; and (3) that is "likely to be redressed" by a favorable decision.).

Dispositive of this issue is the rule that where at least one plaintiff has standing, the Court need not consider whether the other plaintiffs have standing to maintain the suit.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).  Here, plaintiff Li states that he has a tenant who can be evicted under the CDC moratorium because she makes more than $99,000 per year and has allegedly violated multiple lease terms not related to rent repayment.  *See* Dkt. 51, at 2; *see also* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,293–94 (the CDC's moratorium, which applies only where, among other things, a tenant earns less than $99,000 in 2020 and is not being evicted for a reason other than failure to timely pay rent).

Although the tenant can be evicted under the CDC moratorium, she cannot be evicted under the moratoria at issue here.  Plaintiff Li's injury would be redressable by this litigation and

1   he—and hence all plaintiffs—have standing to bring this lawsuit.  *See Vill. of Arlington Heights*,

2   429 U.S. at 264 n.9.

3       **II.  Legal Standard:  Preliminary Injunctions**

4       "'A preliminary injunction is an extraordinary remedy never awarded as of right.'"  *All.*

5   *for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res.*

6   *Def. Council*, 555 U.S. 7, 22 (2008)).  "'A plaintiff seeking a preliminary injunction must

7   establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in

8   the absence of preliminary relief, that the balance of equities tips in his favor, and that an

9   injunction is in the public interest.'"  *Id.* (quoting *Winter*, 555 U.S. at 20.).

10      And, under the Ninth Circuit's "sliding scale" approach, "a preliminary injunction could

11  issue where the likelihood of success is such that 'serious questions going to the merits were

12  raised and the balance of hardships tips sharply in [plaintiff's] favor.'"  *Id.* at 1131 (internal

13  citations omitted).  However, there must always be more than a mere "possibility" of irreparable

14  harm occurring.  *See id.*

15      **III.  Likelihood of Success on the Merits**

16      The first inquiry is whether plaintiffs are likely to succeed on the merits of their Contracts

17  and Takings Clause Claims.  Briefly, it should be noted that defendant Inslee is immune from

18  suit in this matter for reasons that the Court has already explained in similar cases.  *E.g.*

19  *MacEwen v. Inslee*, No. C20-5423 BHS, 2020 WL 4261323, at *2 (W.D. Wash. July 24, 2020)

20  (citing *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020)); *accord Faust v. Inslee*, No. C20-5356

21  BHS, 2020 WL 4816147, at *1 (W.D. Wash. Aug. 19, 2020).  And this Court recommends that

22  defendant Inslee be dismissed on this ground, independent of the merit (or lack of merit) of

23  plaintiffs' claims.  *See* Fed. R. Civ. P. 12(h)(3).

24

1        Nevertheless, the Court will focus primarily on the evaluation of the legal basis of

2   plaintiffs' claims against the moratoria.

3                        **A.  Contracts Clause Claims**

4        "The Contracts Clause provides that '[n]o state shall . . . pass any . . . Law impairing the

5   Obligation of Contracts,' U.S. Const. art. I, § 10, cl. 1, thereby 'restrict[ing] the power of States

6   to disrupt contractual arrangements[.]'"  *LL Liquor, Inc. v. Montana*, 912 F.3d 533, 537 (9th Cir.

7   2018) (quoting *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018)).

8        "[N]ot all state regulation of contracts gives rise to a Contracts Clause claim.  Instead,

9   '[t]he threshold issue is whether the state law has operated as a substantial impairment of a

10  contractual relationship.'"  *Id.* (quoting *Sveen*, 138 S. Ct. at 1821–22).  "If there is a substantial

11  impairment, the inquiry turns to the means and ends of the legislation."  *Sveen*, 138 S. Ct. at

12  1822.  The Supreme Court "has asked whether the state law is drawn in an 'appropriate' and

13  'reasonable' way to advance 'a significant and legitimate public purpose.'"  *Id.* (quoting *Energy*

14  *Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983)).  A court should

15  also look to whether "'the State, in justification, [has] a significant and legitimate public purpose

16  behind the regulation, such as the remedying of a broad and general social or economic

17  problem,' to guarantee that 'the State is exercising its police power, rather than providing a

18  benefit to special interests.'"  *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir.

19  2004) (quoting *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 411–12)).  Finally, courts must "defer to

20  legislative judgment as to the necessity and reasonableness of a particular measure," where, as

21  here, neither the state nor city are contracting parties.  *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 413

22  (internal citation and quotation omitted).

23  ////

24

1

**B. The Impairment Is Constitutional Under the Contracts Clause**

2

The moratoria certainly change the terms of many rental agreements throughout the State.

3

Therefore, this Court assumes, without deciding, that there is a "substantial" impairment of the

4

leases.  Nevertheless, this does not necessarily mean that the impairment is unconstitutional.  *See*

5

*Sveen*, 138 S. Ct. at 1822.

6

Plaintiffs have proffered a host of arguments attacking the constitutionality of the

7

moratoria under the Contracts Clause, which the Court address in turn.

8

**1. *Home Building & Loan Association v. Blaisdell***

9

First, citing *Home Building & Loan Association v. Blaisdell*, 290 U.S. 415 (1934),

10

plaintiffs assert that the moratoria are unconstitutional because they fail to secure regular rental

11

payments as compensation for lessors during the eviction moratoria,

12

The moratoria do not waive the tenants' obligation to pay rent.  However, plaintiffs

13

correctly note that their right to *timely* payment of rent is not secured.  Under the State's

14

moratorium, a tenant (absent certain exceptions) can neither be evicted during the health crisis

15

nor charged fees for late or unpaid rent.  *See* Dkt. 52-1.  Indeed, a tenant's unpaid rent, where the

16

non-payment was due to COVID-19, cannot be treated as an enforceable debt (i.e. by taking the

17

matter to collections) until, generally, the tenant has rejected a reasonable repayment plan

18

offered by the lessor.  *See* Dkt. 52-1, at 7.

19

Similarly, under the City moratorium, a tenant (again with certain exceptions) can

20

neither be evicted for nonpayment of rent during the civil emergency related to COVID-19 nor

21

charged fees for late or unpaid rent.  Dkt. 25-8, at 12.  In addition, tenants who have not paid rent

22

can be eligible for protection from eviction for six months after the civil emergency ends, if they

23

certify that financial hardship prevents them from paying rent.  Dkt. 17-11, at 20.  And a tenant

24

1    who cannot pay rent during the civil emergency or within six months after it can take advantage

2    of a repayment plan, with the lessor being prohibited from evicting a tenant who is making

3    payments pursuant to such a plan.  Dkt. 17-12, at 8–9.

4        Therefore, although the Court finds that the moratoria do not completely "block"

5    remedies for non-payment during the health emergency, plaintiffs correctly argue that during the

6    civil emergency, they are precluded from using the remedy of eviction or preserving the right to

7    *timely* payment of rent.   But such a temporary, health-emergency-based restriction on evictions

8    does not violate Supreme Court precedent regarding the Contracts Clause.

9        The Supreme Court in *Home Building & Loan Association v. Blaisdell*, 290 U.S. 415

10    (1934), made clear that delaying payment of certain financial obligations during a civil

11    emergency is constitutional.  The *Blaisdell* court upheld a Great Depression-era mortgage

12    moratorium law that temporarily increased defaulted mortgagors' redemption periods,

13    postponing foreclosure sales during the economic crisis. 290 U.S. at 416–18, 424–25.  The

14    mortgage moratorium in *Blaisdell* extended mortgagors' redemption periods and provided that

15    during the redemption period, the purchaser could not obtain possession or "oust" the mortgagor

16    from possession.  *Id.* at 445.  However, the underlying mortgage indebtedness remained, the sale

17    was valid, interest was due, the conditions of redemption remained, and—importantly—the

18    mortgagor had to "pay the rental value of the premises[.]"  *Id.*  Thus, although the mortgagee-

19    purchaser could not actually take possession, he or she had "so far as rental value is concerned,

20    the equivalent of possession during the extended period."  *Id.* at 425.

21        The *Blaisdell* Court distinguished a trio of preceding cases—which plaintiffs rely on and

22    none of which guaranteed payment to the mortgagee in the interim—and analogized to cases

23    upholding temporary and conditional restrictions on leases enacted during public housing crises.

24

1   *See* 290 U.S. at 431–32, 442 (citing *Block v. Hirsh*, 256 U.S. 135 (1921); *Bronson v. Kinzie*, 42

2   U.S. 311 (1843); *Howard v. Bugbee*, 65 U.S. 461 (1860); *Barnitz v. Beverly*, 163 U.S. 118

3   (1896)).

4       As in *Blaisdell*, the moratoria at issue here prevent a property owner from ousting a third

5   party, but the underlying indebtedness remains:  no tenant's obligation to pay delinquent rent is

6   being waived.  Notably, although plaintiffs argue that *Blaisdell* requires "continuing payment

7   while the tenant or mortgagor continue[s] to possess the property" (Dkt. 16, at 17), the law in

8   *Blaisdell* did not, in fact, guarantee a monthly rent payment.  Instead, it was up to a court to set

9   the time and manner of repayment.  *Id.* at 417.

10       *Blaisdell* and subsequent cases make clear that there is no precise formula or factor-based

11   test to be applied in every case but that the overarching consideration must be the reasonableness

12   of the impairment based on the facts of the case.  *See U.S. Tr. Co. of N.Y. v. New Jersey*, 431

13   U.S. 1, 23 n.19 (1977) ("Undoubtedly the existence of an emergency and the limited duration of

14   a relief measure are factors to be assessed in determining the reasonableness of an impairment,

15   but they cannot be regarded as essential in every case.").  The undersigned joins at least five

16   other courts that have found that *Blaisdell* supports the reasonableness of COVID-19 eviction

17   moratoria.  *See Apartment Ass'n of L.A. Cnty., Inc. v. Los Angeles*, No. CV2005193DDPJEMX,

18   2020 WL 6700568, at *7 (C.D. Cal. Nov. 13, 2020) (citing cases).  Plaintiffs acknowledged

19   during oral argument, and this Court's research confirms, that to date, there has not been a single

20   court in the country that has found such moratoria to be unconstitutional during this public

21   emergency.

22       Plaintiffs also rely on *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935), a case

23   decided a year after *Blaisdell*.  There the legislative changes at issue (which eased restrictions on

24

1  defaulting mortgagors) "postpone[ed] for a term of many years with undisturbed possession for

2  the debtor and without a dollar for the creditor" and effectively took "from the mortgage the

3  quality of an acceptable investment for a rational investor." *Id.* at 61.

4         The Court in *Kavanaugh* struck down the law, and plaintiffs argue that this precedent is

5  controlling here.  *See* Dkt. 16, at 18; Dkt. 50, at 14.  Although in *Kavanaugh*, the new

6  redemption period was also fixed in length and did not require a certification of hardship,

7  *Kavanaugh* did not focus on these factors in isolation.  The Court's summary focused on the

8  cumulative effect of the restrictions:

9              The case is one of postponement for a term of many years with undisturbed
              possession for the debtor and without a dollar for the creditor. There is not even a
10             requirement that the debtor shall satisfy the court of his inability to pay.
                     Whether one or more of the changes effected by these statutes would be
11            reasonable and valid if separated from the others, there is no occasion to
              consider. . . .  A different situation is presented when extensions are so piled up as
12            to make the remedy a shadow. . . .  What controls our judgment at such times is the
              underlying reality rather than the form or label.  The changes of remedy now
13            challenged as invalid are to be viewed in combination, with the cumulative
              significance that each imparts to all.  So viewed they are seen to be an oppressive
14            and unnecessary destruction of nearly all the incidents that give attractiveness and
              value to collateral security.

15

16  *Id.* at 61–62 (internal citations omitted).

17         Thus, in the Court's view, these cases collectively represent an inquiry into the

18  reasonableness of the legislation under the circumstances.  One consideration is whether

19  compensation is ultimately provided to the property owner for the time that the property owner

20  does not have possession, as in *Blaisdell* and *Block*, or whether, as in *Kavanaugh*, the changes to

21  the contractual relationship essentially strip the property owner of their interest in the property

22  without providing any compensation.

23

24

1    The provisions of the moratoria at issue here are more like the law upheld in *Blaisdell*

2    and less like *Kavanaugh*.  As discussed, the moratoria at issue are temporary, a lessor retains the

3    right to the profits from the rental (even if those profits are delayed), and the ability to bring an

4    action for contract damages is not absolutely barred.  The Contracts Clause allows the temporary

5    delay in payments during a public emergency at least so long as the right to the defaulted rent

6    remains.  *Accord Apartment Ass'n of L.A. Cty.*, 2020 WL 6700568, at *5 (concluding it was a

7    "misread[ing]" of *Blaisdell* to read it as holding that "no government entity, even in an acute and

8    sustained economic emergency, may excuse tenants from paying a reasonable amount of rent

9    contemporaneous with occupancy as a condition to avoiding eviction." (Emphasis and internal

10    quotation marks omitted)).

11                    **2.  The Moratoria Do Not Impermissibly Favor a Special Interest**

12    Plaintiffs next assert that the moratoria favor one group (lessors) over another (tenants)

13    and are therefore impermissible.  Dkt. 16, at 16–17.

14    The Supreme Court disfavors laws that "provid[e] a benefit to special interests"—in

15    contrast to laws that respond to a "legitimate state interest" such as an emergency.  *See Energy*

16    *Rsrvs. Grp., Inc.*, 459 U.S. at 412.  In *Allied Structural Steel Co. v. Spannaus*, for example, the

17    Court struck down a state pension law that was narrowly focused on specific employers and even

18    appeared to be directed toward one particular employer.  *See* 438 U.S. at 247–48 & n.20.

19    The fact that the moratoria here tend to favor tenants at the expense of lessors is not fatal.

20    Plaintiffs point out a number of public benefits to restricting evictions during COVID-19 that

21    generally favor the public interests—and not necessarily just the private interests of the tenants.

22    For instance, the City defendants assert that such moratoria prevent people from becoming

23    homeless, where the risk of infection to others is multiplied and where there is already a

24

1  homelessness crisis that predated the pandemic in Washington State.  Also, allowing more

2  people to "shelter in place" reduces the amount of exposure to COVID-19 encountered by not

3  only tenants, but also the people they may encounter when forced to leave their homes—and

4  avoiding the heightened risk of disease transmission is cited by both the State and City in support

5  of their moratoria.  *See* Dkt. 25-7, at 3; Dkt. 25-8, at 4; Dkt. 52-1, at 3–4.

6      Certainly, requiring tenants to appear in court to defend against their eviction increases

7  the number of contacts for everyone, including court personnel.  *See* Dkt. 43, at 17.  And, of

8  course, there is the general benefit of softening the economic blow that this pandemic is having

9  on everyone by providing stable housing for those who would otherwise be evicted because of

10  the pandemic.  In the face of a striking increase in continuing unemployment claims in the State

11  compared to 2019 (Dkt. 29, at 3) and the nearly 789,000 Washington residents facing a risk of

12  eviction this year (Dkt. 29, at 5), the economic hardship caused by COVID-19 will likely result

13  in many renters being unable to pay their rent.  *See also* Dkt. 25-8.

14      Also, it is clear that efforts are being made to soften the blow on lessors, as well as

15  tenants, in dealing with this temporary crisis.  The City has provided evidence that it has

16  committed $5 million for rental assistance programs in 2020, which will no doubt go to paying

17  rent to lessors who would not otherwise be able to collect from their tenants.  *See* Dkt. 26, at 1.

18  Similarly, State defendants assert that they have paid "over $100 million" to local organizations

19  from federal CARES Act funds, distributed through the Eviction Rental Assistance Program.

20  Dkt. 29, at 6.  And federal Emergency Solutions Grants have provided about $120 million for

21  rental assistance.  Dkt. 29, at 6.  State defendants assert that they have provided "much of these

22  federal funds" directly to lessors and property owners.  Dkt. 29, at 6.  Separately, the Court notes

23

24

1    that King County is also providing some assistance to households that cannot pay rent, with

2    conditions on lessors who accept the payments.  *See* Dkt. 23; *see also* Dkt. 50, at 14 n.5.

3         In summary, the moratoria are designed to address the "legitimate state interest" of

4    protecting the public from the harms associated with this public emergency, rather than

5    promoting the narrow interests of one group over another.  Therefore, such moratoria do not

6    violate the Contracts Clause.

7              **3.  The Moratoria Are Reasonable and Appropriate to the Issues**

8         Plaintiffs argue that the moratoria are "not tailored" to the emergency and that there are

9    "less oppressive means of achieving the governments' interest," so that the moratoria are

10   unconstitutional.  Dkt. 16, at 20, 22 (emphasis removed).  This Court disagrees.

11                        **a.  Appropriate Legal Standard**

12        Plaintiffs rely on *United States Trust Co. of New York*, in which bondholders alleged that

13   legislation impaired state contracts with the bondholders.  *See* 431 U.S. at 3, 17.  Specifically,

14   plaintiffs cite language from *United States Trust Co.* that "a State is not free to impose a drastic

15   impairment when an evident and *more moderate* course would serve its purposes equally well."

16   *Id.* at 31 (emphasis added).

17        But these moratoria affect private contracts between lessors and tenants and not the

18   City's or the State's own contracts (as in *United States Trust Co.*), which would subject

19   legislation to stricter review.  As noted in *United States Trust Co.*:

20              private contracts are not subject to unlimited modification under the police power.
                The Court in *Blaisdell* recognized that laws intended to regulate existing contractual
21              relationships must serve a legitimate public purpose. . . .  A State could not "adopt
                as its policy the repudiation of debts or the destruction of contracts or the denial of
22              means to enforce them.". . .  Legislation adjusting the rights and responsibilities of
                contracting parties must be upon reasonable conditions and of a character
23              appropriate to the public purpose justifying its adoption.  As is customary in
                reviewing economic and social regulation, however, courts properly defer to

24

legislative judgment as to the necessity and reasonableness of a particular measure. . . .

When a State impairs the *obligation of its own contract*, the reserved-powers doctrine has a different basis. . . .

*Id.* at 22–23 (internal citations omitted) (emphasis added).  *United States. Trust Co.* concluded that "[w]e can only sustain the [impairment] if that impairment was both reasonable and necessary to serve the admittedly important purposes claimed by the State."  *Id.* at 29.  Reading the cited language of *United States Trust Co.* in context, the undersigned is not persuaded that the consideration of whether less drastic means would have sufficed to advance the State's interest is applicable in this matter since it affects private, not necessarily public, contracts.

That is not to say that any legislation citing a legitimate public purpose will survive.  In *W.B. Worthen Co. v. Thomas*, 292 U.S. 426 (1934), the Court struck down a law impairing private contracts that was "not limited to the emergency and set up no conditions apposite to emergency relief."  *Id.* at 432.  Because there was no "reasonable relation to [a] legitimate end," it was "a clear violation of" the Contracts Clause.  *Id.* at 433; *see also Allied Structural Steel Co.*, 438 U.S. 234, 242 (1978) (citing *Blaisdell*, 290 U.S. at 445, as requiring that the law be "appropriately tailored to the emergency that it was designed to meet").

Reading these cases together, the Court concludes that legislation impairing private contracts must have reasonable conditions and a character appropriate to—that is, a reasonable relation to—the public purpose justifying its adoption, which must be legitimate.  *See also Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 505 (1987) (holding that "unless the State is itself a contracting party, courts should properly defer to legislative judgment as to the necessity and reasonableness of a particular measure" and refusing to "second-guess the [state's] determinations" that the law in question was "the most appropriate way[] of dealing

with the problem" (internal citations and quotation marks omitted)).  The law should be tailored

to the emergency justifying its enactment—although it need not be a perfect fit.

### b.  Analysis

Defendants advance a laundry list of undisputedly legitimate purposes.

As noted above, defendants assert that the moratoria are intended to avoid the

transmission of the disease by reducing housing instability and the heightened risk of disease

transmission.  *See, e.g.*, Dkt. 25-7, at 3; Dkt. 25-8, at 4; Dkt. 52-1, at 3–4.  Seeking to avoid

housing instability, whether of the rich or of the poor, will keep people in their homes and reduce

COVID-19 transmission.  *Accord Baptiste v. Kennealy*, No. 1:20-CV-11335-MLW, 2020 WL

5751572, at *3, *19 (D. Mass. Sept. 25, 2020) (finding that eviction moratorium without a

requirement for tenants to certify inability to pay rent was a reasonable way to address the

COVID-19 pandemic and survived rational basis review).  Thus, the Court is not persuaded by

plaintiffs' arguments that protections applying equally to well-to-do tenants as to low-income

tenants during the COVID-19 heath crisis are unreasonable.  *See* Dkt. 16, at 20.

Moreover, the State has provided evidence that it considered whether to include a

hardship requirement for tenants to take advantage of the protections of the State's moratorium

but decided against this.  The reason was that—

> [i]n many cases, tenants in genuine economic distress due to the pandemic are
> unable to provide adequate proof of their distress.  Many tenants have informal
> employment or non-traditional sources of income.  For these tenants, proving
> distress is not as simple as submitting a copy of a termination letter from an
> employer. And even if a tenant did not lose their job, they could be facing
> pandemic-related economic distress anyway, such as the burden of caring for
> family members who lost their jobs or are unable to provide for themselves.

1    Dkt. 29, at 8–9.  This rationale supports the State's decision not to include a hardship

2    requirement in its moratorium and shows that the State acted reasonably, rather than with

3    "studied indifference" to the lessors' rights.  *Compare Kavanaugh*, 295 U.S. at 60.

4           The Court notes that plaintiffs take issue with the City's moratorium (including the

5    mandatory repayment plan) as extending six months beyond the COVID-19 health crisis.  *See*

6    Dkt. 16, at 21.  But the City found that "economic impacts from the COVID-19 emergency are

7    likely to last much longer than the civil emergency itself. . . ."  Dkt. 17-11, at 3.  Notably, a

8    tenant must certify financial hardship before taking advantage of the six-month defense (Dkt. 17-

9    11, at 20), so that the relief is eminently reasonable and appropriate to the underlying public

10   purpose.

11          The City's moratorium focuses primarily on a third purpose of avoiding homelessness.

12   *See* Dkt. 25-8, at 2; *see also* Dkt. 52-1, at 3.  Although plaintiffs argue that the moratoria are

13   overinclusive compared to this purpose, the Court defers to the City's finding that most evicted

14   tenants become homeless, which supports the moratoria.  *See* Dkt. 25-8, at 3.  This also supports

15   the City's repayment plan.  Again, the data cited by the City supports that without some form of

16   relief for paying defaulted rent (i.e. installment payments), tenants will be unable to ultimately

17   pay the delinquent rent that accrues, resulting in their "eventual" eviction after the public health

18   crisis has ended and their probable homelessness.  *See generally* Dkt. 17-12, at 3.

19          Additionally, the Court notes that plaintiffs take issue with the state's repayment plan

20   provision, disallowing treating rent that is unpaid because of COVID-19 as an enforceable debt

21   that is currently due unless the tenant has rejected a reasonable repayment plan.  *See* Dkt. 52-1, at

22   7.  But this provision was added specifically "based on input from property owners" and in order

23   to "strike a balance between alleviating stress on tenants and providing an avenue for lessors to

24

1  be made whole." Dkt. 29, at 8.  The State's balance of the interests of tenants and lessors by

2  requiring rejection of a reasonable repayment plan before treating unpaid rent as collectible is an

3  appropriate and reasonable measure, particularly where it is tied directly to nonpayment that is

4  caused by the COVID-19 outbreak.

5         Admittedly, the fit between the moratoria and the interests advanced is not perfect here—

6  as in the case presented by plaintiff Li, where the tenant first began to default on rent payments

7  before the pandemic ever touched our shores (Dkt. 20, at 2) and where the tenant is apparently

8  continuing to earn a substantial income. Dk. 51, at 2.  Presumably, the tenant's nonpayment of

9  rent is not related to the pandemic.  Nevertheless, the State and the City are given some latitude

10 to address the legitimate public interest posed by the pandemic even if they do not always

11 achieve their intended purpose with each individual application. *See Blaisdell*, 290 U.S. at 445.

12        In short, plaintiffs have been unable to demonstrate that they have a likelihood of success

13 in claiming that the moratoria violate the Contracts Clause because the moratoria are designed to

14 address vital public interests during a national public crisis.

15                          **C.  Takings Clause Claims**

16        Defendants assert that plaintiffs cannot obtain injunctive relief for a violation of the

17 Takings Clause because even if there is an alleged "taking," money damages are an available

18 remedy.  *See* Dkt. 28, at 26.  The undersigned agrees and therefore does not reach the merits of

19 the Takings Clause arguments.

20        Defendants rely on *Knick v. Twp. of Scott, Penn.*, 139 S. Ct. 2162, 2175 (2019), in which

21 the Supreme Court reaffirmed prior case law that "the availability of subsequent compensation

22 [for a Takings claim] mean[s] that such an equitable remedy [as a request for injunctive relief]

23 [is] not available."  "Today, because . . . nearly all state governments provide just compensation

24

1   remedies to property owners who have suffered a taking, equitable relief is generally

2   unavailable.  As long as an adequate provision for obtaining just compensation exists, there is no

3   basis to enjoin the government's action effecting a taking." *Id.* at 2176; *see also id.* at 2179

4   ("[a]s long as just compensation remedies are available—as they have been for nearly 150

5   years—injunctive relief will be foreclosed.").

6          Plaintiffs do not request just compensation in their complaint:  they seek injunctive relief.

7   *See* Dkt. 1, at 17–18.  Plaintiffs have not challenged defendants' argument that the Washington

8   Constitution provides an avenue for obtaining compensation via damages for a taking of

9   property.  *See* Dkt. 28, at 26.  In fact, plaintiffs' counsel acknowledged during oral argument that

10  state and federal money damage remedies may be available for any alleged taking but that

11  plaintiffs chose not to file such a claim in this proceeding.  Plaintiffs do not cite to a single case

12  post-dating *Knick* as support for an exception to the rule against injunctive relief where just

13  compensation is available.  *See* Dkt. 50, at 18–19.

14         Instead, plaintiffs argue that cases preceding *Knick* recognize the availability of

15  injunctive relief "in situations where damages do not fully remedy the harm or where

16  compensation would result in duplicative litigation."  Dkt. 50, at 19.  But plaintiffs have failed to

17  show that they will suffer harm that cannot be compensated by damages.  They provide evidence

18  that they rely on the rental properties for supplemental income and to cover their rental

19  properties' costs.  Dkt. 18, at 2; Dkt. 19, at 2; Dkt. 20, at 2.  But they do not provide any

20  evidence to explain whether they or their rental businesses are in fact likely to suffer insolvency,

21  foreclosures of their properties, missed mortgage payments, or other such financial harms from

22  the tenants' nonpayment.  Such assertions rest on conjecture.

23

24

1    Nor do plaintiffs claim that any of them wishes to personally occupy the property as a

2    residence.  No plaintiff claims that the tenants present a risk to health and safety.  No plaintiff

3    has stated an intention to sell the property.  At most, plaintiffs argue that their damages cannot be

4    quantified because one plaintiff (El Papel 2) has holdover tenants and seeks repossession of the

5    property.  Dkt. 50, at 19.  But counsel admitted during oral argument that the record did not

6    include any evidence that any plaintiff any reason to re-take the premises except their intention

7    of re-letting to another tenant.

8    It appears that a measure of just compensation is readily available if plaintiffs were able

9    to establish a government "taking" of their properties, in the form of unpaid rent and late fees.

10   *Accord Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, No. CV

11   SAG-20-1818, 2020 WL 3639991, at *4 (D. Md. July 6, 2020) ("If Plantiffs successfully prove

12   that the Acts unlawfully deprived them of rental income that they had negotiated with their

13   tenants, then their damages should be readily calculable.").  Other courts have agreed when

14   ruling on COVID-19 legislation challenges.  *Accord Baptiste*, 2020 WL 5751572, at *23; *Cty. of*

15   *Butler v. Wolf*, No. 2:20-CV-677, 2020 WL 2769105, at *4 (W.D. Pa. May 28, 2020).

16   Plaintiffs also argue that "an injunction is more appropriate and more economical because

17   it offers a far less costly means of settling the takings claims that will arise from these bans than

18   case-by-case litigation," citing *Horne v. Department of Agriculture*, 569 U.S. 513, 523 (2013).

19   Dkt. 50, at 19.  The cited portion of the case contains no discussion of whether preliminary

20   injunctive relief is available if an action for just compensation could be brought, and it is not

21   persuasive authority in light of *Knick*'s clear holding that injunctive relief is foreclosed if just

22   compensation is available.

23

24

1      Finally, plaintiffs argue that their injury is "of a continuing nature," so that injunctive

2   relief is appropriate under *Kucera v. State, Department of Transportation*, 140 Wn.2d 200, 208

3   (2000).  In *Kucera*, the Washington State Supreme Court overturned a preliminary injunction

4   pending the outcome of property owners' lawsuit alleging violation of a state statutory scheme

5   protecting shoreline areas.  *See id.* at 206.  That case did not involve a "takings" claim.

6   Furthermore, the Court concluded that monetary remedies were adequate to compensate the

7   property owners because they could bring an action for compensation for inverse condemnation.

8   *Id.* at 211.

9      In sum, in *Knick*, the Supreme Court explained that "[a]s long as an adequate provision

10   for obtaining just compensation exists, there is no basis to enjoin the government's action

11   effecting a taking."  139 S. Ct. at 2176.  Plaintiffs do not provide any authority to depart from

12   this controlling precedent.

13      Therefore, there is no basis for injunctive relief on the takings claims.

14   **IV.  No Showing of Irreparable Harm Absent an Injunctio**n

15      The general rule regarding irreparable harm is that "economic injury alone does not

16   support a finding of irreparable harm, because such injury can be remedied by a damage award."

17   *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.

18   1991).   It has long been held that "the temporary loss of income, ultimately to be recovered,

19   does not usually constitute irreparable injury."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

20   Irreparable injury must be demonstrated by something more than speculation.  *See Goldie's*

21   *Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).  Plaintiffs

22   have failed to produce such evidence here.  They fail to provide any controlling authority or any

23

24

1   persuasive authority in similar circumstances to support their claim that merely because land is

2   involved, the Court must presume irreparable injury.

3   **V. The Public Interest and Equities Weigh in Defendants' Favor**

4   The balance of equities and public interests factors merge when the Government is the

5   party opposing the injunction. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir.

6   2014). The undersigned finds that this merged factor weighs in defendants' favor, as discussed

7   below.

8   Plaintiffs rely on the constitutional nature of their claims when arguing that balancing of

9   interests weighs in their favor, an argument already rejected. Plaintiffs alternatively assert that

10   defendants could use other means to prevent a surge of evictions: they propose managing

11   eviction filings in court, compensating landlords, or commandeering hotels and other facilities to

12   house the homeless. *See* Dkt. 16, at 22–23; Dkt. 50, at 23. In response, however, the Governor's

13   senior policy advisor notes that the moratorium is necessary in addition to existing financial

14   assistance "to avert the wave of evictions that would result in the absence of a moratorium."

15   Dkt. 29, at 6. Further, the Court concludes that being forced to leave one's residence facilitates

16   the spread of COVID-19, impedes the ability of tenants to self-isolate, and undermines social

17   distancing directives. These are overriding considerations that weigh in favor of the moratoria.

18   As amicus ACLU points out, the CDC has found that many evictions result in evicted renters

19   moving into shared housing or other congregate settings and moving interstate, increasing the

20   likelihood of COVID-19 transmission. Dkt. 43, at 24; *see also* Dkt. 29, at 4 ("mass evictions

21   would force people out of their homes at the very time when the Governor was mandating that

22   people *stay home*. . . .").

23

24

1    Next, plaintiffs argue that lifting the State and City moratoria would make little impact,

2    overall, since there is also a federal, CDC-mandated eviction moratorium in place.  Dkt. 16, at

3    29.  But plaintiffs acknowledge that the CDC moratorium protects a narrower subset of tenants

4    than the City and State moratoria.  *See* 85 Fed. Reg. 55,293.  Neither the state nor the city

5    eviction moratorium includes any of the same conditions for a tenant to qualify as the CDC

6    moratorium.  Thus plaintiffs' argument that the CDC moratorium is a "backstop" that will

7    prevent a wave of evictions if the City and State moratoria are lifted is not persuasive since the

8    local moratoria protect tenants not covered under the CDC moratorium.

9    In addition, plaintiffs argue that existing legal process adequately protects the public by

10   safeguarding tenant rights.  *See* Dkt. 16, at 30.  But, as ACLU amicus points out, the COVID-19

11   crisis has also hobbled the court system, requiring courts to transition to remote proceedings and

12   reducing their ability to timely hear matters.  *See* Dkt. 43, at 27–29.  ACLU amicus asserts that

13   low-income litigants are disproportionately impacted by remote proceedings.  This is because

14   such litigants are more likely to lack technology access and expertise and because legal aid

15   resources are currently insufficient to provide the amount of assistance that would be required if

16   the moratoria were lifted.  Dkt. 43, at 27–30.   It should also be noted that the City cited a 50%

17   drop in the number of tenants appearing for eviction hearings in King County, resulting in

18   default judgments being entered against them, as a reason for the City's moratorium.  *See* Dkt.

19   25-7, at 2.

20   Even beyond the practical issues facing legal safeguards during COVID-19, amici and

21   defendants have come forward with credible evidence that lifting the moratoria will cause an

22   eviction wave.  As noted, defendants point to the extreme increase in unemployment claims and

23   the high number of Washington residents facing a risk of eviction.  In addition to this evidence,

24

amici point out that in 2018, 72% of Washington households below the federal poverty line were

"severely burdened" by their housing cost and in 2019, 46% of Washington renters were rent-

burdened.  Dkt. 43, at 13.  These rent-burdened households are susceptible to eviction because

had little money left over after paying necessary expenses, so that "[a]ny loss of income or any

significant unanticipated expense makes it impossible to pay rent or puts the household at risk of

eviction."  Dkt. 43, at 13.  An estimated 26-43% of Washington residents are at risk of eviction

by the end of the year.  Dkt. 43, at 19.  ACLU amicus opines that Washington's homelessness

response system is unable to meet an increase in need.  Dkt. 43, at 18.

Amici have also provided evidence that in other jurisdiction at time when there had been

no eviction moratorium in place, evictions have typically spiked during the COVID-19 crisis.

Eviction statistics collected by the Princeton University Eviction Lab reveal a spike in most

surveyed cities without eviction moratoria in the interim between when the Coronavirus Aid,

Relief, and Economic Security Act moratorium expired (as a practical matter, August 24, 2020,

when lessors could first evict tenants) and the CDC moratorium began (September 4, 2020).  *See*

Peter Hepburn and Renee Louis, *Preliminary Analysis: Shifts in Eviction Filings From the*

*CARES Act to the CDC Order*, Eviction Lab (Sept. 22, 2020).[7]  Although plaintiffs raise a

variety of arguments attacking this data, the Court has reviewed the cited Eviction Lab statistics

in detail and finds that they support defendants' conclusions—not plaintiffs'.  And notably,

plaintiffs do not challenge that the moratoria in place have already reduced the number of

evictions in Washington State.  *See* Dkt. 43, at 23 (ACLU amicus brief, citing Washington State

court filings data).  For all these reasons, this Court agrees with defendants' arguments that

---

[7] https://evictionlab.org/shifts-in-eviction-filings-from-cares-act-to-cdc-order/.

1   existing procedures are not adequate to safeguard the public interest in light of the COVID-19

2   outbreak.

3        Finally, plaintiffs argue that it is not better to replace widespread eviction with

4   widespread foreclosures, which would achieve the same end.  *See* Dkt. 16, at 30.  But plaintiffs

5   fail to come forward with information supporting that lessors face a mass risk of foreclosure

6   similar to the mass risk of eviction that defendants have established through their evidence.

7        In addition to these arguments, the Court also notes that pausing the eviction moratorium

8   would have immediate, real world consequences for the nine tenants to be evicted.  Even

9   assuming that each of these tenants is able to secure alternative housing—a questionable

10  assumption in light of the evidence submitted by defendants and amici—forcing them to leave

11  their residences and find new housing carries a real-world consequence of potential exposure to

12  COVID-19 in the process, at a time when COVID-19 cases counts are at record-breaking highs.

13  *See COVID-19 Data Dashboard, Epidemiologic Curves*, Washington State Department of Health

14  (confirmed case counts, as updated Nov. 21, 2020), (showing a 1,554 confirmed case daily

15  average over the week ending November 7, 2020, compared to a 452 confirmed case daily

16  average the week ending on the day that the preliminary injunction was filed).[8]  Catching a

17  potentially deadly virus is a risk of a different order than a loss of rental income with a

18  possibility of other financial consequences.  In the Court's view, this, too, weighs in favor of

19  denying the preliminary injunction motion.

20       In short, plaintiffs have failed to show that the balance of the equities or the public

21  interest weighs in their favor.  Rather, these considerations weigh in favor of denying the

22  preliminary injunction.

23

24  [8] https://www.doh.wa.gov/Emergencies/COVID19/DataDashboard.

1    In reaching this conclusion, the undersigned is not unsympathetic to the concerns that the

2    lessors have raised.  Without a doubt, these moratoria have significantly disrupted plaintiffs'

3    businesses—on top of dealing with the other consequences of a pandemic.

4    The undersigned echoes the concerns of a District Court judge, who, in denying a

5    preliminary injunction motion aimed toward enjoining a similar residential eviction moratorium,

6    observed,

> [c]ourts are an imperfect tool to resolve such conflicts.  So too are ordinances and
> statutes that shift economic burdens from one group to another.  The court
> respectfully implores our lawmakers to treat this calamity with the attention it
> deserves.  It is, but for the shooting, a war in every real sense.  Hundreds of
> thousands of tenants pitted against tens of thousands of landlords—that is the
> tragedy that brings us here.  It is the court's reverent hope, expressed with great
> respect for the magnitude of the task at hand, that our leaders, and not the courts,
> lead us to a speedy and fair solution.

12   *Apartment Ass'n of L.A. Cty., Inc.*, 2020 WL 6700568, at *11.

13                                  **CONCLUSION**

14   The District Court should deny the motion for a preliminary injunction.  Dkt. 16.  The

15   Court should also *sua sponte* dismiss the claims against defendant Inslee.

16   Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

17   fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

18   6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

19   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

20   of those objections for purposes of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

21   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted).

22   ///

23

24

1      Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the

2  matter for consideration on **December 18, 2020,** as noted in the caption.

3      Dated this 2nd day of December, 2020.

4

5

6

7                                        J. Richard Creatura
                                         United States Magistrate Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24