Hon. Richard A. Jones
Hon. J. Richard Creatura

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

| | |
|---|---|
| EL PAPEL, LLC and BERMAN 2, LLC, )<br><br>        Plaintiffs, )<br>                                                )<br>        v.                                       )<br>                                                )<br>ROBERT FERGUSON, in his official )<br>capacity as Attorney General of the State of )<br>Washington; JENNY A. DURKAN, in her )<br>official capacity as the Mayor of the City of )<br>Seattle; and THE CITY OF SEATTLE, a )<br>municipal Corporation, )<br>                                                )<br>        Defendants. )<br>                                                ) | Civil Action No. 2:20-cv-01323-RAJ-JRC<br><br>**PLAINTIFFS' MOTION FOR<br>SUMMARY JUDGMENT**<br><br>**Noted on Motion Calendar:<br>June 18, 2021**<br><br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION AND RELIEF REQUESTED .......................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

EVIDENCE RELIED UPON ......................................................................................................... 7

STATEMENT OF ISSUES ............................................................................................................ 7

AUTHORITY AND ARGUMENT ................................................................................................ 8

I.      THE DEFENDANTS' EVICTION BANS VIOLATE THE CONTRACT CLAUSE OF
        THE UNITED STATES CONSTITUTION BY STRIPPING RESIDENTIAL LEASE
        AGREEMENTS OF THEIR ESSENTIAL ENFORCEMENT MECHANISM ............. 8

*Mot. for Summary Judgment - i*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

    a.    The eviction bans render leases unenforceable ............................................. 8

    b.    The eviction bans are neither a reasonable nor necessary means to cope with the pandemic ................................................................................... 13

        1.    The eviction bans fail to ensure compensation.......................................... 13

        2.    The eviction bans extend beyond the government's interests ..................... 15

        3.    The eviction bans are not tailored to the emergency at hand ..................... 16

        4.    The governments can achieve their interests in a less oppressive manner ................. 18

    c.    Cases upholding other eviction bans are distinguishable .............................. 19

        1.    Other challenged eviction bans still allow landlords to evict in a broader range of circumstances ........................................................................... 19

        2.    Other challenged eviction bans have been shorter in duration .................. 20

        3.    Other challenged eviction bans allow landlords to enforce rental obligations means other than eviction........................................................................... 20

II.    THE DEFENDANTS' EVICTION BANS FORCE LANDLORDS TO ALLOW TENANTS IN MATERIAL BREACH OF THEIR LEASES TO PHYSICALLY OCCUPY LANDLORDS' PROPERTIES, VIOLATING THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION ........................................................... 21

III.    INJUNCTIVE RELIEF IS A PROPER REMEDY FOR PHYSICAL INVASION OF PLAINTIFFS' PROPERTY ............................................................................ 23

CONCLUSION ........................................................................................................ 24

CERTIFICATE OF SERVICE ................................................................................ 26

*Mot. for Summary Judgment - ii*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234 (1978)....................................................................................8, 15

*Apt. Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*,
    No. 20-05193, 2020 WL 6700568 (C.D. Cal. Nov. 13, 2020) ............10, 11, 19, 20

*Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) .......................................21

*Baptiste v. Kennealy*,
    No. 1:20-cv-11335-MLW, 2020 WL 5751572 (D. Mass. Sept. 25, 2020).................10, 19, 20

*Barnitz v. Beverly*, 163 U.S. 118 (1896)..................................................................9, 13, 14

*Block v. Hirsh*, 256 U.S. 135 (1921)...........................................................................14, 23

*Bronson v. Kinzie*, 42 U.S. 311 (1843) .................................................................9, 11, 13, 14

*Christensen v. Ellsworth*, 162 Wn.2d 365 (2007).........................................................................2

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ...........................................................12

*D.A.B.E., Inc. v. City of Toledo*,
    292 F. Supp. 2d 968 (N.D. Ohio 2003)....................................................................23

*Edwards v. Kearzey*, 96 U.S. 595 (1877)...........................................................................9

*Elmsford Apt. Associates, LLC v. Cuomo*,
    No. 20-cv-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) ...........................................19, 20

*First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*,
    482 U.S. 304 (1987)....................................................................................22

*Goodwin v. Walton Cty. Florida*,
    248 F. Supp. 3d 1257 (N.D. Fla. 2017)....................................................................23

*HAPCO v. City of Philadelphia*,
    No. 20-3300, 2020 WL 5095496 (E.D. Penn. Aug. 28, 2020) ........................................19, 20

*Home Building & Loan Association v. Blaisdell*,
    290 U.S. 398 (1934)...........................................................................9, 11–14, 16

*Howard v. Bugbee*, 65 U.S. 461 (1860)...........................................................................13

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)...........................................................21

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .......................................................22

*Kucera v. State, Dep't of Transp.*, 995 P.2d 63 (Wash. 2000) .......................................................24

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)....................................................................................21

*Mot. for Summary Judgment - iii*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*Lynch v. United States*, 292 U.S. 571 (1934).............................................................................8

*Ex parte Milligan*, 71 U.S. 2 (1866) .....................................................................................1

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)..............................................23, 24

*Peters v. Vill. of Clifton*, 498 F.3d 727 (7th Cir. 2007) ......................................................23

*Philip Morris, Inc. v. Harshbarger*,
    159 F.3d 670 (1st Cir. 1998)..........................................................................................23

*RUI One Corp. v. City of Berkeley*,
    371 F.3d 1137 (9th Cir. 2004) .........................................................................................8

*Sveen v. Melin*, 138 S. Ct. 1815 (2018) ............................................................................8, 10

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
    535 U.S. 302 (2002)........................................................................................................21

*U.S. Trust Co. of New York v. New Jersey*,
    431 U.S. 1 (1977)..............................................................................................9, 15, 18

*United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v.*
    *Fortuno*, 633 F.3d 37 (1st Cir. 2011)..............................................................................17

*United States v. General Motors Corp.*, 323 U.S. 373 (1945)......................................22

*United States v. Petty Motor Co.*, 327 U.S. 372 (1946)..................................................22

*The W. Maid*, 257 U.S. 419 (1922) ......................................................................................8

*W.B. Worthen v. Kavanaugh*, 295 U.S. 56 (1935) .........................................11, 14–16

*Yee v. City of Escondido*, 503 U.S. 519 (1992).................................................22, 23

**Constitutional Provisions**

U.S. Const. amend. V.............................................................................................................21

U.S. Const. amend. XIV.........................................................................................................21

U.S. Const. art. I, § 10, cl. 1....................................................................................................8

**Statutes**

City of Los Angeles Municipal Code § 49.99.02 .............................................................19

RCW 59.12.030 ..................................................................................................................2, 3

RCW 59.12.080 .......................................................................................................................3

RCW 59.12.090 .......................................................................................................................3

RCW 59.18.370 .......................................................................................................................3

RCW 59.18.380 .......................................................................................................................3

*Mot. for Summary Judgment - iv*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**Other Authorities**

Furth, Salim, *When the Moratorium Expires: Three Quick Steps to Reduce Eviction*, Mercatus Center (June 19, 2020), available at https://www.mercatus.org/publications/covid-19-economic-recovery/when-moratorium-expires-three-quick-steps-reduce-eviction...........................................................19

Merrill, Thomas W., *Anticipatory Remedies for Takings*, 128 Harv. L. Rev. 1630 (2015)..................................................................................24

Michigan Supreme Court, Administrative Order No. 2020-17, available at https://courts.michigan.gov/Courts/MichiganSupremeCourt/rules/court-rules-admin-matters/Administrative%20Orders/2020-08_2020-06-09_FormattedOrder_AO2020-17.pdf ..................................................18

Peggy Bailey, *Trump Executive Orders Likely Won't Help the Millions Struggling to Pay Rent*, Center on Budget and Policy Priorities (Aug. 8, 2020), available at https://www.cbpp.org/blog/trump-executive-orders-likely-wont-help-the-millions-struggling-to-pay-rent..................................................18

*Mot. for Summary Judgment - v*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## INTRODUCTION AND RELIEF REQUESTED

At the time of this filing, landlords across Washington State have been unable to exercise their fundamental property right to exclude for over a year. This includes when tenants are damaging the property, allowing uninvited occupants to live on the property, failing to pay rent, or engaging in non-violent criminal behavior ranging from prostitution to drug manufacturing. Similarly, landlords in the City of Seattle have also been unable to reclaim their properties. This includes situations where the landlord intends to reoccupy the property or plans to sell the property to help weather the ongoing pandemic, both scenarios the Washington State eviction ban allows. As a result, landlords have lost any genuine control over their own properties for well over a year. There is no doubt that tenants have faced an unprecedented emergency over the last year. So have landlords.

Now Defendants have extended the eviction bans again. Yet Defendants cannot indefinitely suspend property and contract rights long recognized under the common law, state statute, and the United States Constitution. While Defendants can exercise their authority to respond to crisis, courts have long warned against the dangers that attend the muscular exercise of emergency power. *See, e.g.*, *Ex parte Milligan*, 71 U.S. 2, 120–21 (1866) ("The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government.").

Stripping the right to evict for over a year violates the Contract Clause and the Takings Clause of the United States Constitution. Defendants' eviction bans substantially impair every residential lease agreement in the state by removing the key enforcement mechanisms that make rental housing a viable business. The bans are unreasonable because they offer no protections for a landlord's financial and property interests—nothing to protect a landlord from tenants who simply decline to pay rent, damage the property, or violate any number of material terms of the lease agreement. The bans also exceed any government interest in preventing viral spread or

*Mot. for Summary Judgment - 1*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

mitigating economic harm because they do not require tenants to show hardship and do not allow landlords to evict tenants who are able to pay but don't. Meanwhile, Defendants have numerous other tools available to cope with the pandemic that do not involve stripping landlords of the contractual rights they rely on to run their businesses.

Granting a tenant a virtually unassailable right to possess someone else's property for over a year also constitutes a physical taking under the Fifth Amendment. Regardless of the public need, even a temporary taking that requires a property owner to suffer a physical invasion requires compensation. As the eviction bans here do not offer any compensation, such a taking must be declared unconstitutional and enjoined.

## STATEMENT OF FACTS

Earlier this year, in response to the COVID-19 pandemic, the Defendants imposed bans on evictions and restricted landlords' ability to collect rent for indefinite lengths of time.[1] Defendants have thereby substantially and unreasonably impaired residential lease agreements in violation of the Contract Clause of the United States Constitution. Defendants have also stripped landlords of their right of possession and right to exclude in violation of the Fifth Amendment Takings Clause.

**I. Washington Landlord-Tenant Law Before the Pandemic**

Before the pandemic, landlords had a statutory right to evict tenants through an unlawful detainer action to enforce residential lease agreements. RCW 59.12.030. "An unlawful detainer action is a statutorily created proceeding that provides an expedited method of resolving the right to possession of property." *Christensen v. Ellsworth*, 162 Wn.2d 365, 370–71 (2007). A tenant is liable for unlawful detainer in a variety of circumstances, including: When the tenant "holds over or continues in possession" of the property after the residential lease agreement has expired; when a tenant continues in possession after a default in rent and fourteen days after notice in writing has demanded either payment or surrender of the premises; and when a tenant retains possession after "neglect or failure to keep or perform any condition or covenant of the lease or agreement and continues in possession after expiration of a ten-day notice." RCW 59.12.030. A property owner

---

[1] For the sake of simplicity, Defendants' actions at issue in this matter are collectively referred to as "eviction bans."

*Mot. for Summary Judgment - 2*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

who prevails in an unlawful detainer action is entitled to a writ of restitution that restores possession. RCW 59.12.090.

Upon issuance of a summons, a tenant has at least five days to answer before entry of a default judgment. RCW 59.12.080. A landlord has a right to apply immediately for the court to order the tenant to appear and show cause why a writ of restitution should not issue. RCW 59.18.370. The show-cause hearing must occur no more than thirty days from the date the order is served on the tenant. *Id.* Upon notice of a writ of restitution, the tenant has three days to relinquish possession. RCW 59.18.380.

However, this longstanding remedy has been severely impaired by the Defendants' eviction bans.

## II.  Eviction Bans and Rent Repayment Restrictions

Because of the pandemic, the Defendants have imposed bans on evictions and restricted a landlord's ability to collect overdue rent. These bans deny access to statutory remedies under Washington's unlawful detainer and ejectment laws as well as common-law contract remedies.

<u>Washington State's Eviction Ban</u>

In February 2020, Governor Jay Inslee proclaimed a State of Emergency in response to the pandemic. Declaration of Ethan W. Blevins in Support of Plaintiffs' Mot. for Prelim. Inj., Exh. 1, Dkt. # 17-1 at p. 2–3. A month later, he issued another proclamation to prohibit certain "activities related to residential evictions by all residential landlords" until April 17, 2020. *Id.* Exh. 2, Dkt. # 17-2 at p. 3–4. These prohibited actions related to landlords' right to remove a tenant and repossess their property.

The Governor has extended this eviction ban several times, and it is now in place through June 30, 2021, well over a year after the initial proclamation. *See id.* Exhs. 3–5, Dkt. # 17-3, 17-4, 17-5; Declaration of Ethan W. Blevins in Support of Plaintiffs' Motion for Summary Judgment, Exh. 20 at p. 5–9. Upon each renewal, the Governor has made minor changes to the language. In its current form, landlords are prohibited from "threatening to serve or enforce" any notice demanding that a tenant comply with the lease or vacate the premises. *Id.* at p. 5. It likewise

*Mot. for Summary Judgment - 3*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

prohibits landlords from enforcing any judicial eviction orders. *Id.* The ban applies to tenancies that have expired or will expire during the ban. *Id.*

There are few exceptions. A landlord may carry out an eviction order or notice if they submit an affidavit stating that eviction is "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident." *Id.* A landlord may also seek eviction if a 60-day notice is given of intent to either sell the property or personally occupy it as a primary residence. *Id.*

The ban also restricts rent collection and late fees. *Id.* at p. 6. It prohibits landlords from treating unpaid rent as an "enforceable debt or obligation that is owing or collectable," unless the landlord proves in court that the tenant rejected a reasonable repayment plan. *Id.* Similarly, landlords cannot assess late fees for overdue rent during the ban. *Id.* The ban also prohibits rent increases. *Id.* at p. 7.

Landlords who violate the ban face criminal penalties. *Id.* at p. 9.

<u>Seattle Mayor's Eviction Ban</u>

In March 2020, Seattle Mayor Jenny Durkan issued a proclamation of civil emergency. *See* Blevins Decl. ISO Mot. for Prelim Inj., Exh. 6, Dkt. # 17-6 at p. 1–4. Shortly after, she issued an order preventing landlords from initiating any unlawful detainer actions or otherwise evicting tenants unless the eviction is in response to tenant behavior that rises to an imminent threat to health or safety. *Id.* Exh. 7, Dkt. # 17-7 at p. 2–4. The Mayor has extended the ban several times, and it is now set to last through June 31, 2021, or until the civil emergency ends, whichever is earliest. *See id.* Exhs. 8–10, Dkt. # 17-8, 17-9, 17-10; Blevins Decl. ISO Motion for Summary Judgment, Exh. 21 at p. 3–5.

<u>Seattle City Council's Eviction Ban</u>

The Seattle City Council has also passed its own eviction ban. *See* Blevins Decl. ISO Mot. for Prelim. Inj., Exh. 11, Dkt. # 17-11. The Council's ordinance creates an affirmative defense to eviction for the six months following the end of the Mayor's ban, if the reason for eviction is either: (1) the failure to comply with a 14-day notice to pay rent or vacate for rent due during the Mayor's

*Mot. for Summary Judgment - 4*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

ban or six months after; or (2) the tenant "habitually fails to pay rent resulting in four or more pay-or-*vacate* notices in a 12-month period." *Id.* at p. 19. To rely on the affirmative defense, a tenant need only submit a declaration that the tenant is suffering financial hardship. *Id.* The ban does not require the financial hardship to be related to the pandemic. *See id.*

Seattle City Council's Rent Repayment Ordinance

In May 2020, the City Council passed an ordinance governing the repayment of all unpaid rent that accrues during the civil emergency order and the six months following the order's termination. *See* Blevins Decl. ISO Mot. for Prelim. Inj., Exh. 12, Dkt. # 17-12. The ordinance imposes installment plans that vary based on the amount of rent owed. *See id.* at p. 7–8. It also bans late fees or interest on the unpaid rent accrued during or six months following the civil emergency. *Id.* at p. 8. The City Council passed the ordinance in order to address any difficulty paying rent due to "the economic disruptions caused by COVID-19." *Id.* at p. 1. The City Council deemed the ordinance "immediately necessary to protect public health, support stable housing, and decrease the likelihood that individuals and families will fall into homelessness." *Id.* at p. 7.

The ordinance also grants tenants the right to pay overdue rent that accumulated during the civil emergency or six months after in installment plans established by law. *Id.* at p. 7–8. The repayment schedule varies depending on the quantity of overdue rent: one month or less of overdue rent can be paid in three consecutive, equal monthly installments; over one and up to two months of overdue rent is payable in five such installments; and overdue rent over two months is payable in six installments. *Id.* The tenant may also propose an alternative payment schedule, which supersedes this repayment schedule with landlord consent. *Id.* Late fees, interest, or other charges resulting from late payment are prohibited within six months of the end of the civil emergency. *Id.*

### III.     Plaintiff Landlords

Plaintiffs are residential landlords with tenants who are not paying rent.

El Papel, LLC

Mark Travers and Michele Ruess own El Papel, LLC. Declaration of Mark Travers in Support of Plaintiffs' Motion for Summary Judgment ¶ 2. El Papel owns two rental properties in

*Mot. for Summary Judgment - 5*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Seattle. *Id.* ¶ 3. The larger, a 25-unit building of micro-apartments, has two tenants behind on rent. Declaration of Christopher Gardner in Support of Plaintiffs' Motion for Summary Judgment ¶¶ 2–3. One tenant, who has been employed throughout most of the pandemic and has a monthly rent of $750, owes $4,235. *Id.* ¶ 3. The other tenant, with a monthly rent of $925, owes $2,050. *Id.* El Papel would initiate eviction proceedings against the tenant owing $4,235 if Defendants' eviction bans were not in place. Travers Decl. ISO Mot. for Summary Judgment ¶ 9.

The other building is a townhouse. Until the end of December 2021, two tenants whose fix-termed lease expired on July 31, 2020, illegally occupied the townhouse. *Id.* ¶ 4; Declaration of Mark Travers in Support of Plaintiffs' Mot. for Prelim. Inj., Dkt. # 18, ¶ 3. For five months the tenants resided in the townhouse without a valid lease and without paying rent. *Id.* It was only after this litigation began that the tenants vacated the premises. *Id.* However, even though the tenants vacated the townhouse, they did so without paying the balance of their overdue rent, which amounted to $3,786.21. Travers Decl. ISO Mot. for Summary Judgment ¶ 4.

Under the signed lease agreements, El Papel's tenants agreed to pay rent in monthly installments on the first day of each calendar month of the lease term. *Id.* Exhs. 22–23. The lease agreement also imposes a $75 late fee for rent received after the fifth day of a given month. *Id.* The lease agreements do not roll into a month-to-month tenancy after the lease term ended. *Id.*

Berman 2, LLC

Berman 2, LLC, is owned by Osho Berman. Declaration of Osho Berman in Support of Plaintiffs' Mot. for Summary Judgment ¶ 2. Berman 2 owns and manages a residential building with 23 tenants in Seattle. *Id.* ¶ 3. Berman 2 rents these units to low-income tenants, many of whom were previously homeless, at below-market rates. *Id.* ¶ 3. Berman 2 relies on the eviction process to keep these units safe and comfortable for tenants and to keep rates low. *Id.* ¶ 4.

Tenants occupying nine of Berman 2's rental units have accrued overdue rent during the eviction bans and are currently declining to pay rent. *Id.* ¶ 6. The total rent owed during the eviction bans amounts to just over sixteen thousand dollars. *Id.* Mr. Berman has personally attempted to negotiate with his non-paying tenants by phone, text, and in-person, but the non-paying tenants

*Mot. for Summary Judgment - 6*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

have been unresponsive. *Id.* In his communications, Mr. Berman has indicated he is willing to accept partial payment or repayment; however, his tenants have refused to respond and are continuing to occupy Berman 2's rental units in violation of their lease agreements. *Id.* Additionally, Mr. Berman has observed an increase in drug activity and non-leased occupants living on the property without his consent. *Id.* ¶ 5. Mr. Berman would initiate eviction proceedings against his non-paying tenants but for Defendants' eviction bans. *Id.* ¶ 8.

The lease agreements state that Berman 2's tenants agree to "pay all rent and other charges promptly when due or assessed, including utilities for which [the tenant] is responsible and to provide proof of payment." Declaration of Osho Berman in Support of Plaintiffs' Mot. for Prelim. Inj., Exh. 14, Dkt # 19-1. It also provides: "Any rent unpaid by the due date is termed delinquent." *Id.* The lease states that late rent will result in a late payment charge of $75 plus $5 each additional day that rent has not been paid in full. *Id.*

**EVIDENCE RELIED UPON**

Plaintiffs rely on declarations of Ethan W. Blevins, Mark Travers, Osho Berman, and Chris Gardner, as well as the exhibits accompanying those declarations.

**STATEMENT OF ISSUES**

1. **Contract Clause.** The Contract Clause of the United States Constitution prohibits the government from substantially impairing contractual obligations. Under the Defendants' eviction bans, landlords are prohibited from evicting nonpaying tenants or timely collecting overdue rent and late fees. Do the Defendants' eviction bans substantially impair residential lease agreements in an unreasonable or unnecessary manner?

2. **Physical Taking.** A physical taking occurs when the government occupies or allows another individual to occupy private property without owner consent. Under the Defendants' eviction bans, landlords are prohibited from evicting and repossessing their property. Do the Defendants' eviction bans constitute a temporary physical occupation of landlords' properties?

*Mot. for Summary Judgment - 7*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## AUTHORITY AND ARGUMENT

**I.    THE DEFENDANTS' EVICTION BANS VIOLATE THE CONTRACT CLAUSE OF THE UNITED STATES CONSTITUTION BY STRIPPING RESIDENTIAL LEASE AGREEMENTS OF THEIR ESSENTIAL ENFORCEMENT MECHANISM**

The United States Constitution says, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. A Contract Clause analysis contains three steps: whether the law at issue causes a "substantial impairment" of contractual obligations; whether the government has a "significant and legitimate public purpose;" and whether the law "is precisely and reasonably designed to meet" its objective. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242–43 (1978); *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (cleaned up).

### a.    The eviction bans render leases unenforceable

The eviction bans substantially impair every lease agreement throughout Seattle and Washington by removing the key enforcement mechanism. As Justice Holmes said almost a century ago, "[l]egal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp." *The W. Maid*, 257 U.S. 419, 433 (1922). Transforming enforceable lease agreements into mere apparitions with no enforceable content causes a substantial impairment of contractual obligations.

In assessing substantial impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). An obligation is substantially impaired when a law handicaps enforcement of that obligation. "Contracts between individuals or corporations are impaired within the meaning of the Constitution (article 1, s 10, cl. 1) whenever the right to enforce them by legal process is taken away or materially lessened." *Lynch v. United States*, 292 U.S. 571, 580 (1934). After all, "it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether[.]" *Bronson v. Kinzie*, 42 U.S. 311, 317 (1843). Statutory methods of enforcement are among the "legitimate expectations of the contracting

parties" that courts consider when addressing substantial impairment. *See U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.17 (1977); *see also Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 429–30 (1934) ("[T]he laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.") (internal quotation marks omitted).

Cases regarding delay in enforcement of foreclosure remedies offer an apt example of substantial impairment when a law acts on an enforcement mechanism. In *Bronson*, 42 U.S. at 312, for instance, the Supreme Court invalidated a law that delayed foreclosures by extending mortgagors' redemption periods. The Court stated that a government-imposed change to the remedy that effectively impairs contractual obligations offends the Contract Clause because "it is immaterial whether [impairment of a contract] is done by acting on the remedy or directly on the contract itself. In either case it is prohibited by the Constitution." *Id.* at 316. The extended redemption period was thus an unlawful impairment of contract. *Id. See also Barnitz v. Beverly*, 163 U.S. 118, 131 (1896) ("[T]he change of remedy [can be] detrimental to such a degree as to amount to an impairment of the plaintiff's right[.]").

As *Bronson* demonstrates, contractual impairments can still be substantial even where a remedy for contractual breaches is only delayed. After all, "[i]f a State may stay the remedy for one fixed period, however short, it may for another, however long." *Edwards v. Kearzey*, 96 U.S. 595, 602 (1877). Although rent continues to accrue on paper with the hope of collection someday, the ability to collect rent in a timely manner and enforce that obligation in a timely manner is the crux of the rental business model. This is why the unlawful detainer statute offers an expedited process. Hence, the ability to enforce timely payments through the remedies created by state law is an essential tool, and even temporary suspension constitutes a substantial impairment. *See, e.g.*, *Bronson*, 42 U.S. at 311; *Barnitz*, 163 U.S. at 130 (act violated Contract Clause by "car[ving] out for the mortgagor . . . an estate of several months more than was obtainable by him under the former law").

*Mot. for Summary Judgment - 9*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The eviction bans, while differing in minor details, all constitute a substantial impairment of contract because they remove the enforcement mechanism of eviction, thus preventing landlords from enforcing lease obligations unless the tenant's behavior rises to an imminent threat to health or safety. Just as extension on a foreclosure remedy is a substantial impairment of contract, so also is a temporary ban on the remedy of eviction. In both cases, the means of enforcement are stripped away, leaving only a husk of contractual obligations. As two federal district courts have recognized, COVID-19 eviction bans cause a substantial impairment. *See Apt. Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, No. 20-05193, 2020 WL 6700568, at *4–5 (C.D. Cal. Nov. 13, 2020) (concluding that the Los Angeles eviction ban "at a minimum, significantly interfere[s] with landlords' reasonable expectations" and therefore substantially impairs residential lease agreements); *Baptiste v. Kennealy*, No. 1:20-cv-11335-MLW, 2020 WL 5751572, at *16 (D. Mass. Sept. 25, 2020) (holding that the Massachusetts eviction ban substantially impaired residential lease agreements because it "materially undermines the contractual bargain"). Neutering a lease agreement by removing the primary enforcement mechanism "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822.

Additionally, the eviction bans close off other avenues for enforcing rent. The state prevents landlords from treating overdue rent as an enforceable debt through breach-of-contract or similar actions, and the City of Seattle requires landlords to submit to a repayment schedule rather than seek to enforce their contractual rights through an enforcement action. Federal district courts in California and Massachusetts have held that a substantial impairment arises even where the right to sue in contract remains unencumbered. *See Apt. Ass'n of Los Angeles Cty., Inc.*, 2020 WL 6700568, at *4 (holding that limits on eviction for nonpayment caused substantial impairment even though "landlords remain free to sue in contract for back rent owed"); *Baptiste*, 2020 WL 5751572, at *16 (holding that bar on evictions caused substantial impairment even though the law "does not prevent a landlord from suing a tenant for rent owed"). The additional impact on the right to resort

*Mot. for Summary Judgment - 10*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

to common-law remedies such as breach of contract underscores the substantial impairment caused by the eviction bans.

The temporary nature of the eviction bans does not preclude a holding that residential lease agreements have been substantially impaired. *See, e.g.*, *W.B. Worthen v. Kavanaugh*, 295 U.S. 56 (1935) (contracts were substantially impaired where right to foreclose was delayed); *Bronson*, 42 U.S. 311 (same). Landlords rely on timeliness of payment to run their business, and they have a reasonable expectation to obtain ongoing payment, not a theoretical recuperation at an unknown date. In holding that the Los Angeles eviction moratorium caused a substantial impairment, the Central District of California observed: "This Court cannot ignore the possibility that some landlords may face, at the very least, the prospects of reduced cash flow and time value of missed rent payments and increased wear and tear on rental properties, and that these effects were, at least in terms of degree, unforeseeable." *Apt. Ass'n of Los Angeles Cty.*, 2020 WL 6700568, at *5. This Court should not ignore that danger either.

Additionally, the eviction bans substantially impair residential lease agreements because they bar landlords from exiting the contract. The terms of exit are an integral part of any bargain—when and how a party can draw the contract to a conclusion. In Washington, landlords rely on the state's unlawful detainer statute and similar laws as implicit contractual terms that govern the parties' rights to end the contractual relationship. The Defendants' bans on eviction bar landlords for evicting due to breach of contract or for no-fault reasons such as to convert the property to a different use or rent it to a needy family member. Prohibiting landlords from terminating a contract is a substantial impairment.

The inability to terminate a contract distinguishes an eviction moratorium from the extended redemption period upheld in *Blaisdell*. The Minnesota law did not prohibit a mortgagee from exiting the contractual relationship by selling the mortgage. Nor is a mortgagee as impacted by an inability to exit a contract as a landlord, who must attend to a long list of affirmative legal duties vis-a-vis their tenant.

*Mot. for Summary Judgment - 11*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Moreover, statutorily extended redemption periods, like the one upheld in *Blaisdell*, do not unsettle contractual expectations to the same degree as temporary bans on eviction. Courts have long exercised the equitable authority to adjust the time and terms of foreclosure sales. *Blaisdell*, 290 U.S. at 446–47. Thus, the statutory adjustment to redemption periods did not significantly or unreasonably alter reasonable expectations or the preexisting legal landscape in which parties bargained. *See id.* (the statutory redemption period was reasonable because the statute was a "cognate to the historic exercise of the equitable jurisdiction"). By contrast, here there is no preexisting statutory or judicial authority to delay payment obligations or outright bar eviction.

The Defendants may argue, as they did in prior briefing before this Court, that the bans are not a substantial impairment because the rental housing market is already a heavily regulated industry and therefore banning evictions outright does not upset reasonable expectations. *See* Gov. Inslee's Response to Plaintiffs' Mot. for Prelim. Inj., Dkt. # 28 at p. 12–13; City of Seattle's Opp. to Plaintiffs' Mot. for Prelim. Inj., Dkt. # 27 at p. 12–13.

However, simply because an industry is regulated does not mean parties should reasonably expect an erosion of their rights. A variety of laws governs the landlord-tenant relationship, but "[i]f such general regulations were sufficient to invoke the closely regulated industry exception, it would be hard to imagine a type of business that would not qualify." *City of Los Angeles v. Patel*, 576 U.S. 409, 425 (2015). This "heavily regulated industry" exception arises in the Fourth Amendment context as well, where the Supreme Court has been cautious to keep the exception narrow. In *Patel*, the Court rejected the argument that the hotel industry was heavily regulated and therefore enjoyed diminished Fourth Amendment rights, *see id.* at 424–26, refusing to extend the exception beyond the four industries that the Court had identified as heavily regulated (liquor, firearms, mining, and junkyards). *See id.* at 424. The Court held that an industry is not subject to this exception unless something "inherent in the operation of [the industry] poses a clear and significant risk to the public welfare." *Id.* As with hotels, there is nothing inherent in the rental housing industry that poses a clear and significant risk to the public welfare. Hence, burdens on

*Mot. for Summary Judgment - 12*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

lease agreements are not less substantial simply because of the regulatory backdrop in which landlords operate.

### b. The eviction bans are neither a reasonable nor necessary means to cope with the pandemic

#### 1. The eviction bans fail to ensure compensation

This is not the first time that state governments have sought to provide temporary relief from foreclosure or eviction. The Supreme Court has upheld such measures against Contract Clause challenges only when the statutes provided safeguards and enforceable requirements that tenants or mortgagors continue making payments during the extended forbearance period. However, where a statute, like the eviction bans here, provides no enforcement mechanism to ensure continuing payment while the tenant or mortgagor continued to possess the property, the Supreme Court has struck it down as an unreasonable interference with contractual obligations.

This pattern began with *Bronson* in 1843, the case invalidating the Illinois law extending the period in which a defaulting mortgagee had to redeem their property. The *Bronson* Court held that a law imposing a delay in the mortgagee's right to foreclose caused an unconstitutional interference with contract. *Bronson*, 42 U.S. at 319. The Court struck down similar extended redemption periods in *Howard v. Bugbee*, 65 U.S. 461 (1860), and *Barnitz v. Beverly*, 163 U.S. 118 (1896). The parallel in the rental context is clear: just as removing the remedy of foreclosure for failure to pay monthly installments on a mortgage was an unconstitutional interference, so also is a ban that prohibits landlords from evicting when a tenant fails to pay monthly rent or otherwise violates lease terms.

The Supreme Court has adopted a narrow exception for schemes that extended redemption periods but only if the mortgagee's right of reasonable return was adequately protected. In *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, the Supreme Court upheld a Minnesota law that allowed judges to extend contractual redemption periods. *Blaisdell* did not overrule *Bronson*, however, and a key distinction between the cases has direct relevance to the eviction bans.

*Mot. for Summary Judgment - 13*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

In *Blaisdell*, the Minnesota law required the mortgagor to continue paying fair-market rent during the extended redemption period as a condition of the extension, thus providing some relief for the mortgagee. *Id.* at 425. The *Blaisdell* majority relied on this difference in distinguishing *Bronson*: "It will be observed that in the *Bronson* case . . . there was no provision, as in the instant case, to secure to the mortgagee the rental value of the property during the extended period." *Id.* at 432. The same distinction arose in *Barnitz*, where the Court noted: "[T]he act carves out for the mortgagor or the owner of the mortgaged property an estate of several months more than was obtainable by him under the former law, with full right of possession, *and without paying rent or accounting for profits in the meantime.*" *Barnitz*, 163 U.S. at 130 (emphasis added).

The Supreme Court underscored this distinction a year after *Blaisdell* in *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. at 61, where the Supreme Court struck down a temporary delay on foreclosure with no enforceable requirement that the mortgagor make payments. The fatal flaw with the Arkansas law was that the mortgagor "ha[d] every incentive to refuse to pay a dollar." *Id.* at 60–61. That problem did not exist in *Blaisdell*, where the Minnesota statute required continuing payment.

The same distinction arises with respect to eviction bans. In *Block v. Hirsh*, 256 U.S. 135 (1921), the Supreme Court dealt with a rent-control law that banned evictions during a World War One housing shortage. While a divided Court upheld the ban against a Contract Clause challenge, the majority noted that "[m]achinery [wa]s provided to secure to the landlord a reasonable rent" during the eviction ban, *id.* at 157, and the tenant was protected from eviction only "so long as he pa[id] the rent and perform[ed] the other terms and conditions of the lease." District of Columbia Rents Act, Ch. 80, 41 Stat. 298, § 109 (1919). The *Blaisdell* majority later found this fact directly relevant to the Contract Clause analysis, noting that, in *Block*, "provision was made for reasonable compensation to the landlord during the period he was prevented from regaining possession." *Blaisdell*, 290 U.S. at 441–42.

This precedent reveals a telling pattern: the Court has narrowly upheld laws temporarily preventing eviction or foreclosure only where the law requires, as a condition of the extension,

*Mot. for Summary Judgment - 14*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

that the tenants/mortgagors continue paying fair rent (*Blaisdell* and *Block*). Where no such payment is required as a condition of foreclosure protection, the Court has struck down temporary foreclosure delays (*Bronson*, *Howard*, *Barnitz*, and *W.B. Worthen*).

The eviction bans fail to provide an enforceable requirement that tenants protected from eviction pay anything during the interim as a condition of that protection. Governor Inslee's proclamation bans evictions and likewise bars landlords from treating missing rent as an "enforceable debt or obligation that is owing or collectable, where such non-payment was as a result of the COVID-19 outbreak and occurred on or after" the state of emergency began. Blevins Decl. ISO Mot. for Summary Judgment, Exh. 20 at p. 6. Likewise, the City of Seattle does not protect landlords' right to a return, instead creating an incentive for renters not to pay and take advantage of the mandated repayment plan. Rather than protecting landlords' right to compensation, these eviction bans create an unconstitutional "incentive to refuse to pay a dollar." *W.B. Worthen*, 295 U.S. at 60–61.

## 2. The eviction bans extend beyond the government's interests

A law substantially impairing a contract must be "tailored to the emergency that it was designed to meet." *Allied Structural Steel Co.*, 438 U.S. at 242. A substantial impairment is therefore unreasonable and unnecessary when "an evident and more moderate course would serve [the government's] purposes equally well." *United States Trust Co. of New York*, 431 U.S. at 31.

The eviction bans share similar rationales. The Governor's proclamation cites the concern that unemployment prompted by shutdowns will make it difficult for tenants to pay rent and thus increase the likelihood of eviction, "increasing the life, health, and safety risks to a significant percentage of our people." Blevins Decl. ISO Mot. for Summary Judgment, Exh. 20 at p. 1. The Seattle Mayor's proclamation posits a similar causal chain resulting in more evictions, which may "result in a loss of housing and create housing instability, potentially increasing the number of people experiencing homelessness and creating a heightened risk of disease transmission." Blevins Decl. ISO Mot. for Prelim. Inj., Exh. 7, Dkt. # 17-7, at p. 1. The City Council likewise cites more evictions resulting in more homelessness and disease transmission. *Id.*; Blevins Decl. ISO Mot.

*Mot. for Summary Judgment - 15*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

for Prelim. Inj., Exh. 11, Dkt. # 17-11, at p. 1–2. The repayment ordinance, meanwhile, claims that the economic impact of the pandemic will extend beyond the City's state of emergency and that the City has a continuing interest in promoting housing stability and homelessness prevention. *Id.*, Exh. 12, Dkt. # 17-12, at p. 1–2. The eviction bans are not tailored to satisfy these interests.

**3.     The eviction bans are not tailored to the emergency at hand**

The eviction bans extend beyond circumstances where tenants are likely to face homelessness if evicted. By their own terms, the government's interests are limited to preventing homelessness and an increased risk of disease transmission that homelessness entails during the pandemic.

Yet the eviction bans apply broadly to all tenants, regardless of financial circumstance or likelihood of finding alternative housing. A landlord cannot, for instance, file a notice to terminate a month-to-month tenancy with a well-to-do tenant so that the landlord can renovate the rental unit. Nor can a landlord evict tenants with good income for violations of the lease unrelated to rent payment. Tenants in these and similar situations are not likely to end up on the streets if a landlord exercises the right to repossess his property. Yet neither Washington State nor the City of Seattle's eviction bans require a showing of hardship. The Supreme Court, in striking down a law that delayed foreclosure remedies, indicated that a hardship showing was a constitutional necessity: "There is not even a requirement that the debtor shall satisfy the court of his inability to pay." *W.B. Worthen Co.*, 295 U.S. at 61.

The eviction bans' one-size-fits-all approach also distinguishes this case from *Blaisdell*. In that case, the Minnesota statute granted judges authority to extend redemption periods on a case-by-case basis "for such additional time as [a] court may deem just and equitable." 290 U.S. at 416. Indeed, *Blaisdell* distinguished *Bronson* and *Howard* partially on this basis, noting that the extended redemption periods in those cases were "unconditional," unlike the Minnesota law that did not impose an inflexible, across-the-board mandate. *Id.* at 432. The eviction bans fail to offer similar flexibility that would result in a more tailored approach.

*Mot. for Summary Judgment - 16*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The City of Seattle's ban does require that a tenant self-certify that they are experiencing hardship before evoking the affirmative defense to eviction, but that hardship need not be caused by the pandemic. Moreover, this small concession is cold comfort to Seattle landlords, who remain subject to the Governor's and Mayor's eviction bans, neither of which require a showing of hardship. Hardship, moreover, is left undefined in the ordinance, making it difficult for landlords to challenge a tenant's certification.

Additionally, the City of Seattle's eviction ban unnecessarily extends six months beyond the termination of the Mayor's emergency order. By the order's terms, the Mayor will only terminate the order when she has determined "that extraordinary measures are no longer required for the protection of the public peace, safety and welfare." Blevins Decl. ISO Mot. for Prelim. Inj., Exh. 6, Dkt. # 17-6, at p. 4. Yet if the Mayor determines that such measures are no longer necessary, then the City's interest in taking such measures will have come to an end. The City, therefore, has no need to extend the eviction ban to either protect against disease transmission or protect against a surge in homelessness caused by the crisis. *See United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuno*, 633 F.3d 37, 46 (1st Cir. 2011) (to comply with the Contract Clause, substantial impairments on contractual obligations should be "limited to the duration of the emergency").

The restrictions on rent collection have an even less clear relationship to the governments' interests. Washington State's proclamation bars landlords from treating unpaid rent as an enforceable debt by, for instance, bringing a breach-of-contract action. Yet Washington State's interests in preventing homelessness and disease transmission are not furthered by preventing a landlord from bringing an action to collect on overdue rent. The same is true of Seattle's repayment ordinance, which bars landlords from seeking to collect rent in a manner that deviates from the city-mandated repayment schedule. That schedule ensures that renters need not face any repayment obligation until six months after the City emergency has concluded, well after an official determination that a public crisis no longer exists. This not only extends beyond the duration of

*Mot. for Summary Judgment - 17*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

the emergency but also has no bearing on the prevention of homelessness that may exacerbate transmission during the crisis.

### 4. The Defendants can achieve their interests in a less oppressive manner

The Defendants have several other "more moderate courses" of satisfying their interests other than banning virtually all evictions, barring recovery of rent, and leaving no recourse for landlords. *See United States Trust Co. of New York*, 431 U.S. at 31.

The government could, for instance, manage eviction filings to prevent a surge, while still allowing landlords to exercise their contractual rights. For example, Michigan courts have adopted a rule directing courts to process evictions through a "prioritization approach," which requires courts to move through eviction processing in order of five priorities: first, complaints of illegal activity; second, complaints alleging nonpayment of rent for 120 days or more, then 90 days or more, 60 days or more, and 30 days or more. Michigan Supreme Court, Administrative Order No. 2020-17.[2] This ensures that the most serious situations can receive prompt resolution while granting more time for tenants struggling with nonpayment. Similarly, the government could impose a weekly or monthly cap on the number of eviction filings. This would address the governments' concerns about rising eviction rates while allowing landlords to exercise their rights and protect their own interests.

The government can also provide some form of compensation for landlords. This could include, among other things, tax credits or no-interest loans for landlords who agree to continue housing non-payers or partial payers.

Other solutions could allow landlords to exercise their rights and address homelessness should an eviction surge occur. The government could, for instance, exercise its eminent domain power to temporarily commandeer hotels and other facilities for temporary housing, supply homeless individuals with hygiene kits, and so on. *See also* Peggy Bailey, *Trump Executive Orders Likely Won't Help the Millions Struggling to Pay Rent*, Center on Budget and Policy Priorities

---

[2] Available at https://courts.michigan.gov/Courts/MichiganSupremeCourt/rules/court-rules-admin-matters/Administrative%20Orders/2020-08_2020-06-09_FormattedOrder_AO2020-17.pdf.

*Mot. for Summary Judgment - 18*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

(Aug. 8, 2020).[3] (suggesting alternative ways to help renters); Salim Furth, *When the Moratorium Expires: Three Quick Steps to Reduce Eviction*, Mercatus Center (June 19, 2020).[4] (same).

### c.     Cases upholding other eviction bans are distinguishable

The eviction bans at issue in this matter are more restrictive than others around the country. Several federal courts have been skeptical of Contract Clause challenges to various eviction bans. *See, e.g.*, *Apartment Ass'n of Los Angeles Cty., Inc. v. City of Los Angeles*, No. 20-05193, 2020 WL 6700568 (C.D. Cal . Nov. 13, 2020); *Baptiste v. Kennealy*, No. 1:20-cv-11335, 2020 WL 5751572 (D. Mass. Sept. 25ss, 2020); *HAPCO v. City of Philadelphia*, No. 20-3300, 2020 WL 5095496 (E.D. Penn. Aug. 28, 2020); *Elmsford Apt. Associates, LLC v. Cuomo*, No. 20-cv-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020). These cases, however, should not bear on this Court's decision because the Washington and Seattle eviction bans are more vulnerable to legal challenge than the eviction bans previously upheld.

### 1.     Other challenged eviction bans still allow landlords to evict in a broader range of circumstances

The other Contract Clause challenges to eviction bans to date have involved less-restrictive laws than both the Washington and Seattle bans. For instance, the Philadelphia ban challenged in *HAPCO* only prohibited evictions where tenants could prove financial hardship due to the pandemic. *HAPCO*, 2020 WL 5095496, at *3–4. And the New York ban challenged in *Elmsford* only prohibited residential evictions for nonpayment of rent. *Elmsford Apt. Associates, LLC*, 2020 WL 3498456, at *3–4. The Los Angeles eviction ban likewise limits the ban to evictions for any of four reasons: nonpayment of rent, presence of unauthorized occupants or pets, a nuisance related to COVID-19, or "no-fault" reasons such as intent to convert the building to an alternative use. *See* City of Los Angeles Municipal Code § 49.99.02. In short, these cases only underscore the particularly burdensome approach taken by Defendants in comparison to other governments across

---

[3] Available at https://www.cbpp.org/blog/trump-executive-orders-likely-wont-help-the-millions-struggling-to-pay-rent.

[4] Available at https://www.mercatus.org/publications/covid-19-economic-recovery/when-moratorium-expires-three-quick-steps-reduce-eviction.

*Mot. for Summary Judgment - 19*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

the country, in that the eviction bans here do not require a showing of hardship and do not target particular reasons for eviction such as nonpayment.

### 2.       Other challenged eviction bans have been shorter in duration

Additionally, Defendants' eviction bans are longer than the bans challenged in other cases. For example, in *Baptiste*, the Massachusetts ban expired on October 17, 2020. The *Baptiste* court's ruling denying a motion for preliminary injunction emphasized that its decision was limited solely to whether the statute was likely constitutional as of April 2020 when the ban took effect. *Baptiste*, 2020 WL 5751572, at *7, *14. The court emphasized, however, that a different question would arise as to whether "in view of changed facts [the Moratorium is] now still compatible with the requirements of the Constitution" ("now" being September 2020). *Id.* at *7. Even as of April 2020, the *Baptiste* court called the Contract Clause issue a "close question." *Id.* at *14. These eviction bans will last over a full year and several months after April 2020, if not longer. What was a close question in April 2020 has transformed into an answer at this late stage, particularly given Seattle's additional extension of six months of eviction protection beyond the Mayor's eviction ban. *See also HAPCO*, 2020 WL 509496, at *3-4 (Philadelphia ban expired August 31, 2020).

### 3.       Other challenged eviction bans allow landlords to enforce rental obligations through means other than eviction

In most of the other Contract Clause cases challenging eviction bans, landlords still retained the right to sue for delinquent rent. *See Apartment Ass'n of Los Angeles*, 2020 WL 6700568, at *4 (noting that "the Eviction Moratorium does not deprive landlords of their contract remedies"); *Elmsford*, 2020 WL 3498456, at *8 (upholding New York eviction ban in part because it "preserves Plaintiffs' rights as property owners . . . to sue their tenant . . . for back rent"); *Baptiste*, 2020 WL 5751572, at *16 (upholding the state eviction ban, which "does not prevent a landlord from suing a tenant for rent owed"). Here, however, the State bars landlords from treating unpaid rent as a collectable debt for the course of the eviction ban, and the City of Seattle's repayment ordinance gives tenants a right to repay missing rent on the ordinance's terms. Thus, unlike various

*Mot. for Summary Judgment - 20*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

other federal district court cases rejecting Contract Clause theories, the eviction bans here foreclose both fundamental remedies landlords rely upon for unpaid rent.

## II.   THE DEFENDANTS' EVICTION BANS FORCE LANDLORDS TO ALLOW TENANTS IN MATERIAL BREACH OF THEIR LEASES TO PHYSICALLY OCCUPY LANDLORDS' PROPERTIES, VIOLATING THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION

Private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; U.S. Const. amend. XIV. The eviction bans cause a physical taking by compelling landlords to house tenants who no longer satisfy lease terms, including tenants whose leases have already expired.

The Supreme Court has held that a physical occupation of property is a categorical taking requiring compensation. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."). Even minor physical invasions that do not interfere with use constitute a categorical taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982) (holding that a law authorizing television companies to install permanent cables on private properties caused a Fifth Amendment taking).

This categorical rule requiring compensation for physical takings applies even where the government authorizes a third party to physically occupy or invade property. For example, in *Loretto*, government-authorized installation of privately owned cable constituted a physical taking. *Id.* at 440–41. And in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), a navigational easement imposed on a privately owned lagoon caused a categorical taking by authorizing private vessels to intrude on private property.

A physical taking can be either permanent or temporary in nature. *See Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) ("[W]e have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have

*Mot. for Summary Judgment - 21*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

worked a taking of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.") (cleaned up); *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 318 (1987) ("[Supreme Court] cases reflect the fact that 'temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.").

Where diminution of value is not a relevant factor in the takings inquiry, as with physical takings, the temporary nature of the government action does not obviate the taking. For instance, in *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), the government temporarily occupied a plant for wartime use—the temporary nature of the occupation did not obviate the compensation requirement. *See also United States v. Petty Motor Co.*, 327 U.S. 372, 378 (1946) (temporary government use of building was a taking warranting compensation); *United States v. General Motors Corp.*, 323 U.S. 373 (1945) (same). Indeed, even the more limited view of temporary takings expressed by the dissenters in *First English*, 482 U.S. at 331–32, accepted as uncontroversial that "the state certainly may not occupy an individual's home for a month and then escape compensation by leaving and declaring the occupation 'temporary.'"

The eviction bans constitute a categorical taking because they authorize a temporary physical occupation of Plaintiffs' property by a third party against Plaintiffs' will. Plaintiffs and other landlords must suffer occupancy by tenants who no longer meet the conditions for the landlords' consent to their possession. El Papel, for instance, was forced to endure the possession of its property by individuals whose lease had expired. And both businesses must abide possession of their property by individuals who are not meeting the material terms of their lease agreements. Thus, the Plaintiffs are effectively forced to maintain their tenancies in perpetuity, or at least until the Defendants decide, at their leisure, to lift their bans.

Additionally, this situation is distinguishable from cases holding that landlords did not suffer a taking when the government granted tenants certain statutory privileges with respect to the landlord's property. In *Yee v. City of Escondido*, 503 U.S. 519, 526–28 (1992), for instance,

*Mot. for Summary Judgment - 22*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

the Supreme Court dealt with a claim that a rent-control law caused a physical taking because mobile home park owners could "no longer set rents or decide who their tenants will be." The Court disagreed because the tenants were invited by the landlords and "not forced upon them by the government." *Id.* at 528. Here, in contrast, the tenants have exceeded the scope of the landlords' invitation, thus resulting in a compelled physical occupation. *Id.* ("A different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy.").

Nor does this case resemble *Block*, 256 U.S. at 155, where the Supreme Court held that a temporary law allowing tenants to stay beyond lease expiration did not violate the Takings Clause. In *Block*, the regulation still allowed landlords to evict tenants who violated the terms of the lease agreement, unlike the bans here. *Id.* at 157. Moreover, *Block* preceded the entire era of regulatory takings jurisprudence, including *Loretto*'s categorical physical takings rule and the recognition of temporary takings, so subsequent precedent has superseded *Block*'s holding. And *Block* itself recognized that "regulations of the present sort pressed to a certain height might amount to a taking without due process of law." *Id.* at 156. Indeed, a year later the Court indicated that the "certain height" might not need to be much higher, since *Block* had extended "to the verge of the law but fell short" of a taking. *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

Therefore, because the eviction bans force the Plaintiffs to keep their tenants, regardless of the rental agreement's terms, the bans constitute a physical taking.

## III.   INJUNCTIVE RELIEF IS A PROPER REMEDY FOR PHYSICAL INVASION OF PLAINTIFFS' PROPERTY

While just compensation is the default remedy for a taking of property, "injunctive relief is available in limited circumstances." *Goodwin v. Walton Cty. Florida*, 248 F. Supp. 3d 1257, 1266 (N.D. Fla. 2017) (citing *Peters v. Vill. of Clifton*, 498 F.3d 727, 732–33 (7th Cir. 2007)) (recognizing injunctive relief may be granted where there are either unavailable or inadequate procedures for seeking just compensation); *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680–81 (1st Cir. 1998) (affirming preliminary injunction for a facial takings claim); *D.A.B.E., Inc. v.*

*Mot. for Summary Judgment - 23*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*City of Toledo*, 292 F. Supp. 2d 968, 973 (N.D. Ohio 2003) (recognizing that a preliminary injunction is an available remedy for a facial regulatory takings claim). Indeed:

> Courts have generally found remedies to be inadequate [thus permitting injunctions] in three circumstances: (1) the injury complained of by its nature cannot be compensated by money damages, (2) the damages cannot be ascertained with any degree of certainty, and (3) the remedy at law would not be efficient because the injury is of a continuing nature.

*Kucera v. State, Dep't of Transp.*, 995 P.2d 63, 69 (Wash. 2000).

Currently, Plaintiffs are suffering an injury that is "of a continuing nature." *Id.* With every extension the Defendants issue, the Plaintiffs suffer additional harm. Further, the harm caused by a physical invasion of this kind is intangible and difficult to quantify. For example, in El Papel's case, the former holdover tenants' rental agreement had expired. Therefore, El Papel lost more than monetary resources—it lost the right to repossess its property. Moreover, injunctive relief is appropriate because it offers a far less costly means of settling the takings claims across the City and State than the innumerable case-by-case claims for compensation that will arise from these bans. Thomas W. Merrill, *Anticipatory Remedies for Takings*, 128 Harv. L. Rev. 1630, 1662 (2015) (finding that courts generally allow anticipatory relief in order to avoid duplicative litigation).

Therefore, injunctive relief is appropriate to resolve the Plaintiffs' takings claim.

## CONCLUSION

As Justice Holmes stated almost a century ago, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co.*, 260 U.S. at 416. The Defendants have before them a range of constitutional options to address the pandemic. They cannot instead choose to saddle landlords with the costs of this crisis. Plaintiffs respectfully request that the Court grant this motion.

*Mot. for Summary Judgment - 24*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

DATED:  April 9, 2021.                 Respectfully submitted:

s/  ETHAN W. BLEVINS                     s/  KATHRYN D. VALOIS
s/  BRIAN T. HODGES                      KATHRYN D. VALOIS*
Ethan W. Blevins, WSBA # 48219          Fla. Bar. No. 1010150
Brian T. Hodges, WSBA # 31976           Pacific Legal Foundation
Pacific Legal Foundation                4440 PGA Blvd., Suite 307
255 South King Street, Suite 800        Palm Beach Gardens, Florida 33410
Seattle, Washington 98104               Telephone: (561) 691-5000
Telephone: (425) 576-0484               Email: KValois@pacificlegal.org
Email: EBlevins@pacificlegal.org
Email: BHodges@pacificlegal.org         * Pro hac vice

                        *Attorneys for Plaintiffs*

*Mot. for Summary Judgment - 25*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2021, I electronically filed the foregoing PLAINTIFFS'

MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to all counsel of record.

s/  ETHAN W. BLEVINS
Ethan W. Blevins, WSBA # 48219

*Attorney for Plaintiffs*

*Mot. for Summary Judgment - 26*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*