The Honorable Richard A. Jones
The Honorable J. Richard Creatura

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

EL PAPEL, LLC, et al.,

                Plaintiffs,

    v.

ROBERT W. FERGUSON, in his official capacity as Attorney General of the State of Washington; JENNY A. DURKAN, in her official capacity as the Mayor of the City of Seattle; and THE CITY OF SEATTLE, a municipal Corporation,

                Defendants.

NO.  2:20-cv-01323-RAJ-JRC

DEFENDANT ROBERT W. FERGUSON'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT

NOTE ON MOTION CALENDAR: June 18, 2021

ORAL ARGUMENT REQUESTED

1

## TABLE OF CONTENTS

2

I.  INTRODUCTION ................................................................................................ 1

3

II. FACTUAL BACKGROUND ............................................................................. 3

4

    A.  The COVID-19 Pandemic and Washington's Response ........................... 3

5

    B.  The Risk and Costs of Mass Evictions ................................................... 3

6

    C.  The State Eviction Moratorium ............................................................... 4

7

    D.  The Safe Start Plan, Temporary Restrictions, and Healthy Washington Plan ........... 6

8

    E.  The Pandemic's Ongoing Impacts .......................................................... 7

9

    F.  Federal, State, and Local Rental Assistance Measures ............................ 7

10

    G.  The CDC Eviction Moratorium ............................................................... 9

11

    H.  The Landlords' Lawsuit and Motion ....................................................... 10

12

III. ARGUMENT ................................................................................................... 12

13

    A.  Summary Judgment Legal Standard ........................................................ 12

14

    B.  The Court Lacks Subject Matter Jurisdiction Over the Landlords' Claims ........... 12

15

        1.  The Landlords do not have standing ................................................ 12

16

        2.  The Landlords' challenge to the State Moratorium is imminently moot ........ 13

17

    C.  The State Moratorium Comports with the Contracts Clause ................... 14

18

        1.  Contracts Clause legal standard ...................................................... 14

19

        2.  The State Moratorium does not impose a substantial, unforeseeable impairment on rental agreements ........... 15

20

21

            a.  The State Moratorium does not undermine the contractual bargain ........ 15

22

            b.  The State Moratorium does not impair reasonable expectations .............. 19

23

            c.  The Landlords may safeguard or reinstate their rights ............................ 20

24

        3.  The State Moratorium advances a significant public purpose in an appropriate and reasonable way ................... 21

25

            a.  The State Moratorium's purpose is significant and legitimate ................ 21

26

            b.  The State Moratorium is reasonable and appropriate ............................... 22

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

i

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

4.   The Court should apply its prior ruling, in line with all other federal courts who have upheld similar moratoria .......................................... 25

D.   The State Moratorium Does Not Effect an Unconstitutional Taking ..................... 25

1.   The Moratorium does not authorize "permanent occupation" of Landlords' properties .......................................................................... 26

2.   Injunctive relief is unavailable for the Landlords' takings claim..................... 29

IV.   CONCLUSION ............................................................................................................ 30

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

ii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,
   No. 20-cv-03377 (DLF), 2021 WL 1779282 (D.D.C. May 5, 2021),
   *notice of appeal docketed and administrative stay granted* .......................................... 10, 12

*Allied Structural Steel Co. v. Spannaus*,
   438 U.S. 234 (1978) ....................................................................................................... 18

*Already, LLC v. Nike, Inc.*,
   568 U.S. 85 (2013) .......................................................................................................... 13

*Apt. Ass'n of Los Angeles Cnty. v. City of Los Angeles*,
   No. CV 20-05193-DDP, 2020 WL 6700568 (C.D. Cal. Nov. 13, 2020) ......................... 2, 14

*Arkansas Game & Fish Commission v. United States*,
   568 U.S. 23 (2012) ..................................................................................................... 27, 28

*Auracle Homes, LLC v. Lamont*,
   478 F. Supp. 3d 199 (D. Conn. 2020) ........................................................................ passim

*Baptiste v. Kennealy*,
   490 F. Supp. 3d 353 (D. Mass 2020) ............................................................... 2, 14, 25, 26

*Barnitz v. Beverly*,
   163 U.S. 118 (1896) ....................................................................................................... 17

*Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*,
   941 F.3d 1195 (9th Cir. 2019) ....................................................................................... 13

*Bronson v. Kinzie*,
   42 U.S. 311 (1843) .................................................................................................... 16, 17

*Brown v. Azar*,
   No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ............................ 10

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ....................................................................................................... 12

*Chambless Enterprises, LLC v. Redfield*,
   No. 3:20-CV-01455, 2020 WL 7588849 (W.D. La. Dec. 22, 2020) .................................... 10

*Chicago Bd. of Realtors, Inc. v. City of Chicago*,
   819 F.2d 732 (7th Cir. 1987) ......................................................................................... 19

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) ....................................................................................................... 12

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

iii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Connolly v. Pension Benefit Guar. Corp.*,
  475 U.S. 211 (1986)....................................................................................... 22

*Cummings v. DeSantis*,
  No. 2:20-CV-351-FtM-38NPM, 2020 WL 4815816 (M.D. Fla. Aug. 19, 2020)................. 13

*Doe v. Va. Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ......................................................................... 12

*El Papel LLC v. Inslee*, No. 2:20-CV-01323-RAJ-JRC,
  2020 WL 8024348 (W.D. Wash. Dec. 2, 2020),
  *report and recommendation adopted*,
  2021 WL 71678 (Jan. 8, 2021) ................................................................. passim

*Elmsford Apt. Assocs., LLC v. Cuomo*,
  469 F. Supp. 3d 148 (S.D.N.Y. 2020) ........................................................ passim

*Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983)................................................................................ 19, 22

*FCC v. Fla. Power Corp.*,
  480 U.S. 245 (1987)...................................................................................... 26

*Fikre v. FBI*,
  904 F.3d 1033 (9th Cir. 2018) ....................................................................... 14

*First English Evangelical Lutheran Church of Glendale v. Los Angeles County*,
  482 U.S. 304 (1987)...................................................................................... 28

*Gregory Real Estate & Mgmt. v. Keegan*,
  No. CV2020-007629
  (Super. Ct. of Ariz., Maricopa Cnty. July 22, 2020) ....................................... 26

*HAPCO v. City of Philadelphia*,
  482 F. Supp. 3d 337 (E.D. Pa. 2020)........................................................ passim

*Heights Apts., LLC v. Walz*,
  No. 20-CV-2051 (NEB/BRT), 2020 WL 7828818 (D. Minn. Dec. 31, 2020)........... 2, 14, 25

*Home Bldg. & Loan Ass'n v. Blaisdell*,
  290 U.S. 398 (1934)........................................................................... passim

*JL Props. Grp. B, LLC v. Pritzker*,
  No. 20-CH-601
  (12th Cir. Ct., Will Cnty., Ill. July 31, 2020)............................................ 26

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987)...................................................................................... 14

*Knick v. Twp. of Scott, Penn.*,
  139 S. Ct. 2162 (2019)........................................................................... 29, 30

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

iv

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Kucera v. Wash. State Dep't of Transp.*,
  140 Wash. 2d 200 (2000) ............................................................................. 30

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982) ........................................................................... 2, 26, 27

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................... 12

*Matorin v. Commonwealth of Massachusetts*,
  No. 2084CV01334
  (Suffolk Cnty., Mass. Super. Ct. Aug. 26, 2020) ................................... 26

*Matsuda v. City and County of Honolulu*,
  512 F.3d 1148 (9th Cir. 2008) .................................................................. 14

*Penn Central Transp. Co. v. New York City*,
  438 U.S. 104 (1978) ................................................................................... 27

*Philip Morris, Inc. v. Harshbarger*,
  159 F.3d 670 (1st Cir. 1998) .................................................................... 30

*Rental Housing Ass'n v. City of Seattle*,
  No. 20-2-13969-6 SEA
  (King Cnty., Wash. Super. Ct. Feb. 24, 2021) ....................................... 26

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) (per curiam) ........................................................... 21

*Ruckelshaus v. Monsanto Co.*,
  467 U.S. 986 (1984) ................................................................................... 29

*S. Bay United Pentecostal Church v. Newsom*,
  140 S. Ct. 1613 (2020) .............................................................................. 23

*San Francisco Apt. Ass'n v. City & Cnty. of San Francisco*,
  No. CPF-20-517136
  (Cal. Super. Ct., Cnty. of San Francisco Aug. 3, 2020) ....................... 26

*Sanitation & Recycling Indus., Inc. v. City of New York*,
  107 F.3d 985 (2d Cir. 1997) ..................................................................... 19

*Skyworks, Ltd. v. CDC*,
  No. 5:20-CV-2407, 2021 WL 911720 (N.D. Ohio Mar. 10, 2021) ...... 10

*Sveen v. Melin*,
  138 S. Ct. 1815 (2018) .................................................................. 15, 20, 21

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
  535 U.S. 302 (2002) ............................................................................ 26, 28

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

v

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Terkel v. CDC*,
  No. 6:20-CV-00564, 2021 WL 742877 (E.D. Tex. Feb. 25, 2021)....................................... 10

*Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*,
  No. 2:20-CV-02692-MSN-atc, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021),
  *den'g stay pending appeal*, 992 F.3d 518 (6th Cir. 2021)...................................... 10

*Trump v. Hawaii*,
  138 S. Ct. 377 (2017) (per curiam)................................................................ 13

*U.S. Trust Co. of N.Y. v. New Jersey*,
  431 U.S. 1 (1977)............................................................................. 15, 20

*Workman v. Mingo Cnty. Bd. of Educ.*,
  419 F. App'x 348 (4th Cir. 2011)................................................................. 21

*Yee v. City of Escondido*,
  503 U.S. 519 (1992)...................................................................... 26, 27, 28, 29

## Constitutional Provisions

U.S. Const. amend. V ............................................................................ passim

U.S. Const. amend. XIV ............................................................................ 26

U.S. Const. art. I, § 10 .......................................................................... 14

U.S. Const. art. I, § 10, cl. 1 .................................................................. passim

U.S. Const. art. III ............................................................................. 12

Wash. Const. art. I, § 16 ........................................................................ 29

## Statutes

American Rescue Plan Act of 2021,
  Pub. L. No. 117–2, 135 Stat. 4 (2021).......................................................... 8

Consolidated Appropriations Act, 2021,
  Pub. L. No. 116-260, 134 Stat. 1182 (2020)..................................................... 10

Coronavirus Aid, Relief, and Economic Security (CARES) Act,
  Pub. L. No. 116–136, 134 Stat. 281 (2020).................................................... 7, 8

2021 Wash. Sess. Laws, ch. 3 ..................................................................... 8

2021 Wash. Sess. Laws, ch. 115 ............................................................. 9, 13, 14

RCW 38.52.050 .................................................................................... 3

RCW 59.12 ....................................................................................... 19

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

vi

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

| | |
|---|---|
| RCW 59.18 | 19 |
| RCW 59.18.060 | 19 |
| RCW 59.18.140 | 19 |
| RCW 59.18.170 | 19 |
| RCW 59.18.200 | 19 |
| RCW 59.18.257 | 19 |
| RCW 59.18.260 | 19 |
| RCW 59.18.270 | 19 |
| RCW 59.18.280 | 19 |
| RCW 59.18.365–.410 | 19 |
| RCW 59.18.410 | 21 |

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................... 12

**Regulations**

85 Fed. Reg. 55,292 (Sept. 4, 2020) .......................................... 9, 10

86 Fed. Reg. 16731-01 (Mar. 31, 2021) ........................................ 10

**Other Authorities**

Engrossed Substitute H.B. 1368,
   67th Leg., Reg. Sess. (Wash. 2021) ......................................... 8

Engrossed Substitute S.B. 5092,
   67th Leg., Reg. Sess. (Wash. 2021) ......................................... 8

Engrossed Second Substitute S.B. 5160,
   67th Leg., Reg. Sess. (Wash. 2021) ......................................... 9

John D. Echeverria, *Eschewing Anticipatory Remedies for Takings:*
   *A Reply to Professor Merrill*, 128 Harv. L. Rev. 202 (2015) ................ 30

Wash. Office of the Governor, Proclamation 20-19.6 (Mar. 18, 2021),
   https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-19.6.pdf ..........passim

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

vii

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

# I.     INTRODUCTION

The COVID-19 pandemic, the deadliest in over a century, has created both a public health crisis and an economic crisis. Over 5,500 Washingtonians have died from COVID-19 and there have been over 409,000 confirmed and probable cases in the State. And because of the pandemic and the measures necessary to fight it, more than 1.6 million Washingtonians have filed unemployment claims and more than 180,000 have lost their jobs. The State has experienced the worst economic devastation since the Great Depression.

Governor Inslee has issued emergency proclamations to slow COVID-19's spread and mitigate its economic hardships. Like the federal government and many other states, the Governor issued a moratorium on most residential evictions (the State Moratorium). Recognizing that the pandemic would leave many tenants in financial distress and at risk of eviction, the Governor sought to keep people in their homes during this public health emergency. Evictions force people into congregate settings such as homeless shelters and shared living quarters, where COVID-19 spreads most aggressively. Without the State Moratorium, as many as 789,000 Washingtonians would be at risk of eviction. Epidemiological modeling projects that mass evictions on that scale could cause up to 59,000 more COVID-19 infections and 621 more deaths in the state. The State Moratorium helps avoid these unacceptable losses.

Plaintiffs El Papel LLC and Berman 2, LLC (the Landlords) are Seattle property owners with tenants owing unpaid rent. Wishing to evict their tenants during the pandemic, the Landlords filed this lawsuit, alleging that the State Moratorium violates the Contracts Clause and Takings Clause of the U.S. Constitution.

The Landlords' claims fail for several reasons. Jurisdictional bars, including lack of standing and mootness, foreclose the Landlords' claims. The relief sought by the Landlords would not redress their purported injuries because the federal eviction moratorium also blocks them from evicting their tenants for non-payment. And the State Moratorium will end on June 30, 2021, by operation of statute, mooting Plaintiffs' request to enjoin it.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    Defendant Robert W. Ferguson (hereinafter, the State) is further entitled to summary

2    judgment on the Landlord's sixth and seventh claims under the Contracts Clause and the Takings

3    Clause against the State Moratorium. This Court has already concluded that the State

4    Moratorium does not violate the Contracts Clause. *See El Papel LLC v. Inslee*, No. 2:20-CV-

5    01323-RAJ-JRC, 2020 WL 8024348, at *12 (W.D. Wash. Dec. 2, 2020), *report and*

6    *recommendation adopted*, 2021 WL 71678 (Jan. 8, 2021). Given the pervasive regulation of the

7    landlord-tenant relationship, limitations on the statutory remedy of eviction do not violate the

8    Contracts Clause because they do not substantially impair contractual relationships. *See*

9    *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 169 (S.D.N.Y. 2020). Furthermore,

10   a law comports with the Contracts Clause so long as it has "reasonable conditions and a character

11   appropriate to—that is, a reasonable relation to—the public purpose justifying its adoption,

12   which must be legitimate." *El Papel*, 2020 WL 8024348, at *10. The State Moratorium meets

13   that standard, for it is a reasonable and appropriate mechanism "designed to address vital public

14   interests during a national public crisis." *Id.* at *12. The Court should enter summary judgment

15   for the State on the Landlords' Contracts Clause claim, following the Court's prior order

16   upholding the State Moratorium and every other federal court of which the State is aware that

17   has considered—and rejected—such claims against COVID-19 evictions moratoria.[1]

18   The State is also entitled to summary judgment on the Landlords' Takings Clause claim.

19   The State Moratorium is not a physical taking—that is, "the permanent occupation of [a]

20   landlord's property by a third party." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S.

21   419, 440 (1982). Here too, federal courts have uniformly rejected takings claims against state

22   and local eviction moratoria during the pandemic.[2] This Court should join them.

23

24   [1] *See Heights Apts., LLC v. Walz*, No. 20-CV-2051 (NEB/BRT), 2020 WL 7828818, at *14 (D. Minn. Dec. 31, 2020); *Apt. Ass'n of Los Angeles Cnty. v. City of Los Angeles*, No. CV 20-05193-DDP, 2020 WL 6700568, at *8 (C.D. Cal. Nov. 13, 2020); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 387 (D. Mass 2020); *HAPCO v. City*

25   *of Philadelphia*, 482 F. Supp. 3d 337, 355–56 (E.D. Pa. 2020); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 221 (D. Conn. 2020); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 156 (S.D.N.Y. 2020).

26   [2] *See Heights Apts.*, 2020 WL 7828818, at *14; *Baptiste*, 490 F. Supp. 3d at 387–88; *HAPCO*, 482 F. Supp. 3d at 358; *Auracle Homes*, 478 F. Supp. 3d at 225-26; *Elmsford*, 469 F. Supp. 3d at 162–64.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

The State Moratorium is a constitutionally appropriate and critical tool to mitigate the pandemic's catastrophic economic and public health impact. The Landlords' claims all fail as a matter of law and there is no genuine dispute of material fact. The Court should accordingly grant summary judgment in the State's favor.

## II.   FACTUAL BACKGROUND

### A.   The COVID-19 Pandemic and Washington's Response

The SARS-CoV-2 virus that causes COVID-19 is highly contagious and potentially fatal. Declaration of Dr. Scott W. Lindquist ¶¶ 8–9. Seniors and persons with medical conditions are most vulnerable to complications and death, and people of color disproportionately contract and experience severe COVID-19 health outcomes. *Id.* ¶¶ 9–12. The virus spreads primarily through close interactions via respiratory droplets. *Id.* ¶ 8. There is a lag of several days before the onset of symptoms, and some with COVID-19 experience no symptoms. *Id.*

On February 29, 2020, the Governor issued Proclamation 20-05, declaring a State of Emergency in Washington due to COVID-19. Declaration of Kathryn Leathers ¶ 4, Ex. A; *see* RCW 38.52.050. With few proven therapeutics and no vaccine, a primary strategy to slow COVID-19's spread is to minimize interactions outside one's household. Lindquist Decl. ¶¶ 17, 19. The State's mitigation measures grew stricter as cases and deaths accelerated. *Id.* In March 2020, the Governor required people to cease leaving their homes except for essential activities and essential business. Leathers Decl., Ex. C.

### B.   The Risk and Costs of Mass Evictions

From the outset of the pandemic, the Governor's Office understood that the pandemic would significantly reduce economic output and income, making many tenants unable to afford rent. *See* Declaration of Jim Baumgart ¶ 8. A homelessness and housing instability crisis predated the pandemic in the state, where 21% of tenants were extremely low-income and affordable housing stock declined by one-third since 2012. *Id.*, Exs. A, E. Between 2013 and 2017, over 130,000 Washington adults faced an eviction, and by 2018 homelessness reached

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Great Recession levels. *Id.*, Ex. E. An analysis of Seattle unlawful detainer cases showed that most evictions result in homelessness, with only 12.5% of evictees finding another home. Declaration of Cristina Sepe, Ex. A at 3.

Against that backdrop, the Governor's Office anticipated that, without countermeasures, the COVID-19 pandemic's economic dislocations would result in mass evictions, exacerbating housing instability and homelessness in Washington. Baumgart Decl. ¶ 8, Ex. J at 3. Mass evictions would imperil both the economy and public health. *Id.* ¶ 8. Mass evictions would not only displace people from their residences at the very time that it was critical to stay home, but also force many into congregate settings like shelters and over-occupied homes, further spreading COVID-19. *Id.*; Lindquist Decl. ¶¶ 19, 55–58. Residential crowding and increased contact can increase the risk of COVID-19 infections. *See* Lindquist Decl. ¶¶ 56, 62. In Washington, the Department of Health (DOH) has identified 202 COVID-19 outbreaks in homeless services or shelters. Lindquist Decl. ¶ 59, Ex. N at 4. The Governor's Office also recognized that allowing evictions would flood the state court system with unlawful detainer filings, forcing tenants to risk their health to appear in housing courts that are crowded even in normal times. Baumgart Decl. ¶ 19. For those reasons and others, it is unsurprising that a rise in evictions has been found to lead to significant increases in COVID-19 infections and deaths. Baumgart Decl., Ex. S; Lindquist Decl., Exs. O, Q.

## C.    The State Eviction Moratorium

Given the likelihood and obvious dangers of mass evictions amidst the COVID-19 pandemic, on March 18, 2020, Governor Inslee issued Proclamation 20-19, temporarily prohibiting most residential evictions. Leathers Decl., Ex. B. Correctly predicting COVID-19 to "cause a sustained global economic slowdown," the Governor logically determined that "the inability to pay rent by these members of our workforce increases the likelihood of eviction from their homes," which in turn would "increas[e] the life, health, and safety risks to a significant percentage of our people from the COVID-19 pandemic." *Id.* at 1. Originally set to expire on

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

April 17, 2020, the State Moratorium has been amended and extended several times as the pandemic and recession persisted. It is currently set to expire on June 30, 2021. Leathers Decl. ¶ 23; Wash. Office of the Governor, Proclamation 20-19.6 (Mar. 18, 2021) (attached as Leathers Decl., Ex. M).

In crafting amendments to the State Moratorium, the Governor's Office sought input from a wide range of stakeholders, including residential property owners, managers, and landlords (collectively, property owners). Leathers Decl. ¶ 19; Baumgart Decl. ¶¶ 15–16. Based on their input, the Governor added several exceptions to protect property owners and induce tenants able to pay rent to do so.

In its current form, the State Moratorium prohibits property owners from pursuing eviction unless: (1) it is "necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident;"[3] (2) the landlord intends to "personally occupy the premises as a primary residence" (with timely notice to the tenant); or (3) the landlord intends to "sell the property" (also with timely notice). Procl. 20-19.6.

Property owners sought a mechanism to collect unpaid rent during the State Moratorium. Baumgart Decl. ¶ 17. As amended, the State Moratorium provides one. Though it generally prohibits landlords from treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," that prohibition applies only when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020." Procl. 20-19.6. Thus, the State Moratorium permits action other than eviction to collect unpaid rent that predated or is unrelated to the pandemic. The State Moratorium also permits a landlord to collect *any* unpaid rent if a tenant refuses or fails to comply with an offered "re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident." *Id.* The State Moratorium does not forgive any debt of unpaid rent and makes clear that tenants "who are not materially affected by COVID-19 should and must continue to pay rent." *Id.*

---

[3] "Property" was added to this list at the behest of some property owners. Baumgart Decl. ¶ 16.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO. 2:20-cv-01323-RAJ-JRC

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**D.    The Safe Start Plan, Temporary Restrictions, and Healthy Washington Plan**

On May 4, 2020, the Governor set forth a four-phase "Safe Start" reopening plan. Leathers Decl., Ex. D. After a surge in cases, in mid-July the Governor paused the plan and extended the State Moratorium until October 15, 2020. *Id.* In response to the fall surge, on November 17, 2020, the Governor set new temporary restrictions on in-person gatherings, businesses, and other activities statewide. *Id.*, Ex. E. In place for eight weeks, the temporary restrictions prohibited all indoor social gatherings with persons outside one's household unless certain testing and quarantine requirements were met. *Id.* The temporary restrictions also barred numerous activities that had been allowed in Phase 2 under the Safe Start Plan. *Id.*

On January 11, 2021, the Governor implemented a new phased reopening plan to replace the temporary restrictions, the Healthy Washington Plan, which divided counties into eight regions. Leathers Decl. ¶ 12, Exs. F, G. All regions began in Phase 1 of the Healthy Washington Plan, the most restrictive phase. *Id.* On February 14, the West region moved to Phase 2. On March 11, the Governor announced a statewide move to Phase 3, effective March 22. Leathers Decl. ¶ 25. Three counties have rolled back to Phase 2. *See id.* ¶ 26. On May 4, 2021, the Governor announced a two-week pause on counties' movement through the Healthy Washington Plan phases to give the DOH additional time to study whether the "fourth wave" of COVID-19 infections is leveling out. *Id.*

The Food and Drug Administration has authorized three vaccines for Emergency Use Authorization. Lindquist Decl. ¶ 15. Vaccines are critical to reducing COVID-19 case numbers and controlling the pandemic. Sepe Decl., Ex. B. Through the State's vaccination campaign, more than 5.5 million vaccine doses have been administered and 54.4% of the population over the age of 16 have received at least one dose of the vaccine. *See id.*, Ex. C. But only 38.9% of the 16 and over population is fully vaccinated, and there is wide variability among our counties. *See id.*, Exs. C, D, E. While there may be light at the end of this pandemic tunnel, vaccine hesitancy and slowing vaccination rates may pose an obstacle to achieving "herd immunity"—where we reach threshold immunity and transmission of the virus is cut down and containable. *Id.*, Exs. F, G.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

**E.      The Pandemic's Ongoing Impacts**

During the pandemic, at least 18,000 more Washingtonians have had to rely on cash assistance and 160,000 more on food assistance. Baumgart Decl., Ex. I at 3–4 of 4. Over 1.6 million Washingtonians have filed unemployment claims, and the State's unemployment rate had exceeded its Great Recession peak. Baumgart Decl. ¶ 7. Through the first four months of this year, over 265,000 *new* unemployment claims were filed, showing that the jobs crisis persists more than a year after COVID-19 cases here first emerged. *Id.* ¶ 7, Ex. H; Sepe Decl., Ex. H.

With the economy's continuing fragility, housing instability remains a significant concern. According to recent Census survey data, 10.7% of renters in Washington (160,080 people) are behind on their rent. Baumgart Decl., Ex. Z. And 17.8% of renters (265,342 people) reported having little or no confidence in their ability to make rent. *Id.* An analysis by the Aspen Institute found that 649,000 to 789,000 people in Washington (up to 10.3% of the population) would be at risk of eviction without the State Moratorium. Baumgart Decl., Ex. N at 8.

The public health consequences of such mass evictions would be catastrophic. They would result in—according to projections performed by the University of Washington Institute for Health Metrics and Evaluation—between 18,235 to 59,008 more eviction-attributable COVID-19 cases, 1,172 to 5,623 more hospitalizations, and 191 to 621 more deaths in the State. Declaration of Dr. Christopher J. L. Murray, Ex. B.

**F.      Federal, State, and Local Rental Assistance Measures**

On March 27, 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which included $150 billion in direct assistance for state, territorial, and tribal governments. Pub. L. No. 116–136, 134 Stat. 281 (2020). From this fund, in early August 2020, Washington allocated more than $100 million in Eviction Rent Assistance Program (ERAP) grants. Baumgart Decl. ¶ 12. Administered by local community organizations, ERAP funds provide up to three months of rent assistance to property owners on an eligible tenant's behalf. *Id.* Cities and local authorities may run their own rental assistance programs,

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

including as encouraged through certain tax programs under state law. *Id.* The CARES Act also imposed a 120-day national moratorium on evictions of renters participating in federal housing assistance programs or living in a property with a federally backed mortgage. Pub. L. No. 116–136., § 4024, 134 Stat. 281, 492–93 (2020). The CARES Act moratorium expired on July 24, 2020.

In February 2021, the Legislature adopted—and the Governor signed into law—a $2.2 billion COVID relief bill. *See* Engrossed Substitute H.B. 1368, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 3. The measure provided $325 million for the Department of Commerce to administer an emergency rental and utility assistance program, which provides grants to local housing providers. *Id.*, § 3(1). The relief package also sent $40 million towards other housing programs, including grants to local housing providers, *id.* § 3(2), mortgage assistance for homeowners facing foreclosure, *id.*, § 3(3), and grants to landlords who have lost "rental income from elective nonpayor tenants during the state's eviction moratorium," *id.*, § 3(7). The Governor additionally proposed rent assistance funds of $163 million in the 2021 supplemental budget and $152 million in 2022. Baumgart Decl. ¶ 13. And the state operating budget, passed by the Legislature on April 25, 2021, appropriates $658 million to the Department of Commerce to administer rental and utility assistance. Engrossed Substitute S.B. 5092, 67th Leg., Reg. Sess. (Wash. 2021); Baumgart Decl. ¶ 14.

In March 2021, Congress enacted the American Rescue Plan Act of 2021. Pub. L. No. 117–2, 135 Stat. 4 (2021). The legislation provides more than $21.5 billion in emergency rental assistance to help millions of families keep up on their rent and remain in their homes and $5 billion to assist people at risk of or experiencing homelessness.

In April 2021, the Washington Legislature adopted—and the Governor signed into law—a bill that provides certain tenant protections during and after this current public health emergency.[4] Under the bill, the eviction moratorium instituted through Proclamation 20-19.6

---

[4] The Governor partially vetoed two sections of the law. *See* Leathers Decl., Ex. Q.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

ends on June 30, 2021. Engrossed Second Substitute S.B. 5160, 67th Leg., Reg. Sess. (Wash. 2021), *enacted as* 2021 Wash. Sess. Laws, ch. 115. The law requires that, if a tenant has remaining unpaid rent that accrued between March 1, 2020, and December 30, 2021, or the end of the public health emergency (whichever is later), a landlord must offer that tenant a reasonable schedule for repayment of the unpaid rent that does not exceed monthly payments equal to one-third of the monthly rental charges during the period of accrued debt. *Id.*, § 4. But if that tenant "fails to accept the terms of a reasonable repayment plan within 14 days of the landlord's offer," the landlord may proceed with an unlawful detainer action, subject to any requirements of the Eviction Resolution Pilot program. *Id.* If a tenant defaults on rent owed under a repayment plan, the landlord may apply for reimbursement from the Landlord Mitigation Program or proceed with an unlawful detainer action, subject to any requirements of the Eviction Resolution Pilot program. *Id.* The court must consider in the unlawful detainer proceeding the tenant's circumstances, including any decreased income or increased expenses due to COVID-19, and the repayment plan terms offered. *Id.* It is a defense to an unlawful detainer action if the landlord did not offer a reasonable repayment plan. *Id.*

The law additionally provides that landlords are eligible to file certain reimbursement claims under the Landlord Mitigation Program up to $15,000 for unpaid rent that accrued between March 1, 2020, and December 30, 2021. *See id.*, § 5. The law also requires that the Administrative Office of the Courts contract with Dispute Resolution Centers to establish court-based eviction resolution pilot programs. *Id.*, § 7. The law also provides for court-appointed counsel for indigent tenants in unlawful detainer proceedings, subject to the availability of amounts appropriated. *Id.*, § 8.

## G.    The CDC Eviction Moratorium

On September 4, 2020, the U.S. Centers for Disease Control & Prevention (CDC) adopted a nationwide eviction moratorium. 85 Fed. Reg. 55,292 (Sept. 4, 2020). The CDC found eviction moratoria "an effective public health measure" that prevents the spread of disease by

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    "facilitat[ing] self-isolation" and by allowing states "to more easily implement stay-at-home and

2    social distancing directives[,]" and recognized that "housing stability helps protect public health

3    because homelessness increases the likelihood of individuals moving into congregate

4    settings, . . . which then puts individuals at higher risk to COVID-19." *Id.*

5          The CDC moratorium prohibits property owners from evicting tenants who attest that

6    they (1) have used "best efforts" to obtain government rent or housing assistance; (2) expect to

7    earn no more than $99,000 in annual income in 2020; (3) are unable to pay full rent due to

8    substantial loss of income, reduced hours or wages, a lay-off, or medical expenses; (4) are "using

9    best efforts to make timely partial payments" in light of "other nondiscretionary expenses"; and

10   (5) would likely be rendered homeless or forced to "live in close quarters in a new congregate

11   or shared living setting" if evicted. *Id.* at 55,293. The CDC moratorium does not apply wherever

12   a state or local government's eviction moratorium provides "the same or greater level of public-

13   health protection." *Id.* at 55,294. The CDC moratorium has been extended and modified and is

14   currently set to expire on June 30, 2021. *See* Consolidated Appropriations Act, 2021, Pub. L.

15   No. 116-260, § 502, 134 Stat. 1182, 2078–79 (2020); 86 Fed. Reg. 8020-01, 8,021 (Feb. 3, 2021);

16   86 Fed. Reg. 16731-01 (Mar. 31, 2021).[5]

17   **H.      The Landlords' Lawsuit and Motion**

18         The Landlords filed this lawsuit in September 2020, and this Court denied the Landlords'

19   motion for preliminary injunction in December 2020. The Landlords filed an Amended

20   Complaint, dropping Governor Jay Inslee as a state Defendant but adding Attorney General Bob

21         [5] On May 5, 2021, a court vacated the CDC moratorium, holding that the CDC has exceed the statutory
22   authority given to it by Congress in issuing the moratorium. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health &
     Hum. Servs.*, No. 20-cv-03377 (DLF), 2021 WL 1779282, at *10 (D.D.C. May 5, 2021), *notice of appeal docketed
23   and administrative stay granted.* Two other courts have held that the same but that an injunction was inappropriate.
     *Tiger Lily, LLC v. U.S. Dep't of Hous. & Urban Dev.*, No. 2:20-CV-02692-MSN-atc, 2021 WL 1171887, at *10
24   (W.D. Tenn. Mar. 15, 2021), *den'g stay pending appeal*, 992 F.3d 518 (6th Cir. 2021); *Skyworks, Ltd. v. CDC*,
     No. 5:20-CV-2407, 2021 WL 911720, at *13 (N.D. Ohio Mar. 10, 2021). Another court has held that the CDC
     moratorium exceeds the government's Commerce and Necessary and Proper powers. *Terkel v. CDC*, No. 6:20-CV-
25   00564, 2021 WL 742877, at *2 (E.D. Tex. Feb. 25, 2021). The government has appealed the order, which "does not
     extend beyond the particular plaintiffs." Sepe Decl., Ex. K. And two courts have upheld the CDC moratorium. *See
26   Chambless Enterprises, LLC v. Redfield*, No. 3:20-CV-01455, 2020 WL 7588849 (W.D. La. Dec. 22, 2020) (CDC
     moratorium did not exceed statutory authority of the CDC); *Brown v. Azar*, No. 1:20-CV-03702-JPB, 2020
     WL 6364310 (N.D. Ga. Oct. 29, 2020) (same).

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Ferguson, maintaining their challenge to the State Moratorium under the Contracts Clause, U.S. Const. art. I, § 10, and the Takings Clause, *id.* amend. V. *See* Dkt. 81. The Landlords also challenge the Seattle Moratorium and Repayment Ordinances. *See id.*

El Papel, LLC, owns 27 residential units spread across two properties in Seattle. Sepe Decl., Ex. L at 5. A governor for El Papel declares that it has two tenants who owe collectively $6,285 in back rent and would evict one tenant for non-payment if not for the moratoria. Dkt. 95 ¶¶ 6, 10. El Papel has no holdover tenants, contradicting allegations in the Amended Complaint that it is unable to enforce lease term provisions. *Compare id.* ¶ 4, *with* Dkt. 80 ¶¶ 33–36. El Papel has received rental assistance from the King County Eviction Prevention program to settle back rent owed on a unit. Dkt. 95 ¶ 5.

Berman 2, LLC (Berman), owns 22 residential units in Seattle. Sepe Decl., Ex. M at 5. Berman rents units to low-income individuals at below-market rents. Dkt. 97 ¶ 3. The governor for Berman declares that there are nine tenants[6] who owe back rent and they collectively owe $16,479. *Id.* ¶ 6. Many of the tenants receive or received rental assistance through outside programs like the Catholic Community Services' Housing and Essential Needs program and Section 8. *See* Sepe Decl., Ex. M at 8–11. Berman asserts that he contacted tenants "asking them to set up whatever partial payment or repayment plan works for them through the pandemic and run it by [him]." Dkt. 97 ¶ 6. He does not say whether he ever offered and the tenant refused a "reasonable repayment plan," which would enable Berman to treat any unpaid rent as an enforceable debt under the State Moratorium. Procl. 20-19.6.

The Landlords provide little information on their tenants' income, employment status, financial circumstances, family obligations, or other ways in which the pandemic may have affected their lives. Critically, the Landlords do not adduce sufficient evidence revealing whether their tenants would qualify under the CDC moratorium, which would independently preclude the Landlords from evicting them.

---

[6] Another filed, but unsigned, declaration states that three tenants owe back rent. *See* Dkt. 97 at 2.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

### III.    ARGUMENT

**A.    Summary Judgment Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

**B.    The Court Lacks Subject Matter Jurisdiction Over the Landlords' Claims**

**1.    The Landlords do not have standing**

The CDC moratorium leaves the Landlords without Article III standing to challenge the Moratorium. Article III standing is designed "to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013). The "standing inquiry" is therefore "'especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by'" another branch of government is unconstitutional. *Id.* The Landlords fail to meet this "'especially rigorous'" standard.

To have Article III standing, the Landlords must demonstrate "as an irreducible minimum" that they have suffered (1) an injury in fact that is (2) "fairly traceable" to the challenged laws, and that is (3) "likely to be redressed by the requested relief." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992) (cleaned up). The traceability and redressability elements are not met "when there exists an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 756 (4th Cir. 2013).

If Washington's and Seattle's evictions moratoria were enjoined, the CDC moratorium would apply in Washington.[7] While the CDC moratorium protects a narrower subset of tenants, the Landlords have not argued that their tenants could not meet the CDC's requirements to avoid

---

[7] A district court recently vacated the CDC moratorium. *Ala. Ass'n of Realtors*, 2021 WL 1779282, at *10. But the court has administratively stayed the order while it decides the government's emergency motion to stay the motion pending appeal. Minute Order (May 5, 2021), No. 20-cv-3377 (DLF) (D.D.C.). The federal government has also filed its notice of appeal. *Id.*, Dkt. 55.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

eviction. Like the State Moratorium, the CDC moratorium will expire on June 30, 2021, so an injunction would leave the Landlords in the same position they are in now—unable to commence eviction proceedings at least until the federal moratorium expires.

At the preliminary injunction stage, this Court held that the Landlords had standing, because a tenant of then-Plaintiff Karvell Li would not have qualified for the CDC moratorium based on the tenant's income history. *El Papel*, 2020 WL 8024348, at *5. But Mr. Li has voluntarily dismissed all his claims against Defendants, Dkt. 84, and the remaining Landlords do not otherwise explain why the CDC moratorium poses no obstacle to their abilities to evict tenants for nonpayment. *See* Dkt. 95 ¶ 9 (explaining that but for the State and City moratoria, El Papel would start eviction proceedings for one non-paying tenant); Dkt. 97 ¶ 8 (stating the same for Berman's non-paying tenants). The Landlords lack standing.

### 2. The Landlords' challenge to the State Moratorium is imminently moot

The State Moratorium will end on June 30, 2021, *see* 2021 Wash. Sess. Laws, ch. 115, § 4(1)—mooting Plaintiffs' requests for declaratory and injunctive relief. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Courts "treat the voluntary cessation of challenged conduct by government officials with more solicitude than similar action by private parties." *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1198 (9th Cir. 2019) (cleaned up). "For this reason, the repeal, amendment, or expiration of challenged legislation is generally enough to render a case moot and appropriate for dismissal." *Id.* This principle applies to the expiration of executive actions. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (per curiam) (dismissing as moot a challenge to an executive order's provisions that had "'expired by [their] own terms'"); *Cummings v. DeSantis*, No. 2:20-CV-351-FtM-38NPM, 2020 WL 4815816, at *3 (M.D. Fla. Aug. 19, 2020) (replacement COVID-19 orders mooted claims challenging predecessor orders).

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

No live controversy will remain when the State Moratorium ends on June 30, 2021. The Legislature has passed, and the Governor has signed, a robust statutory scheme guiding landlord-tenant relationships affected by the COVID-19 pandemic. *See* 2021 Wash. Sess. Laws, ch. 115. This legislation is the result of substantial deliberation among policymakers and stakeholders and not an attempt to manipulate jurisdiction. *See Fikre v. FBI*, 904 F.3d 1033, 1038 (9th Cir. 2018) ("The rigors of the legislative process bespeak finality and not for-the-moment, opportunistic tentativeness.") (cleaned up). And the 2021 legislative session has concluded—another indication that the ending date is firmly in place. Instead of giving an advisory opinion on the State Moratorium's constitutionality, the Court should dismiss the claims as moot.

## C.     The State Moratorium Comports with the Contracts Clause

Even if the Court concludes that this case is justiciable, the State is entitled to summary judgment on the Landlords' sixth claim for declaratory and injunctive relief under the Contracts Clause. *See* Dkt. 81 ¶¶ 96–101. As this Court has already held, the State Moratorium—as well as the City's Moratorium—"do[es] not violate the Contracts Clause." *El Papel*, 2020 WL 8024348, at *9. And several federal courts are in accord—rejecting Contracts Clause challenges to state or local eviction moratoria.[8]

### 1.     Contracts Clause legal standard

Article I, Section 10 of the U.S. Constitution prohibits states from passing laws "impairing the Obligation of Contracts." U.S. Const. art. I, § 10. The Contracts Clause is "not to be read literally[,]" *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502–03, (1987), but is construed "narrowly in order to ensure that local governments retain the flexibility to exercise their police powers effectively[,]" *Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1152 (9th Cir. 2008) (citations omitted).

Courts apply a two-step inquiry under the Contracts Clause. First, courts determine

---

[8] *Heights Apts.*, 2020 WL 7828818, at *12; *Apt. Ass'n of L.A. Cnty.*, 2020 WL 6700568, at *8; *Baptiste*, 490 F. Supp. 3d at 353; *HAPCO*, 482 F. Supp. 3d at 355–56; *Auracle Homes*, 478 F. Supp. 3d at 199; *Elmsford*, 469 F. Supp. 3d at 172.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

"whether the state law has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018) (cleaned up). Second, if and only if a substantial impairment exists, courts evaluate "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983)). The State Moratorium—a temporary, carefully-crafted emergency measure—meets both steps.

### 2. The State Moratorium does not impose a substantial, unforeseeable impairment on rental agreements

Three factors govern the analysis of whether a law imposes a "substantial impairment" on a contractual relationship: "the extent to which" the law (1) "undermines the contractual bargain," (2) "interferes with a party's reasonable expectations," and (3) "prevents the party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. Each factor indicates that the State Moratorium does not impair the Landlords' contractual relationships with their tenants.[9]

### a. The State Moratorium does not undermine the contractual bargain

The State Moratorium does not undermine the Landlords' contractual bargain with their tenants because the mere delay in the right to exercise a statutory remedy does not materially alter the lease agreements. In *Home Building and Loan Association v. Blaisdell*, 290 U.S. 398 (1934)—the "leading case in the modern era of Contract Clause interpretation[,]" *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 15 (1977)—the Supreme Court upheld a Depression-era mortgage moratorium law extending mortgagors' redemption period *for up to two years*. The Court recognized that contractual obligations may be "impaired by a law which renders them invalid, or releases or extinguishes them[,]" such as a "state insolvent law" that wholly "discharge[s] the debtor from liability" for preexisting debts. *Blaisdell*, 290 U.S. at 431. The mortgage moratorium, however, did not impose such an impairment, for it represented a "temporary restraint of enforcement . . . to protect the vital interests of the community[]" from a

---

[9] At the preliminary injunction stage, the Court assumed without deciding that there was a substantial impairment of the leases. *El Papel*, 2020 WL 8024348, at *6.

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

"great public calamity." *Id.* at 439.

The same is true of the State Moratorium here. As a federal district court explained in upholding New York's eviction moratorium, it "does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants." *Elmsford*, 469 F. Supp. 3d at 172; *see also HAPCO*, 482 F. Supp. 3d at 352 (Philadelphia moratorium is "only a minimal alteration of contractual obligations" because, "[a]s in *Blaisdell*, . . . it merely postpone[s] the date on which landlords may commence eviction proceedings and collect full rent") (internal quotation marks and citation omitted); *Auracle Homes*, 478 F. Supp. 3d at 224 (Connecticut moratorium does "not eliminate Plaintiffs' contractual remedies for evicting nonpaying tenants; Plaintiffs instead have to wait before they may issue notices to quit or initiate summary proceedings.").

The Landlords' assertion that the State Moratorium "remove[s] the enforcement mechanisms of eviction" and "prevents landlords from treating overdue rent as an enforceable debt," Dkt. 93 at 15, overlooks the fact that "tenants are still bound to their contracts," and the Landlords may still "obtain a judgment for unpaid rent if the tenants fail to honor their obligations[,]" *Elmsford*, 469 F. Supp. 3d at 172. In fact, the State Moratorium expressly permits property owners to treat unpaid rent as an enforceable debt if they "demonstrate . . . to a court that the resident was offered, and refused or failed to comply with" a reasonable repayment plan. Procl. 20-19.6. In this way and others, the State Moratorium preserves the primary benefit of the Landlords' bargain.

The Landlords contend that the eviction moratoria "substantially impair every lease agreement throughout Seattle and Washington by removing the key enforcement mechanism," citing cases pre-dating 1900. Dkt. No. 93 at 13. They cite *Bronson v. Kinzie*, 42 U.S. 311 (1843), for the proposition that a contractual impairment may be substantial even where a remedy for contractual breaches is merely delayed. *Id.* at 14. But in distinguishing *Bronson*, and upholding a mortgage foreclosure law, the Court in *Blaisdell* made the point that the statute challenged in

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Blaisdell* did not substantively impair the debt. 290 U.S. at 425. The *Blaisdell* Court went on to

reject the argument the Landlords raise:

> [I]t does not follow that conditions may not arise in which a temporary restraint of enforcement may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions with respect to the enforcement of contracts if made necessary by a great public calamity such as fire, flood, or earthquake. *** And, if state power exists to give temporary relief from the enforcement of contracts in the presence of disasters due to physical causes such as fire, flood, or earthquake, that power cannot be said to be nonexistent when the urgent public need demanding such relief is produced by other and economic causes.

*Blaisdell*, 290 U.S. at 439. *Blaisdell* also distinguished the very cases relied on by Plaintiffs, like

*Bronson* and *Barnitz v. Beverly*, 163 U.S. 118 (1896), explaining that those cases did not consider

states' interests in exercising its police powers to "safeguard the vital interests of its people." *Id.*

at 434. *Blaisdell* made clear that socioeconomic changes—like the "constantly increasing density

of population, the interrelation of the activities of our people and the complexity of our economic

interests"—correspondingly change the boundaries of the state's police power. *Id.* at 442.

The Landlords next contend that *Blaisdell* instructs that the moratoria can only be upheld

if tenants continue to pay fair rent. *See* Dkt. 93 at 14–15. But as this Court has already explained,

"the law in *Blaisdell* did not, in fact, guarantee a monthly rent payment. Instead, it was up to a

court to set the time and manner of repayment." *El Papel*, 2020 WL 8024348, at *7. And

*Blaisdell* actually shows why the State Moratorium is constitutional. *See HAPCO*, 482 F. Supp.

3d at 350 (upholding Philadelphia moratorium, noting that *Blaisdell* "is strikingly similar to the

instant case"). The Supreme Court found several factors significant in rejecting the Contracts

Clause challenge: (1) "the state legislature had declared in the Act itself that an emergency need

for the protection of homeowners existed"; (2) "the state law was enacted to protect a basic

societal interest, not a favored group"; (3) "the relief was appropriately tailored to the emergency

that it was designed to meet"; (4) "the imposed conditions were reasonable"; and (5) "the

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

legislation was limited to the duration of the emergency." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978) (discussing *Blaisdell*, 290 U.S. at 244–47). Under these considerations, the State Moratorium is clearly constitutional—it was enacted to address a global pandemic, limited to the duration of the emergency (and will end before the end of the public health emergency), enacted to protect the broader interests of public health and housing security, and tailored to protect vulnerable tenants. The Court did not hold that the contemporaneous rent aspect of the Minnesota order was essential to its reasonableness. The opinion includes a list of other factors that rendered the order reasonable, including that, like here, many essential contractual obligations remained intact, e.g., "the integrity of the mortgage indebtedness [was] not impaired" and "the validity of the sale and the right of mortgagee-purchaser to title obtain a deficiency . . . [were] maintained." *Blaisdell*, 290 U.S. at 445–46. As the Court has already explained: "*Blaisdell* and subsequent cases make clear that there is no precise formula or factor-based test to be applied in every case but that the overarching consideration must be the reasonableness of the impairment *based on the facts of the case*." *El Papel*, 2020 WL 8024348, at *7 (emphasis added).[10]

The Landlords further misconstrue the State Moratorium when arguing that the State Moratorium "prevents landlords from treating overdue rent as an enforceable debt through breach-of-contract or similar actions." Dkt. 93 at 15. This is wrong. The State Moratorium prohibits treating unpaid rent "as an enforceable debt or obligation that is owing or collectable," when nonpayment was "a result of the COVID-19 outbreak and occurred on or after February 29, 2020." Procl. 20-19.6. Thus, the State Moratorium permits action other than eviction to collect unpaid rent that predated or is unrelated to the pandemic. The State Moratorium additionally

---

[10] And while the State Moratorium does not condition its protection on the continued payment of rent, the State has allocated hundreds of millions of dollars to landlords to cover unpaid rent during the course of the pandemic—rental assistance funds of which the Landlords themselves have taken advantage of. The Landlords totally ignore this aspect of the State's pandemic response, which significantly mitigates the financial burden of the State Moratorium. *See El Papel*, 2020 WL 8024348, at *9 (discussing the State's and City's efforts "to soften the blow on lessors" through rental assistance); *supra* pp. 8–9 (discussing rental assistance measures).

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1  permits a landlord to collect *any* unpaid rent if a tenant refuses or fails to comply with an offered

2  "re-payment plan that was reasonable based on the individual financial, health, and other

3  circumstances of that resident." *Id.*

### b. The State Moratorium does not impair reasonable expectations

5  "The primary consideration in determining whether the impairment is substantial is the

6  extent to which reasonable expectations under the contract have been disrupted." *Sanitation &*

7  *Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). The reasonableness

8  of a party's contractual expectations largely depends on "whether the industry the complaining

9  party has entered has been regulated in the past." *Energy Rsrvs. Grp.*, 459 U.S. at 411. "Because

10  past regulation puts industry participants on notice that they may face further government

11  intervention in the future," later regulations are "less likely to violate the contracts clause where

12  [they] cover[] the same topic as the prior regulation and share[] the same overt legislative intent

13  to the protect the parties protected by the prior regulation." *Elmsford*, 469 F. Supp. 3d at 169–70

14  (citations and quotation marks omitted).

15  This factor, too, undercuts the Landlords' Contracts Clause claim. "[T]he landlord-tenant

16  relationship is, if nothing else, heavily regulated." *Chicago Bd. of Realtors, Inc. v. City of*

17  *Chicago*, 819 F.2d 732, 736 (7th Cir. 1987). The Residential Landlord Tenant Act (RLTA),

18  RCW 59.18, regulates many aspects of the landlord-tenant relationship by, for example,

19  establishing a duty to keep the premises fit for human habitation, RCW 59.18.060; requiring

20  notice of rent increases, RCW 59.18.140; and regulating late fees, RCW 59.18.170, notices of

21  termination, RCW 59.18.200, tenant screening, RCW 59.18.257, and security deposits,

22  RCW 59.18.260–.280. The Forcible Entry and Forcible and Unlawful Detainer Act and RLTA

23  specifically regulate evictions, too. *See* RCW 59.12; RCW 59.18.365–.410. Thus, an "eviction

24  moratorium" cannot "operate as a substantial impairment of [the Landlords'] contractual rights,"

25  because it is not "wholly unexpected government" action. *Auracle Homes*, 478 F. Supp. 3d

26  at 224 (internal quotation marks and citations omitted).

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Several courts, examining Contract Clause challenges to eviction moratoria in other locales, have relied upon this history of regulation to conclude that eviction moratoria are relatively minor alterations to existing regulatory frameworks, and therefore do not interfere with landlords' reasonable expectations. *See, e.g.*, *HAPCO*, 482 F. Supp. 3d at 352 ("Against this heavily-regulated backdrop, it is doubtful that any impairment . . . has occurred as a result of the [eviction moratorium].") (internal quotation marks and citations omitted); *Elmsford*, 469 F. Supp. 3d at 169–70.

Additionally, none of the Landlords' lease agreements expressly provides for nonpayment of rent as a ground for eviction. As the Supreme Court has held, "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." *U.S. Trust Co.*, 431 U.S. at 19 n.17. And any implied contract rights that are conferred by state laws, "including judicial remedies such as eviction, may be the subject of a Contracts Clause claim 'only when those laws affect the validity, construction, and enforcement of contracts.'" *Elmsford,* 469 F. Supp. 3d at 172 (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 189 (1992)).

### c.     The Landlords may safeguard or reinstate their rights

Finally, the State Moratorium allows the Landlords to protect their contractual rights and thus does not impair them. In *Sveen*, the Supreme Court held that a law altering contractual remedies without nullifying them does not "prevent[] the party from safeguarding or reinstating [their] rights." 138 S. Ct. at 1822. The State Moratorium neither relieves tenants' obligation to pay all rent owed nor eliminates the Landlords' right to enforce that obligation. Rather, it merely requires them "to wait before they may issue notices to quit or initiate summary proceedings." *Auracle Homes*, 478 F. Supp. 3d at 224. Because "the tenants are still bound to their contracts, the contractual bargain is not undermined and landlord rights are safeguarded." *HAPCO*, 482 F. Supp. 3d at 353. The State Moratorium further mitigates the temporary burden by allowing property owners to evict if they sell or personally occupy the home. Or they may offer

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

a reasonable repayment plan and, if refused or violated, take steps to recover unpaid rent and any damages resulting from a tenant holding over. RCW 59.18.410. The State Moratorium preserves landlord protections and imposes no substantial impairment.

**3.      The State Moratorium advances a significant public purpose in an appropriate and reasonable way**

Even if the State Moratorium substantially impaired any contract, it still would not violate the Contracts Clause under the second step of the inquiry. A temporary emergency measure to prevent economic dislocation and slow the spread of disease, the State Moratorium furthers "a significant and legitimate public purpose" in "an appropriate and reasonable way." *Sveen*, 138 S. Ct. at 1822 (internal quotation marks and citation omitted).

**a.      The State Moratorium's purpose is significant and legitimate**

The State Moratorium's purposes—to "reduce economic hardship" of those "unable to pay rent as a result of the COVID-19 pandemic" and "promote public health and safety by reducing the progression of COVID-19 in Washington State," Procl. 20-19.6—are not just significant and legitimate, but compelling. *See, e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("Stemming the spread of COVID–19 is unquestionably a compelling interest . . . ."); *Workman v. Mingo Cnty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."). This Court has already held that the purposes of the State and City moratoria are "undisputedly legitimate purposes." *El Papel*, 2020 WL 8024348, at *10.

The State Moratorium is one tool, of several, addressing the gravest public health crisis in over a century and the associated economic fallout that has triggered soaring unemployment. *See* Baumgart Decl. ¶¶ 7, 21. The State Moratorium seeks to avert a mass increase in evictions that would trigger a housing instability and homelessness crisis, which would exacerbate the spread of COVID-19. Experts agree that policies that limit evictions reduce COVID-19

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

infections and deaths, and that an individual risk of infection is substantially higher for individuals who experience eviction or whose household structures merged because of housing instability. *See* Lindquist Decl. ¶¶ 61–63. Within our State, mass evictions could cause up to 59,008 more eviction-attributable COVID-19 cases, 5,623 more hospitalizations, and 621 more deaths. Murray Decl., Ex. B.

The Landlords' attempt to minimize the broad public benefits of the State Moratorium falls flat. *See* Dkt. 93 at 20–21. The manifest purpose of the State Moratorium is to protect the entire state from the economic and public health consequences that would result from mass evictions. It does not relieve any obligations of tenants, who continue to owe any unpaid rent. *See Energy Rsrvs. Grp.*, 459 U.S. at 412 (explaining that the "requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests"). Virtually every law "regulating commercial and other human affairs . . . creates burdens for some that directly benefit others[,]" but that does not make it unconstitutional "whenever legislation requires one person to use his or her assets for the benefit of another." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986). Designed to avert an economic and public health catastrophe, the State Moratorium advances state interests that are just as important—if not more so—as those served by the mortgage moratorium upheld in *Blaisdell*. *El Papel*, 2020 WL 8024348, at *9 (State Moratorium was "designed to address the 'legitimate state interest' of protecting the public from the harms associated with this public emergency, rather than promoting the narrow interests of one group over another").

**b.    The State Moratorium is reasonable and appropriate**

The only remaining question, then, is whether the State Moratorium is "reasonable" and "appropriate" in advancing the State's interests. The answer is yes. Where, as here, the State is not itself a "contracting party," the Court must "defer" to the Governor's "judgment as to the necessity and reasonableness of a particular measure[]" in answering that question. *Energy Rsrvs. Grp.*, 459 U.S. at 412–13 (internal quotation marks and citation omitted). And this

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

"latitude 'must be especially broad'" where "officials 'undertake to act in areas fraught with medical and scientific uncertainties,'" such as responding to the COVID-19 pandemic. *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). So long as "those broad limits are not exceeded, they should not be subject to second-guessing by '. . . [the] judiciary,' which lacks the background, competence, and expertise to assess public health." *Id.* (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

The State Moratorium fits paradigmatically within the Supreme Court's standard for a reasonable and appropriate law. Like the mortgage moratorium upheld in *Blaisdell*, the State Moratorium is a response to an unprecedented "emergency which threaten[s] the loss of homes." 290 U.S. at 444–45 (internal quotation marks omitted). The State Moratorium is "not for the mere advantage of particular individuals but for the protection of a basic interest of society[,]" that is, to prevent mass evictions and the spread of COVID-19. *Id.* at 445. Its terms are reasonable: it does not repudiate or reduce tenants' rent obligations, so their "indebtedness is not impaired." *Id.* And the State Moratorium is "temporary in operation[]" and "limited to the exigency which called it forth." *Id.* at 447. In sum, "as in *Blaisdell*, where [the Court upheld] temporary measures enacted in response to emergency conditions to allow people to remain in their homes," the State Moratorium advances important state goals in a reasonable, appropriate way. *HAPCO*, 482 F. Supp. 3d at 355; *see El Papel*, 2020 WL 8024348, at *7 ("*Blaisdell* supports the reasonableness of COVID-19 eviction moratoria.").

For that reason, this Court and other federal courts have uniformly rejected Contracts Clause challenges to state and local eviction moratoria—including the State Moratorium. As this Court previously explained, "legislation impairing private contracts must have reasonable conditions and a character appropriate to—that is, a reasonable relation to—the [legitimate] public purpose justifying its adoption[.]" *El Papel*, 2020 WL 8024348, at *10. The State Moratorium meets this standard, as this Court already held, because it is a reasonable and

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

appropriate means of "address[ing] vital public interests during a national public crisis." *Id.* at *12. Like other moratoria upheld during this public health emergency, the State Moratorium "undoubtedly helps residents remain in their homes and, especially considering the COVID-19 pandemic during which it is critical that people . . . remain socially distant from each other[.]" *HAPCO*, 482 F. Supp. 3d at 355. This Court should continue defer to the Governor's judgment that a temporary moratorium on evictions is a "reasonable" and "appropriate" way to keep renters in their homes and slow the spread of COVID-19, and therefore a permissible regulation under the Contracts Clause. *See El Papel*, 2020 WL 8024348 at *10.

The Landlords maintain their argument that the State Moratorium is unreasonable because it does not require a showing of hardship. Dkt. 93 at 21. But "[s]eeking to avoid housing instability, whether of the rich or of the poor, will keep people in their homes and reduce COVID-19 transmission." *El Papel*, 2020 WL 8024348, at *10. Moreover, the State considered but decided not to include a hardship requirement because:

> In many cases, tenants in genuine economic distress due to the pandemic are unable to provide adequate proof of their distress. Many tenants have informal employment or non-traditional sources of income. For these tenants, proving distress is not as simple as submitting a copy of a termination letter from an employer. And even if a tenant did not lose their job, they could be facing pandemic-related economic distress anyway, such as the burden of caring for family members who lost their jobs or are unable to provide for themselves.

Baumgart Decl. ¶ 18. This Court has already considered and credited the State's explanation in holding the Moratorium reasonable. *See El Papel*, 2020 WL 8024348, at *11 (discussing the State's efforts to balance interests of tenants and landlords).

The Landlords offer a number of policy prescriptions but ignore key facets of the State Moratorium and cannot show the Moratorium is unreasonable in comparison. For example, the Landlords point out that Michigan courts have directed a "prioritization approach" to evictions, Dkt. 93 at 23, but ignore that the State Moratorium allows for evictions where they are necessary to respond to a significant and immediate risk to the health, safety, or property of others created by the resident;" the landlord intends to "personally occupy the premises as a primary residence"

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

(with notice to the tenant); or the landlord provides notice of intent to "sell the property." The Landlords also suggest that the State could impose a cap on the number of eviction filings, Dkt. 93 at 23, but this option was determined to be too difficult to implement across the State through various systems and ineffective in halting the rise in evictions. *See* Baumgart Decl. ¶ 15.

The Court should continue to defer to the executive judgment as to the necessity and reasonableness of the State Moratorium.

### 4. The Court should apply its prior ruling, in line with all other federal courts who have upheld similar moratoria

Against the great weight of authority, the Landlords make strained arguments to distinguish the State Moratorium from the state and local moratoria upheld around the country. Dkt. 93 at 24–25. But these arguments are premised on an incorrect understanding of the State Moratorium and ignore the Court's prior order. *See El Papel*, 2020 WL 8024348, at *10 ("The law should be tailored to the emergency justifying its enactment—although it need not be a perfect fit."); *Heights Apts.*, 2020 WL 7828818, at *12 (the state's moratorium measures "need not be drawn with surgical precision to avoid constitutional infirmity").

The Landlords contend, for example, that "the State bars landlords from treating unpaid rent as a collectable debt." Dkt. 93 at 25. But the State Moratorium expressly permits property owners to treat unpaid rent as an enforceable debt if they show a court a tenant "was offered, and refused or failed to comply with" a reasonable repayment plan. Procl. 20-19.6. And other courts have sustained eviction moratoria with similar features to the State's Moratorium. *Baptiste*, 490 F. Supp. 3d at 386–87 (upholding state moratorium without a requirement for tenants to certify inability to pay rent); *Heights Apts.*, 2020 WL 7828818, at *2 (upholding state moratorium that limited evictions to where the resident endangered the safety of others; significantly damaged property, violating a lease term; or the property owner or family sought to move in).

### D. The State Moratorium Does Not Effect an Unconstitutional Taking

The Landlords' claim that the Moratorium constitutes a physical taking in violation of

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

the Fourteenth Amendment also fails. Because regulation of the landlord-tenant relationship that falls short of a permanent physical occupation is not a physical taking, every court to consider takings claims against state or local eviction moratoria during the COVID-19 pandemic has rejected them.[11] This Court should too.

### 1. The Moratorium does not authorize "permanent occupation" of Landlords' properties

The Landlords invoke only one of the three regulatory takings tests, contending that the Moratorium constitutes a "physical occupation of property" and is therefore a "categorical taking." Dkt. 93 at 26 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)),[12] and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982)). They are mistaken. *Loretto* held that it was a per se taking for the state to mandate a "*permanent* physical occupation of another's property[.]" 458 U.S. at 435 (emphasis added). But the Court expressly denied that this "physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships." *Id.* at 440; *see also FCC v. Fla. Power Corp.*, 480 U.S. 245, 252 (1987) ("statutes regulating the economic relations of landlords and tenants are not *per se* takings"). That "broad" power is perfectly compatible with the *Loretto* rule so long as the government does not compel "the permanent occupation of the landlord's property by a third party." 458 U.S. at 440. The Moratorium falls outside that "very narrow" rule, *id.* at 441, as cabined by this seminal case.

If *Loretto* had left any doubts that landlord-tenant regulations fall outside the physical occupation rule, the Court dispelled them in *Yee v. City of Escondido*, 503 U.S. 519 (1992). In

---

[11] *See, e.g.*, *Baptiste*, 490 F. Supp. 3d at 388–90; *HAPCO*, 482 F. Supp. 3d at 358; *Auracle Homes*, 478 F. Supp. 3d at 220–21; *Elmsford*, 469 F. Supp. 3d at 164; *Rental Housing Ass'n v. City of Seattle*, No. 20-2-13969-6 SEA (King Cnty., Wash. Super. Ct. Feb. 24, 2021); *Matorin v. Commonwealth of Massachusetts*, No. 2084CV01334 (Suffolk Cnty., Mass. Super. Ct. Aug. 26, 2020); *San Francisco Apt. Ass'n v. City & Cnty. of San Francisco*, No. CPF-20-517136 (Cal. Super. Ct., Cnty. of San Francisco Aug. 3, 2020); *JL Props. Grp. B, LLC v. Pritzker*, No. 20-CH-601 (12th Cir. Ct., Will Cnty., Ill. July 31, 2020); *Gregory Real Estate & Mgmt. v. Keegan*, No. CV2020-007629 (Super. Ct. of Ariz., Maricopa Cnty. July 22, 2020).

[12] *Tahoe-Sierra* did not involve a physical taking claim but held that "[a]nything less than a 'complete elimination of value' or a 'total loss' . . . would require the kind of analysis applied in *Penn Central*." 535 U.S. at 330 (rejecting claim of a *per se* regulatory taking). Because the Landlords do not claim that the Moratorium represents a "complete elimination of value" of their properties, they have no claim of a regulatory or categorical taking, and *Tahoe* is of no avail to them.

---

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    *Yee*, mobile home park owners challenged an ordinance that, along with a state law, prevented

2    them from either "set[ting] rents," "decid[ing] who their tenants will be," "evict[ing] a mobile

3    home owner," or "easily convert[ing] the property to other uses." *Id.* at 526–27. This made "the

4    mobile home owner . . . effectively a perpetual tenant of the park," according to the park owners.

5    *Id.* at 527. They argued for a *per se* taking under *Loretto*, because "what has been transferred

6    from park owner to mobile home owner is no less than a right of physical occupation of the park

7    owner's land." *Id.* The Supreme Court unanimously rejected the park owners' expansive theory

8    of physical takings. *See id.* at 532 (majority), 539 (concurrence). "The government effects a

9    physical taking only where it *requires* the landowner to submit to the physical occupation of his

10   land." *Id.* at 527 (majority). The mobile home laws did "no such thing" because the park owners

11   "voluntarily rented their land to mobile home owners." *Id.* Given that acquiescence, the laws

12   "merely regulate[d] petitioners' *use* of their land by regulating the relationship between landlord

13   and tenant[,]" and do not constitute a physical taking. *Id.* at 528.

14        The Moratorium, too, temporarily regulates the landlord-tenant relationship by delaying

15   owners' recourse to eviction. As in *Yee*, because the Landlords "voluntarily open[ed] their

16   property to occupation by others," they "cannot assert a *per se* right to compensation based on

17   their inability to exclude particular individuals." 503 U.S. at 531. The Moratorium thus regulates

18   the rental relationship without a physical taking. *Elmsford*, 469 F. Supp. 3d at 164.

19        The Landlords' reliance on *Arkansas Game & Fish Commission v. United States*, 568

20   U.S. 23 (2012), for the proposition that "[a] physical taking can be either permanent or temporary

21   in nature," Dkt. 93 at 26, is misplaced. *Arkansas Game* did not hold that a temporary occupation

22   of property constitutes a categorical taking. It rather held, "simply and only, that government-

23   induced flooding temporary in duration gains no automatic exemption from Takings Clause

24   inspection." *Arkansas Game*, 568 U.S. at 38. Far from constituting a *per se* taking, such a

25   "temporary physical invasion[]" of property "should be assessed by case-specific factual

26   inquiry" under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

27

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

*Arkansas Game*, 568 U.S. at 38. In conducting that inquiry, "time is indeed a factor in determining the existence *vel non* of a compensable taking." *Id.* Nor can the Landlords find support in *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 318 (1987), which was limited to the denial of "all use" of a property and has since been interpreted to eschew the categorical approach that the Landlords espouse here. *See Tahoe-Sierra*, 535 U.S. at 321 (interpreting *First English*, holding that temporary takings are not *per se* violations but are instead analyzed under the multifactor *Penn Central* test).

The Landlords' attempts to distinguish *Yee* fail. Just as in *Yee*, the Landlords voluntarily invited their tenants to occupy their properties; their tenants were "not forced upon them by the government." 503 U.S. at 528. And the Landlords' claim that their tenants "have exceeded the scope of the landlords' invitation" is no different than the claim in *Yee*, where the landlords similarly argued they could not evict their tenants. *Id.* at 526–27 ("Because under the California Mobilehome Residency Law the park owner cannot evict a mobile home owner or easily convert the property to other uses, the argument goes, the mobile home owner is effectively a perpetual tenant of the park . . . ."). The Moratorium allows the Landlords to "change the use" of their land, for instance, by selling or occupying the property themselves—with even less notice than the ordinance in *Yee*. *Compare id.* at 528 ("a park owner who wishes to change the use of his land may evict his tenants, albeit with 6 or 12 months notice[]"), *with* Procl. 20-19.6 (requiring 60-day notice for sale or re-occupation).

The Landlords' pre-*Yee* cases also miss the mark. The Landlords cite several World War II-era cases in which the federal government itself occupied a building for a period of time. Dkt. 93 at 27 (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), *United States v. Petty Motor Co.*, 327 U.S. 372, 378 (1946), and *United States v. Gen. Motors Corp.*, 323 U.S. 373 (1945)). None of those cases involved the mere regulation of a landlord's relationship with a third-party tenant whom they had voluntarily invited to occupy the property.

The U.S. Supreme Court "has consistently affirmed that States have broad power to

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

28

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1    regulate housing conditions in general and the landlord-tenant relationship in particular without

2    paying compensation for all economic injuries that such regulation entails." *Yee*, 503 U.S.

3    at 528–29 (internal quotation marks and citation omitted). In any event, the Moratorium does

4    not deprive the Landlords of any rent nor relieve tenants of their obligation to pay the full amount

5    of rent owed. It merely forecloses for a period of time a particular remedy—eviction—for

6    nonpayment. That temporary regulation of the landlord-tenant relationship is not a *per se* taking

7    because it does not authorize a permanent physical invasion of the Landlords' property.

8    **2.    Injunctive relief is unavailable for the Landlords' takings claim**

9         The Landlords' request for injunctive relief fails for the same reasons this Court

10   previously denied their request for a preliminary injunction: even if the Landlords had a viable

11   takings claim, their only remedy would be damages. *See El Papel*, 2020 WL 8024348, at *12–

12   13; *Knick v. Twp. of Scott, Penn.*, 139 S. Ct. 2162, 2175 (2019) ("the availability of subsequent

13   compensation mean[s] that such an equitable remedy [is] not available"). Because the Takings

14   Clause only prohibits the state from taking private property for public use "without just

15   compensation," U.S. Const. amend. V, "[e]quitable relief is not available to enjoin an alleged

16   taking of private property for a public use, duly authorized by law, when a suit for compensation

17   can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*,

18   467 U.S. 986, 1016 (1984). Washington has an adequate, effective procedure to compensate

19   takings of property, *see* Wash. Const. art. I, § 16, so the Landlords cannot obtain injunctive relief.

20        None of the cases cited by the Landlords support injunctive relief for their takings claim.

21   Three of their cases denied injunctive relief—including because a landowner failed to pursue

22   just compensation—rendering contrary dicta irrelevant. *See* Dkt. 93 at 28–29 (citing *Goodwin v.*

23   *Walton Cnty. Florida*, 248 F. Supp. 3d 1257, 1266 (N.D. Fla. 2017), *Peters v. Vill. of Clifton*,

24   498 F.3d 727, 732–33 (7th Cir. 2007) (holding takings claim unripe because landowner failed to

25   seek just compensation), and *D.A.B.E., Inc. v. City of Toledo*, 292 F. Supp. 2d 968, 973 (N.D.

26   Ohio 2003)). A fourth case, *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 680 (1st

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

29

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

Cir. 1998), dealt with an uncompensated taking and was decided more than 20 years before the Supreme Court decided *Knick*. Dkt. 93 at 28–29. Finally, the Landlords cite *Kucera v. Wash. State Dep't of Transp.*, 140 Wash. 2d 200 (2000), for the proposition that the "continuing nature" of their injury and alleged difficulty with quantifying it entitles them to an injunction. Dkt. 93 at 29. But *Kucera* involved no takings claim at all, and there, the court held that adequate compensation was available through an inverse condemnation action. *See* 140 Wash. 2d at 211. Even so, the Landlords do not explain how their injury could continue after the Moratorium's expiration or how their harm is difficult to quantify when the essence of their claim is lost rent.[13]

The Landlords are left with nothing but a law review article arguing that the Supreme Court should adopt a more permissive approach to injunctive relief for takings claims. Dkt. 93 at 29 (citing Thomas W. Merrill, *Anticipatory Remedies for Takings*, 128 Harv. L. Rev. 1630, 1662 (2015)). But that article in no way establishes the availability of injunctions for takings claims when the requirements of public use and just compensation are satisfied. *See* John D. Echeverria, *Eschewing Anticipatory Remedies for Takings: A Reply to Professor Merrill*, 128 Harv. L. Rev. 202 (2015). To the contrary, the controlling law is still that set forth in *Knick*: "As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." 139 S. Ct. at 2179.

## IV.    CONCLUSION

The Court should enter summary judgment in favor of Defendant Ferguson and dismiss the Landlords' claims. This case will be imminently moot, and the Landlords do not have standing to pursue their claims. The Court has previously rejected the Landlords' Contracts Clause and Takings Clause claims at the preliminary injunction stage. It should do so again here, in line with every other federal court that have upheld state and local eviction moratoria.

DATED this 7th day of May, 2021.

---

[13] El Papel's claim that "it lost the right to repossess its property" (Dkt. 93 at 29) is plainly wrong: The Moratorium actually *preserves* a landlord's right to "personally occupy the premises as the owner's primary residence." Procl. 20-19.6. And El Papel's holdover tenants have, in any event, vacated the unit.

DEFENDANT FERGUSON'S OPPOSITION TO PLAINTIFFS' MSJ AND CROSS-MSJ NO.  2:20-cv-01323-RAJ-JRC

30

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

ROBERT W. FERGUSON
Attorney General

*s/ Cristina Sepe*
CRISTINA SEPE, WSBA No. 53609
ZACHARY PEKELIS JONES, WSBA No. 44557
BRIAN H. ROWE, WSBA No. 56817
Assistant Attorneys General
JEFFREY T. EVEN, WSBA No. 20367
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206)474-7744
(360) 753-6200
cristina.sepe@atg.wa.gov
zach.jones@atg.wa.gov
brian.rowe@atg.wa.gov
jeffrey.even@atg.wa.gov

*Attorneys for Defendant Robert W. Ferguson,*
*in his official capacity as Attorney General of the*
*State of Washington*

DEFENDANT FERGUSON'S OPPOSITION
TO PLAINTIFFS' MSJ AND CROSS-MSJ
NO.  2:20-cv-01323-RAJ-JRC

31

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 474-7744

1

### <u>DECLARATION OF SERVICE</u>

2      I hereby declare that on this day I caused the foregoing document to be electronically

3   filed with the Clerk of the Court using the Court's CM/ECF System which will send notification

4   of such filing to all counsel of record.

5      DATED this 7th day of May, 2021, at Tacoma, Washington.

6

7                                              *s/ Cristina Sepe*
                                               Cristina Sepe, WSBA No. 53609
8                                              Assistant Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26