Hon. Richard A. Jones

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| EL PAPEL, LLC; and BERMAN 2, LLC, | ) | Civil Action No. 2:20-cv-01323-RAJ-JRC |
| Plaintiffs, | ) | |
| | ) | **PLAINTIFFS' COMBINED** |
| v. | ) | **RESPONSE TO DEFENDANTS'** |
| | ) | **CROSS-MOTIONS FOR SUMMARY** |
| ROBERT W. FERGUSON, in his official | ) | **JUDGMENT AND REPLY IN** |
| capacity as Attorney General of the State of | ) | **SUPPORT OF PLAINTIFFS' MOTION** |
| Washington; JENNY A. DURKAN, in her | ) | **FOR SUMMARY JUDGMENT** |
| official capacity as the Mayor of the City of | ) | |
| Seattle; and THE CITY OF SEATTLE, a | ) | **Noted on Motion Calendar:** |
| municipal Corporation, | ) | **June 18, 2021** |
| | ) | |
| Defendants. | ) | **ORAL ARGUMENT REQUESTED** |
| | ) | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iii

INTRODUCTION .......................................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.     THE PLAINTIFFS' CLAIMS ARE JUSTICIABLE................................................................ 2

    A.   The Plaintiffs have standing........................................................................................... 2

       1.   The CDC's halt order does not deprive landlords of access to federal court. .............. 2

          a.   The Halt Order is not in effect. .............................................................................. 3

*Pls' Response to D.s' XMSJs - i*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

b. Redressability does not require that relief remove all barriers. ................................ 3

c. Plaintiffs' prayer for nominal damages satisfies redressability. .............................. 5

d. Plaintiffs do not need to litigate the applicability of the Halt Order to establish standing here. ................................................................................................ 5

2. Plaintiffs have standing to challenge the repayment ordinance. .................................. 7

B. Plaintiffs' challenge to the state moratorium is not imminently moot ........................... 7

II.   THE EVICTION BANS VIOLATE THE CONTRACT CLAUSE ............................... 9

A. Barring one side of a bargain from enforcing a contract for well over a year constitutes a substantial impairment. ................................................................................. 9

1. The eviction bans undermine the contractual bargain .................................. 9

2. The eviction bans interfere with landlords' reasonable expectations ...................... 10

3. The eviction bans prevent landlords from safeguarding or reinstating their rights. ................................................................................................ 14

B. The eviction bans are neither reasonable nor necessary to achieving the governments' interests. ............................................................................................ 15

III.   THE DEFENDANTS' EVICTION BANS CONSTITUTE A PHYSICAL OCCUPATION OF THE PLAINTIFFS' PROPERTIES, VIOLATING THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION ............................. 21

A. Injunctive relief is an appropriate remedy in some physical invasion takings cases ..... 22

B. Landlord-Tenant disputes can constitute a physical taking. .......................................... 23

C. A temporary occupation of property can constitute a categorical taking...................... 27

CONCLUSION................................................................................................ 29

CERTIFICATE OF SERVICE ................................................................................................ 30

*Pl.s' Response to D.s' XMSJs - ii*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. U.S. Dep't of Housing and Urban Development*,
  No. 20-cv-3377, 2021 WL 1779282 (D.D.C. May 5, 2021)......................................................3

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978) .........................................16, 18, 19

*Apartment Ass'n of Los Angeles County, Inc. v City of Los Angeles*,
  No. 20-01593, 2020 WL 6700568 (C.D. Cal. 2020) ....................................................10, 11, 14

*Arkansas Game & Fish Commission v. United States*,
  568 U.S. 23 (2012)........................................................................................................27, 28

*Armstrong v. United States*, 364 U.S. 40 (1960) ..............................................................................1

*Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020) ....................................................11, 15

*W.B. Worthen Co. ex rel. Bd. of Comm'rs of Street Imp. Dist. No. 513 of Little
  Rock, Ark. v. Kavanaugh*, 295 U.S. 56 (1935)..........................................................................17

*In re Bliemeister*, 296 F.3d 858 (2002)..........................................................................................8

*Block v. Hirsh*, 256 U.S. 135 (1921)..............................................................................................26

*Bronson v. Kinzie*, 42 U.S. 311 (1843) ..........................................................................................9

*Brown v. Azar*,
  497 F. Supp. 3d 1270 (N.D. Ga. 2020) (appeal filed Nov. 9, 2020)........................................4

*Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020)..........................................................28

*Chambless Enterprises, LLC v. Azar*,
  3:20-cv-01455, 2020 WL 7588849 (W.D. La. 2020)
  (appeal filed Jan. 22, 2021)........................................................................................................4

*Chmielewski v. City of St. Pete Beach*,
  890 F.3d 942 (11th Cir. 2018) ..................................................................................................27

*Christensen v. Ellsworth*, 162 Wn.2d 365 (2007)..........................................................................13

*Clapper v. Amnesty Int'l*, 568 U.S. 398 (2013) ..............................................................................2

*Duke Power Co. v. Carolina Envtl.*, 438 U.S. 59 (1978)................................................................23

*Energy Reserves Grp., Inc. v. Kansas Power and Light Co.*,
  459 U.S. 400 (1983) ............................................................................................................12, 15

*FCC v. Florida Power Corp.*, 480 U.S. 245 (1987) ........................................................................25

*Pl.s' Response to D.s' XMSJs - iii*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*,
    482 U.S. 304 (1987)................................................................27, 28

*Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995)...................................7

*Fresh Pond Shopping Center, Inc. v. Callahan*,
    464 U.S. 875 (1983)......................................................................26

*Goodwin v. Walton Cty., Florida*, 248 F. Supp. 3d 1257 (N.D. Fla. 2017)................22

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991).........................26, 28

*Hill v. Blind Industries and Services of Maryland*,
    179 F.3d 754 (9th Cir. 1999) ..............................................................8

*Home Building & Loan Ass'n v. Blaisdell*,
    290 U.S. 398 (1934)..........................................................10, 11, 13, 19

*Ibrahim v. Dep't of Homeland Sec.*,
    669 F.3d 983 (9th Cir. 2012) ...............................................................4

*ICR Graduate Sch. v. Honig*, 758 F. Supp. 1350 (S.D. Cal. 1991) ......................23

*Johnson v. Rancho Santiago Community College District*,
    623 F.3d 1011 (9th Cir. 2010) .............................................................8

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)....................................24

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838)........................................................................9

*Kimball Laundry Co. v. United States*,
    338 U.S. 1 (1949)........................................................................27

*Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019) ........................23

*Kucera v. State, Dep't of Transp.*,
    995 P.2d 63 (Wash. 2000)............................................................22, 23

*Lamplighter Vill. Apts. LLP v. City of St. Paul*,
    No. 21-413, 2021 WL 1526797 (D. Minn. Apr. 19, 2021)................................22

*Larson v. Valente*, 456 U.S. 228 (1982) ...............................................3

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)..............................................................21, 24, 25

*Lynch v. United States*, 292 U.S. 571 (1934)........................................9, 10

*Maldonado v. Morales*, 556 F.3d 1037 (9th Cir. 2009)....................................4

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) ........................................3

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ...............................................................24

*Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*,
    145 F.3d 1399 (D.C. Cir. 1998) ..................................................................3

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978) ..................................................................................28

*Pennsylvania Coal Co. v. Mahon*, 260 U.S 393 (1922)...........................................29

*Pumpelly v. Green Bay Co.*, 13 Wall. 166 (1872) ...................................................25

*Raines v. Byrd*, 521 U.S. 811 (1997) ........................................................................2

*Skyworks, Ltd. v. Centers for Disease Control and Prevention*,
    No. 5:20-cv-2407, 2021 WL 911720 (N.D. Ohio Mar. 10, 2021).........................3, 4

*Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*,
    560 U.S. 702 (2010)..................................................................................22

*Sveen v. Melin*, 138 S. Ct. 1815 (2018) .............................................9, 10, 11, 12, 13

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002).............................................................................24, 28

*Terkel v. Ctrs. for Disease Control & Prevention*,
    No. 6:20-cv-564, 2021 WL 742877 (E.D. Tex. Feb. 25, 2021)...........................3

*Texaco, Inc. v. Short*,
    454 U.S. 516 (1982).........................................................................9, 10, 13

*Tiger Lily, LLC v. U.S. Dep't of Housing and Urban Development*,
    No. 2:20-cv-02692, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021)....................3

*U.S. Trust Co. of New York v. New Jersey*,
    431 U.S. 1 ...........................................................................10, 13, 17, 19

*United States v. General Motors Corp.*,
    323 U.S. 373 (1945)..................................................................................27

*United States v. Petty Motor Co.*, 327 U.S. 372 (1946)............................................27

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (Mar. 8, 2021) ..................................5, 7

*Veix v. Sixth Ward Building & Loan Association of Newark*,
    310 U.S. 32 (1940)..............................................................................11, 13

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..................................................................................3

*W.B. Worthen v. Thomas*, 292 U.S. 426 (1935).......................................................17

*Pl.s' Response to D.s' XMSJs - v*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

*Yee v. City of Escondido*, 503 U.S. 519 (1992)................................................21, 24–27

**Statutes**

5 U.S.C. § 706(2)(c)........................................................................................................3

City of Seattle Ordinance 126081 § 2(A) .....................................................................7

Seattle Municipal Code § 22.206.160(c) ....................................................................13

**Constitutional Provisions**

U.S. Const. amend. V...................................................................................................22

U.S. Const. amend. XIV..............................................................................................22

**Other Authorities**

85 Fed. Reg. 55,292 (Sept. 4, 2020) ....................................................................2, 4, 6

California Apartment Association, "Gov. Newsom announces plan to pay rental
     housing providers 100% of rent owed" (May 10, 2021),
     https://caanet.org/gov-newsom-announces-plan-to-pay-rental-housing-
     providers-100-of-rent-owed..................................................................................21

California Assembly Bill No. 3088 § 1179.03(b)(3), (g)(2)(B) ..................................21

City and County of San Francisco Ordinance 93-20 (2020) .......................................18

Engrossed Second Substitute S.B. 5160, 67th Leg., Reg. Sess. § 5(1)(d)(i), (4)
     (Wash. 2021)..........................................................................................................20

Engrossed Substitute H.B. 1368, 67th Legislature, 2021 Reg. Sess., § 3(2)
     (Wash. 2021)..........................................................................................................19

Engrossed Substitute S.B. 5092, 67th Legislature, 2021 Reg. Sess., § 129(45)(a)–
     (b) (Wash. 2021) ...................................................................................................19

New York Times, *See How Vaccinations Are Going in Your County and State*
     (Updated May 28, 2021),
     https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-
     doses.html?action=click&module=Spotlight&pgtype=Homepage#by-state. ........16

New York Times, *Tracking Coronavirus in Washington: Latest Map and Case
     Count* (Updated May 28, 2021),
     https://www.nytimes.com/interactive/2021/us/washington-covid-cases.html.......16

Nolo.com, Ann O'Connell, Emergency Bans on Evictions and Other Tenant
     Protections Related to Coronavirus, https://www.nolo.com/evictions-ban ............21

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## INTRODUCTION

This case is not about whether the Defendants can or cannot take effective action to combat the pandemic. They undoubtedly can. Rather, this case is about whether Defendants can target one segment of society to carry a disproportionate burden of the costs of those efforts. This they cannot do. *See Armstrong v. United States*, 364 U.S. 40, 49 (1960) ("The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").

Defendants challenge Plaintiffs' standing on the grounds that they will still be helpless to exercise their statutory and constitutional rights even if they win due to the Centers for Disease Control and Prevention's Halt Order barring certain evictions. But that Order is not in effect after having been invalidated by multiple federal courts. Even if it were in effect, Plaintiffs are entitled to this partial relief despite a speculative possibility that the Halt Order will bar eviction of some of their tenants, though there is no evidence in the record that this will be the case. Moreover, the nominal damages sought in Plaintiffs' complaint qualify as stand-alone relief, notwithstanding how the Halt Order may affect Plaintiffs' ability to exercise their property rights. Nominal damages also prevent Plaintiffs' claims from becoming moot should the eviction bans expire before this Court renders relief.

Denying access to an eviction remedy for over a year is a substantial impairment. Defendants urge this Court to hold that a near complete bar on Plaintiffs' key remedy for contract violations for fifteen months is not a substantial impairment on their lease agreements. But a contract is nothing more than a vain wish if it cannot be enforced.

The eviction bans are neither reasonable nor necessary because they create a perverse incentive for tenants to ignore lease obligations during the course of the eviction bans, regardless of whether such tenants have in fact suffered hardship or are otherwise capable of abiding by the terms of the lease. Defendants' failure to offer meaningful protection for Plaintiffs' rights is not necessary to combating the pandemic.

*Pl.s' Response to D.s' XMSJs - 1*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The eviction bans, moreover, impose a physical taking by forcing landlords to allow tenants to occupy their property even after those tenants have violated the terms that granted them a possessory interest in that property. By authorizing third-party occupation of landlords' property even temporarily, the Defendants have caused a physical taking within the meaning of the Fifth Amendment. Declaratory and injunctive relief are both appropriate remedies for that taking.

**ARGUMENT**

## I.   THE PLAINTIFFS' CLAIMS ARE JUSTICIABLE.

### A.   The Plaintiffs have standing.

#### 1.   The CDC's Halt Order does not deprive landlords of access to federal court.

Defendants both argue that Plaintiffs lack standing because—should this Court grant relief—the CDC's Halt Order barring certain evictions for non-payment would still limit Plaintiffs' contract and property rights. *See* Def. Robert W. Ferguson's Opp. to Pls.' MSJ and XMSJ, Dkt. #104 (State's XMSJ) at 12; Def. City of Seattle's Opening/Response Br. on XMSJ, Dkt. #103 (City's XMSJ) at 9. *See also* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 (Halt Order), 85 Fed. Reg. 55,292 (Sept. 4, 2020). This argument fails for at least four reasons: (1) the Order is not in effect; (2) if it were, redressability is satisfied where judgment would remove only one barrier to full relief; (3) the record establishes redressability in spite of the Halt Order; and (4) Plaintiffs' request for nominal damages satisfies redressability.[1]

---

[1] The State wrongly claims this Court should apply an "especially rigorous" standing analysis because Plaintiffs challenge action by a political branch of government. *See* State's XMSJ at 12 (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013)). But this principle applies where a federal court has been asked to invalidate action by other *federal* branches. *Clapper*, 568 U.S. at 408 ("Our standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the *Federal Government* was unconstitutional.") (emphasis added). The separation-of-powers concerns that gave rise to the "especially rigorous" language simply do not arise where federal courts are called upon to analyze the constitutionality of a *state* political branch. The "especially rigorous" phrase, moreover, has only been mentioned rarely by the Supreme Court in passing and only in the context of the exercise of a power expressly committed to another branch of the federal government by the Constitution. *See Clapper*, 568 U.S. at 408 (constitutional challenge to national security surveillance authority over foreign nationals); *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (constitutional challenge to scope of President's veto authority).

*Pl.s' Response to D.s' XMSJs - 2*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

### a. The Halt Order is not in effect.

The Halt Order poses no redressability issue because it is not in effect. Four federal courts have set aside the Order under the Administrative Procedure Act. *See Alabama Ass'n of Realtors v. U.S. Dep't of Housing and Urban Development*, No. 20-cv-3377, 2021 WL 1779282 (D.D.C. May 5, 2021); *Tiger Lily, LLC v. U.S. Dep't of Housing and Urban Development*, No. 2:20-cv-02692, 2021 WL 1171887 (W.D. Tenn. Mar. 15, 2021); *Skyworks, Ltd. v. Centers for Disease Control and Prevention*, No. 5:20-cv-2407, 2021 WL 911720 (N.D. Ohio Mar. 10, 2021); *Terkel v. Ctrs. for Disease Control & Prevention*, No. 6:20-cv-564, 2021 WL 742877 (E.D. Tex. Feb. 25, 2021). An order "set aside" under the APA is vacated. *See* 5 U.S.C. § 706(2)(c); *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.") (cleaned up). Defendants note that the D.C. court decision invalidating the Halt Order has been stayed, but no stay has been imposed with respect to the other federal cases. Hence, the Halt Order is not now in effect.

### b. Redressability does not require that relief remove all barriers.

Even if the Halt Order were in effect, Plaintiffs can seek redress even if the challenged action is only one of several obstacles to full relief. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–64 (1977) (holding that a plaintiff cannot be denied standing just because additional obstacles would remain after relief was granted); *see also Larson v. Valente*, 456 U.S. 228, 243 (1982) (holding that a favorable decision need not relieve a plaintiff's every injury to satisfy the redressability requirement). Defendants wrongly assume that "a small incremental step" does not provide redress, insisting that Plaintiffs must also challenge the Halt Order to have standing. *Massachusetts v. E.P.A.*, 549 U.S. 497, 524 (2007). Such an assumption "would doom most challenges to regulatory action" because lawmakers "do not generally resolve massive problems in one fell swoop." *Id.* The Ninth Circuit has likewise held that a plaintiff "is

*Pl.s' Response to D.s' XMSJs - 3*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

not required to solve all roadblocks simultaneously and is entitled to tackle one roadblock at a time." *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 993 (9th Cir. 2012) (citation omitted).

Even where other regulations continue to apply, relief from one of several regulations has important consequences. Such relief reduces the number and stringency of regulatory requirements, the range of possible punishments, and the number of governments or agencies regulating an activity. Here, for instance, the Halt Order is less severe than the State and City eviction bans because it only bars evictions for non-payment and requires a declaration establishing hardship and other criteria. *See* 85 Fed. Reg. 55,292–93, 55,297. Plaintiffs' requested relief would, at minimum, bring them one key step closer to reclaiming their property rights. That suffices for standing purposes.

The Defendants rely on out-of-circuit precedent at odds with this circuit. *See* States' XMSJ at 12; City's XMSJ at 9. Indeed, the single Ninth Circuit case that the City cites for support, *Maldonado v. Morales*, 556 F.3d 1037, 1043–44 (9th Cir. 2009), favors standing here because it held that a city regulation did not bar the plaintiff from challenging a state law that prohibited the same conduct.

Moreover, litigation challenging the Halt Order is already occurring. At least six lawsuits have challenged the Halt Order, and undersigned counsel in this matter represents the Plaintiffs in two of those cases.[2] Defendants in effect would ask this Court to impose a highly formalistic standing formula requiring *these* particular plaintiffs to challenge the Halt Order despite existing challenges, fomenting duplicative litigation just so they can seek relief from laws that indisputably harm them. Plaintiffs, moreover, are likely unable to challenge the Halt Order, which only takes effect in locations where state or local moratoria are either non-existent or less protective of tenants than the Halt Order. Defendants' argument would put Plaintiffs in an impossible position, unable to challenge any of the moratoria causing them indisputable injury.

---

[2] In addition to the cases mentioned *supra*, *see Chambless Enterprises, LLC v. Azar*, 3:20-cv-01455, 2020 WL 7588849 (W.D. La. 2020) (appeal filed Jan. 22, 2021); *Brown v. Azar*, 497 F. Supp. 3d 1270 (N.D. Ga. 2020) (appeal filed Nov. 9, 2020). Undersigned counsel is also counsel of record in *Chambless*, 2020 WL 7588849, and *Skyworks*, 2021 WL 911720.

*Pl.s' Response to D.s' XMSJs - 4*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**c.**     **Plaintiffs' prayer for nominal damages satisfies redressability.**

The Halt Order, even if it were in effect, poses no barrier to redressability here because Plaintiffs have requested nominal damages, which offer independent grounds for relief even if Plaintiffs remained unable to evict under the Halt Order.

The Supreme Court has recently held that nominal damages satisfy redressability as stand-alone relief. In *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 796–97 (Mar. 8, 2021), the lower courts had held that Petitioners' challenge to a campus speech policy had become moot after the university rescinded the policy. The question before the Supreme Court was "whether a plaintiff who sues over a completed injury and established the first two elements of standing (injury and traceability) can establish the third by requesting only nominal damages." *Id.* at 797. The Court said "yes": "[W]e conclude that a request for nominal damages satisfies the redressability requirement of standing where a plaintiff's claim is based on a completed violation of a legal right." *Id.* at 802.

Here, Plaintiffs seek injunctive and declaratory relief as well as nominal damages. First Amended Complaint for Declaratory and Injunctive Relief (corrected), Dkt. #81, at 17–18. There is no dispute that Plaintiffs have satisfied the injury and traceability elements of standing. Therefore, even if injunctive or declaratory relief would not fully redress Plaintiffs' injuries due to the additional barrier of the Halt Order, the request for nominal damages suffices to provide adequate redress for standing purposes.

**d.**     **Plaintiffs do not need to litigate the applicability of the Halt Order to establish standing here.**

Even if the Halt Order were in effect, even if redress required all barriers to be removed, and even if nominal damages did not satisfy redressability, this Court still should not require Plaintiffs to litigate the applicability of the Halt Order in advance just so they can challenge the eviction bans at issue in this case.

The Halt Order only bars eviction under a specific set of circumstances. Specifically, a tenant must proactively present their landlord with a declaration that states, under penalty of

*Pl.s' Response to D.s' XMSJs - 5*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

perjury, that they: have used "best efforts" to obtain government rental assistance; expect to earn no more than $99,000 in annual income; cannot pay full rent due to loss of income; are using their best effort to make timely partial payments; and would likely become homeless upon eviction. 85 Fed. Reg. 55,297.

Defendants argue that Plaintiffs must somehow know, without benefit of the discovery process, whether their tenants will be eligible for eviction under the Halt Order. None of Plaintiffs' tenants have presented them with a declaration as required by the CDC. *See* Second Declaration of Chris Gardner ISO Pls.' MSJ; Second Declaration of Osho Berman ISO Pls.' MSJ. Moreover, Plaintiffs have no means of learning, outside formal discovery, whether their tenants are making best efforts to receive assistance or make partial payments, particularly where their tenants are not responding to landlord communications. Plaintiffs do know, however, that certain tenants are paying no rent at all, and such tenants would have to be able to truthfully declare that paying nothing was their "best effort" at paying partial rent in order to qualify for protection under the Halt Order.

Additionally, Mr. Berman does know that there are independent grounds for evicting certain tenants despite the Halt Order. The Halt Order only bars eviction for non-payment of rent. 85 Fed. Reg. 55,292–93. Mr. Berman has stated, however, that he has tenants who are allowing occupants to live on the property without Mr. Berman's consent, which violates the terms of their lease agreements. Declaration of Osho Berman ISO Pls.' Mot. for Summary Judgment, Dkt. #97, ¶ 5; Declaration of Osho Berman ISO Pls.' Mot. for Prelim. Inj., Dkt. #19, ¶ 7, Exh. 14 (*see* paragraph 10 regarding changes in occupancy).

Plaintiffs deserve the chance to move forward with the eviction process and deal with the Halt Order's applicability in a setting where they can fairly and fully litigate that issue, assuming the tenants even submit a declaration.

*Pl.s' Response to D.s' XMSJs - 6*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**2.      Plaintiffs have standing to challenge the repayment ordinance.**

The City of Seattle claims that Plaintiffs lack standing to challenge the repayment ordinance because Plaintiffs have not shown that any of their tenants plan to rely on the ordinance. This argument lacks merit.

Tenants need not declare their intent to follow the city-imposed repayment schedule in order to rely upon it. The ordinance simply provides that tenants who fail to pay rent during the civil emergency or six months after may "elect to pay such overdue rent in installments." City of Seattle Ordinance 126081 § 2(A).The tenant "elects" to do so by simply not paying until required to do so by the ordinance, or according to some alternative agreement entered into with the landlord. No one disputes that the Plaintiffs have tenants who are not paying rent, thus implicitly availing themselves of the right granted by the ordinance to forego paying rent until later. Under normal circumstances, Plaintiffs could bring a breach-of-contract claim against non-paying tenants today. The repayment ordinance prohibits such action because tenants now have a right to forego repayment until the time set by the City. Plaintiffs have therefore suffered a concrete injury directly traceable to the repayment ordinance.

**B.      Plaintiffs' challenge to the state moratorium is not imminently moot**

The State claims that, despite repeated extensions over the last year, Plaintiffs' claims against the Governor's Order will soon be moot when the current order expires at the end of June. Even if the order does expire, this Court will retain subject-matter jurisdiction because Plaintiffs have included a request for nominal damages in their prayer for relief. *See* First Amended Complaint, Dkt. #80 at 18. As discussed above, nominal damages serve as stand-alone relief that preserve a claim from becoming moot even after a government ceases its unconstitutional conduct. *See Uzuegbunam*, 141 S. Ct. at 802.

The State has forfeited any sovereign immunity defense to the nominal damages claim by failing to raise it. A state "waive[s] [its] Eleventh Amendment protection by voluntarily appearing and defending on the merits" so long as "the State has been adequately notified of the pendency of the suit and of the particular matters at issue." *Fordyce v. City of Seattle*, 55 F.3d 436, 441 (9th

*Pl.s' Response to D.s' XMSJs - 7*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Cir. 1995). *See also In re Bliemeister*, 296 F.3d 858, 861 (2002) ("Sovereign immunity is quasi-jurisdictional [and] may be forfeited where the state fails to assert it . . . ."). For example, in *Johnson v. Rancho Santiago Community College District*, 623 F.3d 1011, 1020 (9th Cir. 2010), the Ninth Circuit held that a state defendant had forfeited an immunity defense to a nominal damages claim where it failed to raise the defense in summary judgment briefing, even though the State had asserted a generic sovereign immunity defense in its Answer and had specifically opposed an amendment to the complaint adding a nominal damages claim on immunity grounds.

Here, the State has failed to address immunity with respect to the nominal damages claim in any of its briefing, including its opposition to Plaintiffs' Motion for Preliminary Injunction, its objections to the Magistrate Judge's Report and Recommendation, its response to Plaintiffs' Objections to the Report and Recommendation, and its cross-motion for summary judgment and response to Plaintiffs' Motion for Summary Judgment. While the State did list sovereign immunity generically as an affirmative defense in its answer to the First Amended Complaint and previously argued that Governor Inslee was immune because he was not connected to enforcement, the State has never taken issue with Plaintiffs' claim for nominal damages.

Much like *Johnson*, a generic reference to sovereign immunity in an Answer does not preserve an argument that has not appeared once in multiple rounds of merits briefing. *Johnson*, 623 F.3d at 1020. Indeed, the State did not raise any immunity defense at all in its cross-motion for summary judgment. By filing two answers and at least four substantive briefs in this matter without once raising immunity as to Plaintiffs' nominal damages claim, the "state's conduct during the litigation clearly manifests acceptance of the federal court's jurisdiction" and is "incompatible with an assertion of Eleventh Amendment immunity" with respect to the request for nominal damages. *Hill v. Blind Industries and Services of Maryland*, 179 F.3d 754, 759 (9th Cir. 1999). "Having chosen to defend on the merits in federal courts, the [State] will be held to that choice." *Johnson*, 623 F.3d at 1020 (internal quotation marks omitted).

*Pls' Response to D.s' XMSJ - 8*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## II.   THE EVICTION BANS VIOLATE THE CONTRACT CLAUSE

### A.   Barring one side of a bargain from enforcing a contract for well over a year constitutes a substantial impairment.

In assessing substantial impairment, this Court should consider three questions: (1) do the eviction bans undermine the contractual bargain?; (2) do the eviction bans interfere with landlords' reasonable expectations?; and (3) do the eviction bans prevent landlords from safeguarding or reinstating their rights? *See Sveen v. Melin*, 138 S. Ct. 1815, 1817 (2018).

### 1.   The eviction bans undermine the contractual bargain

Barring landlords from enforcing their lease agreements, even temporarily, undermines the contractual bargain. The courts have long held that laws acting on contractual remedies can impair a contract as surely as laws restricting contractual rights. *See Sveen*, 138 S. Ct. at 1825 (stating that the Court saw "no meaningful distinction" between laws acting on enforcement and laws directly interfering with a contractual right or obligation); *Texaco, Inc. v. Short*, 454 U.S. 516, 528 (1982) ("We have subsequently made clear, however, that, when the practical consequences of extinguishing a right are identical to the consequences of eliminating a remedy, the constitutional analysis is the same."); *Lynch v. United States*, 292 U.S. 571, 580 (1934) ("Contracts between individuals or corporations are impaired within the meaning of the Constitution (article 1, s 10, cl. 1) whenever the right to enforce them by legal process is taken away or materially lessened."); *Bronson v. Kinzie*, 42 U.S. 311, 317 (1843) ("But it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether."). Whether a right is extinguished directly or by simply barring the remedy, the practical result is the same. *See Sveen*, 138 S. Ct. at 1825 ("[E]ven when the consequence formally related to enforcement . . . the laws in fact wiped out substantive rights."). *Cf. Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 567 (1838) (referring to a right without a judicial remedy as a "monstrous heresy, slavish in the extreme").

Despite the repeated and recent holdings that courts should look to the practical consequences of impeding a contractual remedy, the City insists that such an approach is "an

*Pl.s' Response to D.s' XMSJs - 9*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

outdated formalism," plucking a phrase out of context from *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.17. City's XMSJ at 14. Not only does the City fail to grapple with more recent holdings in *Texaco* and *Sveen* confirming that the analysis is the same, whether a right is directly impaired or the remedy is materially reduced, but the City also fails to mention that *U.S. Trust* itself in the same footnote acknowledged that curtailing enforcement of contractual remedies can result in substantial impairment. *Id.* ("The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement . . . .)." The Court's phrase, "outdated formalism," was simply explaining that access to remedies should be viewed as part of the contracting parties' reasonable expectations rather than a wholly separate inquiry. *See id.*

The City also severely mischaracterizes Plaintiffs' position, claiming that Plaintiffs argue that "any change to the law governing enforcement of a contract violates the Contract Clause." City's XMSJ at 15. But Plaintiffs' position has always been the one laid down by the Supreme Court, that a contractual right is impaired "whenever the right to enforce [it] by legal process is taken away or materially lessened," *Lynch*, 292 U.S. at 580, or where laws restricting enforcement "in fact wiped out substantive rights." *Sveen*, 138 S. Ct. at 1825. As *Blaisdell* recognized, "Nothing can be more material to the obligation than the means of enforcement. The ideas of validity and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion." *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 430 (1934) (cleaned up). Landlords have no means of exercising their contractual rights during the eviction bans because they cannot access the remedy for violations of those rights.

### 2.     The eviction bans interfere with landlords' reasonable expectations

Landlords can reasonably expect to have access to longstanding remedies granted by state statute for violations of lease agreements. As the United States District Court for the Central District of California recently held, "it would be difficult to conclude that the [Los Angeles] Moratorium does not, at a minimum, significantly interfere with landlords' reasonable expectations." *Apartment Ass'n of Los Angeles County, Inc. v City of Los Angeles*, No. 20-01593,

*Pl.s' Response to D.s' XMSJs - 10*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

2020 WL 6700568, at *4 (C.D. Cal. 2020).[3] As the district court pointed out, the pandemic and the measures passed to grapple with it "have no precedent in the modern era, and . . . no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium." *Id.* The eviction bans have imposed unforeseeable burdens such as "reduced cash flow and time value of missed rent payments and increased wear and tear on rental properties." *Id.* The eviction bans here, which are more restrictive than Los Angeles's, *see* Pls.' MSJ at 10, have extended for almost seven months longer than when Judge Pregerson found a substantial impairment. Surely no landlord could reasonably expect lack of access to contractual remedies for this extended period.

Defendants urge this Court to hold that stripping landlords of the means to enforce their lease agreements for over a year does not unsettle reasonable expectations because the landlord-tenant relationship is already regulated. The Contract Clause caselaw is clear, however, that only regulations on the same topic that resemble the challenged regulation matter when assessing reasonable expectations. For instance, in *Veix v. Sixth Ward Building & Loan Association of Newark*, 310 U.S. 32 (1940), the Supreme Court upheld a change to the statutory terms for withdrawing shares from a building-and-loan association where the change was but one incremental step in a series of laws and amendments governing withdrawal. Thus, the plaintiff had "purchased into an enterprise already regulated in the particular to which he now objects" and therefore "purchased subject to further legislation upon the same topic." *Id.* at 38.

This same principle played an important role in *Blaisdell* and in the Supreme Court's most recent foray into the Contract Clause, *Sveen v. Melin*. In *Blaisdell*, the Court held that the mortgagees' expectations were not dashed by a statutory delay in foreclosure because courts had always had the power to impose such a delay. *Blaisdell*, 290 U.S. at 447 (referring to the statutory extension as a "cognate to the historic exercise of the equitable jurisdiction," which allowed courts

---

[3] The City correctly points out that Plaintiffs wrongly claimed that the district court in *Baptiste v. Kennealy*, 490 F. Supp. 3d 353 (D. Mass. 2020), had held that the Massachusetts eviction ban imposed a substantial impairment. The court in *Baptiste* instead held that it was unwilling at that early stage to determine whether a substantial impairment existed, although it acknowledged that landlords could not reasonably expect the eviction ban. *See id.* at 384–85. Plaintiffs regret the error and appreciate the correction.

*Pls.' Response to D.s' XMSJs - 11*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

to extend redemption periods). Likewise, in *Sveen*, the Supreme Court held that a statutory default rule that automatically removed an ex-spouse as a life insurance beneficiary did not defeat reasonable expectations because divorce courts had always held the authority to do the same thing. *See Sveen*, 138 S. Ct. at 1822 ("[T]he law is unlikely to disturb any policyholder's expectations because it does no more than a divorce court could have done."). Hence, where the challenged statute only deviates minimally from a pre-existing statutory regime on the same subject matter, then the law likely has not destroyed reasonable expectations. The question is not simply whether the industry is heavily regulated on the whole, but whether past regulation of the same variety made it foreseeable to the contracting parties that the challenged regulation might eventuate. *See Energy Reserves Grp., Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 416 (1983) ("Price regulation existed and was foreseeable as the type of law that would alter contract obligations.").

Defendants, in arguing that landlords operate in a "highly regulated" industry, simply point to a wide array of unrelated regulations that would not prompt landlords to foresee that their government would bar them from evicting tenants for over a year in response to a once-in-a-century pandemic. For example, Defendants cite regulations regarding maintaining a habitable environment, notifying tenants of rent increases, imposing late fees, and so on. *See* City's XMSJ at 12–13; State's XMSJ at 19–20. None of these regulations are on the same topic of eviction regulation.

Defendants rightly point out that the Residential Landlord Tenant Act (RLTA) and Seattle's Just Cause Eviction Ordinance do touch on eviction, but neither undermine the reasonable expectation that the right to exclude would be extinguished. The RLTA sets procedures that a landlord must follow in evicting tenants and does not, like the eviction bans, impose substantive limits on the circumstances in which a landlord can exercise the right to exclude. Since the RLTA does not touch on the same particulars as the eviction moratoria, its procedural requirements regarding notice, hearings, execution of a writ of restitution, and so forth could not have led landlords to foresee that severe substantive restrictions would be placed on the circumstances in which they could exercise the statutory rights granted by the RLTA. If anything, the RLTA's

*Pl.s' Response to D.s' XMSJs - 12*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

expedited process for eviction has created the opposite expectation—that the state would continue to protect landlords' access to a speedy remedy. *See Christensen v. Ellsworth*, 162 Wn.2d 365, 370–71 (2007) ("An unlawful detainer action is a statutorily created proceeding that provides an expedited method of resolving the right to possession of property.").

Seattle's Just Cause Eviction Ordinance touches more closely upon the topic at issue here—that is, substantive limits on when a landlord may exercise the right to evict. Yet those limits could not have led a reasonable landlord to foresee that the right to evict would be almost entirely extinguished for over a year. The Just Cause Eviction Ordinance requires a landlord to prove that a "just cause" exists to evict. The just causes listed are numerous, including: failure to pay rent, habitually late payments, waste, nuisance, violation of material lease terms, criminal activity, owner intent to self-occupy, sell, or remodel, and where eviction is required to achieve compliance with housing laws or emergency orders. *See generally* Seattle Municipal Code § 22.206.160(c). The eviction bans are not simply an incremental step on top of a pre-existing regulatory structure, as with *Veix*, or a statutory adoption of a pre-existing judicial power as in *Sveen* or *Blaisdell*. Rather, the eviction bans are instead an *abrogation* of the pre-existing landlord regulations, such as the RLTA and Just Cause Eviction Ordinance, which allowed landlords to preserve and enforce their rights under their lease agreements.

The City also argues that modifications to a remedy are less likely to dash the expectations of contracting parties than a law acting directly on the contract's express terms. City's XMSJ at 12. The City cites a footnote in *U.S. Trust* for this proposition. 431 U.S. at 19 n.17 (1977). Yet five years later the Supreme Court expressly held that "when the practical consequences of extinguishing a right are identical to the consequences of eliminating a remedy, the constitutional analysis is the same." *Texaco*, 454 U.S. at 528. The Court reaffirmed this position as recently as 2018. *Sveen*, 138 S. Ct. at 1825. As *Blaisdell* itself recognized, "The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." 290 U.S. at 240. Here, the Court should not treat removal of the eviction remedy as a lesser

*Pl.s' Response to D.s' XMSJs - 13*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

impairment than directly interfering with the contract because removal of the remedy effectively extinguishes the right.

### 3.     The eviction bans prevent landlords from safeguarding or reinstating their rights.

The eviction bans prevent landlords from safeguarding their rights to pursue contractual remedies for a tenant's failure to abide by their lease terms. Defendants have argued that the eviction bans safeguard landlord interests because rent is still owed and because the eviction ban is only temporary. The first point conflates the right to exclude with the right to receive payment under the terms of the contract. Landlords, under the RLTA and Seattle's Just Cause Eviction Ordinance, have a right to evict for numerous reasons beyond simply non-payment of rent, including for waste, nuisance, criminal activity, remodeling the unit, selling the unit, self-occupying the unit, and more. While the State allows a curtailed right to sue to collect missing rent during the eviction ban (something Seattle's repayment ordinance forbids), this fails to offer any safeguard for a landlord's right to evict or reclaim property for any variety of other reasons. Moreover, even after a landlord will have collected back rent, the non-paying tenant will immediately fall into default again, a reality that can only be addressed through the eviction process. *See Apartment Ass'n of Los Angeles Cty.*, 2020 WL 6700568 at *4 (holding that Los Angeles eviction moratorium caused a substantial impairment even though landlords could sue to collect delinquent rent).

Defendants' second point, that the eviction bans are just temporary, fails to recognize that the expedited process under the unlawful detainer statute that guarantees a timely means of repossessing property is itself a vital component of the statutory remedy. An imposed delay abrogates that remedy. Nor have Defendants recognized that timeliness of payment is itself an express term in the lease agreements, allowing for a steady income stream that makes the landlord business model possible. Landlords face numerous ongoing expenses, from maintenance to mortgages, that depend upon timely payment. The inability to enforce their contracts, even

*Pl.s' Response to D.s' XMSJs - 14*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

temporarily, severely undermines that fundamental aspect of the contractual bargain. The speculative promise of eventual repayment does not safeguard or reinstate this contractual right.

Defendants also make the unwarranted assumption that defaulting tenants will be able to pay back thousands of dollars in accumulated back rent. As the United States District Court in the District of Massachusetts recognized in analyzing Massachusetts' eviction ban, "the Moratorium is likely, as a practical matter, to deprive the landlords of their contractual right to receive the rent they are owed." *Baptiste*, 490 F. Supp. 3d at 384–85. The same is true here.

**B.** **The eviction bans are neither reasonable nor necessary to achieving the governments' interests.**

Given the substantial impairment caused by the eviction bans, this Court should turn to whether they are reasonable and necessary to achieve a legitimate government purpose. Indeed, given the unprecedented and radical nature of the government's impairment on lease agreements across Seattle and Washington, the Court should analyze reasonableness and necessity with a skeptical eye. *See Energy Reserves*, 459 U.S. at 411 ("The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected.") Despite major strides in the battle against the pandemic, Defendants continue to deny landlords even a modest means of enforcing their legal rights. The eviction bans fail the reasonableness and necessity standards because they force landlords to shoulder a burden that should be carried by the public as a whole, fail to require any demonstration of hardship, and bypass less-restrictive alternatives of addressing the governments' interests.

Both Defendants emphasize that this Court has already determined that Plaintiffs are unlikely to succeed on the merits, and the City claims that nothing has changed since that time. But Plaintiffs have gone almost six additional months without the ability to exercise their contractual rights since the ruling on the preliminary injunction. As the federal court in *Baptiste* recognized, the length of the eviction ban and improving circumstances relating to the pandemic both bear on the reasonableness and necessity of the government's actions. *Baptiste*, 490 F. Supp. 3d at 374 ("In essence, in deciding whether to extend the Moratorium . . . the Governor

*Pl.s' Response to D.s' XMSJs - 15*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

has an obligation to consider, among other things, whether the Moratorium . . . is in view of changed facts now still compatible with the requirements of the Constitution. The manner in which such hard decisions are made and explained, as well as the nature of them, will influence the degree of deference from the courts that they deserve, and that may affect the ultimate outcome of this case."). At this point, over half of King County residents have been fully vaccinated, while 45% of the state has been fully vaccinated, with over half having received at least one dose. *See* New York Times, *See How Vaccinations Are Going in Your County and State* (Updated May 28, 2021).[4] Meanwhile, the daily case count across Washington has plummeted. *See* New York Times, *Tracking Coronavirus in Washington: Latest Map and Case Count* (Updated May 28, 2021).[5] As these eviction bans drag on, what might have been reasonable and necessary in March of 2020 may no longer be so 15 months later. This Court should engage in a fresh analysis of the eviction bans in light of changed circumstances and the more thorough briefing offered at the summary judgment stage.

At the outset, the parties dispute the precise standard to apply here. The City complains that the Plaintiffs "ignore" the deference due the government, City's XMSJ at 17, but the language the City dislikes comes directly from the Supreme Court, which requires that laws burdening contractual obligations be "precisely and reasonably designed to meet a grave temporary emergency in the interest of the general welfare." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 243 (1978).[6] While the City correctly points out that less deference is due where the government is a contracting party, *Allied Structural Steel* did not involve a government contract, nor did it limit its language to that context. Thus, this Court, in assessing necessity and reasonableness, can and should look to whether the eviction bans extend beyond what is necessary for the government to fulfill its interests.

---

[4] https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html?action=click&module=Spotlight&pgtype=Homepage#by-state.
[5] https://www.nytimes.com/interactive/2021/us/washington-covid-cases.html.
[6] The City quotes the "precisely and reasonably designed to meet" standard but mistakenly attributes the language to Plaintiffs' arguments, not the Supreme Court. *See* City's XMSJ at 17.

*Pl.s' Response to D.s' XMSJs - 16*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

The eviction bans are not precisely and reasonably designed to meet the governments' objectives because their protections extend to those tenants who are not suffering financial hardship and are not at risk of homelessness. The Supreme Court has held that a contractual impairment relieving one party of its contractual obligations due to financial distress must at least require the benefiting party to demonstrate hardship. *See W.B. Worthen Co. ex rel. Bd. of Comm'rs of Street Imp. Dist. No. 513 of Little Rock, Ark. v. Kavanaugh*, 295 U.S. 56, 61 (1935) ("There is not even a requirement that the debtor shall satisfy the court of his inability to pay.").

The City fails to explain why it has any legitimate interest in preventing the eviction of fully employed tenants perfectly capable of meeting their rental obligations, given that such tenants are unlikely to become homeless and thereby exacerbate spread of COVID-19. *See* City's XMSJ at 21. Instead, the City dismisses *Kavanaugh* on the mistaken ground that the case involved the government as a contracting party. The case happened to be brought by municipal bondholders, but the law that had adjusted the terms of payment on bonds and similar instruments was a *state* statute. *Kavanaugh*, 295 U.S. at 57–59. Therefore, the tougher standard that applies when "the State's self-interest [was] at stake" was not employed by the Court. *U.S. Trust*, 431 U.S. at 25. Moreover, the Court gave no indication that it was employing a stricter test, instead expressly stating that another private-contract case, *W.B. Worthen v. Thomas*, 292 U.S. 426 (1935), "supplies the applicable rule." *Kavanaugh*, 295 U.S. at 63. This would be unsurprising even if the case did genuinely implicate the state's self-interest, since the rule applying less deference to government contracts did not arise for another forty years. *See U.S. Trust*, 431 U.S. at 25.

For its part, the State does attempt to provide a rationale for the lack of a hardship showing, though the attempt is wanting. According to the State, tenants facing distress are too often "unable to provide adequate proof of their distress" because they may have informal jobs, unusual income sources, or the burden of caring for unemployed family members. State's XMSJ at 24. This excuse begs the question, since Defendants are the ones who decide what "adequate proof" means. The State has plenty of examples to look to where eviction bans have imposed a hardship requirement while liberally defining valid evidence of distress. *See, e.g.*, Order of the Governor of the State of

*Pl.s' Response to D.s' XMSJs - 17*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Maryland Temporarily Prohibiting Evictions of Tenants Suffering Substantial Loss of Income Due to COVID-19 (Mar. 16, 2020) (protecting against eviction "if the tenant can demonstrate to the court, through documentation or other objectively verifiable means, that the tenant suffered a substantial loss of income . . . due to job loss, reduction in compensated hours of work, closure of place of employment, or the need to miss work to care for a homebound school-age child"); City and County of San Francisco Ordinance 93-20 (2020) (allowing that documentation of hardship "may include, without limitation, bank statements, pay stubs, employment termination notices, proof of unemployment insurance claim filings, sworn affidavits, and . . . third-party documentation such as a letter from an employer"). The State is quite capable of setting evidentiary standards for hardship showings that address its concern, and courts, which routinely deal with fiendishly complicated evidence, are quite capable of parsing messy facts.

In addition to a hardship requirement, Plaintiffs' briefing has noted other less extreme approaches that preserve the government's ability to cope with the pandemic while better honoring Plaintiffs' rights. If other less severe methods of achieving the Defendants' interests exist, then the eviction bans are not adequately "tailored to the emergency [they were] designed to meet." *Allied Structural Steel*, 438 U.S. at 242–43. More moderate approaches include full compensation to landlords with non-paying tenants, caps on eviction rates, a priority system for eviction processing, and flexible eviction delays to be set by a judge based on landlord and tenant circumstances. There is also the simple possibility that the Defendants could allow the unprecedented amount of public benefits in the forms of stimulus, unemployment benefits, rental assistance, and more to effectively keep people housed.

The Defendants' responses fail to dismiss these suggestions as viable alternatives. For example, Defendants deny that *Blaisdell*'s holding has any bearing on whether landlords must receive ongoing compensation for losses in order to render an impairment on contractual remedies constitutionally sound, whether such compensation comes from the other party to the contract, from the government itself, or from a mixture of the two. The City's response is to claim that *Blaisdell*'s facts should not play a role in how we assess its holding regarding reasonableness. *See*

*Pl.s' Response to D.s' XMSJs - 18*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

City's XMSJ at 23–24. The City cites a footnote in *U.S. Trust* for this notion, 431 U.S. at 22 n.19, but that footnote only states that two factors, existence of an emergency and the limited duration of a measure, will not always be dispositive; it said nothing about *Blaisdell*'s holding on ongoing compensation. Indeed, a year after *U.S. Trust*, the Supreme Court stated that the law in *Blaisdell* would have been invalid if the Minnesota statute had lacked any of its safeguards for mortgagees' interests: "The *Blaisdell* opinion thus clearly implied that if the Minnesota moratorium legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause of the Constitution." *Allied Structural Steel*, 438 U.S. at 242. These "characteristics" considered significant by the *Blaisdell* Court included ongoing compensation for the mortgagee during the moratorium and a provision allowing judges to adjust the length of the enforcement delay based on individual circumstances. *See Blaisdell*, 290 U.S. at 425, 432, 447. The eviction bans at issue here offer neither of these safeguards and therefore step beyond the line drawn in *Blaisdell* and underscored in *Allied Structural Steel*.

The rental assistance pointed to by Defendants does not satisfy the landlords' constitutionally protected interests. These programs are not adequately funded to fully compensate landlords for damage done to their units, unpaid rent, or other costs associated with the eviction bans. House Bill 1368, for instance, allots $30 million toward rental assistance, though this is only available to landlords with tenants with an income at or below 80 percent of the area median income. *See* Engrossed Substitute H.B. 1368, 67th Legislature, 2021 Reg. Sess., § 3(2). The program also allots $2 million for distressed landlords who own fewer than four units and have tenants who decline to pay rent, though such landlords can only receive up to 80 percent of rent owed and must agree not to take any legal action against the tenant. *Id.* § 3(7). A recent appropriations bill likewise devotes $658 million to emergency rental and utility assistance, with similar limitations on eligibility based on area median income. *See* Engrossed Substitute S.B. 5092, 67th Legislature, 2021 Reg. Sess., § 129(45)(a)–(b). As the State's own declarant concedes: "[T]hese programs covered only a fraction of the anticipated need for rental assistance, which is

*Pl.s' Response to D.s' XMSJs - 19*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

in the billions of dollars." Declaration of Jim Baumgart ISO Defendant Ferguson's Cross-Motion for Summary Judgment, Dkt. #105, ¶ 12.

Nor is the recently adopted Landlord Mitigation Program adequate to make landlords whole. The program offers reimbursement for unpaid rent, limited to $5,000 per tenancy and $15,000 total. *See* Engrossed Second Substitute S.B. 5160, 67th Leg., Reg. Sess. § 5(1)(d)(i), (4) (Wash. 2021). The landlord must abandon certain rights to qualify for these funds, such as agreeing to waive any claims against the tenant related to the tenancy or pursuing collection for damages. *Id.* §5(8)(a). The program, moreover, expressly disavows any obligation to maintain adequate funds to fulfill all landlord applications. *Id.* § 5(1)(c)(7).

The Defendants' responses to Plaintiffs' other less-restrictive alternatives do not adequately explain why such alternatives are either ineffective or somehow impracticable. The State, for instance, does not explain why the Michigan courts' priority system, *see* Plaintiffs' XMSJ at 18, cannot be implemented in Washington. Rather, the State simply points out that there are a few extremely narrow exceptions to the state moratorium, a non sequitur that does not respond to the priority alternative, which would still allow for evictions for non-payment and other material lease breaches. Likewise, the State's rejection of a cap on eviction filings is conclusory and inadequate. *See* State's XMSJ at 24. The State simply states, without elaboration, that a cap would be too difficult to implement. This response is hard to credit, given that "the Governor has issued hundreds of proclamations and amendments under his emergency authority" through the course of the pandemic, from stay-at-home and mask mandates, special business regulations that vary by industry, and a four-phase reopening plan. Declaration of Kathryn Leathers ISO State's XMSJ, Dkt. #106, ¶ 3. Washington can do difficult things.

The Defendants' eviction bans are among the most—if not the most—severe in the nation, and the more moderate approaches taken by other states and cities demonstrate that the Defendants can safeguard their interests in a less oppressive fashion. Right now, 17 states plus the District of Columbia have an eviction moratorium of some sort in place. California's moratorium, for example, requires that tenants pay 25 percent of the monthly rent to qualify for eviction protection,

*Pl.s' Response to D.s' XMSJs - 20*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

and submit a declaration of hardship. *See* California Assembly Bill No. 3088 § 1179.03(b)(3), (g)(2)(B). The legislation forbids only those evictions for non-payment of rent, allowing landlords to still evict for material breaches of the lease agreement or for no-fault reasons such as intent to sell, remodel, or self-occupy. *Id.* § 1179.03.5(a). Governor Newsom has recently announced that the State will soon commit to fully reimbursing landlords for missed rent. *See* California Apartment Association, "Gov. Newsom announces plan to pay rental housing providers 100% of rent owed" (May 10, 2021).[7]

Other active moratoria likewise take a more moderate approach than Defendants. Most either require a hardship showing or allow evictions for reasons other than non-payment of rent. *See, e.g.*, New York State Assembly, Bill No. S06362A, 2021-2022 Reg. Sess. (offering protection for eviction if a tenant submits a hardship declaration); Oregon Legislative Assembly, Enrolled H.B. 4401, 2020 Third Special Sess. (same); Office of the Governor State of Hawaii, Fifth Supplemental Proclamation 6 (Apr. 16, 2020) (prohibiting eviction for failure to pay rent or other related charges). *See also* Nolo.com, Ann O'Connell, Emergency Bans on Evictions and Other Tenant Protections Related to Coronavirus (maintains an updated chart of the various eviction moratoria among the states).[8]

## III. THE DEFENDANTS' EVICTION BANS CONSTITUTE A PHYSICAL OCCUPATION OF THE PLAINTIFFS' PROPERTIES, VIOLATING THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION

The Defendants argue the Plaintiffs' physical takings claim lacks merit for three primary reasons. First, the Defendants argue injunctive relief is unavailable in takings claims. *See* City's XMSJ at 26–29; State's XMSJ at 37–38. Second, the Defendants argue landlord-tenant disputes can never amount to a physical taking under *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982) and *Yee v. City of Escondido*, 503 U.S. 519 (1992). City's XMSJ at 29–30; State's XMSJ at 33–38. And third, the State argues temporary physical occupations are not per se categorical takings. State's XMSJ at 34–37. The Defendants' arguments lack merit.

---

[7] https://caanet.org/gov-newsom-announces-plan-to-pay-rental-housing-providers-100-of-rent-owed/.

[8] https://www.nolo.com/evictions-ban.

*Pls' Response to D.s' XMSJs - 21*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**A.    Injunctive relief is an appropriate remedy in some physical invasion takings cases**

Private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V; U.S. Const. amend. XIV. As a result, just compensation is generally the default remedy for a taking of property; however, "injunctive relief is available in limited circumstances," namely when the procedures for seeking just compensation are unavailable or inadequate. *See Lamplighter Vill. Apts. LLP v. City of St. Paul*, No. 21-413, 2021 WL 1526797 (D. Minn. Apr. 19, 2021) (granting the plaintiffs' request for a preliminary injunction based on their likelihood to succeed on their per se and regulatory takings claims); *Goodwin v. Walton Cty., Florida*, 248 F. Supp. 3d 1257, 1266 (N.D. Fla. 2017) (recognizing injunctive relief may be granted where there are either unavailable or inadequate procedures for seeking just compensation). *See also Stop the Beach Renourishment, Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 723 (2010) ("[W]e see no reason why [compensation] would be the exclusive remedy for a judicial taking.").

Here, the Defendants have not provided an adequate forum for the Plaintiffs to recover just compensation. Under the Defendants' eviction bans, the Plaintiffs are suffering an injury "of a continuing nature." *Kucera v. State, Dep't of Transp.*, 995 P.2d 63, 69 (Wash. 2000). The Defendants have extended their eviction bans consistently for the past year, and with every extension, the Plaintiffs suffer additional harm. This harm cannot be quantified in total until the Defendants end their eviction bans and total the amount of overdue rent and other financial losses the Plaintiffs have suffered. This leaves the Plaintiffs with no remedy or recourse other than injunctive relief until the Defendants decide to end their bans and provide some relief to the Plaintiffs and other suffering landlords. And at over fourteen months in place, it appears as if the Defendants are happy to allow their bans to continue in perpetuity and deny the Plaintiffs and other landlords any type of relief. Therefore, injunctive relief is the only remedy available to the Plaintiffs at this time. *See id.* ("Courts have generally found remedies to be inadequate [thus permitting injunctions when] . . . the remedy at law would not be efficient because the injury is of a continuing nature."); *Lamplighter Vill. Apts. LLP*, 2021 WL 1526797, at *5 ("Plaintiffs have

*Pl.s' Response to D.s' XMSJs - 22*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

established the existence of irreparable harm because continued enforcement of the ordinance is likely to result in ongoing violations of Plaintiffs' constitutional rights, and 'loss of [constitutional] freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. . . . Plaintiffs' Motion for a preliminary injunction is GRANTED[.]'") (internal citation omitted).

Additionally, the harm caused by the Defendants' eviction bans is not just monetary. Instead, the Defendants' eviction bans deprive the Plaintiffs of the rights to exclude and repossess their properties—fundamental rights, the deprivation of which is incalculable and cannot be remedied by just compensation. *See Kucera*, 995 P.2d at 69. ("Courts have generally found remedies to be inadequate [thus permitting injunctions when] . . . the injury complained of by its nature cannot be compensated by money damages [and] the damages cannot be ascertained with any degree of certainty[.]").

Therefore, because no other forms of relief are available to the Plaintiffs, injunctive relief is appropriate to resolve the Plaintiffs' takings claim. *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2179 (2019) ("As long as just compensation remedies are available . . . injunctive relief will be foreclosed.").

However, even if this Court disagrees and finds the Plaintiffs are not entitled to injunctive relief, the Plaintiffs are entitled to declaratory relief and a holding that the Defendants' bans constitute an unconstitutional taking under the Fifth Amendment, something neither Defendant disputes. *See Duke Power Co. v. Carolina Envtl.*, 438 U.S. 59, 71 n.15 (1978) (recognizing that declaratory relief is a suitable remedy for a Fifth Amendment takings claim); *ICR Graduate Sch. v. Honig*, 758 F. Supp. 1350, 1355 (S.D. Cal. 1991) ("Generally, courts will consider declaratory relief only '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'").

**B.     Landlord-Tenant disputes can constitute a physical taking.**

Plaintiffs note at the outset that neither the Magistrate Judge nor this Court addressed the likelihood of success on the merits with regard to Plaintiffs' Takings Claim when analyzing

*Pl.s' Response to D.s' XMSJs - 23*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Plaintiffs' Motion for Preliminary Injunction. Rather, the Magistrate Judge's Report and recommendation only held that injunctive relief would be improper and did not reach the Takings claim itself. *See* Dkt. #63 at 22–25. While Defendants frequently note that this Court has already held that Plaintiffs were not likely to succeed on the merits, that is not the case with respect to Plaintiffs' physical takings claim.

Generally, the Supreme Court has held that a physical occupation of property is a categorical taking requiring compensation. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner . . . regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."). Even minor physical invasions that do not interfere with use constitute a categorical taking. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421 (1982) (holding that a law authorizing television companies to install permanent cables on private properties caused a Fifth Amendment taking).

This categorical rule requiring compensation for physical takings applies even where the government authorizes a third party to physically occupy or invade property. For example, in *Loretto*, government-authorized installation of privately owned cable constituted a physical taking. *Id.* at 440–41. And in *Kaiser Aetna v. United States*, 444 U.S. 164 (1979), a navigational easement imposed on a privately owned lagoon caused a categorical taking by authorizing private vessels to intrude on private property.

Despite this clear line of physical takings cases and the precedent they have set, the Defendants argue the Supreme Court, in *Yee v. City of Escondido*, carved out a formalistic exception for landlord-tenant regulations, precluding them from takings liability. 503 U.S. 519 (1992); City's XMSJ at 29–30; State's XMSJ at 34–37. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1951 (2017) (Roberts, C.J., dissenting) ("We have said often enough that the answer to this question generally resists . . . rigid formulas."). The Defendants are mistaken.

*Pl.s' Response to D.s' XMSJs - 24*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

In *Yee*, a group of mobile home park owners sued the City of Escondido for implementing a rent control ordinance that prohibited landlords from increasing rent without city council approval. 503 U.S. at 523–26. Importantly, the city enacted this rent control ordinance under the State of California's existing mobile home residency law, which limited the bases upon which a park owner may terminate a mobile homeowner's tenancy. *Id.* at 524. Consequently, with both the city's rent control ordinance and the state's mobile home residency law, landlords were left with less control over their own properties. *Id.* at 523–26.

In evaluating whether the city's rent control ordinance effected a taking of mobile home park owners' properties, the Supreme Court examined a series of long-established physical takings cases and reached the conclusion that these cases, including *Loretto*, 458 U.S. at 440–41, *FCC v. Florida Power Corp.*, 480 U.S. 245, 252 (1987), and *Pumpelly v. Green Bay Co.*, 13 Wall. 166, (1872), required the physical occupation to be *compelled* by the governing entity. *Yee*, 503 U.S. at 526–32 (emphasis added). The Supreme Court then ruled that because the mobile home park owners voluntarily rented their land to their tenants, no physical taking occurred. *Id.* However, the Supreme Court did note that a physical taking could occur if the government was "to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528.

Here, the Plaintiffs fall into the exception the Supreme Court crafted in *Yee*, namely that they are forced by the Defendants' eviction bans to, over objection, refrain from terminating their tenancies even after tenants are no longer entitled to a possessory interest. *Id*. While the Plaintiffs readily admit that they voluntarily leased their properties to various tenants, these tenancies in many cases have run their course or are now in breach, leaving some tenants as holdovers or otherwise ending the acquiesced occupation, and in other instances have rolled over into month-to-month tenancies, leaving landlords beholden to the uncertain duration of the Defendants' eviction bans. Dkt. #18; Dkt. #19; Dkt. #52; Dkt. #67; Dkt. #68; Dkt. #94; Dkt. #95; Dkt. #96; Dkt. #97.

*Pl.s' Response to D.s' XMSJs - 25*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Unlike in *Yee*, the Plaintiffs are required to allow tenants to continue occupying the property even after the "invitation" has ended—either due to violations of lease terms or lease expiration—leaving the Plaintiffs and other similarly situated landlords with no recourse as the Defendants issue extension after extension of their respective eviction bans. Protecting these types of landlord-tenant relationships is not what the Supreme Court had in mind when it issued its ruling in *Yee*. 503 U.S. at 526–32. Instead, because "the right to exclude is doubtless . . . one of the most essential sticks in the bundle of rights that are commonly characterized as property" the Justices built an escape hatch into *Yee* for landlord-tenant situations like the one currently before this Court, situations in which the invited status of the tenants has expressly ended and the governing entity still requires landlords to refrain from ending their tenancies. *Id.* at 527–29. Therefore, the Supreme Court's holding in *Yee* is not applicable in this case because the Defendants' regulations have taken a possessory interest held by landlords that would allow them to repossess the property after tenants have lost any possessory interest of their own by violating the terms of the lease.

Additionally, although the Defendants have argued their evictions bans are justified by the coronavirus pandemic, "the very fact that there is no foreseeable end to the emergency takes this case outside the Court's holding in *Block v. Hirsh*, 256 U.S. 135 (1921)." *Fresh Pond Shopping Center, Inc. v. Callahan*, 464 U.S. 875, 878 (1983) (Rehnquist, J., dissenting). The Defendants' eviction bans have been in place now for well over a year, and with each further extension of their bans, the harm they create becomes more irreparable. This continuing schema cannot be upheld. *Block*, 256 U.S. at 460 ("A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change."); *Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991) ("In [the takings context], 'permanent' does not mean forever, or anything like it. A taking can be for a limited term—what is 'taken' is, in the language of real property law, an estate for years, that is, a term of finite duration as distinct from the infinite term of an estate in fee simple absolute.") (cleaned up).

Therefore, despite the Defendants' general assertion that the Supreme Court's holding in *Yee* precludes physical takings in the landlord-tenant context, *Yee* itself does not stand for that

*Pl.s' Response to D.s' XMSJs - 26*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

proposition. Instead, *Yee* left open physical takings when the government requires a landlord to refrain from terminating a tenancy where the tenants have forfeited a possessory interest, thus compelling an uninvited occupancy.

### C.      A temporary occupation of property can constitute a categorical taking.

Oddly, Washington State alone argues the Supreme Court in *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23 (2012), did not hold that a temporary occupation of property can constitute a physical taking. State's XMSJ at 35–36. Washington State is mistaken.

In *Arkansas Game & Fish Commission*, the Supreme Court did examine whether a temporary physical occupation via flooding, constituted a taking. 568 U.S. at 26–40. However, the Supreme Court did not limit its ultimate conclusion of law that temporary takings are just as compensable and categorical as permanent ones. *Id.* at 33 ("[W]e have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have worked a taking of property no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.") (cleaned up); *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cty.*, 482 U.S. 304, 318 (1987) ("[Supreme Court] cases reflect the fact that 'temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation."); *Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 950 (11th Cir. 2018) ("Moreover, even a temporary or intermittent invasion of private property can trigger physical takings liability.").

Instead, the Court made clear that the temporary nature of government action does not obviate the taking. For instance, in *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), the government temporarily occupied a plant for wartime use— the temporary nature of the occupation did not obviate the compensation requirement. *See also United States v. Petty Motor Co.*, 327 U.S. 372, 378 (1946) (temporary government use of building was a taking warranting compensation); *United States v. General Motors Corp.*, 323 U.S. 373 (1945) (same). Indeed, even the more limited view of temporary takings expressed by the dissenters in *First English*, 482 U.S. at 331–32,

*Pl.s' Response to D.s' XMSJs - 27*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

accepted as uncontroversial that "the state certainly may not occupy an individual's home for a month and then escape compensation by leaving and declaring the occupation 'temporary.'" Thus, even temporary takes can be categorical in nature. *Caquelin v. United States*, 959 F.3d 1360, 1369 (Fed. Cir. 2020) ("We do not think that *Arkansas Game* implies that a non-categorical approach to finding a taking applies . . . Indeed, the Court reaffirmed the recognition of *Tahoe-Sierra* that 'when the government physically takes possession of an interest in property for some purpose, it has a categorical duty to compensate the former owner.' In addition, the Court, pointing to several categorical-takings cases, stated that 'the takings claims approved in these cases were not confined to instances in which the Government took outright physical possession of the property involved.'") (cleaned up).

Further, it is clear the Defendants' readings of *Arkansas Game & Fish Commission*, 568 U.S. at 26–40, and *First English*, 482 U.S. at 318, are incorrect. The Defendants argue *Arkansas Game & Fish Commission* and *First English* stand only for the limited proposition that their respective factual scenarios are not automatically exempt from the Takings Clause. State's XMSJ at 35–36. Specifically, the Defendants argue these cases are not per se violations but instead must be analyzed under the *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978), ad hoc balancing test. However, no court has ever read these two cases as so limited in reach. *Hendler*, 952 F.2d at 1376 ("It is equally true, however, that the government when it has taken property by physical occupation could subsequently decide to return the property to its owner, or otherwise release its interest in the property. Yet no one would argue that that would somehow absolve the government of its liability for a taking during the time the property was denied to the property owner.") (cleaned up).

Consequently, the State of Washington's stance that *Arkansas Game & Fish Commission* does not apply outside the flooding context and that temporary takings cannot be categorical in nature is incorrect.

*Pl.s' Response to D.s' XMSJs - 28*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## CONCLUSION

"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S 393, 416 (1922). The Defendants have decided that landlords must give up longstanding rights indefinitely so that the Defendants can go about combating the pandemic by their preferred method. Defendants can and must pursue their objectives in the constitutional way.

DATED:  May 28, 2021.

Respectfully submitted,

s/  ETHAN W. BLEVINS_____            s/  KATHRYN D. VALOIS__
s/  BRIAN T. HODGES_____            KATHRYN D. VALOIS*
ETHAN W. BLEVINS, WSBA # 48219            Fla. Bar. No. 1010150
BRIAN T. HODGES, WSBA # 31976            Pacific Legal Foundation
Pacific Legal Foundation            4440 PGA Blvd., Suite 307
255 South King Street, Suite 800            Palm Beach Gardens, Florida 33410
Seattle, Washington 98104            Telephone: (561) 691-5000
Telephone: (425) 576-0484            Email: KValois@pacificlegal.org
Email: EBlevins@pacificlegal.org
Email: BHodges@pacificlegal.org            * *Pro hac vice*

*Attorneys for Plaintiffs*

*Pl.s' Response to D.s' XMSJs - 29*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

s/ ETHAN W. BLEVINS
Ethan W. Blevins, WSBA # 48219

*Attorney for Plaintiffs*

*Pl.s' Response to D.s' XMSJs - 30*
*Case No: 2:20-cv-01323-RAJ-JRC*

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*