UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EL PAPEL LLC, *et al.*,

     Plaintiffs,

  v.

JENNY A. DURKAN, *et al.*,

     Defendants.

CASE NO. 2:20-cv-01323-RAJ-JRC

REPORT AND RECOMMENDATION

NOTED FOR: October 1, 2021

  The District Court has referred this matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), and local Magistrate Judge Rules MJR1, MJR3, and MJR4.

  In 2020, in the throes of a worldwide pandemic and corresponding economic downturn, local governments imposed measures including restrictions on landlords' ability to evict tenants for nonpayment and to collect overdue rent.  At issue in this lawsuit is the constitutionality of such eviction restrictions imposed by Washington State and the City of Seattle.  Two landlords bring suit against the City's Mayor (Jenny Durkan), the City, and the State Attorney General (Robert Ferguson), alleging that the State's moratorium on most residential evictions and the

1   City's eviction moratorium, rent repayment plan requirement, and additional six-month defense

2   against eviction[1] violate their civil rights—specifically, their rights to be free from impairment of

3   contract and from physical takings of their properties.

4          The parties have now filed cross-motions for summary judgment, which are ripe for

5   decision.  Dkts. 93, 103, 104.  The parties request oral argument, but oral argument is not

6   necessary for resolution of the issues presented.

7          This Court—and the District Court—previously found that plaintiffs were unlikely to

8   succeed on the merits of their claims.  *See* Dkt. 78; *see also Apartment Ass'n of L.A. Cty., Inc. v.*

9   *City of L.A.* ("AALAC"), No. 20-56251, 2021 WL 3745777, at *9 (9th Cir. Aug. 25, 2021)

10  (citing with approval this Court's report and recommendation on the preliminary injunction

11  related to the Contracts Clause issue and the order adopting that report and recommendation).

12         The Court has now taken a hard look at plaintiffs' renewed arguments, including the

13  supplemental authority provided by all parties, but finds that plaintiffs have failed to provide

14  evidence from which a trier of fact could conclude that the restrictions violate the Contracts

15  Clause or the Takings Clause.

16         Specifically, plaintiffs have failed to provide evidence from which a factfinder would

17  conclude that the State or City restrictions were not appropriate and reasonable ways to advance

18  significant and legitimate goals of preventing disease transmission, housing displacement, and

19  homelessness.  And plaintiffs have failed to provide evidence from which a factfinder would

20

21         [1] Although the restrictions at issue are three distinct measures enacted by City of Seattle
     authorities (including a moratorium on evictions) and one eviction moratorium enacted by the
22   State, the Court will collectively refer to all measures as "eviction restrictions" in this Report and
     Recommendation, for ease of reference.  Moreover, the Court will refer to the restrictions
23   individually as the "State's moratorium," the "City's moratorium," the City's "six month
     defense," and the City's "repayment plan requirement."  *See infra*, Background (explaining the
24   particulars of each restriction).

conclude that a physical taking occurred.  Finally, plaintiffs' claims for injunctive relief related to the State's moratorium are now moot.  Therefore, defendants' motions for summary judgment dismissal should be granted, plaintiffs' summary judgment motion should be denied, and this matter should be dismissed with prejudice.

## BACKGROUND[2]

### I.  The COVID-19 Pandemic

Over the last year and a half, the novel coronavirus ("COVID-19"), first identified as a cluster of pneumonia cases in late 2019, has grown to a pandemic of unprecedented proportions. *See Timeline:  WHO's COVID-19 Response*, World Health Organization (last visited Sept. 10, 2021).[3]  On January 21, 2020, Washington State reported the United States' first COVID-19 case.  Dkt. 107, at 2.  Within approximately a month, officials recognized community spread of the disease within Washington State, and by the end of February, COVID-19 had claimed its first victim in Washington State.  *See* Dkt. 107, at 3.

It is now known that COVID-19 spreads easily from person to person, transmitted primarily by respiratory droplets or small particles; that the population had little to no pre-existing immunity to the virus; that pre-symptomatic and asymptomatic infections occur and cause unknowing spread of the virus; and that the risk of transmission is significantly greater indoors.  Dkt. 107, at 3, 5.  Some patients suffer severe or critical illness or even death—and

---

[2] Except as otherwise cited, the facts in this section are taken from the parties' evidence on summary judgment.  The Court takes judicial notice of several official sources for various background facts.

[3] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline#

1   some survivors appear to experience long-term health complications.  Dkt. 107, at 3–4.

2   Outbreaks threaten to overwhelm the healthcare system.  Dkt. 107, at 5.

3   Due to the ease of transmission and lack of approved drugs, therapeutics, or vaccines (at

4   the time) to treat or prevent COVID-19 (*see* Dkt. 107, at 6), the COVID-19 outbreak exploded,

5   becoming a leading cause of global death in 2020.  *See World Health Statistics 2021*, WHO

6   (2021), at viii (estimating that at least 3 million global excess deaths in 2020 were attributable to

7   COVID-19), 7 (reporting that COVID-19 was one of the top 10 causes of death in the world in

8   2020).[4]

9   Washington State is no exception from the devastation the COVID-19 pandemic has

10  wrought.  According to the State Department of Health, at the time of this writing, there have

11  been nearly 600,000 reported COVID-19 cases in Washington State, 32,662 hospitalizations, and

12  6,605 deaths.  *COVID-19 Data Dashboard*, Wash. State Dep't of Health (last visited September

13  10, 2021).[5]

14  **II. Washington State's COVID-19 Response**

15  On February 29, 2020, the Governor of Washington State declared a State of Emergency.

16  Dkt. 107, at 6.  The Governor instituted a number of measures to mitigate the spread and impact

17  of COVID-19 in the State, including prohibiting large or public gatherings and closing schools,

18  colleges, and universities.  Dkt. 107, at 6.

19  According to a State epidemiologist, by mid-March 2020—and despite these measures—

20  Washington had the highest absolute number and among the highest number per capita of

21  COVID-19 cases in the country.  Dkt. 107, at 7.  "From a public health standpoint, [the]

---

[4] *Available at* https://www.who.int/data/gho/publications/world-health-statistics
[5] https://www.doh.wa.gov/Emergencies/COVID19/DataDashboard

1    transmission rate was unsustainable[.]" Dkt. 107, at 8.  Therefore, the Governor issued

2    restrictions including a stay-at-home order, the moratorium at issue in this lawsuit, and, later, a

3    mask mandate for public settings.  *See* Dkt. 107, at 9, 12.

4           The first iteration of the State's moratorium, Proclamation 20-19, prohibited serving a

5    notice of unlawful detainer for default payment of rent, issuing a 20-day notice of unlawful

6    detainer unless the landlord attested that the action was necessary for health and safety, and

7    initiating judicial actions for writs of restitution for failure to pay rent.  *See* Dkt. 106-1, at 6–7.

8           Throughout 2020, cases continued to ebb and surge, with corresponding implementation,

9    modifications, and pauses of the Governor's phased reopening plan.  *See* Dkt. 107, at 10–14.

10   Although Proclamation 20-19 was set to expire April 17, 2020 (Dkt. 106-1, at 6), the Governor

11   amended and extended the State's moratorium repeatedly, through June 30, 2021.  *See* Dkt. 106,

12   at 6–10.

13          As amended, the State's moratorium stated, in pertinent part—

14                  Landlords, property owners, and property managers are prohibited from
             serving or enforcing, or threatening to serve or enforce, any notice requiring a
15           resident to vacate any dwelling or parcel of land occupied as a dwelling, including
             but not limited to an eviction notice, notice to pay or vacate, notice of unlawful
16           detainer, notice of termination of rental, or notice to comply or vacate.  This
             prohibition applies to tenancies or other housing arrangements that have expired or
17           that will expire during the effective period of this Proclamation.  This prohibition
             applies unless the landlord, property owner, or property manager (a) attaches an
18           affidavit attesting that the action is necessary to respond to a significant and
             immediate risk to the health, safety, or property of others created by the resident;
19           or (b) provides at least 60 days' written notice of intent to (i) personally occupy the
             premises as a primary residence, or (ii) sell the property.
20                  [Similar provision applicable to judicial eviction orders or agreements to
             vacate omitted.]
21                  . . .
                    Landlords, property owners, and property managers are prohibited from
22           assessing, or threatening to assess, late fees for the non-payment or late payment of
             rent or other charges related to a dwelling or parcel of land occupied as a dwelling,
23           and where such non-payment or late payment occurred on or after February 29,
             2020[.]
24

REPORT AND RECOMMENDATION - 5

1
2
3
4
5
6
7
8

. . .

Except as provided in this paragraph, landlords, property owners, and property managers are prohibited from treating any unpaid rent or other charges related to a dwelling or parcel of land occupied as a dwelling as an enforceable debt or obligation that is owing or collectable, where such non-payment was as a result of the COVID-19 outbreak and occurred on or after February 29, 2020, and during the State of Emergency proclaimed in all counties in Washington State.  This includes attempts to collect, or threats to collect, through a collection agency, by filing an unlawful detainer or other judicial action, withholding any portion of a security deposit, billing or invoicing, reporting to credit bureaus, or by any other means.  **This prohibition does not apply to a landlord, property owner, or property manager who demonstrates by a preponderance of the evidence to a court that the resident was offered, and refused or failed to comply with, a re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident; failure to provide a reasonable re-payment plan shall be a defense to any lawsuit or other attempts to collect.**

9
10

Dkt. 106-1, at 46–47 (bullet points omitted) (emphasis in original).  Landlords who violated these prohibitions faced criminal penalties.  Dkt. 106-1, at 48.

11
12
13
14
15
16

By early 2021, the State transitioned to a county-by-county phased reopening plan.  Dkt. 107, at 16.  And in June 30, 2021, corresponding with the end of the State's moratorium, Washington State lifted many other COVID-19 restrictions.  *See Inslee announces statewide reopening date of June 30 and short-term statewide move to Phase 3*, Washington Governor Jay Inslee (May 13, 2021).[6]

17
18
19
20
21

In the meantime, the State legislature also acted, submitting Engrossed Second Substitute Senate Bill ("E2SSB") 5160 for the Governor's signature on April 20, 2021.  Dkt. 106, at 11.  As enacted, that bill provides a variety of protections to tenants and ends the eviction moratorium on June 30, 2021.  *See* Dkt. 106, at 11–12.  Among those protections are the creation of an eviction resolution pilot program, a right to counsel program, and a rental assistance program in

22
23
24

[6] https://www.governor.wa.gov/news-media/inslee-announces-statewide-reopening-date-june-30-and-short-term-statewide-move-phase%C2%A03.

REPORT AND RECOMMENDATION - 6

1    Washington State.  *See* Dkt. 126-1, at 23, 25.  E2SSB 5160 became effective April 22, 2021.

2    Dkt. 106, at 11.

3        Between the expiration of the State's moratorium on June 30, 2021, and the "full

4    implementation of Senate Bill 5160," the Governor has passed a "bridge" measure that expires

5    September 30, 2021.  Dkt. 126-1, at 24.  Under the bridge measure, eviction is not allowed for

6    unpaid rent that accrued between February 2020 and July 2021 due to COVID-19, until—

7            both (1) a rental assistance program and an eviction resolution pilot program as
             contemplated by Section 7 of E2SSB 5160 have been implemented and are
8            operational in the county in which the rental property is located; and (2) a tenant
             has been provided with, and has, since the effective date of this order, rejected or
9            failed to respond within 14 days of receipt of such notice to an opportunity to
             participate in an operational rental assistance program and an operational eviction
10           resolution pilot program provided by E2SSB 5160.

11   Dkt. 126-1, at 25.  Moreover, such unpaid rent cannot be treated as a currently owing or

12   collectable, enforceable debt or obligation "where such non-payment was, in whole or in part, a

13   result of the COVID-19 crisis, until such time as the landlord and tenant have been provided with

14   an opportunity to resolve nonpayment of rent through a rental assistance program and an eviction

15   resolution pilot program as provided by Section 7 of E2SSB 5160."  Dkt. 126, at 29.

16       In addition, related to rent that accrues between August 1, 2021, and September 30,

17   2021—

18           landlords are prohibited from serving or enforcing, or threatening to serve or
             enforce, any notice requiring a tenant to vacate any dwelling, including but not
19           limited to an eviction notice, notice to pay or vacate, unlawful detainer summons
             or complaint, notice of termination of rental, or notice to comply or vacate, if,
20           unless otherwise permitted by this order or under state law, a tenant has (1) made
             full payment of rent; or (2) made a partial payment of rent based on their individual
21           economic circumstances as negotiated with the landlord; or (3) has a pending
             application for rental assistance that has not been fully processed; or (4) resides in
22           a jurisdiction in which the rental assistance program is anticipating receipt of
             additional rental assistance resources but has not yet started their program or the
23           rental assistance program is not yet accepting new applications for assistance.

24

Dkt. 126-1, at 26.  Late fees are also disallowed.  *See* Dkt. 126-1, at 26.  And landlords cannot

evict tenants for unpaid rent from February 29, 2020, through September 30, 2021, "if the

landlord has made no attempt to establish a reasonable repayment plan with the tenant per

E2SSB 5160, or if they cannot agree on a plan and no local eviction resolution pilot program per

E2SSB 5160 exists."  Dkt. 126-1, at 6.

### III.  The City's Restrictions

The City of Seattle also took measures to respond to the COVID-19 crisis, including in

the context of residential tenancies.  On March 3, 2020, defendant Durkan proclaimed a civil

emergency.  Dkt. 17-6, at 5.  On March 16, defendant Durkan placed a temporary moratorium on

residential evictions.  *See* Dkt. 124, at 6.  That moratorium is set to expire September 30, 2021.

Dkt. 124, at 6.  The City's moratorium forbids eviction unless the eviction is "due to actions by

the tenant constituting an imminent threat to the health or safety of neighbors, the landlord, or the

tenant's or landlord's household members."  Dkt. 17-7, at 4.  A landlord cannot collect late fees

or other charges due to late payment of rent during the moratorium, either.  Dkt. 17-7, at 4.

On September 30, 2021, the City Council also passed an ordinance providing a six-month

defense against evictions due to hardship, which will go into effect September 30, 2021.  Dkt.

124, at 6.  This six month defense applies where eviction would result from nonpayment that

results in having to vacate the housing unit within six months of the end of the mayor's

moratorium.  Dkt. 17-11, at 20.  A tenant may invoke the six month defense only by self-

certifying financial hardship preventing payment of rent.  Dkt. 17-11, at 20.

In addition, on May 11, 2020, the City Council adopted an ordinance governing failure to

pay rent "when due during, or within six months after the termination of, the civil emergency

proclaimed by Mayor Durkan on March 3, 2020[.]"  Dkt. 17-12, at 8.  Under the repayment plan

requirement, a tenant may elect to pay eligible, overdue rent in installments over three to six months, and failure of a landlord to accept payment under the installment schedule is a defense to eviction.  Dkt. 17-12, at 8–9.  Moreover, landlords may not collect late fees, interest, or other charges during or within one year after the termination of the mayor's civil emergency.  Dkt. 17-12, at 9.

## IV.  Plaintiffs

Plaintiffs, who brought suit in this Court in September 2020, are two residential landlords whose tenants are (or were) not paying rent.  *See* Dkts. 95, 97.  El Papel, LLC, has provided evidence that certain tenants owe thousands of dollars of unpaid rent and (for one tenant) against whom, "[b]ut for the Defendants' eviction moratoria," El Papel would initiate eviction proceedings.  Dkt. 95, at 2.  The relevant leases, according to plaintiffs, provide for eviction as a remedy for nonpayment and $75 monthly late fees.  Dkt. 95, at 2.  In addition, certain of Berman 2, LLC's tenants are not paying rent and have not responded to repeated efforts to reach them to set up a payment plan.  Dkt. 97, at 2.  At the time plaintiffs moved for summary judgment, the Berman 2 tenants owed $16,479 in back rent.  Dkt. 97, at 2.  Plaintiffs assert that "[b]ut for the Defendants' eviction moratoria," Berman 2 would evict its nonpaying tenants.  Dkt. 97, at 2.

## V.  Current Circumstances

Before delving into the parties' arguments, the Court would be remiss not to note the drastic surge in COVID-19 cases currently ongoing and occurring after the parties submitted their briefing.

Three vaccines were authorized for emergency use by the FDA (Dkt. 107, at 6), and as of September 7, 2021, 67% of people over 11 years old in Washington have been fully vaccinated against COVID-19.  *COVID-19 Data Dashboard*, Wash. State Dep't of Health (last visited Sept.

10, 2021).[7]  Nevertheless, there has been a dramatic increase in COVID-19 cases since summer 2021, with current case counts near or exceeding those from the previous height of the pandemic. *See id.* (Epidemiologic Curves).  This surge is attributable to the spread of a COVID-19 variant (the "Delta variant"), which is highly contagious, more transmissible than prior strains, and now the dominant strain of the virus in Washington State.  *See* DOH Communications, *Delta variant drives sharp increase in COVID-19 cases, hospitalizations*, Wash. State Coronavirus Response (COVID-19) (Aug. 3, 2021).[8]  This surge in cases has led the Governor to re-impose the statewide mask mandate and to require vaccinations for certain groups.  *See Inslee announces educator vaccination requirement and statewide indoor mask mandate*, Wash. Governor Jay Inslee (Aug. 18, 2021).[9]

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Where there is a complete failure of proof concerning an essential element of the non-moving party's case on which the nonmoving party has the burden of proof, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  And when presented with a motion for summary judgment, the court shall

---

[7] https://www.doh.wa.gov/Emergencies/COVID19/DataDashboard
[8] https://coronavirus.wa.gov/news/delta-variant-drives-sharp-increase-covid-19-cases-hospitalizations
[9] https://www.governor.wa.gov/news-media/inslee-announces-educator-vaccination-requirement-and-statewide-indoor-mask-mandate

1    review the pleadings and evidence in the light most favorable to the nonmoving party. *Anderson*

2    *v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

3         Once the moving party has carried its burden under Fed. R. Civ. P. 56, the party opposing

4    the motion must do more than simply show that there is some metaphysical doubt as to the

5    material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The

6    opposing party cannot rest solely on its pleadings but must produce significant, probative

7    evidence in the form of affidavits, and/or admissible discovery material that would allow a

8    reasonable jury to find in his favor. *Id.* at n.11; *Anderson*, 477 U.S. at 249–50.  However,

9    weighing of evidence and drawing legitimate inferences from facts are jury functions, and not

10   the function of the court. *See United Steel Workers of Am. v. Phelps Dodge Corps.*, 865 F.2d

11   1539, 1542 (9th Cir. 1989).

12        **II. Standing**

13        The Court begins by addressing the parties' arguments concerning standing. *See Steel*

14   *Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (holding that a federal court cannot

15   assume standing in order to address the merits).

16        **A. CDC Eviction Moratorium**

17        According to defendants, because the CDC has imposed an eviction moratorium,

18   plaintiffs are not able to evict their tenants regardless of the outcome of this suit, so that plaintiffs

19   lack standing. *See* Dkt. 103, at 11–12; Dkt. 104, at 20.  However, on August 26, 2021, the

20   United States Supreme Court vacated a District Court's stay of an order vacating the CDC

21   eviction moratorium, so that the CDC eviction moratorium is no longer in effect. *See Ala. Ass'n*

22   *of Realtors v. Dep't of Health & Hum. Servs.*, No. 21A23, 2021 WL 3783142, at *4 (U.S. Aug.

23   26, 2021) (per curiam); *see also Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,

24

No. 20-CV-3377 (DLF), 2021 WL 1779282, at *10 (D.D.C. May 5, 2021) (setting aside the

CDC moratorium and rejecting arguments that the order should be limited to parties before the

Court because "when 'regulations are unlawful, the ordinary result is that the rules are vacated—

not that their application to the individual petitioner is proscribed.'" (quoting *Nat'l Mining Ass'n*

*v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). Thus, defendants'

argument fails.

### B.  The City's Repayment Plan Requirement

Next, the City argues that plaintiffs lack standing to challenge the City's repayment plan

requirement because they have failed to make a showing that any of their tenants are electing to

use a repayment plan.  Dkt. 103, at 12.

As noted, the repayment plan prevents eviction of tenants who are electing to repay rent

that became overdue during or within six months after the end of Seattle's state of emergency.

*See* Dkt. 17-12, at 8–9.  Plaintiffs appear to concede that their tenants are not currently partially

repaying overdue rent under eviction repayment plans.  *See* Dkt. 111, at 13.  However, as

plaintiffs point out, they, too, are currently bound by the City's ordinance.  Specifically,

plaintiffs cannot evict their tenants until they issue a notice to terminate tenancy that includes a

statement that informs the tenants of their right to pay overdue rent in installments.  *See* Dkt. 17-

12, at 9.  And plaintiffs are unable to impose late fees, interest, or other charges due to "late

payment of rent[.]"  Dkt. 17-12, at 9.  Based on these provisions, plaintiffs have shown that they

have standing to challenge the repayment plan requirement.

### III.  Mootness

The State argues that any challenge to the State's moratorium is now moot, as that

moratorium ended June 30, 2021.  Dkt. 104, at 21.  Plaintiffs acknowledge that the earlier State

1    moratorium expired but argue that the bridge measure harms plaintiffs in a similar enough

2    manner that they need not amend their complaint to bring new claims challenging that

3    moratorium.  Dkt. 130, at 5.  Focusing solely on the issue of injunctive relief, the Court agrees

4    that the challenge to the State's moratorium (even if it encompasses the bridge measure) is moot,

5    as the bridge moratorium expires by its own terms on September 30, 2021.  This will occur

6    before this Report and Recommendation will be ripe for decision by the District Court.  And

7    plaintiffs make no argument that E2SSB 5160 re-enacts the same provisions that they challenge

8    in this lawsuit.  *See* Dkt. 130.

9           The Court briefly notes that plaintiffs claim that the bridge moratorium does not expire in

10   September 2021 but continues indefinitely.  Dkt. 130, at 4.  Contrary to plaintiffs' claims, the

11   bridge moratorium has a clear end date of September 30, 2021—the bridge moratorium

12   repeatedly states as much.  Dkt. 131-1, at 4; 6, 7.

13          Even though the claim for injunctive relief against the State must be dismissed as moot,

14   the Court will nevertheless address the merits of the claims because plaintiffs are claiming

15   nominal damages and declaratory relief.  *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802

16   (2021); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (standing is to be

17   determined separately for injunctive relief and damages).  Should the District Court disagree that

18   the injunctive relief claims pertinent to the State are moot, it should nevertheless reject those

19   claims for the same reasons discussed below.

20          **IV.  Contracts Clause**

21                 **A.  State's Moratorium**

22          Article I, section 10, clause 1 of the U.S. Constitution provides that "No State shall . . .

23   pass any . . . Law impairing the Obligation of Contracts[.]"  Plaintiffs argue that the State's

24

1   moratorium violated the Contracts Clause, justifying an award of nominal damages.  *See* Dkt. 93,

2   at 12; Dkt. 130, at 5.

3         "[N]ot all state regulation of contracts gives rise to a Contracts Clause claim.  Instead,

4   '[t]he threshold issue is whether the state law has operated as a substantial impairment of a

5   contractual relationship.'" *LL Liquor, Inc. v. Montana*, 912 F.3d 533, 537 (9th Cir. 2018)

6   (quoting *Sveen*, 138 S. Ct. at 1821–22).  Here, the Court assumes that the State's restriction

7   substantially impaired the contractual relationship.[10]  *See AALAC*, 2021 WL 3745777, at *6

8   ("We need not decide whether the eviction moratorium is a substantial impairment of contractual

9   relations because even assuming it is, given the challenges that COVID-19 presents, the

10  moratorium's provisions constitute an 'appropriate and reasonable way to advance a significant

11  and legitimate public purpose.'" (Internal citation omitted.)).

12        "If there is a substantial impairment, the inquiry turns to the means and ends of the

13  legislation." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).  The Supreme Court "has asked

14  whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant

15  and legitimate public purpose.'" *Id.* (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light

16  *Co.*, 459 U.S. 400, 411–12 (1983)).  A court should also look to whether "'the State, in

17  justification, [has] a significant and legitimate public purpose behind the regulation, such as the

18  remedying of a broad and general social or economic problem,' to guarantee that 'the State is

19  exercising its police power, rather than providing a benefit to special interests.'"  *RUI One Corp.

20  v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (quoting *Energy Rsrvs. Grp., Inc.*, 459

21  U.S. at 411–12)).

22

23  _____

24     [10] Therefore, the Court does not address the parties' arguments regarding whether the
leases are a substantial impairment to contracts.  *E.g.*, Dkt. 93, at 13–18.

1      Finally, courts must "defer to legislative judgment as to the necessity and reasonableness

2   of a particular measure," where, as here, neither the state nor city are contracting parties. *Energy*

3   *Rsrvs. Grp., Inc.*, 459 U.S. at 413 (internal citation and quotation omitted); *see also AALAC*,

4   2021 WL 3745777, at *5 (characterizing modern Contracts Clause jurisprudence as inquiring

5   into whether  the "adjustment of the rights and responsibilities of contracting parties is based

6   upon reasonable conditions and is of a character appropriate to the public purpose justifying the

7   legislation's adoption." (internal citation and quotations omitted)).

8      The Court turns to plaintiffs' arguments.

9                    **1.  Failure to Ensure Compensation**

10     Plaintiffs argue that the State's moratorium provided no enforcement mechanism to

11  ensure continuing payment—or "just compensation"—for occupation of the premises.  Dkt. 93,

12  at 18.  Characterized as such, plaintiffs assert that Supreme Court case law holds that such a law

13  violates the Contracts Clause.  Dkt. 93, at 18.

14     For approximately 15 months, the State's moratorium prohibited landlords from "serving

15  or enforcing, or threatening to serve or enforce" a notice of eviction, similar notice, or judicial

16  eviction for tenancies that expired during the relevant period.  *See* Dkt. 106-1, at 46–47, 80.

17  Although this prohibition had certain exceptions, those exceptions were for tenants creating risks

18  or for sale or the landlord's occupancy of the residence.  *See* Dkt. 106-1, at 80; *see also* Dkt. 106

19  (describing differences between the proclamations).  Moreover, landlords could not treat unpaid

20  rent as an enforceable debt or obligation that was then owing or collectable, if the nonpayment

21  was due to COVID-19 and occurred after February 29, 2020.  Dkt. 106-1, at 81.  The moratorium

22  included an exception from the prohibition against treating unpaid rent as owing or collectable,

23  but only if the landlord could demonstrate that the resident was offered and refused a reasonable

24

1    repayment plan.  *See* Dkt. 106-1, at 81.  This moratorium was in effect between March 2020

2    (Dkt. 17-2, at 4) and June 2021.  Dkt. 106-1, at 79.

3           Thus, the State moratorium effectively prevented plaintiffs from evicting tenants for

4    nonpayment for nearly a year-and-a-half in most situations and from collecting unpaid rent

5    through other means, unless they first attempted to negotiate a repayment plan.  However, as the

6    State points out, the moratorium did not forgive or cancel unpaid rent—instead, it delayed the

7    ability to collect unpaid rent or evict tenants for nonpayment.  This distinction—between the

8    *delay* in the ability to obtain compensation for the occupancy of the property and the

9    *cancellation* of amounts owed to compensate the landlord for the occupancy—owed is

10   important.

11          Citing a series of Supreme Court cases from as early as 1843, plaintiffs argue that

12   delaying the right to foreclosure (and by extension, the right to eviction) coupled with failing to

13   provide for compensation for possession of the property in the meantime is unconstitutional.  *See*

14   Dkt. 93, at 18–19 (citing authorities).  But as this Court has already concluded, and as the Ninth

15   Circuit has recently confirmed, plaintiffs' interpretation of Supreme Court precedent is flawed:

16              [Plaintiff] correctly observes that the Court in those [cited] Contracts Clause
                cases often appears to have referenced in its discussion whether the law provided
17              for some sort of reasonable rental value to be paid to the property owner during the
                moratoria's interim.  In [*Home Building & Loan Association v. Blaisdell*], for
18              example, the Court upheld a moratorium on foreclosures, at least in part because it
                "secure[d] to the mortgagee the rental value of the property" during the emergency
19              period.  290 U.S. [398, 403 (1934).]  The other cases [plaintiff] discusses appear
                to have viewed reasonable rent as a relevant consideration as well.

20              But [plaintiff's] assertion that, as a matter of constitutional law, eviction
                moratoria require fair rental compensation in the interim fails for two main
21              reasons.  *First*, even in the more Contracts Clause-friendly era in which some of
                these cases were decided, the authorities [plaintiff] cites do not clearly impose
22              [plaintiff's] preferred inflexible rent payment rule.  While these cases treated
                reasonable rent as a relevant criterion in the analysis, they do not purport to impose
23              such a requirement as a categorical matter.  Indeed, even [plaintiff] in its opening

24

brief acknowledges that its desired contemporaneous rent requirement "may not have been elevated to a hard and fast 'rule' in every case."

In other words, there is no apparent ironclad constitutional rule that eviction moratoria pass Contracts Clause scrutiny only if rent is paid during the period of the moratoria. Instead, each of the cases [plaintiff] cites turned on its own facts and circumstances. That reasonable rent may have been a relevant consideration in some cases thus does not make it a constitutional floor in all cases. And it does not thereby create a Contracts Clause constitutional baseline in a case involving a public health situation like COVID-19. . . .

In claiming that any eviction moratorium is constitutional only if rent is contemporaneously paid, [plaintiff] relies most heavily on *Blaisdell*. But *Blaisdell* shows why [plaintiff's] attempt to divine a bright-line "reasonable rent" rule is unpersuasive. *Blaisdell* identified several factors that supported the state law's constitutionality. As the Court later explained, these included that the law contained a declaration of emergency, "protect[ed] a basic societal interest," was "appropriately tailored," and imposed "reasonable" conditions "limited to the duration of the emergency." *Allied Structural* [*Steel Co. v. Spannaus*], 438 U.S. [234, 242 (1978)]; *see also Blaisdell*, 290 U.S. at 444–47[]. Nothing in *Blaisdell* suggests that a "reasonable rent" requirement was dispositive. Indeed, *Blaisdell* specifically rejected the notion that Contracts Clause analysis should proceed with a "literal exactness like a mathematical formula." 290 U.S. at 428[]. Instead, "[e]very case must be determined upon its own circumstances." *Id.* at 430[] (quotations omitted).

*AALAC*, 2021 WL 3745777, at *7–8; *see also* Dkt. 63, at 14 ("*Blaisdell* and subsequent cases make clear that there is no precise formula or factor-based test to be applied in every case but that the overarching consideration must be the reasonableness of the impairment based on the facts of the case.").

Here, too (and as the Court has previously ruled), *Blaisdell* undermines, rather than supports, plaintiffs' claims. The State moratorium was analogous to *Blaisdell* in material respects. As explained above, the State moratorium was temporary in operation, it was tied to the duration of a civil emergency and a related economic crisis, and it was addressed toward undisputedly legitimate societal goals. This is also unlike plaintiffs' cited authority of *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935), where a law that eased restrictions on

1    mortgagors in a variety of ways effectively took "from the mortgage the quality of an acceptable

2    investment for a rationale investor." *Id.* at 61.

3        Although plaintiffs make much of the provision in the *Blaisdell* legislation providing for

4    compensation to the property owner in the meantime, as noted, it was the totality of the

5    circumstances and not a single factor that led the Supreme Court to uphold the law.  *See also*

6    *Allied Structural Steel*, 438 U.S. at 242.  Moreover, even if the Court read the case law cited in

7    plaintiffs' briefing as requiring compensation to the landlord for the period of occupancy, none

8    of the eviction restrictions forgave or waived the obligation of paying rent.  The State

9    moratorium never *cancelled* overdue rent obligations but *delayed* the ability to collect unpaid

10   rent (due to COVID-19) if the landlord could not demonstrate attempts to negotiate a reasonable

11   repayment plan and prevented eviction during the 15-month period in most circumstances.  This

12   is similar to the *Blaisdell* legislation's provision for mortgagors to pay the rental value of the

13   premises in a manner set by a court.  *See* 290 U.S. at 416–17.  Plaintiffs make much of the

14   "flexible" nature of the compensation provision in *Blaisdell*, but the State's restriction was also

15   flexible—landlords could treat unpaid rent as immediately due and payable if the tenant failed to

16   adhere to a reasonable repayment plan or if the non-payment was not "as a result of the COVID-

17   19 outbreak."  *See* Dkt. 106-1, at 47.

18       **2.  Connection between the Moratorium's Purpose and Means**

19       Plaintiffs next challenge whether the eviction moratorium was sufficiently "'tailored to

20   the emergency that it was designed to meet.'"  Dkt. 93, at 20 (quoting *Allied Structural Steel Co.*,

21   438 U.S. at 242).

22       The Court observes that because the government is not a party to the contract being

23   impaired, "'courts properly defer to legislative judgment as to the necessity and reasonableness

24

1    of a particular measure.'" *AALAC*, 2021 WL 3745777, at *5 (quoting *Energy Reserves*, 459 U.S.

2    at 413).  The Supreme Court has not required a "precise[]" or perfect fit between the legislation

3    and the objective but instead that the relief be "appropriately tailored to the emergency that it

4    was designed to meet."  *See* Dkt. 93, at 13; *Allied Structural Steel Co.*, 438 U.S. at 242.

5         Plaintiffs argue that although the State's moratorium was meant to mitigate the effects of

6    imminent unemployment caused by shutdowns and a resulting eviction crisis caused by inability

7    to pay rent, it unreasonably extended to "all tenants, regardless of financial circumstance or

8    likelihood of finding alternative housing."  Dkt. 93, at 21.  But as the Court previously found, the

9    State had an "undisputedly legitimate purpose[]" in "avoid[ing] the transmission of the disease

10   by reducing housing instability[.]"  Dkt. 63, at 20; *see also* Dkt. 107, at 2 (State's evidence that

11   "[i]n the absence of the moratorium, renters evicted from their homes would, at minimum,

12   increase their mobility to find a new home to rent, thus increasing their in-person contacts with

13   those outside their household" and would "likely move in" to "crowded shared living

14   environments[.]"); *accord AALAC*, 2021 WL 3745777, at *6 ("The City fairly ties the

15   moratorium to its stated goal of preventing displacement from homes, which the City reasonably

16   explains can exacerbate the public health-related problems stemming from the COVID-19

17   pandemic.").  The State has provided statistic modelling estimating that mass evictions would

18   result in Washington State sustaining up to 59,008 more eviction-attributable COVID-19 cases,

19   up to 5,623 more hospitalizations, and up to 621 more deaths.  *See* Dkt. 108-1, at 64.  While this

20   conclusion may be implausibly precise, it is nevertheless reasonable to conclude that a

21   significant increase in hospitalizations and deaths would likely occur if tenants had been evicted

22   from their homes during a massive pandemic such as the one we are still confronting.

23

24

1          Moreover, in support of their summary judgment motion, the State has come forward

2     with evidence that the State considered but declined to incorporate a hardship requirement:

3              In many cases, tenants in genuine economic distress due to the pandemic are unable
                  to provide adequate proof of their distress.    Many tenants have informal
4              employment or non-traditional sources of income.    For these tenants, proving
                  distress is not as simple as submitting a copy of a termination letter from an
5              employer.    And even if a tenant did not lose their job, they could be facing
                  pandemic-related economic distress anyway, such as the burden of caring for
6              family members who lost their jobs or are unable to provide for themselves.  Not
                  all tenants in need of protection are able to submit a declaration of hardship, much
7              less provide proof of their circumstances.  In light of that, we considered it best to
                  not put the burden of proof on tenants, but to impose a simple moratorium on
8              evictions with certain exceptions. . . .
                  We also considered that housing court is often crowded, and it would be
9              difficult for tenants facing eviction to defend themselves without endangering their
                  health.  If the eviction moratorium were to expire, be lifted, or otherwise end, mass
10             unlawful detainer filings would flood the state courts, which are experiencing
                  record backlogs of stayed civil, criminal, juvenile, child welfare, and other
11             proceedings. . . .

12    Dkt. 105, at 9–10.

13         In response, plaintiffs argue that the State is "quite capable of parsing messy facts" and

14    adjusting evidentiary requirements for a hardship exception.  Dkt. 111, at 24.  This is not

15    responsive to the State's secondary rationale that forcing tenants to defend themselves in eviction

16    court would likely endanger their health and the overall goal of avoiding housing instability

17    regardless of the availability of alternative housing.  Moreover, it is not the function of the Court

18    to invalidate government action because it was not, in the Court's view, a perfect match to the

19    Government's objective.  The Court is only charged with determining if the state's action was

20    "adequately tailored" to meet the emergency, as required by *Allied Structural Steel.*  It is not

21    required, as essentially argued by plaintiffs, to determine the "least restrictive means" of

22    achieving that goal.  *See* Dkt. 111, at 24 ("If other less severe methods of achieving the

23    Defendants' interests exist, then the eviction bans are not adequately 'tailored to the emergency. .

24

. .'"); *accord Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 386 n.10 (D. Mass. 2020) ("In any event, the court must determine whether there was a rational basis for the Moratorium when it was enacted, not whether it was necessary because there was no less burdensome way to address the impact of evictions during the pandemic.").

Plaintiffs also assert that the State's restriction on treating unpaid rent as an immediately enforceable debt lacks a connection to preventing disease transmission and homelessness.  Dkt. 93, at 22.  But plaintiffs do not show any reason to depart from the Court's previous finding that—

> this provision was added specifically based on input from property owners and in order to strike a balance between alleviating stress on tenants and providing an avenue for lessors to be made whole. . . .  The State's balance of the interests of tenants and lessors by requiring rejection of a reasonable repayment plan before treating unpaid rent as collectible is an appropriate and reasonable measure, particularly where it is tied directly to nonpayment that is caused by the COVID-19 outbreak.

Dkt. 63, at 21–22 (internal quotation marks and citation omitted); *compare Blaisdell*, 290 U.S. at 446 ("It does not matter that there are, or may be, individual cases of another aspect.  The Legislature was entitled to deal with the general or typical situation.  The relief afforded by the statute has regard to the interest of mortgagees as well as to the interest of mortgagors.  The legislation seeks to prevent the impending ruin of both by a considerate measure of relief.").

Plaintiffs further argue that a number of more moderate means could have accomplished the same ends.  *See* Dkt. 93, at 23–24.  They propose managing or capping eviction filings, providing compensation to landlords, commandeering housing, and providing hygiene kits to homeless persons.  Most of these proposals are, again, nonresponsive to alleviating disease transmission caused by housing displacement and avoiding tenants having to go to court.  Moreover, the State has come forward with evidence that although it considered other

1    alternatives, "[a] mere cap on evictions would be too difficult to implement across the state and

2    through various institutions, and it would not be effective in halting a rise in evictions." Dkt.

3    105, at 8. And the State points out that it has, essentially, managed evictions by allowing only

4    certain evictions—that is, those for sale or occupancy of the property by the landlord or where

5    tenants pose a risk to others.

6         As for the proposal to compensate landlords instead of restricting evictions, the State has

7    also come forward with evidence that although funding has, in fact, been made available, "those

8    funds have been inadequate to avert the wave of evictions that would result in the absence of the

9    moratorium." Dkt. 105, at 6–7. The State provides evidence of Eviction Rental Assistance

10   Program funding (over $100 million distributed by the State to local organizations), Emergency

11   Solutions Grants (about $120 million spent in the State in 2020), local tax revenues for certain

12   cities, and over $400 million for Washington State renters in 2021 under the American Rescue

13   Plan. Dkt. 105, at 7. But, according to the State, all this covered "only a fraction of the

14   anticipated need for rental assistance, which is in the billions of dollars." Dkt. 105, at 7. The

15   State also points out that it has continued to appropriate and propose funds for rental assistance

16   programs, including working with the State legislature to transition from eviction restrictions to

17   rental assistance and other tenancy supports. Dkt. 105, at 7.

18        As the Ninth Circuit also discussed in *AALAC*, these efforts support the constitutionality

19   of the eviction restriction by showing that the State has used the restrictions coupled with other

20   measures as part of a broad remedial framework:

21        Further weakening [the plaintiff's] challenge is the fact that the eviction
          moratorium is but one aspect of a broader remedial framework applicable to
22        landlords during the pandemic. In response to [the plaintiff's] concerns, [the City]
          fairly argue[s] that the City's creation of an Emergency Rental Assistance Program
23        supports the eviction moratorium's reasonableness. . . .

                    . . . .
24

1          . . . Although the interaction between these various programs is a matter of
some complexity, the availability of such relief, while not dispositive, remains
2    relevant in assessing the overall reasonableness of the City's actions.  *See Energy
Reserves*, 459 U.S. at 418[.]  That other government programs provide some relief
3    to landlords thus further undermines [plaintiff's] Contracts Clause challenge.

4    *AALAC*, 2021 WL 3745777, at *8.

5          Plaintiffs assert that purposes such as avoiding disease transmission lack legitimacy

6    where circumstances have improved over the last six months, since the Order denying the motion

7    for preliminary injunction.  *See* Dkt. 111, at 21–22.  But, as discussed in the background section

8    of this Report and Recommendation, the picture is not as rosy as plaintiffs paint it.  A State

9    epidemiologist opines that "while mitigation efforts in Washington State helped reduce the

10   spread of COVID-19 in mid-March through April 2021, cases have started to rebound" and that

11   continued mitigation efforts (including the eviction restrictions) have been crucial to avoiding

12   overwhelming hospitals and attempting to control the public health emergency.  *See* Dkt. 107, at

13   18; *see also* Dkt. 107, at 23–24.  Plaintiffs fail to provide evidence to contradict the State's

14   evidence that restrictions remained necessary throughout the relevant time period to control the

15   spread of COVID-19, instead simply citing reduced cases and increased vaccination results in

16   May 2021.  *See* Dkt. 111, at 22; *but see* Dkt. 109-1, at 131 (State's materials stating that as of

17   May 2021, herd immunity was unlikely until at least 70% of the population was fully

18   vaccinated).

19         For all these reasons, the Court finds that plaintiffs have failed to raise a genuine issue of

20   material fact that the state law was not drawn in an appropriate and reasonable way to advance a

21   significant and legitimate public purpose.  The State's moratorium passes muster under the

22   Contracts Clause.

23              **B.  City Restrictions**

24

Plaintiffs also assert that the City's restrictions violate the Contracts Clause. *See* Dkt. 93, at 22. They challenge the Mayor's eviction moratorium, currently set to expire September 30, 2021. *See* Dkt. 124, at 6. Although it appears that the City moratorium will not be renewed ("the Emergency Moratorium on Residential Evictions will sunset and Ordinance 126075, which provides a defense against evictions due to hardship from COVID-19 for six months, goes into effect" (Dkt. 124, at 6)), the Court observes that plaintiffs also seek nominal damages related to their claim against the City. *See* Dkt. 80, at 18.

Similar to the State moratorium, the City moratorium forbids eviction unless the tenant poses a risk to others—although the City moratorium does not include an exception for occupancy or sale of the property by the landlord. *See* Dkt. 17-7, at 4. For the same reasons that the Court finds that the State moratorium does not violate the Contracts Clause, the Court finds that the City moratorium is constitutional. *See supra*, Discussion part III(A).

Separately, plaintiffs challenge the City's six-month defense against eviction, which will go into effect September 30, 2021. Dkt. 124, at 6. Essentially, this defense applies to evictions within six months of the end of the City eviction moratorium and where the eviction is for unpaid rent during the period including that covered by the City's eviction moratorium or for a habitual failure to pay rent "resulting in four or more pay-or-vacate notices in a 12-month period." Dkt. 17-11, at 20. A tenant may invoke the defense only by self-certifying financial hardship preventing payment of rent. Dkt. 17-11, at 20.

Plaintiffs argue that this defense "unnecessarily extends six months beyond the termination of the Mayor's emergency order" so that by the time the defense is in effect, "the City's interest in taking such measures will have come to an end." Dkt. 93, at 22. But plaintiffs previously raised this argument in their preliminary injunction motion, and the Court found that

1    the City had supported this six-month extension by explaining that "economic impacts from the

2    COVID-19 emergency are likely to last much longer than the civil emergency itself[.]"  Dkt. 63,

3    at 21 (internal citation and quotation marks omitted).

4          So too, on summary judgment:  defendants have come forward with evidence that the

5    pandemic has exacerbated Washington's pre-existing rental issues and that—despite over a year

6    of relief efforts—loss of income, inability to pay rent, and risk of eviction continue to plague

7    tenants—as the City predicted when it enacted these measures.  Even before the pandemic, there

8    was a "significant lack of affordable housing across the state" (Dkt. 105, at 2) and "46% of

9    Washington households were rent burdened (contributing more than 30% of [their] income to

10   rent) with about half of those households contributing more than 50% of their income to rent."

11   Dkt. 100-5, at 3.  In April 2020, as the pandemic took hold, Washington State unemployment

12   reached its highest rate in decades.  *See* Dkt. 25-1, at 4.

13         A year later, Washington monthly unemployment claims continued to outpace those from

14   the prior year (Dkt. 105, at 3; Dkt. 109-1) and nearly 11% of Washington households were

15   behind on rent (Dkt. 100-6, at 2, 4).   Surveys indicated that job loss and hours reductions had

16   declined some since the beginning of the pandemic, yet renter financial distress remained high.

17   Dkt. 115-1, at 24; *see also* Dkt. 106-1, at 96 (Washington legislative findings that the COVID-19

18   pandemic had caused a "economic downturn throughout Washington state" that

19   disproportionately affected low and moderate-income workers).  According to one source, as of

20   March 2021, the country is facing a "rental crisis, with over 8 million rental households behind

21   on their rent."  Dkt. 115-3, at 4; *see also* Dkt. 106, at 5 ("over 300,000 renters need or will need

22   assistance by May 2021").  The King County unemployment rate in March 2021 was 5.4%—

23   well above the 3.0% rate two years prior—the average rent debt per household was $4,903, and

24

1    nearly 45,000 households were behind on rent.  Dkt. 100-7, at 2–3; Dkt. 100-11, at 2.  The CDC

2    has stated that when eviction moratoria lift and based on March 2021 reports of tenants behind

3    on rent, there will be a "wave of evictions" on a scale "unprecedented in modern times."  Dkt.

4    100-2, at 7.  The City has also provided evidence that an eviction crisis would result in

5    homelessness and an increased risk of disease transmission.  *See* Dkt. 25-4, at 6 (finding that

6    most evicted persons in Seattle became homeless, many moved in with family or friends, and

7    only 12.5% found another apartment or home to move into); Dkt. 25-5, at 2, 4 (CDC findings

8    that homelessness increases the likelihood of COVID-19 transmission and severity of disease

9    and that eviction moratoria assist in reducing the community spread of COVID-19).

10           Underpinning the City's defense is the rationale that the "economic impacts from the

11   COVID-19 emergency are likely to last much longer than the civil emergency itself" (Dkt. 17-

12   11, at 3)—a rationale borne out by the undisputed evidence cited above.  *But see* Dkt. 93, at 22

13   (plaintiffs' brief, claiming that there is no need to extend the eviction ban because "the City's

14   interest in taking such measures will have come to an end").  Allowing defaulted tenants

15   additional time to repay amounts due is adequately tailored to the City's goal of preventing

16   evictions and homelessness, as well as corresponding potential to cause a spike in the COVID-19

17   pandemic.  And for similar reasons as discussed above in the context of the eviction moratoria,

18   this defense does not violate the Contracts Clause, either.

19           Plaintiffs take issue with the self-certification of hardship, which they state is "left

20   undefined in the ordinance, making it difficult for landlords to challenge a tenant's certification."

21   Dkt. 93, at 22.[11]  This argument appears to be entirely speculative, as no landlord complains in a

22

23           [11] The Supreme Court recently temporarily enjoined a New York law pertaining to
     evictions during COVID-19.  *Chrysafis v. Marks*, No. 21A8, 2021 WL 3560766, at *1 (U.S.

24   Aug. 12, 2021).  "If a tenant self-certifies financial hardship" due to COVID-19, the law

1 | declaration that it has been unable to challenge or realistically suspect it will not be able to

2 | challenge whether a tenant is truly in financial hardship.  In any event, "difficulty" challenging a

3 | hardship certification does not transform the six-month defense into a violation of the Contracts

4 | Clause.

5 |        Similarly, plaintiffs' challenge to the City's repayment plan requirement also fails.  The

6 | City allows tenants to elect to pay eligible, overdue rent installments over a period of three to six

7 | months, with failure of the landlord to accept such payment being a defense to eviction.  Dkt. 17-

8 | 12, at 8–9.  Landlords also cannot collect late fees or interest on unpaid rent accrued during or

9 | six months after the civil emergency.  Dkt. 17-12, at 8.

10 |        Again, and as the Court has also previously found, it is eminently reasonable for the City

11 | to attempt to strike a balance between the landlords' entitlement to unpaid rent and the likelihood

12 | of a wave of evictions and homelessness by providing for delayed repayment of unpaid rent

13 | under a mandated schedule.  This provision does not violate the Contracts Clause, either.

14 | Indeed, contrary to plaintiffs' claims that the City's restrictions collectively "creat[e] an

15 | incentive for renters not to pay and take advantage of the mandated repayment plan" (Dkt. 93, at

16 | 20), the City is attempting to facilitate the repayment of delinquent rent by encouraging renters to

17 | repay under a mandatory repayment plan.

18 |        In sum, plaintiffs fail to come forward with evidence from which a factfinder could find

19 | in their favor on the Contracts Clause claims or to show that they are entitled to judgment as a

20 |

21 | "generally precludes a landlord from contesting that certification and denies the landlord a hearing." *Id.*  The Supreme Court concluded that "[t]his scheme violates the Court's

22 | longstanding teaching that ordinarily, 'no man can be a judge in his own case' consistent with the Due Process Clause." *Id.* (internal citation omitted).  Here, no due process claim is before

23 | the Court.  And, in any event, there is no evidence that the ordinance implementing the six month defense prevents a landlord from contesting or having a hearing regarding hardship rather than

24 | simply leaving the definition and method of establishing of hardship open.

1  matter of law.  Defendants are entitled to summary judgment dismissal of the Contracts Clause

2  claims, and the Court turns to the Takings Clause arguments.

3      **V.  Takings Clause**

4          The Fifth Amendment's Takings Clause prohibits the government from taking private

5  property unless it is for a "public use" and "just compensation" is paid to the owner.  U.S. Const.

6  amend. V.  A "physical taking," occurs when the government "authorizes a physical occupation

7  of property."  *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992).  Plaintiffs argue that the

8  eviction restrictions constitute a physical taking "by compelling landlords to house tenants who

9  no longer satisfy lease terms, including tenants whose leases have already expired."  Dkt. 93, at

10  26.

11          As the Court previously concluded, generally, injunctive relief is barred for Takings

12  Clause claims.  *See* Dkt. 63, at 23–25.  However, because plaintiffs also bring claims for

13  declaratory relief and nominal damages, the Court now addresses the merits of the Takings

14  Clause arguments.

15          "The government effects a physical taking only where it *requires* the landowner to

16  submit to the physical occupation of his land."  *Yee*, 503 U.S. at 527; *see also FCC v. Fla. Power

17  Corp.*, 480 U.S. 245, 252 (1987) ("This element of required acquiescence is at the heart of the

18  concept of occupation.").  *Yee* supplies the rule that is dispositive of the physical taking

19  arguments in this matter.

20          *Yee* holds that a government can restrict the circumstances in which a tenant may be

21  evicted without committing a physical taking.  In *Yee*, mobile home park owners challenged a

22  combination of municipal ordinance and state statute that effectively limited the bases upon

23  which the owners could evict their tenants.  *See* 503 U.S. at 524–25.  The owners argued that this

24

1   amounted to a physical taking because the right to occupancy of their land had been restricted.

2   But, the Supreme Court disagreed:

3       [The park owners] voluntarily rented their land to mobile homeowners. . . .  Put
        bluntly, no government has required any physical invasion of petitioners' property.
4       [The] tenants were invited by [the owners], not forced upon them by the
        government. . . .
5       . . .

6           On their face, the state and local laws at issue here merely regulate [the
        owners'] *use* of their land by regulating the relationship between landlord and
7       tenant.  This Court has consistently affirmed that States have broad power to
        regulate housing conditions in general and the landlord-tenant relationship in
        particular without paying compensation for all economic injuries that such
8       regulation entails.

9   *Id.* at 528–29 (internal citations and quotation marks omitted).

10       Here, too, the government has not required a physical invasion of plaintiffs' property.

11   Instead, plaintiffs have voluntarily rented their land to residential tenants and temporarily lost the

12   ability to evict tenants in certain situations during the COVID-19 crisis and for six months after

13   September 30, 2021.  Contrary to plaintiffs' arguments, none of the restrictions are permanent.

14   Plaintiffs retained the ability to sue their tenants for unpaid rent due to COVID-19 under the

15   State moratorium, except where the resident had not been offered or was complying with a

16   repayment plan.  *See* Dkt. 106-1, at 47.  The City allows tenants to take advantage of a

17   repayment plan, but neither the City nor the State has forgiven or cancelled unpaid rent.

18       Notably, other District Courts faced with similar challenges have reached the same

19   conclusion—finding that various eviction restrictions related to the COVID-19 pandemic did not

20   violate the Takings Clause.  *See Heights Apartments, LLC v. Walz*, 510 F. Supp. 3d 789, 812 (D.

21   Minn. 2020); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020); *Auracle Homes,*

22   *LLC v. Lamont*, 478 F. Supp. 3d 199, 220–21 (D. Conn. 2020); *Elmsford Apartment Assocs.,*

23   *LLC v. Cuomo*, 469 F. Supp. 3d 148, 162–64 (S.D.N.Y. 2020).

24

1        Plaintiffs argue that *Yee* is distinguishable because here, they must allow tenants who

2   would otherwise be evicted to remain.  *See* Dkt. 111, at 32.  This is not a persuasive reason to

3   depart from *Yee*:  the state law at issue in *Yee* also only permitted eviction in a narrow

4   circumstance—where the park owner wanted to change the use of the land—and required that

5   the owner give six to twelve months' notice.  *Yee*, 503 U.S. at 528.  Under the relevant eviction

6   restrictions here, landlords could still evict tenants for creating risks to others or their property or

7   for personal occupation or sale of the property (State moratorium); for tenants' actions

8   threatening others' or their own health or safety (City moratorium) or where the eviction was for

9   something other than financial hardship caused by COVID-19 (six month defense).

10        In supplemental briefing before this Court, plaintiffs argue that a recently decided

11   Takings Clause case,  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), supports their

12   physical takings claim.  *See* Dkt. 130, at 9.  However, this case involves materially different

13   circumstances:  the landowners in *Cedar Point Nursery* were forced to allow unionizing activity

14   by third persons for a specified amount of time (141 S. Ct. at 2069), whereas here, the landlords

15   invited the renters to their units when they formed rental agreements and remain free to evict

16   tenants under the circumstances enumerated above.

17        Plaintiffs do not bring an alternative claim for a regulatory taking, so that based on the

18   analysis above, their Takings Clause claims should be dismissed with prejudice.

19                                                        **CONCLUSION**

20        The undersigned recommends that defendants' motions for summary judgment (Dkts.

21   103, 104, 110) be granted, that plaintiffs' motion for summary judgment (Dkt. 93) be denied, that

22   all claims be dismissed with prejudice, and that the case be closed.

23

24

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **October 1, 2021,** as noted in the caption.

Dated this 15th day of September, 2021.

J. Richard Creatura
Chief United States Magistrate Judge