# Exhibit 1

2022 WL 289180
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

Lyndsey BALLINGER; Sharon
Ballinger, Plaintiffs-Appellants,

v.

CITY OF OAKLAND, Defendant-Appellee.

No. 19-16550
|
Argued and Submitted October 22, 2020
|
Submission Withdrawn July 16, 2021
|
Resubmitted January 25,
2022 San Francisco, California
|
Filed February 1, 2022

**Synopsis**
**Background:** Landlords filed § 1983 action alleging that
city's requirement that they pay relocation fee to their tenant
before they could move back into their own home upon
expiration of lease constituted unlawful physical taking. The
United States District Court for the Northern District of
California, Haywood S. Gilliam, Jr., J., 398 F.Supp.3d 560,
dismissed complaint, and landlords appealed.

**Holdings:** The Court of Appeals, R. Nelson, Circuit Judge,
held that:

[1] relocation fee was not unconstitutional physical taking;

[2] ordinance did not effect "physical taking" under Takings
Clause;

[3] ordinance did not place unconstitutional exaction on
landlords' preferred use of their home; and

[4] landlords' payment of relocation fees did not constitute
"seizure" for Fourth Amendment purposes.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Failure to State a Claim.

West Headnotes (27)

**[1]** **Federal Courts** 🔑

Court of Appeals reviews dismissal for failure
to state claim de novo, accepting as true all
allegations of material facts. Fed. R. Civ. P. 12(b)
(6).

**[2]** **Eminent Domain** 🔑

Whenever regulation results in physical
appropriation of property, per se "taking" has
occurred. U.S. Const. Amend. 5.

**[3]** **Eminent Domain** 🔑

Government action that physically appropriates
property is no less physical taking because it
arises from regulation or statute, or ordinance,
or miscellaneous decree; essential question
is whether government has physically taken
property for itself or someone else, by whatever
means, or has instead restricted property owner's
ability to use his own property. U.S. Const.
Amend. 5.

**[4]** **Landlord and Tenant** 🔑

States have broad power to regulate housing
conditions in general and landlord-tenant
relationship in particular without paying
compensation for all economic injuries that such
regulation entails.

**[5]** **Landlord and Tenant** 🔑

Government may place ceilings on rents
landowner can charge, or require landowner
to accept tenants he does not like, without
automatically having to pay compensation.

**[6]** **Eminent Domain** 🔑

Legislative enactments regulating economic relations of landlord and tenants are not per se takings. U.S. Const. Amend. 5.

**[7]** **Eminent Domain** 🔑

Relocation fee that city ordinance required landlords to pay their tenant after terminating lease for cause was not unconstitutional physical taking; ordinance merely regulated landlords' use of their land by regulating relationship between landlord and tenant. U.S. Const. Amend. 5.

**[8]** **Eminent Domain** 🔑

Government effects physical taking only where it requires landowner to submit to physical occupation of his property. U.S. Const. Amend. 5.

**[9]** **Eminent Domain** 🔑

When person voluntarily surrenders liberty or property, state has not deprived person of interest protected by Takings Clause. U.S. Const. Amend. 5.

**[10]** **Eminent Domain** 🔑

Even though money is generally considered fungible, money may still be subject to per se taking if it is specific, identifiable pool of money. U.S. Const. Amend. 5.

**[11]** **Eminent Domain** 🔑

City ordinance requiring landlords to pay tenant relocation fee upon termination of lease for cause merely imposed obligation to pay money on happening of contingency, which happened to be related to real property interest, but did not seize sum of money from specific fund, and thus did not effect "physical taking" under Takings Clause; relocation fee was monetary obligation triggered by landlords' actions with respect to use of their property, not burden on their interest in property. U.S. Const. Amend. 5.

**[12]** **Courts** 🔑

Dissenting opinions cannot be considered when determining holding of fractured Supreme Court decision—only opinions of those who concurred in judgments can be considered.

**[13]** **Courts** 🔑

When neither plurality opinion of United States Supreme Court nor concurrence is logical subset of the other, only specific result is binding on lower courts.

**[14]** **Eminent Domain** 🔑

Money can be subject to taking when government procures interest earned on lawyers' trust accounts, procures interest accrued in interpleader funds, seizes ownership of liens, demands that one pay debt owed to third party to state itself, or enter cash order without court order. U.S. Const. Amend. 5.

**[15]** **Eminent Domain** 🔑

Obligation to pay money in tax and government services user fee context is not generally compensable under Takings Clause because taxes and user fees are collected in exchange for government benefits to payor. U.S. Const. Amend. 5.

**[16]** **Eminent Domain** 🔑

When it comes to takings, Constitution is concerned with means as well as ends. U.S. Const. Amend. 5.

**[17]** **Eminent Domain** 🔑

Though Takings Clause prohibits government from denying benefit to person because he exercises constitutional right or coercing people into giving those rights up by imposing unconstitutional conditions on use of

private land, predicate for any unconstitutional conditions claim is that government could not have constitutionally ordered person asserting claim to do what it attempted to pressure that person into doing. U.S. Const. Amend. 5.

**[18]  Eminent Domain**

Takings Clause's "unconstitutional conditions doctrine" allows government to condition use of one's property on agreeing to exaction, or dedication of one's other property to public use, so long as there is nexus and rough proportionality between property that government demands and social costs of applicant's proposal. U.S. Const. Amend. 5.

**[19]  Eminent Domain**

In evaluating exaction's constitutionality under Takings Clause, court must balance (1) vulnerability of land-use permit applicants who can be strong-armed by government entities with broad discretion, with (2) legitimate government interests in landowners internalizing negative externalities of their conduct. U.S. Const. Amend. 5.

**[20]  Eminent Domain**

City ordinance requiring landlords to pay tenant relocation fee before they could move back into their own home upon expiration of lease did not conditionally grant or regulate grant of government benefit, such as permit, and thus did not place unconstitutional exaction on their preferred use of their home, in violation of Takings Clause. U.S. Const. Amend. 5.

**[21]  Searches and Seizures**

Fourth Amendment applies to searches and seizures in civil context. U.S. Const. Amend. 4.

**[22]  Searches and Seizures**

To establish deprivation of Fourth Amendment rights, plaintiff must allege that seizure was caused by state action. U.S. Const. Amend. 4.

**[23]  Civil Rights**

Private individual's actions can only be considered state action for purposes of § 1983 if sufficiently close nexus makes private action treated as that of government entity itself. 42 U.S.C.A. § 1983.

**[24]  Civil Rights**

Merely authorizing, approving, or acquiescence to private action, such as creation or modification of any legal remedy, is not enough to show state action for purposes of § 1983. 42 U.S.C.A. § 1983.

**[25]  Civil Rights**

Action by private party pursuant to statute, without something more, is not sufficient to justify characterization of that party as state actor for purposes of § 1983. 42 U.S.C.A. § 1983.

**[26]  Searches and Seizures**

Landlords' payment of relocation fees to tenants pursuant to city ordinance did not constitute state action, and thus did not constitute "seizure" for Fourth Amendment purposes; city did not participate in monetary exchange, exercise coercive power over tenants, or actively encourage, endorse, or participate in any wrongful interference by tenants with landlords' money. U.S. Const. Amend. 4.

**[27]  Constitutional Law**

Outside First Amendment context, facial challenge must prove that law is unconstitutional in all of its applications, considering only those applications in which law actually authorizes or prohibits conduct. U.S. Const. Amend. 1.

Appeal from the United States District Court for the Northern District of California, Haywood S. Gilliam, Jr., District Judge, Presiding, D.C. o. :18-cv-07186-HSG

**Attorneys and Law Firms**

J. David Breemer (argued), Meriem Lee Hubbard, and Daniel M. Ortner, Pacific Legal Foundation, Sacramento, California, for Plaintiffs-Appellants.

Kevin P. McLaughlin (argued), Deputy City Attorney; David A. Pereda, Special Counsel; Maria Bee, Chief Assistant City Attorney; Barbara J. Parker, City Attorney; Office of the City Attorney, Oakland, California; for Defendant-Appellee.

Brendan Darrow and Matthew Siegel, Berkeley, California, for Amici Curiae League of California Cities and California State Association of Counties.

Nathaniel P. Bualat, Pilar Stillwater, and Rebecca Suarez, Crowell & Moring LLP, San Francisco, California, for Amicus Curiae Western Center on Law and Poverty.

Before: Richard R. Clifton, N. Randy Smith, and Ryan D. Nelson, Circuit Judges.

## OPINION

R. NELSON, Circuit Judge:

The City of Oakland required the Ballingers to pay their tenants over $6,000 before the Ballingers could move back into their own home upon the expiration of the lease. The Ballingers challenge the payment as an unconstitutional physical taking under the Takings Clause. Instead, the requirement to pay tenants a relocation fee before an owner may move back into their home is more properly classified as a wealth-transfer provision but not an unconstitutional taking. We therefore affirm the dismissal of the Ballingers' physical takings, exaction, and seizure claims.

I

In September 2016, Lyndsey and Sharon Ballinger leased their Oakland home for one year while fulfilling military

assignments on the east coast. After one year, the lease converted to a month-to-month tenancy.

Under the City of Oakland ("the City") Municipal Code, even after a lease has ended and converted to a month-to-month tenancy, the tenancy may only end if the landlord has good cause. Oakland, Cal. Mun. Code § 8.22.360(A). Ending the tenancy, or "evicting," for good cause, includes when a landlord chooses to move back into her home at the end of the month. *Id.* § 8.22.360(A)(8)–(9). In January 2018, the City adopted the Uniform Residential Tenant Relocation Ordinance ("the Ordinance"), which requires landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment based on rental size, average moving costs, the duration of the tenants' occupancy, and whether the tenants earn a low income, are elderly or disabled, or have minor children. *See id.* § 8.22.820. Half the payment is due upon the tenant's receipt of the notice to vacate and the other half upon actual vacation. *Id.* § 8.22.850(D)(1). And the payment need not be spent on relocation costs. Failing in bad faith to make the payments allows a tenant to bring an action against the landlord for injunctive relief, the relocation payment, attorneys' fees, and treble damages. *Id.* § 8.22.870(A).

**\*2** When the Ballingers were reassigned to the Bay area, they decided to move back into their Oakland home. The Ballingers gave their tenants sixty days' notice to vacate the property, paying half the relocation payment up front and the remainder after the tenants vacated. In total, the Ballingers paid their tenants $6,582.40 in relocation fees.

The Ballingers sued the City, bringing facial and as-applied constitutional challenges under the Declaratory Judgment Act and 📖 42 U.S.C. § 1983. Characterizing the relocation payment as a "ransom" of their home, they claimed that the relocation fee is an unconstitutional physical taking of their money for a private purpose and without just compensation. Alternatively, they claimed that the fee constitutes an unconstitutional exaction of their Oakland home, and an unconstitutional seizure of their money under the Fourth and Fourteenth Amendments.

The district court dismissed each claim under Federal Rule of Civil Procedure 12(b)(6). It held that "no precedent supports the Ballingers' argument that legislation requiring the payment of money constitutes a physical taking." Because "[t]he Ordinance ... was generally applicable legislation," the district court concluded that it did not give rise to

an actionable exaction claim, and the Ballingers had not shown the requisite state action for their seizure claim. The Ballingers appealed. [1]

## II

**[1]** We review a dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo, accepting as true all allegations of material facts. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1100 n.1, 1102 (9th Cir. 2008). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Id.* at 1104.

## III

We affirm the district court's dismissal of the Ballingers' taking claim. The Ballingers assert that the Ordinance effected an unconstitutional physical taking of their money for a private rather than public purpose and without just compensation. But we disagree—even though money can be the subject of a physical, also called a per se, taking, the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest. Because there was no taking, we need not address whether the relocation fee is required for a public purpose or what just compensation would be. *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1093 (9th Cir. 2015) (private takings claim is not an independent cognizable claim).

### A

**[2]** **[3]** The Takings Clause of the Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const., amend. V; *see also Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226, 238–39, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (incorporating the Takings Clause through the Fourteenth Amendment). "Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred." *Cedar Point Nursery v. Hassid*, —— U.S. ——, 141 S. Ct. 2063, 2072, 210 L.Ed.2d 369 (2021).

"[A]ppropriation means *taking* as one's own." *Id.* at 2077 (citation and quotation marks omitted). "Government action that physically appropriates property is no less a physical taking because it arises from ... a regulation (or statute, or ordinance, or miscellaneous decree)." *Id.* at 2072. The "essential question ... is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Id.* We assess physical appropriations "using a simple, *per se* rule: The government must pay for what it takes." *Id.* at 2071.

**\*3** **[4]** **[5]** **[6]** The Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). [2] For example, "the government may place ceilings on the rents the landowner can charge, or require the landowner to accept tenants he does not like, without automatically having to pay compensation." *Yee v. City of Escondido*, 503 U.S. 519, 529, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (citations omitted). "Ordinary rent control often transfers wealth from landlords to tenants by reducing the landlords' income and the tenants' monthly payments," and "[t]raditional zoning regulations can transfer wealth from those whose activities are prohibited to their neighbors." *Id.* The "transfer [of wealth] in itself does not convert regulation into physical invasion." *Id.* at 530, 112 S.Ct. 1522 (challenge to mobile home rent control should be analyzed as regulatory taking); *see also Com. Builders of N. Cal. v. City of Sacramento*, 941 F.2d 872, 875 (9th Cir. 1991) (every fee provision cannot be a compensable taking). So legislative enactments "regulating the economic relations of landlords and tenants are not *per se* takings." *FCC v. Fla. Power Corp.*, 480 U.S. 245, 252, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987).

**[7]** **[8]** Here, the Ordinance imposes a transaction cost to terminate a lease agreement. We see little difference between lawful regulations, like rent control, and the Ordinance's regulation of the landlord-tenant relationship here. Thus, the relocation fee is not an unconstitutional physical taking—it "merely regulate[s] [the Ballingers'] *use* of their land by

regulating the relationship between landlord and tenant."
*Yee, 503 U.S. at 528, 112 S.Ct. 1522.* [3]

**[9]** The Ballingers argue that a taking "does not become a
lesser intrusion simply because it is related to a commercial
transaction" and the "decision to leave the rental market." *See
Horne v. Dep't of Agric., 576 U.S. 350, 365, 135 S.Ct.
2419, 192 L.Ed.2d 388 (2015)* (raisin growers' decision to
be raisin farmers made federal government's confiscation of
raisins no less a taking); *Loretto, 458 U.S. at 439 n.17, 102
S.Ct. 3164* ("[A] landlord's ability to rent his property may
not be conditioned on his forfeiting the right to compensation
for a physical occupation."). But "[w]hen a person voluntarily
surrenders liberty or property," like when the Ballingers chose
to rent their property causing them to pay the relocation fee
when they caused the tenants to relocate, "the State has not
*deprived* the person of a constitutionally protected interest."
*L.L. Nelson Enters., Inc. v. County of St. Louis, 673 F.3d
799, 806 (8th Cir. 2012)* (citing *Zinermon v. Burch, 494
U.S. 113, 117 n.3, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)*);
*see Yee, 503 U.S. at 527, 112 S.Ct. 1522; Fla. Power,
480 U.S. at 252, 107 S.Ct. 1107.*

**\*4** Here, the Ballingers voluntarily chose to lease their
property and to "evict" under the Ordinance—conduct that
required them to pay the relocation fee, which they would not
be compelled to pay if they continued to rent their property.
*See Yee, 503 U.S. at 527, 112 S.Ct. 1522.* "A different case
would be presented were the statute, on its face or as applied,
to compel a landowner over objection to rent his property or
to refrain in perpetuity from terminating a tenancy." *Id.
at 528, 112 S.Ct. 1522.* Here, the Ordinance "is a regulation
of [the Ballingers'] *use* of their property, and thus does not
amount to a *per se* taking." *Id. at 532, 112 S.Ct. 1522.*

### B

**[10]** **[11]** Based on the U.S. Supreme Court's "long-settled
view that property the government could constitutionally
demand through its taxing power can also be taken by eminent
domain," *Koontz v. St. Johns River Water Mgmt. Dist.,
570 U.S. 595, 616, 133 S.Ct. 2586, 186 L.Ed.2d 697 (2013)*,
the relocation fee's obligation to pay money rather than
real or personal property does not mean that it cannot be

an unconstitutional taking. Even though money is generally
considered fungible, *see United States v. Sperry Corp.,
493 U.S. 52, 62 n.9, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989)*,
money may still be subject to a per se taking if it is a specific,
identifiable pool of money, *see Phillips v. Wash. Legal
Found., 524 U.S. 156, 169–70, 118 S.Ct. 1925, 141 L.Ed.2d
174 (1998)*. Indeed, the Supreme Court has held multiple
times that money can be subject to a taking, and these cases
show why the relocation fee here is not one: The Ordinance
"merely impose[s] an obligation on a party to pay money on
the happening of a contingency," which happens to be related
to a real property interest, but does not "seize a sum of money
from a specific fund." *McCarthy v. City of Cleveland,
626 F.3d 280, 284 (6th Cir. 2010)* (citing *Brown v. Legal
Found. of Wash., 538 U.S. 216, 223–24, 123 S.Ct. 1406, 155
L.Ed.2d 376 (2003)*).

### 1

To begin with, the district court concluded that *Eastern
Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141
L.Ed.2d 451 (1998)* "is the law," so "the obligation to pay
money is not a taking." Because a majority of justices in
*Eastern Enterprises* failed to agree to the same rationale,
we reject that anything more than the *Eastern Enterprises*
holding is binding in this court.

In *Eastern Enterprises*, the plaintiff challenged a statute
that retroactively imposed obligations to pay for retired
miners' medical expenses, claiming that this payment
obligation was an unconstitutional taking of its money and
a violation of substantive due process. *524 U.S. at 514–
15, 517, 118 S.Ct. 2131.* In sum, a four-Justice plurality held
that the payment obligation was a regulatory taking. *Id.
at 529, 118 S.Ct. 2131* (O'Connor, J., joined by Rehnquist,
C.J., Scalia, and Thomas, JJ.). But five Justices, split between
Justice Kennedy's concurrence and a four-Justice dissent,
conveyed that the Takings Clause is implicated only by laws
that appropriate specified and identified property interests.
*See id. at 540, 118 S.Ct. 2131* (Kennedy, J., concurring in
the judgment and dissenting in part); *id. at 555, 118 S.Ct.
2131* (Breyer, J., joined by Stevens, Souter, and Ginsburg, JJ.,
dissenting).

In his concurrence, Justice Kennedy rejected the regulatory takings claim because there was no "specific property right or interest ... at stake" and the statute did "not appropriate, transfer, or encumber an estate in land (*e.g.*, a lien on a particular piece of property), a valuable interest in an intangible (*e.g.*, intellectual property), or even a bank account or accrued interest." *Id.* at 540–41, 118 S.Ct. 2131 (Kennedy, J., concurring). Instead, the payment obligation "simply impose[d] an obligation to perform an act, the payment of benefits," and was "indifferent as to how the regulated entity elects to comply or the property it uses to do so." *Id.* at 540, 118 S.Ct. 2131. But he concluded the statute violated substantive due process and thus concurred only in the plurality's holding. Justice Breyer, writing for the four Justices in dissent, agreed that the Takings Clause is limited to claims based on "the operation of a specific, separately identifiable fund of money," or "a specific interest in physical or intellectual property ... [but not] an ordinary liability to pay money." *Id.* at 554–55, 118 S.Ct. 2131 (Breyer, J., dissenting).

**\*5**  **[12]**  So five Justices agreed that mere obligations to pay money could not constitute a regulatory taking unless connected to a "specific property right," but four of them dissented from the Court's holding. Dissenting opinions cannot be considered when determining the holding of a fractured Supreme Court decision—only the opinions of those who concurred in the judgments can be considered.

*Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

**[13]**  Even then, only an opinion that "can reasonably be described as a logical subset of the other" is binding. *United States v. Davis*, 825 F.3d 1014, 1021–22 (9th Cir. 2016) (en banc). But neither the plurality nor Justice Kennedy's concurrence are a logical subset of the other since they differed on why the statute was unconstitutional. *Compare E. Enters.*, 524 U.S. at 522–38, 118 S.Ct. 2131 (O'Connor, J., plurality) (unconstitutional regulatory taking), *with id.* at 539–47, 118 S.Ct. 2131 (Kennedy, J., concurring) (substantive due process violation). Thus, "only the specific result" of *Eastern Enterprises*, that the statute at issue was unconstitutional, is binding in this court. *Davis*, 825 F.3d at 1022.[4]

That said, as the district court noted, "all circuits that have addressed the issue" of the precedential value of *Eastern Enterprises* "have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property." *McCarthy*, 626 F.3d at 285 (collecting cases). Indeed, *Koontz* appeared to endorse that "the relinquishment of funds linked to a specific, identifiable property interest" invoked a per se takings analysis. 570 U.S. at 614, 133 S.Ct. 2586. We hold, as other circuits have, that in certain circumstances not argued here, money can be the subject of a taking. But here, the City's Ordinance imposes a general obligation to pay money and does not identify any specific fund of money; therefore, it does not effectuate an unconstitutional physical taking.[5]

**\*6**  **[14]**  By way of example, money can be subject to a taking when the government procures the interest earned on lawyers' trust accounts, *see Brown*, 538 U.S. at 235, 123 S.Ct. 1406; *Phillips*, 524 U.S. at 160, 118 S.Ct. 1925; procures the interest accrued in interpleader funds, *see Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 162, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); seizes ownership of liens, which are the right to receive money secured by a particular piece of property, *see Armstrong v. United States*, 364 U.S. 40, 48, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960); demands that one pay a debt owed to a third party to the state itself, *see Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 245, 1 L.Ed. 568 (1796) (opinion of Chase, J.); *Cities Serv. Co v. McGrath*, 342 U.S. 330, 335, 72 S.Ct. 334, 96 L.Ed. 359 (1952); or seizes money without a court order, *see Cedar Point*, 141 S. Ct. at 2076 ("We have recognized that the government can commit a physical taking ... by simply 'enter[ing] into physical possession of property without authority of a court order.' "); *see also* Richard A. Epstein & Eduardo M. Peñalver, *The Fifth Amendment Takings Clause*, Nat'l Const. Ctr., https://constitutioncenter.org/interactive-constitution/interpretation/amendment-v/clauses/634 ("bag full of cash" is subject to physical taking).

The money in all those cases was taken from known persons in the form of a specific, identified property interest to which

those persons were already entitled. *See* Swisher Int'l v. Schafer, 550 F.3d 1046, 1055 n.6 (11th Cir. 2008).

[15] [16] In contrast, the obligation to pay money in the tax and government services user fee context is not generally compensable under the Fifth Amendment because taxes and user fees are collected in exchange for government benefits to the payor. *See* Sperry Corp., 493 U.S. at 62 n.9, 110 S.Ct. 387 ("artificial" to treat an award deduction from Iran-United States Claims Tribunal as a physical taking because "[u]nlike real or personal property, money is fungible"); Brushaber v. Union Pac. R. Co., 240 U.S. 1, 24–25, 36 S.Ct. 236, 60 L.Ed. 493 (1916) (taxes could constitute a taking if "the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation, but a confiscation of property"); *see also* Koontz, 570 U.S. at 615, 133 S.Ct. 2586 (collecting cases distinguishing taxes and user fees from money that can be taken). Thus, when it comes to takings, "[t]he Constitution ... is concerned with means as well as ends." Horne, 576 U.S. at 362, 135 S.Ct. 2419; *see also* Dickman v. Comm'r of Internal Rev., 465 U.S. 330, 336, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984) ("We have little difficulty accepting the theory that the use of valuable property—in this case money—is itself a legally protectible property interest.").

Here, the Ballingers' rely on Koontz to argue that the relocation fee is an unconstitutional taking. But Koontz cuts against them. The exaction in Koontz operated on "the direct link between the government's demand and a specific parcel of real property," 570 U.S. at 614, 133 S.Ct. 2586. The Ballingers claim that direct link exists between the government's demand for their money and their real property. We cannot deny that the relocation fee here is linked to real property, but no more so than property and estate taxes. Rather than a mere obligation to pay in relation to the use of one's property, the government in Koontz demanded and specifically identified that it wanted Koontz's payment of money in exchange for granting a benefit to either Koontz's parcel of land or another identified parcel of land. *Id.* at 613, 133 S.Ct. 2586 ("[U]nlike Eastern Enterprises, the monetary obligation burdened petitioner's ownership of a specific parcel of land."). So the demand for payment in

Koontz was "functionally equivalent to other types of land use exactions" and amounted to a taking of an interest in the real property itself. *Id.* at 612–13, 133 S.Ct. 2586 ("In that sense, this case bears resemblance to our cases holding that the government must pay just compensation when it takes a lien—a right to receive money that is secured by a particular piece of property.").

*7 Instead, the relocation fee required by the Ordinance is a monetary obligation triggered by a property owner's actions with respect to the use of their property, not a burden on the property owner's interest in the property. It is more akin to the obligations to pay money that other circuits have held were not takings, such as

- costs to clean up hazardous waste under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), United States v. Alcan Aluminum Corp., 315 F.3d 179, 190 (2d Cir. 2003);

- survivor's benefits required from previous employers of coal miners who died from Black Lung Disease, W.V. CWP Fund v. Stacy, 671 F.3d 378, 387 (4th Cir. 2011);

- fines for traffic offenses caught on municipal traffic cameras, McCarthy, 626 F.3d at 286;

- quarterly monetary assessments based on tobacco manufacturers' market share under the Fair and Equitable Tobacco Reform Act, Swisher Int'l, 550 F.3d at 1057; and

- special monetary assessments on domestic utilities that benefit from facilities that process environmentally contaminated uranium, Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (en banc) ("Requiring money to be spent is not a taking of property." (citation omitted)).

Unlike the cases that have found a taking of funds a violation of the Takings Clause, this Ordinance neither identifies the Ballingers' $6,582.40 as a parcel of money it intends to take, nor seeks to seize any escrow accounts or funds that meet certain criteria. Thus, the Ballingers' physical-taking claim was not "an appropriate vehicle to challenge the power of [a legislature] to impose a mere monetary obligation without

regard to an identifiable property interest." 🚩 *McCarthy, 626 F.3d at 286* (quoting 🚩 *Swisher Int'l, 550 F.3d at 1057*) (alteration in original). [6]

IV

**[17]** For the same reasons, we disagree with the Ballingers that the City placed an unconstitutional condition, called an exaction, on their preferred use of their Oakland home. Though the Takings Clause prohibits the government from "deny[ing] a benefit to a person because he exercises a constitutional right" or "coercing people into giving [those rights] up" by imposing unconstitutional conditions on the use of private land, the "predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." 🚩 *Koontz, 570 U.S. at 604, 612, 133 S.Ct. 2586* (citation omitted). Because the relocation fee here was not a taking, it cannot have been an unconstitutional exaction.

A

**[18]** **[19]** The unconstitutional conditions doctrine of the Takings Clause allows the government to condition the use of one's property on agreeing to an exaction, or the dedication of one's other property to the public use, "so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal." 🚩 *Id.* at 605–06, 133 S.Ct. 2586 (quoting 🚩 *Dolan v. City of Tigard, 512 U.S. 374, 391, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)*, and 🚩 *Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)*). In evaluating the constitutionality of an exaction, we must balance (1) the vulnerability of "land-use permit applicants" who can be strongarmed by government entities with "broad discretion" with (2) legitimate government interests in "landowners internaliz[ing] the negative externalities of their conduct." 🚩 *Id.* at 604–05, 133 S.Ct. 2586.

**\*8** The Supreme Court has limited the scope of exaction claims to the administrative-conditions context. *E.g.,* 🚩 *City*

*of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 702, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999)* ("[W]e have not extended the rough-proportionality test of 🚩 *Dolan* beyond the special context of exactions—*land-use decisions conditioning approval of development on the dedication of property to public use.*" (emphasis added)); 🚩 *Lingle, 544 U.S. at 546, 125 S.Ct. 2074* (describing 🚩 *Nollan* and 🚩 *Dolan* as "Fifth Amendment takings challenges to adjudicative land-use exactions"); 🚩 *Koontz, 570 U.S. at 604, 614, 133 S.Ct. 2586* (describing 🚩 *Nollan* and 🚩 *Dolan* as "involv[ing] a special application" of the unconstitutional conditions doctrine "when owners apply for land-use permits," where "central concern" is "the risk that the government may use its substantial power and discretion in land-use permitting" (citation omitted)). Following the Supreme Court's lead, we have applied an exactions analysis only to generally applicable administrative, not legislative, action. *See, e.g.,* 🚩 *McClung v. City of Sumner, 548 F.3d 1219, 1227 (9th Cir. 2008)* ("In comparison to legislative land determinations, the 🚩 *Nollan*/🚩 *Dolan* framework applies to adjudicative land-use exactions where the 'government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit.' " (citation omitted)); 🚩 *San Remo Hotel, LP v. San Francisco City & County, 364 F.3d 1088, 1097 (9th Cir. 2004)*. [7]

But the doctrine barring unconstitutional conditions is broader than the exactions context. *See* 🚩 *Koontz, 570 U.S. at 604, 133 S.Ct. 2586* (collecting cases relating to different contexts); 🚩 *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Env't Prot., 560 U.S. 702, 713–14, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010)* ("The Takings Clause ... is not addressed to the action of a specific branch or branches. It is concerned simply with the act, and not with the governmental actor ....").

Last year, in a now-vacated opinion, we relied on 🚩 *McClung* to reject as an exaction "a general requirement imposed through legislation, rather than an individualized requirement to grant property rights to the public imposed as a condition for approving a specific property development." 🚩 *Pakdel v. City & County of San Francisco, 952 F.3d 1157, 1162 n.4 (9th Cir. 2020)* (cleaned up), *vacated 5 F.4th 1099 (9th*

Cir. 2021). However, the Supreme Court invited us to "give further consideration to [this] claim in light of [its] recent decision" in 🔖 *Cedar Point Nursery*. 🔖 *Pakdel v. City & County of San Francisco*, —— U.S. ——, 141 S. Ct. 2226, 2229 n.1, 210 L.Ed.2d 617 (2021).

In 🔖 *Cedar Point Nursery*, the Court highlighted that "[t]he essential question is not ... whether the government action at issue comes garbed as regulation (or statute, or ordinance, or miscellaneous decree)." 🔖 141 S. Ct. at 2072. Yet the Court still limited the exactions context to "[w]hen the government conditions the grant of a benefit such as a permit, license, or registration" on giving up a property right. 🔖 *Id.* at 2079. Thus, the Supreme Court has suggested that any government action, including administrative and legislative, that conditionally grants a benefit, such as a permit, can supply the basis for an exaction claim rather than a basic takings claim. *See* 🔖 *id.* at 2072; *see, e.g.,* 🔖 *Com. Builders of N. Cal.*, 941 F.2d at 873 (applying exactions analysis to legislative ordinance imposing a fee to finance low-income housing in connection with the issuance of permits for nonresidential development).

### B

**\*9** Here, the Ballingers claim that the City's Ordinance (a legislatively imposed condition) is an unconstitutional exaction. The district court rejected their exaction claim as based on a generally applicable legislative condition when a properly pled exaction claim can only arise from administrative, not legislative, conditions.

**[20]** In light of 🔖 *Pakdel*, 141 S. Ct. at 2229 n.1, and 🔖 *Cedar Point Nursery*, 141 S. Ct. at 2072, 2079, we agree with the Ballingers that "[w]hat matters for purposes of 🔖 *Nollan* and 🔖 *Dolan* is not *who* imposes an exaction, but *what* the exaction does," and the fact "[t]hat the payment requirement comes from a [c]ity ordinance is irrelevant." But the Ballingers miss, under the 🔖 *Nollan*/🔖 *Dolan* framework, that whatever the government action is, it must condition the grant of a benefit on an unconstitutional taking. *See* 🔖 *Dolan*, 512 U.S. at 391– 92, 114 S.Ct. 2309 (exactions where government bodies "make some sort of individualized determination that the required dedication [or condition]

is related both in nature and extent to the impact of the proposed development."); 🚩 *McClung*, 548 F.3d at 1227 (exactions analysis applies to "determinations conditioning permit approval on the grant of property rights to the public"). Here, the Ordinance does not conditionally grant or regulate the grant of a government benefit, such as a permit, and therefore does not fall under the unconstitutional-conditions umbrella.

Lastly, even so, the "starting point to our analysis" of exactions claims is still whether the substance of the condition, such as granting an easement as in 🔖 *Nollan* and 🔖 *Dolan*, would be a taking independent of the conditioned benefit. 🔖 *Cedar Point*, 141 S. Ct. at 2073; 🔖 *Koontz*, 570 U.S. at 612, 133 S.Ct. 2586; *see* 🔖 *Nollan*, 483 U.S. at 831, 107 S.Ct. 3141; 🔖 *Dolan*, 512 U.S. at 384, 114 S.Ct. 2309. Here, the relocation fee is not a compensable taking, so the relocation fee did not constitute an exaction. We therefore affirm the dismissal of the Ballingers' exaction claim.

### V

**[21]** **[22]** Finally, we also affirm the dismissal of the Ballingers' seizure claim. The Fourth Amendment applies to searches and seizures in the civil context. 🔖 *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 51, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993); *see also* ⚠️ *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (incorporating the Fourth Amendment through the Fourteenth Amendment). To adequately plead a seizure claim, a plaintiff must allege a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 🔖 42 U.S.C. § 1983. And to establish a deprivation of Fourth Amendment rights, the Ballingers must allege the seizure was caused by state action. *See* 🔖 *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The Ballingers claim their tenants were "willful participant[s] in joint activity with the State or its agents" and that the Ordinance authorizes a "meaningful interference with [the Ballingers'] possessory interest in [their] property." The district court correctly rejected these arguments.

**[23]** **[24]** **[25]** A private individual's actions can only be considered state action if a "sufficiently close nexus"

makes private action "treat[able] as that of the [government entity] itself." 🔖 *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (citation omitted). Merely "authoriz[ing]," "approv[ing,] or acquiesc[ing]" to private action—such as the "creation or modification of any legal remedy"—is not enough to show state action. 🔖 *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52–53, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (citations omitted). And an "[a]ction by a private party pursuant to [a] statute, without something more, [is] not sufficient to justify a characterization of that party as a 'state actor.' " 🔖 *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

**\*10** **[26]** **[27]** The Ballingers have not established a cognizable theory of state action. The City did not participate in the monetary exchange between the Ballingers and their tenants. *See* 🔖 *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164–65, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Neither did it "exercise[ ] coercive power" over the Ballingers' tenants or "provide[ ] such significant encouragement, either overt or covert, that the [tenants'] choice must in law be deemed to be that of the State." 🔖 *Blum*, 457 U.S. at 1004, 102 S.Ct. 2777. Because the tenants were not willful participants in joint activity with the State, they cannot be fairly treated as the State itself. *Cf.* 🔖 *Stypmann v. City & County of San Francisco*, 557 F.2d 1338, 1341–42 (9th Cir. 1977). Nor did the City actively encourage, endorse, or participate in any wrongful interference by the tenants with the Ballingers' money. *Cf.* 🔖 *Presley v. City of Charlottesville*, 464 F.3d 480, 488 (4th Cir. 2006). At most, the City was only involved in adopting an ordinance providing the terms of eviction and payment. *See* 🔖 *Sullivan*, 526 U.S. at 53, 119 S.Ct. 977. But enacting the Ordinance of this nature is not enough—entitling tenants to demand a relocation payment is a "kind of subtle encouragement ... no more significant than that which inheres in [a government entity]'s creation or modification of *any* legal remedy." *See* 🔖 *id.* (emphasis added). Adopting the Ballingers' expansive notion of state action would eviscerate the "essential dichotomy between public and private acts." 🔖 *Id.* (citation and quotation marks omitted). Thus, we affirm the district court's dismissal of the Ballingers' seizure claim. [8]

**AFFIRMED.**

**All Citations**

--- F.4th ----, 2022 WL 289180

---

## Footnotes

1    The City argues that because the Ballingers neglected to include a statement of the issues presented in their opening brief on appeal, we should dismiss their appeal for failure to comply with Federal Rule of Appellate Procedure 28(a)(5). *See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010). The Ballingers should have done so, but we see no reason to dismiss this appeal when the Ballingers' opening brief otherwise makes the issues presented very clear.

2    In the past, this court has analyzed regulations of the landlord-tenant relationship as a regulatory taking rather than a physical taking. *See, e.g.,* 🔺*Rancho de Calistoga*, 800 F.3d at 1089 n.1 ("The Supreme Court laid to rest any argument that a mobile home rent control ordinance constitutes a physical taking ...."); 🔖 *MHC Fin. LP v. City of San Rafael*, 714 F.3d 1118, 1126–27 (9th Cir. 2013); 🔖 *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc). These challenges failed. But here, the Ballingers "rely solely on physical takings law," and expressly forego a regulatory takings claim. We therefore do not address the principles of regulatory takings. *See* 🔖 *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323–24, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (courts may not apply principles of physical takings claims to regulatory takings claims).

3    Further, "[t]he government effects a physical taking only where it *requires* the landowner to submit to the physical occupation" of his property. 🔖 *Yee*, 503 U.S. at 527, 112 S.Ct. 1522; *see also* 🔖 *Fla. Power,*

480 U.S. at 252, 107 S.Ct. 1107 ("This element of required acquiescence is at the heart of the concept of occupation."). The Ballingers never asserted that there was a physical occupation of their property. To the contrary, they invited their tenants to lease their property and paid the relocation fee. *See* *Yee*, 503 U.S. at 532, 112 S.Ct. 1522 (citing *Fla. Power*, 480 U.S. at 252–53, 107 S.Ct. 1107).

4    Our prior applications of *Eastern Enterprises* either accord with this conclusion, were reversed by the Supreme Court, or did not reach the issue. *See* *Chevron U.S.A., Inc. v. Bronster*, 363 F.3d 846, 852 (9th Cir. 2004) (suggesting *Eastern Enterprises* is "of no precedential value outside the specific facts of that case" (citing *Ass'n of Bituminous Contractors v. Apfel*, 156 F.3d 1246, 1254–55 (D.C. Cir. 1998))), *rev'd on other grounds sub nom.*, *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005); *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 854 (9th Cir. 2001) (en banc) (relying on *Eastern Enterprises* plurality to hold that money may only constitute a regulatory taking), *aff'd*, *Brown*, 538 U.S. at 235, 123 S.Ct. 1406 (but agreeing with dissenters in part); *Quarty v. United States*, 170 F.3d 961, 969 (9th Cir. 1999) (assuming without deciding *Eastern Enterprises* plurality was binding and finding no taking had occurred).

5    "[P]hysical takings jurisprudence is 'as old as the Republic.' " *Cedar Point Nursery*, 141 S. Ct. at 2071 (citation omitted). Because the lack of records of discussion on the meaning of the Takings Clause, the statements of its author, James Madison, "thus provide unusually significant evidence about what the clause was originally understood to mean." William M. Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 791 (1995); Akhil Reed Amar, *The Bill of Rights* 78 (1998). Generally, Madison thought a federal constitution would best protect property interests and other rights. *See* The Federalist No. 10 (James Madison). One year after the ratification of the Bill of Rights, Madison wrote that the same sense of property includes "land, or merchandi[s]e, or money." James Madison, *Property*, Papers 14:266–68 (Mar. 29, 1792), *reprinted in The Founders' Constitution*, ch. 16, *available at* https://press-pubs.uchicago.edu/founders/documents/v1ch16s23.html. "Government," he wrote, "is instituted to protect property of every sort." *Id.* "If there be a government then which prides itself in maintaining the inviolability of property; which provides that none shall be taken *directly* even for public use without indemnification to the owner, and yet ... violates their actual possessions, in the labor that acquires their daily subsistence, ... such a government is not a pattern for the United States." *Id.*

6    Because we hold that the relocation fee is not a taking, we need not address the Ballingers' arguments that the relocation fee is taking for a private, rather than public, purpose and without just compensation.

7    At least one Justice highlighted his disagreement. *See, e.g., Cal. Bldg. Indus. Ass'n v. City of San Jose*, 577 U.S. 1179, 136 S. Ct. 928, 928, 194 L.Ed.2d 239 (2016) (Thomas J., concurring in denial of certiorari) ("I continue to doubt that the existence of a taking should turn on the type of governmental entity responsible for the taking." (quotation marks and citation omitted)); *Parking Ass'n of Ga. v. City of Atlanta*, 515 U.S. 1116, 1117–18, 115 S.Ct. 2268, 132 L.Ed.2d 273 (1995) (Thomas, J., joined by O'Connor, J., dissenting in denial of certiorari) ("It is not clear why the existence of a taking should turn on the type of governmental entity responsible for the taking. A city council can take property just as well as a planning commission can.").

8    We affirm dismissal of the Ballingers' facial Fourth Amendment challenge as well. Outside the First Amendment context, a facial challenge must prove that a law is "unconstitutional in all of its applications," considering only those applications "in which [the law] actually authorizes or prohibits conduct." *City of Los Angeles v. Patel*, 576 U.S. 409, 418, 135 S.Ct. 2443, 192 L.Ed.2d 435 (2015) (citation omitted). But the Ballingers' as-applied seizure claim proves the Ordinance is not "unconstitutional in all applications," dooming a facial challenge. *See Bell v. City of Chicago*, 835 F.3d 736, 739 (7th Cir. 2016) (rejecting a facial Fourth Amendment seizure claim as "the Ordinances' actual application in [the plaintiffs'] case does not violate the

Fourth Amendment" (cleaned up)); *see also* 📁 *Patel*, 576 U.S. at 444–45, 135 S.Ct. 2443 (Alito, J., dissenting) (questioning whether facial Fourth Amendment claims are ever viable given that "reasonableness ... is pre-eminently the sort of question which can only be decided in the concrete factual context of an individual case" (citation omitted)).

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 2

2022 WL 326092
Only the Westlaw citation is currently available.
United States District Court, D. Oregon.

MOE FARHOUD, STARK FIRS LIMITED
PARTNERSHIP, ALDER VILLAGE,
INC., STAR KREST, NIC., ASH STREET
COURTYARD LLC, TYLER SHERMAN,
and CRYSTAL SHERMAN, Plaintiffs,
v.
GOVERNOR KATE BROWN, in her official
capacity; STATE OF OREGON; CITY OF
PORTLAND, an Oregon municipal corporation;
and MULTNOMAH COUNTY OF OREGON,
an Oregon municipal corporation, Defendants.

Case No. 3:20-cv-2226-JR
|
Filed 02/03/2022

**Attorneys and Law Firms**

John DiLorenzo, Jr., Aaron K. Stuckey, and Evan
Christopher, Davis Wright Tremaine llp, 1300 SW Fifth
Avenue, Suite 2400, Portland, OR 97201. Of Attorneys for
Plaintiffs.

Keith Ketterling, Steven C. Berman, and Megan K. Houlihan,
Stoll Stoll Berne Lokting & Shlachter pc, 209 SW Oak Street,
Suite 500, Portland, OR 97204. Special Assistant Attorneys
General and of Attorneys for Defendants Governor Kate
Brown and State of Oregon.

Jenny M. Madkour, County Attorney for Multnomah County,
and B. Andrew Jones, Senior Assistant County Attorney,
Multnomah County Attorney's Office, 501 SE Hawthorne
Boulevard, Suite 500, Portland, OR 97214. Of Attorneys for
Defendant Multnomah County.

Naomi Sheffield, Senior Deputy City Attorney, Portland City
Attorney's Office, 1221 SW Fourth Avenue, Room 430,
Portland, OR 97204. Of Attorneys for Defendant City of
Portland.

**OPINION AND ORDER**

Michael H. Simon United States District Judge

**\*1** United States Magistrate Judge Jolie A. Russo issued
Findings and Recommendations concluding that the Court
should grant Defendants' motions to dismiss and deny
Plaintiffs' motion for partial summary judgment. After
Plaintiffs filed their objections and Defendants responded,
Plaintiffs asked the Court to postpone its ruling on those
objections until after the Supreme Court decided *Whole
Woman's Health v. Jackson*. Plaintiffs stated that the Supreme
Court's decision in that case would likely inform the Court's
analysis of whether Plaintiffs have standing to sue Governor
Brown. The Court agreed and permitted supplemental
briefing from the parties on the applicability of *Whole
Woman's Health* after the Supreme Court issued its decision.
*See Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021).

Under the Federal Magistrates Act (Act), the Court may
"accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate." 28 U.S.C.
§ 636(b)(1)(c). If a party objects to a magistrate judge's
findings and recommendations, "the court shall make a de
novo determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate judge's findings and
recommendations to which no party has objected, the Act
does not prescribe any standard of review. *See Thomas
v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication
that Congress, in enacting [the Act], intended to require a
district judge to review a magistrate's report to which no
objections are filed."); *United States v. Reyna-Tapia*, 328
F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the
court must review de novo magistrate judge's findings and
recommendations if objection is made, "but not otherwise").
Although absent objections no review is required, the Act
"does not preclude further review by the district judge[ ] *sua
sponte* ... under a *de novo* or any other standard." *Thomas*,
474 U.S. at 154. Indeed, the Advisory Committee Notes to
Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely
objection is filed," the Court reviews the magistrate judge's
recommendations for "clear error on the face of the record."

For those portions of the Findings and Recommendations
suggesting dismissal of Plaintiffs' claims against the State
of Oregon and the City of Portland, there are no objections.
The Court reviews those portions for clear error. Finding no
such error, the Court adopts those portions of the Findings
and Recommendations. For those portions of the Findings and

Recommendations suggesting dismissal of Plaintiffs' claims against Governor Brown and Multnomah County, Plaintiffs objected. Plaintiffs object to the conclusion that their claims against Multnomah County are moot and that they lack standing to sue Governor Brown. Plaintiffs also object that the Findings and Recommendations did not address the merits of Plaintiffs' substantive arguments advanced in their opposition to Defendants' motions to dismiss and in support of Plaintiffs' motion for partial summary judgment.

**\*2** For the reasons explained below, after de novo review, the Court declines to adopt the portion of the Findings and Recommendations concluding that Plaintiffs' claims against the County are moot but adopts the portion of the Findings and Recommendations concluding that Plaintiffs lack standing to sue Governor Brown. Because the Court holds that Plaintiffs' claims against the County are not moot, the Court discusses the merits of the County's motion to dismiss Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure and Plaintiffs' cross-motion for partial summary judgment on the right of access to courts. For the reasons explained below, the Court dismisses Plaintiffs' claims under Rule 12(b)(6).

## BACKGROUND

Beginning March 8, 2020, Governor Brown issued a series of executive orders in response to the COVID-19 pandemic. Executive Orders 20-03, 20-24, 20-30, 20-38, 20-67, 21-05, 21-10, and 21-36 declared a state of emergency and repeatedly extended that state of emergency, with the most recent order extending the state of emergency to June 30, 2022. Governor Brown also issued Executive Orders 20-11, 20-13, and 20-56, which imposed a moratorium on residential evictions for nonpayment of rent between March 22, 2020 and June 30, 2020 and between September 30, 2020 and December 31, 2020.

The Oregon Legislature enacted similar protections for residential tenants in response to COVID-19. The Legislature first passed House Bill (H.B.) 4213, which implemented an eviction moratorium prohibiting landlords from evicting tenants for nonpayment of rent that accrued from April 1, 2020 to September 30, 2020 and gave tenants a grace period until March 31, 2021 to pay any unpaid rent that had accrued from April to September 2020. H.B. 4213 § 3. Later, the Legislature passed H.B. 4401, which extended the moratorium period from September 30, 2020 to June 30, 2021 and extended the grace period to pay any unpaid rent accrued

during that time from March 31, 2021 to June 30, 2021. H.B. 4401 § 7(1). Further, under H.B. 4401, courts must dismiss any complaint filed by a landlord during the grace period that seeks possession of the property for nonpayment of rent, and landlords may not file any action during the emergency period to recover unpaid rent. *Id.* §§ 7(6), 8(2)(f). H.B. 4401 also established a landlord compensation fund. *Id.* § 2(1). Landlords may apply to the fund to receive 80 percent of unpaid rent accrued after April 1, 2020, if they agree to forgive the remaining 20 percent. H.B. 4401 does not provide any state official with enforcement authority and instead is only enforced by private rights of action. Later, the Legislature passed S.B. 282, which extended the grace period to pay rent accrued between April 1, 2020 and June 30, 2021 to February 28, 2022. S.B. 282 § 1. Next, the Legislature passed S.B. 278, which prohibited landlords from evicting residential tenants for up to 60 days based on nonpayment of rent if the tenant shows the landlord documentation that the tenant has applied for emergency rental assistance. S.B. 278 § 2. Most recently, the Legislature passed Senate Bill 891, which extends the period to submit rental assistance documentation to landlords until June 30, 2022 and provides that landlords may not evict those tenants if their rental assistance applications are still pending. S.B. 891 § 2. (The Court takes judicial notice of S.B. 891, which was not mentioned by any party in their written submissions. *See* Fed. R. Evid. 201.)

Multnomah County (County) also enacted an eviction moratorium in response to COVID-19. The County first adopted Ordinance 1282 in March 2020, which prohibited evictions of residential tenants that had experienced a substantial loss of income due to COVID-19 and gave those tenants a six-month grace period to pay any unpaid rent. Later, the County enacted Ordinance 1284 to mirror the statewide eviction moratorium implemented through Governor Brown's Executive Orders and the County's eviction moratorium. County Ordinance 1287 later extended the grace period to pay unpaid rent to January 8, 2021 or the first day the County's declared state of emergency was no longer in effect, whichever was later. The County then enacted Ordinance 1292, which rescinded Ordinances 1282, 1284, and 1287. The County replaced its prior ordinances with Ordinance 1296, which adopted the statewide moratorium enacted in S.B. 278, prohibiting the eviction of tenants who had informed their landlords of a pending application for rental assistance. County Ordinance 1296 extends the 60-day moratorium period in S.B. 278 to 90 days and remains in effect until March 1, 2022.

**\*3** The City of Portland responded to COVID-19 with two ordinances extending the County's eviction moratorium to all areas within the City of Portland, some of which extends beyond Multnomah County. City Ordinance 189890 applied Multnomah County Ordinance 1282 to all areas within the City of Portland. Ordinance 189890 expired on the repeal of County Ordinance 1282 on September 24, 2020. The City then enacted City Ordinance 190156, which applied Multnomah County Ordinance 1287 to all areas within the City of Portland. City Ordinance 190156 expired on February 1, 2021 and has not been replaced.

In this lawsuit, Plaintiffs assert claims under 42 U.S.C. § 1983 against Governor Brown, the State of Oregon, Multnomah County, and the City of Portland. In their First Amended Complaint, Plaintiffs contend that Defendants' eviction moratoria violate Plaintiffs' rights under several provisions of the United States Constitution. Plaintiffs allege violations of the Contracts Clause in section 10 of Article I, the Takings Clause in the Fifth Amendment, the Due Process Clause in the Fourteenth Amendment, the Unreasonable Seizure Clause in the Fourth Amendment, and the Petition Clause in the First Amendment.

## DISCUSSION

### A. Governor Brown

The State argues that Plaintiffs lack standing to sue Governor Brown because she has no enforcement authority under H.B. 4401. Plaintiffs respond that they have standing because Governor Brown must "take care" that all laws of the state are executed. Plaintiffs also state that the Supreme Court's recent decision in *Whole Woman's Health* did not disturb this basis for standing. Although intertwined, standing and the exception to Eleventh Amendment immunity under *Ex parte Young* are distinct doctrines. *See Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108 (9th Cir. 1999) (explaining that *Ex parte Young* does not provide a basis for standing). The Court will first address whether Governor Brown is immune from suit in federal court under the Eleventh Amendment.

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). Under the Eleventh Amendment, states are protected from suit in federal court. *See Savage v.*

*Glendale Union High Sch.*, 343 F.3d 1036, 1040 (9th Cir. 2003). In *Ex parte Young*, the Supreme Court carved out an exception to Eleventh Amendment sovereign immunity for suits seeking prospective injunctive relief against a state official in his or her official capacity. 209 U.S. 123, 159-60 (1908). To sue a state official under *Ex parte Young*, that official "must have some connection with the enforcement" of the challenged law and that connection must be more direct than a "generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision." *L.A. Cnty. B. Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (quoting *Ex parte Young*, 209 U.S. at 157). The Supreme Court explained that to be subject to suit under *Ex parte Young*, the state official must possess some enforcement authority over the challenged law. *See Whole Woman's Health*, 142 S. Ct. at 534 (dismissing the state attorney general as immune from suit because "the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S.B. 8 that a federal court might enjoin him from exercising").

The exception to Eleventh Amendment sovereign immunity under *Ex parte Young* does not apply to Plaintiffs' claims against Governor Brown because she has no enforcement authority over H.B. 4401. In *Whole Woman's Health*, the Supreme Court made clear that to sue a state official under *Ex parte Young*, the plaintiff must point to some provision in the challenged law that provides the official with enforcement authority. 142 S. Ct. at 534. The plaintiffs in *Whole Woman's Health* challenged the constitutionality of S.B. 8, a Texas law that prohibited abortions after six weeks. S.B. 8, however, differed from other laws restricting abortion because it was enforceable only through a private right of action and conferred no enforcement authority on any state official. The plaintiffs sued several defendants, including the Texas Attorney General and state licensing officials. *Id.* at 530. The Supreme Court held that *Ex parte Young* did not apply to the plaintiffs' claims against the state attorney general because that official had no enforcement authority in connection with S.B. 8. *Id.* at 534. The Supreme Court did, however, allow the claims against the licensing officials to proceed under *Ex parte Young* because those officials needed to take certain enforcement actions related to Texas's Health and Safety Code, which included S.B. 8. *Id.* at 535.

**\*4** Here, like the state attorney general in *Whole Woman's Health*, Governor Brown has no enforcement authority under the challenged law. H.B. 4401, like S.B. 8, is enforced only

through a private right of action. Thus, under *Whole Woman's Health*, the *Ex parte Young* exception to Eleventh Amendment immunity does not apply to Governor Brown. Plaintiffs, however, argue that despite *Whole Woman's Health*, three federal appellate court decisions remain good law and state that a private party may sue a state official under *Ex parte Young* on the sole basis that the state official has a general duty to "take care" that all laws of the state are faithfully executed. *See* Or. Const. art. V, § 10. The Court is not persuaded.

Plaintiffs first cite *Los Angeles County Bar Association v. Eu*, 979 F.2d 697 (9th Cir. 1992), in which the Ninth Circuit allowed claims to proceed against the Governor of California under *Ex parte Young*. The plaintiff in *Eu* challenged a California statute that prescribed the number of judges in Los Angeles County, arguing that the number of judges was unconstitutionally low. *Id.* at 699. The Ninth Circuit explained that the plaintiff could sue the Governor because, if the court held that the statute prescribed too few judges, the state legislature would need to amend the statute to provide for more judges, and the Governor would be statutorily bound to appoint judges to fill those positions. *Id.* at 704. Thus, the Ninth Circuit reasoned, the Governor had an adequate connection with the challenged law.

This conclusion, however, provides no assistance to Plaintiffs where here, Governor Brown is under no statutory obligation to carry out any part of H.B. 4401. Plaintiffs contend that Governor Brown's emergency powers under ORS Chapter 401 provide her with the authority to nullify H.B. 4401. But that argument speaks to the redressability prong of standing—whether Governor Brown is capable of redressing Plaintiffs' injuries—not Eleventh Amendment immunity. The fact that Governor Brown may have the *ability* to set aside H.B. 4401 or enact an identical emergency order subject to criminal penalties (*see* ORS § 401.990) does not show that H.B. 4401 affirmatively invests Governor Brown with any enforcement authority. Governor Brown's emergency powers therefore differ from the Governor of California's statutory obligation to appoint judges in *Eu*. Further, the Ninth Circuit in *Eu* expressly rejected the additional argument Plaintiffs advance here, when the court held that under *Ex parte Young*, the connection between the state official and challenged law "must be fairly direct" and that "a generalized duty to enforce state law ... will not subject an official to suit." *Id.*

Plaintiffs also cite *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982), in which the Sixth Circuit allowed claims against the Governor of Ohio to go forward even though the statute at issue gave the Governor no enforcement authority. *Id.* at 665. The Sixth Circuit explained that there was a "sufficient connection" between the Governor and the challenged statute even "in the absence of specific state enforcement provisions" because there was a "substantial public interest in enforcing the trade practices legislation." *Id.* at 665 n.5. The Supreme Court's decision in *Whole Woman's Health*, however, undermines this holding, and the Ninth Circuit has already held that a state official may be sued under *Ex parte Young* only if that official has some connection more direct than a general duty to take care that the laws of the state are faithfully executed. *See* *Eu*, 979 F.2d at 704. The Court is bound by Ninth Circuit precedent.

**\*5** Finally, Plaintiffs rely on *Boler v. Earley*, 865 F.3d 391 (6th Cir. 2017), in which the Sixth Circuit concluded that *Ex parte Young* applied to some claims against the Governor of Michigan. The *Ex parte Young* issue in *Boler*, however, was whether the plaintiffs sought prospective injunctive relief or retroactive money damages and not whether the Governor had an adequate connection with the challenged law. *See* *id.* at 412-13. Further, the plaintiffs in *Boler* challenged the Governor's direct involvement with an ongoing water crisis in Flint, Michigan, and not the constitutionality of a statute over which the Governor had enforcement authority. *See id.* at 399-400. *Boler* therefore carries no persuasive weight.

In sum, because H.B. 4401 invests Governor Brown with no enforcement authority, *Ex parte Young* does not apply and she is immune from suit under the Eleventh Amendment. *See* *Whole Woman's Health*, 142 S. Ct. at 534; *Eu*, 979 F.2d at 704. Other courts have reached similar conclusions. *See, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (concluding that *Ex parte Young* did not apply to the Governor of California because "his only connection to" the challenged law was "his general duty to enforce California law"); *Jevons v. Inslee*, --- F. Supp. 3d ---, 2021 WL 4443084, at \*6 (E.D. Wash. Sept. 21, 2021), *appeal docketed*, No. 22-35050 (9th Cir. Jan. 18, 2022) (concluding that *Ex parte Young* did not apply to the plaintiff's claims against the Governor of Washington because the Governor had no enforcement authority over the challenged law beyond a "duty of general enforcement"); *Axos Bank v. Rosenblum*, 2020 WL 7344594, at \*4 (D. Or. Dec. 14, 2020) (concluding that *Ex parte Young* did not apply

to the plaintiff's claim against the Oregon Attorney General because she lacked enforcement authority over H.B. 4204, which is H.B. 4401's companion statute). Because Governor Brown is immune from suit, the Court need not address whether Plaintiffs have standing to sue Governor Brown.

## B. Multnomah County

### 1. Mootness

Plaintiffs argue that their claims against Multnomah County are not moot because Multnomah County Ordinance 1296, which is in effect until March 1, 2022, is substantially similar to the County Ordinances at issue in Plaintiffs' Complaint. The County argues that Plaintiffs' claims against the County are moot because County Ordinances 1282, 1284, and 1287 have all expired and Ordinance 1296 materially differs from those expired Ordinances. For the reasons below, the Court agrees with Plaintiffs and concludes that Plaintiffs' claims against the County are not moot.

"The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "A case becomes moot 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome' of the litigation." *Id.* (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). A defendant's voluntary cessation of challenged conduct does not always moot the case. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant ... free to return to his old ways." (simplified) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982))).

**\*6** Courts presume a claim is moot when a government actor has voluntarily ceased the challenged conduct "unless there is a reasonable expectation that the legislative body is likely to enact the same or substantially similar legislation in the future." *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1197 (9th Cir. 2019). If a government actor has in fact enacted substantially similar legislation that inflicts essentially the same harm on plaintiffs but only to a lesser degree, the case is not moot. *See N.E.*

*Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (holding that the plaintiffs' claim challenging repealed legislation was not moot because the legislature enacted new legislation that "disadvantaged [the plaintiffs] in the same fundamental way," even though to a "lesser degree"); *Cuviello v. City of Vallejo*, 944 F.3d 816, 824 (9th Cir. 2019) ("If the amended ordinance threatens to harm a plaintiff in the same fundamental way—even if to a lesser degree—the plaintiff will still have a live claim for prospective relief.").

Plaintiffs' claims against Multnomah County are not moot because County Ordinance 1296 is substantially similar to the now-expired County Ordinances at issue in Plaintiffs' Complaint. The County Ordinances at issue in the Complaint —Ordinances 1282, 1284, and 1287—imposed a moratorium on all evictions of residential tenants for nonpayment of rent for a six-month grace period beginning after the County's declared emergency period ended. County Ordinance 1296 essentially inflicts the same alleged harm to Plaintiffs but in a slightly different way. Under County Ordinance 1296, landlords may not evict residential tenants for up to 90 days if the tenant notifies the landlord before March 1, 2022 that he or she has applied for rental assistance. Both the expired Ordinances and the currently effective Ordinance 1296 impose the same type of harm because they substantially restrict Plaintiffs' ability to evict nonpaying tenants and Ordinance 1296 is merely a continuation of the prior Ordinances but with slightly different terms. That Ordinance 1296 prohibits evictions of a more limited group of tenants does not alter this conclusion because Ordinance 1296 still essentially inflicts the same alleged harm on Plaintiffs, only to a lesser degree. *See N.E. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 662; *Cuviello*, 944 F.3d at 824; *Jevons*, 2021 WL 4443084, at \*5 (concluding that the landlords' challenge to the Governor of Washington's then-expired eviction moratoria was not moot because the Governor had imposed a substantially similar new moratorium, even though "under different conditions"). Thus, Plaintiffs' claims against the County are not moot.

### 2. Failure to State a Claim

#### a. Standards

2022 WL 326092

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

**\*7** A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

### b. Contracts Clause

"The Contracts Clause restricts the power of States to disrupt contractual arrangements." *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). Courts apply a two-step test to determine whether the challenged law violates the Contracts Clause. *See id.* The first question is whether the law at issue amounts to a "substantial impairment" of the contractual relationship. *Id.* at 1821-22. To determine whether the law amounts to a substantial impairment, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822. Next, if the law is a substantial impairment to the contractual relationship, the second question is whether the law was "drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Id.* (simplified) (quoting *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983)).

### i. Substantial Impairment

Here, the County's eviction moratoria (collectively, the Eviction Moratorium) substantially impair Plaintiffs' contractual relationships. First, the Eviction Moratorium significantly undermines the parties' contractual bargain. Although the County argues that the Eviction Moratorium does not permanently forgive tenants' obligation to pay back unpaid rent, Plaintiffs allege many of their tenants will never pay back the accrued rent and simply find housing elsewhere at the end of the moratorium period. *See* ECF 17, ¶ 3 ("[E]ven with regard to the rent and other expenses Plaintiffs could, eventually, sue to recover, the practical reality is that the tenants who cannot afford to pay one month's rent now will be highly unlikely to afford the total of past-due rent that will continue to accumulate each month until the State declares the 'end' of the statewide emergency. Plaintiffs' 'right' to unpaid rent is little more than an illusion."); ECF 17, ¶ 33 ("[T]he cost of the governments' failure to act has continued to fall on Plaintiffs' shoulders, all of whom have been left to their own devices. On the other hand, Defendants have continued to subsidize other, more politically favored, segments of society that have also been impacted by Defendants' responses to the pandemic."); *see also Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021) (reversing the district court's dismissal of the plaintiffs' Contracts Clause challenge to New York's prohibition on enforcement of personal guarantees on commercial leases for a 16-month period during the COVID-19 pandemic and stating, "the practical likelihood of landlords" recovering the unpaid rent "appears speculative at best"). The Eviction Moratorium by its terms extinguished a tenant's obligation to pay rent during the moratorium period,

which Plaintiffs allege effectively extinguished Plaintiffs' prospect of ever recovering that unpaid rent. And under the current terms of the Eviction Moratorium, that grace period is extended by an additional 90 days so long as the tenant attests to the landlord that he or she has submitted a pending application rental assistance.

**\*8** The second factor, whether the Eviction Moratorium interferes with Plaintiffs' reasonable expectations, also tips in Plaintiffs' favor. Laws that interfere with contracts of highly regulated industries are less likely to substantially impair those contracts. *See* 📄 *Energy Reserves Grp.*, 459 U.S. at 411 ("In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past."). Even assuming that residential tenant leasing is a heavily regulated industry, the nature of the Eviction Moratorium differs in a material way from prior government regulation of residential tenant leasing and therefore still interferes with Plaintiffs' reasonable expectations. Oregon law regulates many aspects of the landlord-tenant relationship, such as the types of payment the landlord may require, the imposition of late fees, the landlord's duty to maintain the property in a habitable condition, rent increases, and utility and service charges, among others. *See generally* ORS Ch. 90. No part of ORS Chapter 90, however, before the State's COVID-19 legislation, prohibited landlords from evicting non-paying tenants. Thus, even though state law regulates many aspects of the landlord-tenant relationship, Plaintiffs had no reasonable expectation that their ability to collect rent or otherwise initiate eviction proceedings for nonpayment of rent would be impaired.

Third, the moratorium prevents Plaintiffs from safeguarding their contractual rights. Plaintiffs allege their contractual rights include the ability to receive the agreed-upon rent monthly. *See* ECF 17, ¶ 3. Plaintiffs also allege that as landlords, they incur regular expenses such as payment on the mortgage for the rental property, utility charges, repair and maintenance costs, property taxes, and property management fees. ECF 17, ¶ 52. The Eviction Moratorium by its terms does not safeguard Plaintiffs' contractual right to receive rent monthly because Plaintiffs may not evict tenants who have not paid rent for months at a time. Further, although the Eviction Moratorium allows Plaintiffs to seek repayment of unpaid rent after the moratorium and grace period expires, this does little to safeguard Plaintiffs' rights. Plaintiffs allege that the "tenants who cannot afford to pay one month's rent now will be highly unlikely to

afford the total of past-due rent" that accrues during a period which now approaches two years. ECF 17, ¶ 3. The moratorium therefore differs from other laws found to safeguard contractual rights, such as recording statutes, because it does more than impose "minimal paperwork burdens" in order to receive monthly rent. *See* 📄 *Sveen*, 138 S. Ct. at 1823. Thus, the Eviction Moratorium substantially impairs Plaintiffs' contractual relationships.

Moreover, the Eviction Moratorium mirrors the foreclosure moratorium struck down by the Supreme Court in 📄 *W.B. Worthen Co. ex rel. Board of Commissioners of Street Improvement District No. 513 of Little Rock v. Kavanaugh*, 295 U.S. 56 (1935). The foreclosure moratorium in *Worthen*, enacted during a state of emergency following the Great Depression, extended the period between default and foreclosure from 65 days to two and a half years. 📄 *Id.* at 61. The moratorium also permitted the debtor to remain in "undisturbed possession" of the property "without a dollar for the creditor" during that time without "even a requirement that the debtor [ ] satisfy the court of his inability to pay." *Id.* The Supreme Court explained that the moratorium, which removed "nearly all the incidents that give attractiveness and value to collateral security," differed from the foreclosure moratorium upheld in 📄 *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934). 📄 *Id.* at 62. The Supreme Court in *Worthen* explained that the moratorium in *Blaisdell* did not violate the Contracts Clause because it retained some benefits to the creditor during the moratorium period and restricted the debtor's ability to benefit from the moratorium. 📄 *Id.* at 63. In *Blaisdell*, the foreclosure moratorium only empowered a court to stay foreclosure if the debtor could show his or her necessity and required the debtor to pay the fair rental value for the property if he or she remained in possession before foreclosure. *Id.*

Here, unlike the moratorium in *Blaisdell*, tenants need not show to a court during eviction proceedings that he or she has in fact experienced financial hardship as a result of the COVID-19 pandemic. Like the moratorium in *Worthen*, the Eviction Moratorium removes nearly all benefits of the contractual bargain that benefit the landlord during the moratorium period. A tenant may remain in possession of the property with no payment to the landlord, and since the enactment of County Ordinance 1296, to remain in possession, tenants need only attest to their landlords that they have applied for rental assistance. Because

the Eviction Moratorium substantially impairs Plaintiffs' contractual relationships, the Court now considers whether it is a reasonable way to advance a significant and legitimate public purpose. *See* Sveen, 138 S. Ct. at 1822.

#### ii. Appropriate and Reasonable Way to Advance Significant and Legitimate Public Purpose

**\*9** The Ninth Circuit recently addressed a Contracts Clause challenge to a nearly identical eviction moratorium in California. In *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, 10 F.4th 905 (9th Cir. 2021), the Ninth Circuit affirmed the district court's denial of the plaintiff's motion for a preliminary injunction, concluding that the plaintiff was not likely to succeed on the merits of its Contracts Clause claim. Id. at 908. The Ninth Circuit concluded that the eviction moratorium did not violate the Contracts Clause because even if it amounted to a substantial impairment of the plaintiff's contracts, it still was an "appropriate and reasonable way to advance a significant and legitimate public purpose." Id. at 913 (quoting Sveen, 138 S. Ct. at 1822). In reaching that conclusion, the court examined the history of Contracts Clause jurisprudence, noting that the Supreme Court has over the last century "significantly curtail[ed] the Contracts Clause's prohibitive force." *See* id. at 912-13. The Ninth Circuit explained that the defendant had "fairly tie[d] the moratorium to its stated goal of preventing displacement from homes, which the City reasonably explain[ed] can exacerbate the public health-related problems stemming from the COVID-19 pandemic." Id. at 914.

Like the plaintiff in *Apartment Association*, Plaintiffs here do not challenge that the Eviction Moratorium's purpose is a significant and legitimate public purpose. Instead, Plaintiffs argue that the Eviction Moratorium is an unreasonable means to reach the County's legitimate end. The Eviction Moratorium states that the moratorium is "necessary to avoid mass evictions for non-payment of rent directly attributed to the lingering impacts of [the] COVID-19 pandemic, promote housing stability, and protect the health and safety of community members in Multnomah County." County Ordinance 1296. The County, like the defendant in *Apartment Association*, reasonably ties the eviction moratorium to its stated end of preventing mass-evictions

and protecting Multnomah County residents' health and safety. *See* Apartment Association, 10 F.4th at 914. Thus, even if the Eviction Moratorium substantially impairs Plaintiffs' contractual relationships, it still is an appropriate and reasonable way to advance the County's legitimate public purpose.

#### c. Takings Clause

Plaintiffs assert a claim under the Takings Clause, alleging that the Eviction Moratorium constitutes a per se taking without just compensation. The County argues that the moratorium is not a per se taking because it only regulates the economic relationship between landlord and tenant and does not authorize unwanted physical occupation of the landlord's property. The County also contends the moratorium only imposes a temporary limitation on Plaintiffs' rights and is therefore not a per se taking under Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440 (1982). The County also argues that Plaintiffs may not seek injunctive relief for their Takings Claim under Knick v. Township, 139 S. Ct. 2162 (2019).

#### i. Whether the County Moratorium Constitutes a Per Se Taking

The Fifth Amendment provides: "Nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Supreme Court recognizes two types of takings under the Fifth Amendment: physical, or per se, takings and regulatory takings. *See* Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2071-72 (2021) (explaining the standards for determining whether government action is a physical or regulatory taking). A physical taking occurs when the government condemns property by eminent domain, takes possession of property for itself or someone else, or occupies property. Id. Regulatory takings, on the other hand, occur when the government "imposes regulations that restrict an owner's ability to use his own property." [1] Id.

Last term, in *Cedar Point*, the Supreme Court addressed whether a California law requiring agricultural employers to open their property to union organizers for up to three hours per day, 120 days per year amounted to a physical taking. Id. at 2069. The Supreme Court held that it did. Id.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

at 2077. Under the challenged law, after filing the proper notice with the state Agricultural Labor Relations Board, union organizations gained the right to "take access" to an agricultural employer's property and were "free to meet and talk with employees as they wish[ed]." *Id.* at 2069. The law required agricultural employers to open their property to these organizers, no matter if their employees lived on the property. *See id.* The Supreme Court explained that the California law constituted a physical taking because it nullified the agricultural employer's right to exclude union organizers from their property. *Cedar Point*, 141 S. Ct. at 2076. The right to exclude, the Supreme Court explained, is one of the most "treasured," "fundamental," and "essential" rights of property ownership. *Id.* at 2072. By temporarily extinguishing the property owner's right to exclude, the Court held, the government must provide just compensation. *Id.* at 2073.

**\*10** The County argues that the Supreme Court's decision in *Yee v. City of Escondido*, 503 U.S. 519 (1992), governs Plaintiffs' takings claim, not *Cedar Point*. The Court agrees. The plaintiffs in *Yee* challenged a mobile home rent control ordinance, arguing that the inability to increase rent at the rate they desired permitted existing tenants to remain on their property indefinitely and later realize more profit when those tenants later sold their mobile homes. *Id.* at 525. The Supreme Court held that the rent control ordinance was not a physical taking. *Id.* at 527. The Court explained that the rent control ordinance only regulated the economic relationship between landlord and tenant but did not compel the mobile home park owners to continue renting to their tenants and could still evict those tenants. *Id.* at 527-28. The Court also noted that a "different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *Id.* at 528.

Like the park owners in *Yee*, Plaintiffs here voluntarily invited their tenants onto their property. This fact draws a critical distinction from *Cedar Point*, which conferred a unilateral right on third parties to take access of an employer's property. The Eviction Moratorium here grants no right to third parties to access Plaintiffs' properties. Instead, only those tenants to whom Plaintiffs have already granted possession may remain on Plaintiffs' property. Moreover, Plaintiffs may still evict tenants for reasons other than nonpayment of rent and thus

retain their right to exclude. In other words, the moratorium does not compel Plaintiffs "over objection to rent [their] property" or prohibit them "in perpetuity from terminating a tenancy." *Id*; *see also Ballinger v. City of Oakland*, --- F.4th ---, 2022 WL 289180, at \*3-4 (9th Cir. 2022) (holding that an ordinance requiring landlords to pay tenants' relocation costs was not a physical taking and stating, " '[w]hen a person voluntarily surrenders liberty or property,' like when the Ballingers chose to rent their property causing them to pay the relocation fee when they caused the tenants to relocate, 'the State has not *deprived* the person of a constitutionally protected interest' " (emphasis in original) (quoting *L.L. Nelson Enters., Inc. v. County of St. Louis*, 673 F.3d 799, 806 (8th Cir. 2012))). Plaintiffs, therefore, fail to allege a physical, or per se, taking.

### ii. Injunctive Relief

Plaintiffs' takings claim also fails because they only seek declaratory and injunctive relief, which is generally unavailable under the Takings Clause. *See Knick v. Township of Scott*, 139 S. Ct. 2162, 2176 (2019). Plaintiffs argue that courts may enjoin a taking when the government has taken the property not for "public use," citing *Ross v. City of Berkeley*, 655 F. Supp. 820, 839-40 (N.D. Cal. 1987). *Ross*, however, does not address injunctive relief. Instead, it considers what standard courts should apply when assessing whether the government had taken property for public use. *Id.* The court explained that to show there was no "public use" under *Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986), a plaintiff need only show that the government took the property not for a "legitimate state interest" (rather than with no rational basis) if the government had accomplished the taking through means other than intentional eminent domain. *Ross*, 655 F. Supp. at 839-40. The authority on which the Ninth Circuit relied on in *Hall*, however, was later abrogated by the Supreme Court in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540 (2005) (overruling the "legitimate state interest" requirement in *Agins v. City of Tiburon*, 447 U.S. 255 (1980)).

Plaintiffs also draw the Court's attention to an additional nuance in the analysis of the general prohibition against injunctive relief for takings claims discussed in *Knick*. In

2022 WL 326092

*Cedar Point*, which was decided two years after *Knick*, the Supreme Court reversed the dismissal of the plaintiffs' takings claim, which only sought declaratory and injunctive relief. *Cedar Point, 141 S. Ct. at 2070*. On remand, the district court entered a judgment declaring the access regulation unconstitutional and enjoining enforcement of the regulation against the plaintiffs. *Cedar Point Nursery v. Hassid*, 1:16-cv-185-JLT-BAM, ECF 39.

**\*11** Plaintiffs here argue that the relief awarded in *Cedar Point* may conflict with the Supreme Court's prior statement in *Knick* that injunctive relief is generally not available under the Takings Clause and that "governments need not fear that courts will enjoin their activities." *See Knick, 139 S. Ct. at 2168*.

*Cedar Point*, however, is consistent with *Knick* because *Knick* provides only that injunctive relief is not available under the Takings Clause if there are adequate means to obtain "just compensation." *See id. at 2168* ("So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities."); *id. at 2176* ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking."); *id. at 2177* ("Given the availability of post-taking compensation, barring the government from acting will ordinarily not be appropriate."). The Supreme Court in *Cedar Point* did not address whether just compensation was available, either because the parties did not raise that issue or because the Supreme Court was satisfied that there was no adequate means to obtain just compensation for a temporary but recurring physical taking of the plaintiffs' property under the specific facts presented in that case. In other words, the Supreme Court in *Cedar Point* effectively applied the exception to the general rule stated in *Knick*.

Here, Plaintiffs have alleged no facts showing that even if the Eviction Moratorium did amount to a physical taking, they have no access to adequate means of obtaining just compensation. Plaintiffs' Takings Clause claim, therefore, fails because it only seeks injunctive relief. *See Or. Rest. & Lodging Ass'n v. Brown*, 2020 WL 6905319, at *6 (D. Or. Nov. 24, 2020) (dismissing Takings Clause claim challenging Governor Brown's eviction moratorium because the plaintiffs only sought injunctive relief).

### d. Arbitrary and Confiscatory Price Controls

Plaintiffs also bring a claim under the Fourteenth Amendment, alleging that the Eviction Moratorium amounts to a confiscatory price control in violation of their due process rights. A price control law violates the Fourteenth Amendment if it is "arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt." *Nebbia v. People of New York*, 291 U.S. 502, 539 (1934). Rent control is a form is price control. *See Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1043 (9th Cir. 2000) (Fletcher, J., concurring) ("An ordinary rent control law is constitutionally indistinguishable from a price control law."); *Adamson Cos. v. City of Malibu*, 854 F. Supp. 1476, 1485 (C.D. Cal. 1994) ("Rent control is a form of price-control regulation."). Plaintiffs' price control claim fails because the Eviction Moratorium does not impose rent control or other form of price control. The moratorium prohibits eviction for nonpayment of rent while in effect but does not regulate the price of rent that Plaintiffs and their tenants may negotiate.

### e. Unreasonable Seizures

Plaintiffs also bring a claim under the Fourth Amendment, alleging the County unreasonably seized their property. To state a claim under the Fourth Amendment, Plaintiffs must allege that "a seizure occurred and that it was unreasonable." *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 534 (9th Cir. 2019), *rev'd on other grounds*, 141 S. Ct. 2063 (2021). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Ninth Circuit has explained that the Fourth Amendment applies only to government conduct carried out in an investigatory capacity:

> **\*12** The phrase "searches and seizures" connotes that the type of conduct regulated by the fourth amendment must be somehow designed to elicit a benefit for the government in an investigatory or, more broadly, an administrative capacity. Thus, unlike the "state

actor" requirement of the fourteenth amendment, the fourth amendment cannot be triggered simply because a person is acting on behalf of the government. Instead, the fourth amendment will only apply to governmental conduct that can reasonably be characterized as a "search" or a "seizure."

*United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990). The Ninth Circuit emphasized the limited applicability of the Fourth Amendment to conduct not related to a criminal investigation:

"Only rarely ... has the [Supreme] Court considered the nature of fourth amendment restrictions on the conduct of government officials in noncriminal investigations." *The Supreme Court, 1986 Term-Leading Cases*, 101 Harv. L. Rev. 119, 230 (1987). Even rarer are the instances in which the Court has considered the application of the fourth amendment to noncriminal *noninvestigatory* governmental conduct. Yet, when the Court has considered the application of the fourth amendment to governmental conduct in a noncriminal context, it has been careful to observe that the application of the amendment is limited.

*Id.* at 1430 (emphasis in original). To be subject to the Fourth Amendment, the government must intend for its conduct to be a "search or seizure, be it in the context of a criminal investigation or an administrative inspection." *Id.* at 1431. The Ninth Circuit has continued to apply the rule laid out in *Attson* to determine whether non-law enforcement government conduct is subject to the Fourth Amendment. *See* Mann v. County of San Diego, 907 F.3d 1154, 1164 (9th Cir. 2018) (citing *Attson* and concluding that the Fourth Amendment applied to medical examinations because they were "at least partially investigatory"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924 (9th Cir. 2001) ("[F]or the conduct of a non-law enforcement governmental party, such as Ruiz, to be subject to the Fourth Amendment, Arpin must show that Ruiz acted 'with the intent to assist the government in its investigatory or administrative purposes, and not for an independent purpose.' " (quoting *Attson*, 900 F.2d at 1433)).

Plaintiffs have alleged no facts showing that the County enacted the moratorium to act in an investigatory capacity related to any criminal or administrative investigation. Plaintiffs, therefore, fail to state a claim under the Fourth Amendment. *See id.*

### f. Right of Access to the Courts

Plaintiffs also bring a claim for a violation of the right to access the courts under the Petition Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment. Although the source of the right to access the courts remains "unsettled," to state a right of access claim, the plaintiff must allege facts showing "official action is presently denying an opportunity to litigate for some class of potential plaintiffs" and he or she has a nonfrivolous underlying claim. *Christopher v. Harbury*, 536 U.S. 403, 413, 415 (2002). A delayed ability to litigate, rather than an outright prohibition, does not violate the Constitution. *See Sosna v. Iowa*, 419 U.S. 393, 410 (1975) (distinguishing between "total deprivation" of access to divorce courts due to a filing fee and delay in access to divorce courts due to one-year residency requirement); *Eu*, 979 F.2d at 706 (stating that "we can find no basis in the Constitution for a rigid right to resolution of all civil claims" within a certain time).

*13 Plaintiffs argue the Eviction Moratorium violates their right to access the courts because it prohibits landlords from initiating eviction proceedings for nonpayment of rent. The moratorium, however, does not permanently remove Plaintiffs' ability to access the courts for all purposes. Plaintiffs may initiate eviction proceedings for reasons other than nonpayment of rent and may file breach of contract actions against tenants. [2] The moratorium therefore does not violate Plaintiffs' right to access the courts under the First or Fourteenth Amendments. *See* Heights Apartments, LLC v. Walz, 510 F. Supp. 3d 789, 811 (D. Minn. 2020) ("Because the [Executive Orders] foreclose the Landlords' ability to obtain only one kind of relief and only does so temporarily, the EOs do not violate the Petition Clause."); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 174 (S.D.N.Y. 2020) ("Although nonpayment proceedings have been suspended, Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court – and the fact that is not their preferred remedy is of no moment. They will also have the opportunity

to bring eviction proceedings for reason of nonpayment once the order expires, a right preserved by the portion of EO 202.28 that extends relevant statutes of limitation for the duration of court closures.").

## CONCLUSION

The Court ADOPTS IN PART the Findings and Recommendation (ECF 54). The Court GRANTS all pending Motions to Dismiss (ECF 18, 19, 21) and DENIES Plaintiffs' Partial Motion for Summary Judgment (ECF 33). If Plaintiffs believe that they can cure the deficiencies identified in this Opinion and Order, Plaintiffs may file a Second Amended Complaint within two weeks from the date of this decision.

**IT IS SO ORDERED.**

DATED this 3rd day of February, 2022.

**All Citations**

Slip Copy, 2022 WL 326092

## Footnotes

1    Plaintiffs do not argue that the Eviction Moratorium is a regulatory taking, so the Court will not address that issue.

2    Plaintiffs argue that H.B. 4401 and the later local moratoria that adopted H.B. 4401 preclude them from filing breach of contract lawsuits against nonpaying tenants. The County responds that no provision in the operative County ordinance (Ordinance 1296), which refers to S.B. 278, bars any landlord from suing and alleging breach of contract by nonpayment. The Court has identified no provision of County Ordinance 1296 that prohibits any landlord from bringing such a lawsuit.

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.